**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**Wilmington Division**

| | |
|---|---|
| FREDRIC N. ESHELMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. _____ |
| v. ) | |
| ) | |
| ALAN H. AUERBACH AND ) | |
| PUMA BIOTECHNOLOGY, INC., ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Fredric N. Eshelman, in support of his Complaint against Defendants Alan H.

Auerbach and Puma Biotechnology, Inc. ("Puma"), states the following:

## NATURE OF THE ACTION

1.      This action arises out of the publication of a defamatory investor presentation that

falsely charges Dr. Fredric Eshelman with committing scientific fraud in the clinical trial of the

antibiotic Ketek®.  The exact opposite is true: Dr. Eshelman was a *victim* of fraud, not a

perpetrator.  Upon information and belief, Puma's CEO Alan Auerbach personally presented the

defamatory investor presentation – and amplified it by orally making false and defamatory

statements – to certain Puma stockholders on January 7, 2016 and to additional stockholders

thereafter.[1]  That same day, Defendants sent the defamatory investor presentation to all Puma

---

[1] The defamatory investor presentation is attached as <u>Exhibit A</u> and was published on Puma's website at
<u>http://investor.pumabiotechnology.com/sites/pumabiotechnology.investorhq.businesswire.com/files/doc_library/file/</u>
<u>010716_PBYI_Investor_Presentation.pdf</u>.  At all times relevant to this complaint, Auerbach was Puma's CEO and
chairman of the board, and acted as an agent of Puma within the scope of his employment at Puma.  Puma is
responsible for Auerbach's misconduct under the doctrine of *respondeat superior*.  Therefore, all references to
Auerbach shall be read as references to Auerbach and Puma.

stockholders and published it to a global internet audience by posting it on Puma's website.

2.     Auerbach directed and caused Puma to maliciously and intentionally publish the false accusations about Dr. Eshelman because, as Puma's CEO and incumbent chairman of the board, Auerbach hoped to discredit Dr. Eshelman in a proxy contest for the election of a minority slate to Puma's board of directors. When Dr. Eshelman requested a retraction, Defendants doubled down, asserting that their accusations were "factual" and further defaming Dr. Eshelman by falsely claiming that he is unfit to serve as a director because of other alleged undisclosed criminal "past activities." Just as Auerbach planned, his false accusations caused substantial harm to Dr. Eshelman.

3.     Upon information and belief, Puma's other directors – Jay M. Moyes, Adrian M. Senderowicz, Troy E. Wilson, and Frank E. Zavrl – were complicit in the publication, presentation, and dissemination of the defamatory investor presentation and Defendants' malicious response to Dr. Eshelman's request for a retraction.

4.     Dr. Eshelman brings this action to vindicate his rights under civil law, to restore his reputation as a member of the pharmaceutical profession and as a philanthropist, director, investor, and business leader with integrity, and to establish Defendants' liability for the harm that they have caused to Dr. Eshelman by the false and defamatory statements. Dr. Eshelman seeks an award of compensatory damages for the reputational and economic harm caused by Defendants' false accusations, and, given the willful and malicious nature of Defendants' conduct in knowingly publishing defamatory falsehoods about Dr. Eshelman, Dr. Eshelman also seeks an award of punitive damages.

## PARTIES

5.     Plaintiff Fredric Eshelman is a resident of, and is domiciled in, Wilmington, North Carolina. Dr. Eshelman founded Pharmaceutical Product Development and spent decades

building a reputation as a leader in healthcare and the pharmaceutical sector.

6.      Defendant Puma Biotechnology, Inc. (NYSE: PBYI) ("Puma") is a Delaware corporation with its principal place of business in Los Angeles, California. Puma is a biopharmaceutical company with a focus on the acquisition, development, and commercialization of innovative products to enhance cancer care.

7.      Defendant Alan Auerbach is a resident of, and is domiciled in, Los Angeles California. Auerbach has been the chairman of the board, CEO, and president of Puma since Puma's inception.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

9.      This Court has personal jurisdiction over Defendants pursuant to N.C.G.S. § 1-75.4, which extends jurisdiction to the full extent permissible under the Due Process Clause of the United States Constitution, both under subsection (3) because this action arises out of Defendants' actions in North Carolina and under subsection (4) because Defendants injured Dr. Eshelman, Dr. Eshelman's reputation, and Dr. Eshelman's business in North Carolina and because solicitation activities were carried on within North Carolina by or on behalf of Defendants at the time of the injury.

10.     This Court has personal jurisdiction over Defendants because Defendants expressly aimed and purposefully directed their defamatory statements at Dr. Eshelman, a North Carolina resident (and against PPD, a company headquartered in North Carolina), knowing that the brunt of the injury would be felt in North Carolina. This Court also has personal jurisdiction over the Defendants because Puma availed itself of the capital of North Carolina by having over fifty stockholders (including two institutional stockholders) in the state and Defendants

repeatedly sent proxy solicitations into the state by mail. Defendants published their defamatory statements in an investor presentation that they sent to more than fifty stockholders in North Carolina. In addition, by sending the investor presentation, letter, and other materials relating to the proxy contest to stockholders in North Carolina, Defendants repeatedly solicited North Carolina stockholders to reject Dr. Eshelman's proxy proposals, thereby manifesting their intent to engage in interactions within North Carolina residents and creating in Dr. Eshelman a cause of action for defamation that is cognizable in North Carolina courts. In addition, by posting the defamatory investor presentation to Puma's website, Defendants knowingly and intentionally published their defamatory statements to the public in North Carolina. Defendants also knowingly targeted North Carolina because they knew that healthcare and the pharmaceutical sector are major industries in North Carolina, and therefore Defendants knew that North Carolina residents and companies in healthcare and the pharmaceutical sector would – and did – access Defendants' defamatory statements on Puma's website, which Defendants made accessible in North Carolina.

11.     In addition, Puma does business with BofA Merrill Lynch Asset Holdings, Inc., which has its registered office and registered mailing address in North Carolina and whose officers are residents of North Carolina. Upon information and belief, Puma does business with contract research organizations that are headquartered, incorporated, and/or registered to do business in North Carolina.

12.     Finally, Auerbach was previously employed by Diagnostic Products Corporation, which is headquartered and incorporated in North Carolina. He was also previously employed by Wells Fargo Securities, which was previously headquartered in North Carolina. Upon information and belief, Auerbach previously lived in North Carolina. Upon information and belief, because Auerbach previously lived and worked in North Carolina, because healthcare and

the pharmaceutical sector are important industries in North Carolina, and because Auerbach continues to be employed in healthcare and the pharmaceutical sector, Auerbach continues to have business and personal contacts with North Carolina and to avail himself of the resources and privileges of North Carolina.

13.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the property that is the subject of the action is situated in this district and because Defendants are subject to the Court's personal jurisdiction in this district.

## FACTS

### Dr. Eshelman Builds A Strong Reputation As A Member Of The Pharmaceutical Profession And As A Leader In Healthcare, The Pharmaceutical Sector, And Support Of Higher Education

14.     Dr. Eshelman is a member of – and a leader in – the pharmaceutical profession, with more than 35 years of strategic development, executive, operational, and financial leadership experience in healthcare and the pharmaceutical sector.

15.     Dr. Eshelman earned his Doctor of Pharmacy from the University of Cincinnati, and completed a residency at Cincinnati General Hospital.  He earned a Bachelor of Science in pharmacy from the University of North Carolina ("UNC") and is also a graduate of the Owner/President Management program at Harvard Business School.

16.     Dr. Eshelman is the founder and former CEO and Executive Chairman of a North Carolina based global contract pharmaceutical research organization providing drug discovery, development, and lifecycle management services.  He was also the founding chairman of Furiex Pharmaceuticals, Inc., which was headquartered in North Carolina.

17.     Dr. Eshelman is the founder of Eshelman Ventures, LLC ("Eshelman Ventures"), a North Carolina based investment company primarily interested in healthcare companies.  Dr. Eshelman usually serves as a director on the boards of the portfolio companies in which

Eshelman Ventures invests.

18.     Dr. Eshelman has served as Senior Vice President, Development and as a member of the board of directors of the former Glaxo, Inc., as well as in various management positions with Beecham Laboratories and Boehringer Mannheim Pharmaceuticals.

19.     Dr. Eshelman also serves as the chairman of the Board of Directors for The Medicines Company.

20.     In addition to his visionary business leadership, Dr. Eshelman is also respected for his public service.  Dr. Eshelman was appointed by the North Carolina General Assembly to serve on the Board of Governors for the state's multi-campus university system as well as the North Carolina Biotechnology Center.  He chairs the board of visitors for UNC's Eshelman School of Pharmacy.  Dr. Eshelman has also served on the executive committees of the Medical Foundation of North Carolina and the Board of Trustees for UNC-Wilmington.  Dr. Eshelman has received many awards including the Davie and Distinguished Service Awards from UNC and Outstanding Alumnus from both the UNC and University of Cincinnati schools of pharmacy, as well as the NC Entrepreneur Hall of Fame Award.

21.     Dr. Eshelman is also a philanthropist, having given and/or committed *over $140 million* to charitable causes.  For example, in 2003, Dr. Eshelman gave $20 million to UNC's School of Pharmacy, providing scholarships to pharmacy students, enriching and expanding graduate education, and creating graduate student fellowships and supporting faculty development in teaching and research.  In 2008, he gave $9 million for cancer research.  In 2012, he gave $2.5 million for pharmacy education, pharmacy practice, research, and training.  In 2014, Dr. Eshelman gave another $3 million to support UNC's drug-discovery center.  Finally, in 2014, Dr. Eshelman committed $100 million to UNC to create an Institute for Innovation, which is accelerating the creation and development of ideas leading to discoveries and transformative

6

changes in education, research, and healthcare. Dr. Eshelman also chairs his family foundation, The Eshelman Foundation, which supports children's causes in North Carolina and Wilmington.

### The Ketek® Clinical Trial

22.     In 2001, Aventis Pharmaceuticals, Inc. ("Aventis") was a pharmaceutical company engaged in developing, testing, and marketing pharmaceutical products, including Oral Telithromycin, also known as "Ketek®," a drug developed for the treatment of respiratory tract infections.

23.     On November 1, 2001, Aventis entered into a contract with PPD, under which PPD was to perform certain enumerated clinical research services in connection with a clinical study Aventis was conducting to determine the safety and effectiveness of Ketek®. Under the contract and 21 C.F.R. Section 312.52, Aventis retained responsibility for quality assurance. Under the contract, PPD was to report any physician serving as a clinical investigator who did not comply with the study plan to Aventis, and PPD did not have the authority to end a clinical investigator's participation in the study or to report a clinical investigator's conduct to the FDA. At the time of the Aventis-PPD contract, Dr. Eshelman was the CEO of PPD.

24.     On November 5, 2001, Aventis, through PPD, entered into a contract with Dr. Maria Anne Kirkman Campbell, under which Kirkman Campbell was to participate in the Ketek® clinical trial as a clinical investigator. Under the terms of the contract, Kirkman Campbell agreed to conduct the study in strict compliance with the criteria set forth in the study protocol.

25.     Kirkman Campbell disregarded her obligations under the contract and instead defrauded PPD and Aventis by submitting false documentation to them concerning the Ketek® clinical trial.

26.     After discovering red flags relating to Kirkman Campbell, PPD personnel notified

Aventis of the issue and recommended that Aventis exclude the Kirkman Campbell data from the Ketek® clinical trial. Once Dr. Eshelman was generally apprised of what was known at the time about the situation, he instructed PPD's head of quality assurance to place a call directly to Aventis' head of quality assurance. He also cooperated fully in bringing Kirkman Campbell's misconduct to light.

27. At no time did Dr. Eshelman participate in, authorize, or condone Kirkman Campbell's fraud. Dr. Eshelman was not involved in Kirkman Campbell's fraud in any way. Dr. Eshelman, like PPD, was a victim of Kirkman Campbell's fraud.

### Auerbach Intentionally Publishes The False And Defamatory Investor Presentation To Discredit Dr. Eshelman In A Proxy Contest

28. Since Puma was founded, Auerbach has been Puma's chairman of the board and CEO.

29. As a holder of Puma stock and an experienced business leader in healthcare and the pharmaceutical sector, Dr. Eshelman determined that Puma could perform better with more effective oversight. So, on October 28, 2015, proposed that Puma's stockholders increase the size of Puma's board from five to nine directors and elect Dr. Eshelman and three other highly-qualified nominees to the board.

30. Threatened and enraged by the proxy contest, Auerbach set out to discredit Dr. Eshelman.

31. Even though Auerbach knew that Dr. Eshelman had been a victim of Kirkman Campbell's fraud, Auerbach intentionally set out to falsely convey the opposite to stockholders and the public: that Dr. Eshelman had been involved in clinical trial fraud and that he was fired as CEO of PPD as a result.

32. Upon information and belief, Auerbach personally presented the defamatory investor presentation – and amplified it with false and defamatory statements he made orally – to

8

certain Puma stockholders on January 7, 2016 and to additional stockholders thereafter. That same day, Defendants sent the defamatory investor presentation to all Puma stockholders and also published it to a global internet audience by posting it on Puma's website.

33.     Through the following statements, the investor presentation falsely charged Dr. Eshelman with scientific fraud in the clinical trial of Ketek® and of being fired as the CEO of PPD as a result of such fraud:

- "Eshelman Continues to Demonstrate a Lack of Integrity"

- "Eshelman's misrepresentations are no surprise given his history"

- "Eshelman was Chief Executive Officer (CEO) of Pharmaceutical Product Development (PPD) when it managed a clinical trial during the development of the antibiotic drug Ketek...Fraud was uncovered in this trial by the FDA's Office of Criminal Investigation"

- "As Chief Executive Officer of PPD, Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008"

- "Eshelman was replaced as CEO of PPD in 2009"

- "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company; particularly a company that is in the process of seeking FDA approval"

**Eshelman Promptly Demands A Retraction,**
**But Defendants Again Demonstrate Their Actual Malice**
**By Doubling Down On The Defamatory Investor Presentation**
**And By Further Defaming And Threatening Dr. Eshelman**

34.     On January 20, 2016, Dr. Eshelman sent a letter to Puma, Auerbach, and the other members of Puma's board. In that letter, Dr. Eshelman demanded an immediate apology and retraction of the defamatory investor presentation.

35.     In his letter, Dr. Eshelman explained:

The presentation falsely implies that I personally committed, directed, or condoned fraud in the clinical trial of Ketek. As you know, and as is well-documented in the public record, the exact opposite is true: PPD discovered the fraud committed by others and, under my leadership, reported it. These facts among others led a United States Attorney to identify PPD as a victim of the fraud committed by Dr. Kirkman Campbell in the criminal indictment filed July 24, 2008 in *United States of America v. Maria "Anne" Kirkman Campbell aka Anne Kirkman Campbell*, CR-03-CO-0437-M, in the United States District Court for the Northern District of Alabama.

36.     Dr. Eshelman concluded his letter by requesting a response by the end of the week. Rather than setting the record straight, Defendants elected to double down on their false accusations. On January 27, 2016 – *before* Dr. Eshelman had received a response from Defendants – Defendants posted on Puma's website another purported solicitation document falsely asserting that the defamatory investor presentation "included certain *factual* and publicly available information regarding Eshelman's background." (Exhibit B.) With that document, Defendants also published Dr. Eshelman's retraction request and Defendants' response. (*Id.*) Defendants falsely claimed that they had already responded to Dr. Eshelman's letter, when in fact Dr. Eshelman did not receive Defendants' letter until Defendants had published it to a worldwide internet audience.

37.     In their letter, Defendants not only refused to correct the original falsehoods in the defamatory investor presentation, they also threatened and further defamed Dr. Eshelman, writing: "Puma has uncovered additional, public, and true information about you and your past activities which would be relevant to your shareholder proposal and prior comments in this regard. Puma will be compelled to ensure that shareholders are aware of this information if you persist with further public statements or filings about Puma, its Board, and its management."

38.     Defendants' response – and their decision to send that response to stockholders and to publish it to a global internet audience on Puma's website – are further evidence of Defendants' actual malice.

### Dr. Eshelman Suffers Significant Harm
### Due To Defendants' False Accusations

39.     Not surprisingly, Defendants' false claims have been extremely damaging to Dr. Eshelman's reputation and business.

40.     As Auerbach and Puma specifically intended, their false accusations harmed Dr. Eshelman's reputation with stockholders, the business community, and the public.

41.     Dr. Eshelman's ability to be elected as a director of the board or into a leadership position for other public companies, particularly healthcare and pharmaceutical companies, has been impaired.

42.     Defendants' false and defamatory statements have also harmed Dr. Eshelman's general commercial relationships, have harmed his business standing, and have impaired his ability to enter into commercial relationships.

43.     Defendants' false and defamatory statements have also impaired Dr. Eshelman's ability to attract co-investors to invest alongside Eshelman Ventures, depriving Dr. Eshelman of business opportunities.

44.     Defendants' false and defamatory statements have also damaged Dr. Eshelman's reputation in his community and among his acquaintances.

45.     In addition to the reputational harm and detrimental impact on Dr. Eshelman's business, Eshelman has been damaged by having to expend resources to respond to the defamatory statements.

### COUNT ONE — LIBEL PER SE

46.     Dr. Eshelman repeats and realleges each of the foregoing paragraphs as if set forth fully herein.

47.     Upon information and belief, Puma's CEO Alan Auerbach personally presented the defamatory investor presentation – and amplified it by orally making false and defamatory

statements – to certain Puma stockholders on January 7, 2016 and to additional stockholders thereafter. That same day, Defendants sent the defamatory investor presentation to all Puma stockholders and also published it to a global internet audience by posting it on Puma's website.

48.     In the investor presentation, Defendants falsely charged Dr. Eshelman with scientific fraud in the clinical trial of the antibiotic Ketek® and of being fired as CEO of PPD as a result of such fraud.

49.     Defendants' statements were understood by those who read them to be statements of fact regarding Dr. Eshelman.

50.     Specifically, through the following statements, Defendants charged Dr. Eshelman with clinical trial fraud in the Ketek® study and with being replaced as CEO of PPD as a result:

- "Eshelman Continues to Demonstrate a Lack of Integrity"

- "Eshelman's misrepresentations are no surprise given his history"

- "Eshelman was Chief Executive Officer (CEO) of Pharmaceutical Product Development (PPD) when it managed a clinical trial during the development of the antibiotic drug Ketek…Fraud was uncovered in this trial by the FDA's Office of Criminal Investigation"

- "As Chief Executive Officer of PPD, Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008"

- "Eshelman was replaced as CEO of PPD in 2009"

- "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company; particularly a company that is in the process of seeking FDA approval"

51.     Defendants' accusations are false. Dr. Eshelman did not commit, authorize, or condone scientific fraud in the clinical trial of Ketek® or otherwise. The exact opposite is true. Dr. Eshelman was a victim of a clinical trial fraud committed by Kirkman Campbell. PPD (the company of which Dr. Eshelman was CEO) discovered the fraud committed by Kirkman Campbell and, under Dr. Eshelman's leadership, reported it. Dr. Eshelman was not "replaced"

as CEO as a result of scientific clinical trial fraud or for any other reason. Rather, at Dr. Eshelman's behest, PPD hired a new CEO as a part of a process preparing for Dr. Eshelman's retirement.

52.     Dr. Eshelman in no way approved the false and defamatory accusations published by Defendants.

53.     Defendants disseminated and published their false and defamatory accusations by sending them to Puma's stockholders and by posting them on Puma's website, in a manner that achieved widespread exposure to a global internet audience.

54.     Defendants acted with actual malice, showing intentional or reckless disregard for the falsity of their accusations about Dr. Eshelman. Defendants' disregard for the truth is demonstrated by their actions and omissions including but not limited to the following:

- It is well documented in the public record that Defendants' accusations are false. For example, in a publicly-available criminal indictment, filed on July 24, 2008 in *United States of America v. Maria "Anne" Kirkman Campbell aka Anne Kirkman Campbell*, CR-03-CO-0437-M, in the United States District Court for the Northern District of Alabama, a United States Attorney identified PPD as a victim of the fraud committed by Kirkman Campbell. Upon information and belief, before they published the defamatory investor presentation, Defendants reviewed publicly available sources demonstrating that their statements about Dr. Eshelman were false.

- The publicly available Congressional testimony of Dr. Eshelman and others demonstrates that Defendants' accusations are false. For example, Dr. Eshelman testified that PPD personnel discovered certain irregularities at the Kirkman Campbell site and reported them to Aventis.[2] In addition, Dr. Eshelman testified that – based on the testimony of the head of the institutional review board who worked on the Ketek® study – he understood that PPD personnel had reported potential issues to the institutional review board. *Id.* Dr. Eshelman also made clear that he was not involved in Kirkman Campbell's fraud in any way, explaining: "It is not my recollection that I knew in detail at the time about Dr. Kirkman Campbell nor is it my recollection that I understood and appreciated the magnitude of the overall issue. ... In fact, I did not have all the facts at my disposal at

---

[2] *See* https://www.youtube.com/watch?v=mzOBlX7hLMs; https://www.youtube.com/watch?v=GeM9ZDMBc0M; https://www.youtube.com/watch?v=FhEOyN8ceAE.

that time. Had I known what I know now, in retrospect, I would have picked up the phone and I would have called. ... someone at Aventis at a high level of authority and expressed my concerns about this. ... I think under the conditions we absolutely did our job in trying to identify departures from GCP and data integrity issues and to some extent, fraud." *Id.*

- As demonstrated by the fact that Defendants included hyperlinks to Dr. Eshelman's Congressional testimony in the defamatory investor presentation, Defendants were actually aware that their accusations were false before they published the defamatory investor presentation.

- The publicly-available Congressional testimony of others – including Paul Chew, President of U.S. Research and Development for Sanofi-Aventis Pharmaceuticals and Sharon Hill Price, the CEO of Copernicus Group institutional review board – corroborates Dr. Eshelman's testimony.

- Despite the fact that Defendants had actual knowledge of numerous publicly-available sources showing that Dr. Eshelman was *not* responsible for any fraud, they deliberately and intentionally ignored important sources and recklessly disregarded others.

- Because Defendants knew that Dr. Eshelman had not been responsible for any fraud, they deliberately and carefully crafted the presentation to avoid using the words "committed," "directed," or "condoned," and instead stated that Dr. Eshelman was "*involved in* clinical trial fraud." However, because Defendants wanted to ensure that readers would conclude that Dr. Eshelman's so-called "involvement" in the clinical trial fraud was as that of a perpetrator rather than a victim, they placed the statement among numerous statements that, taken together, convey their intended defamatory meaning clearly and unambiguously. For example, it would make no sense to say that someone "demonstrates a lack of integrity" because he was a victim of fraud. The statement only makes sense if the "involvement" in fraud was that of a perpetrator. Nor are victims typically "forced to testify." Indeed, Dr. Eshelman was not "forced" to testify, but cooperated fully in bringing Kirkman Campbell's misconduct to light. Likewise, it would make no sense for Dr. Eshelman to be "replaced as CEO of PPD in 2009" simply because he had been a victim of fraud; the accusation conveys one and only one meaning, that Dr. Eshelman was "replaced" because he had culpable "involvement" in fraud. This too, is false, not only because Dr. Eshelman's only so-called "involvement" was that of a victim, but also because Dr. Eshelman was not "replaced" at all. Rather, it was at Dr. Eshelman's behest that PPD hired a new CEO as a part of a process preparing for Dr. Eshelman's retirement. Finally, Defendants wrote, "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company." This statement, like others in the investor presentation, is only logical if Dr. Eshelman's purported "involvement" was that of a perpetrator, rather than of a victim.

- Auerbach intentionally disregarded the truth (and caused Puma to intentionally disregard the truth) because he wanted to discredit Dr. Eshelman in the proxy contest so he could keep Dr. Eshelman off Puma's board of directors.

- Because Auerbach and Puma knew their accusations were false, they purposefully and deliberately avoided contacting Dr. Eshelman about their accusations before publishing them in the investor presentation.

- After Dr. Eshelman demanded a retraction and specifically directed Defendants to the criminal indictment that proves Defendants' accusations are false, Defendants refused to retract their false accusations and instead doubled down on them and further defamed Dr. Eshelman with statements Defendants sent to stockholders and published on Puma's website on January 27, 2016.

55.     Defendants made these accusations with the intent to harm, and out of hostility toward, Dr. Eshelman.

56.     Defendants' accusations are defamatory *per se* because they are susceptible of but one meaning – that Dr. Eshelman was responsible for scientific fraud in the clinical trial of the antibiotic drug Ketek® and that he was replaced as CEO of PPD as a result.

57.     Defendants' accusations are also defamatory *per se* because they disgrace and degrade Dr. Eshelman, hold Dr. Eshelman up to public hatred, contempt, and ridicule, and cause Dr. Eshelman to be shunned and avoided.

58.     In addition, Defendants' false accusations of clinical trial fraud and resulting termination are defamatory *per se* because they have harmed Dr. Eshelman in his business as a member of the pharmaceutical profession and as a leader, director, and significant investor in healthcare and the pharmaceutical sector. Defendants' false accusation that Dr. Eshelman was responsible for fraud in the clinical trial of a pharmaceutical drug and that he was "replaced" as CEO of PPD as a result: (i) has touched Dr. Eshelman in his special occupation as a member of the pharmaceutical profession and as a leader, director, and significant investor in healthcare and the pharmaceutical sector; and (ii) contains an imputation that is necessarily hurtful in its effect on Dr. Eshelman's profession and business.

59.     Defendants' accusations are defamatory *per se* because they accuse Dr. Eshelman of an infamous crime, fraud.

60.     As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's reputation has been impugned.

61.     As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's relationships with other members of the pharmaceutical profession, other directors with whom Dr. Eshelman serves, investors, potential investors, portfolio companies, potential portfolio companies, and others have been undermined.

62.     As a result of the false and defamatory accusations published by Defendants, confidence in Dr. Eshelman's integrity and fitness as a member of the pharmaceutical profession and as a director, leader, and investor in healthcare and the pharmaceutical sector has been undermined.

63.     As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's business and investments have been adversely affected in an amount yet to be determined.

64.     As a result of the false and defamatory statements published by Defendants, Dr. Eshelman has been forced to make an expenditure of money to remedy the defamation.

65.     In view of the foregoing, Dr. Eshelman is entitled to actual, presumed, and punitive damages in an amount to be specifically determined at trial.

## COUNT TWO — LIBEL PER QUOD

66.     Dr. Eshelman repeats and realleges each of the foregoing paragraphs as if set forth fully herein.

67.     Upon information and belief, Puma's CEO Alan Auerbach personally presented the defamatory investor presentation – and amplified it by orally making false and defamatory statements – to certain Puma stockholders on January 7, 2016 and to additional stockholders thereafter. That same day, Defendants also sent the defamatory investor presentation to all Puma

stockholders and also published it to a global internet audience by posting it on Puma's website.

68. In the investor presentation, Defendants falsely charged Dr. Eshelman with scientific fraud in the clinical trial of the antibiotic Ketek® and of being fired as CEO of PPD as a result of such fraud.

69. Defendants' statements were understood by those who read them to be statements of fact regarding Dr. Eshelman.

70. Specifically, Defendants charged Dr. Eshelman with clinical trial fraud and with being terminated as a result of such fraud through the following statements:

- "Eshelman Continues to Demonstrate a Lack of Integrity"

- "Eshelman's misrepresentations are no surprise given his history"

- "Eshelman was Chief Executive Officer (CEO) of Pharmaceutical Product Development (PPD) when it managed a clinical trial during the development of the antibiotic drug Ketek…Fraud was uncovered in this trial by the FDA's Office of Criminal Investigation"

- "As Chief Executive Officer of PPD, Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008"

- "Eshelman was replaced as CEO of PPD in 2009"

- "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company; particularly a company that is in the process of seeking FDA approval"

71. Defendants' accusations – that Dr. Eshelman was "involved in clinical trial fraud" and was "replaced" as CEO of PPD – are defamatory when considered in connection with the innuendo that Dr. Eshelman has a "lack of integrity" and a "history" in which he "was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008," and that Dr. Eshelman "was replaced as CEO of PPD in 2009." With the statements set forth in the investor presentation, Defendants specifically intended and endorsed the false innuendo that Dr. Eshelman's "involvement" with the Ketek® clinical trial fraud was not as a victim, but as a

perpetrator.

72.     Defendants' accusations are false. Dr. Eshelman did not commit, authorize, or condone clinical trial fraud. The exact opposite is true. Dr. Eshelman was a victim of fraud committed by Kirkman Campbell. PPD (the company of which Dr. Eshelman was CEO) discovered the fraud committed by Kirkman Campbell and, under Dr. Eshelman's leadership, reported it. Dr. Eshelman was not "replaced" as CEO as a result of scientific clinical trial fraud or for any other reason. Rather, at Dr. Eshelman's behest, PPD hired a new CEO as a part of a process preparing for Dr. Eshelman's retirement.

73.     Dr. Eshelman in no way approved the false and defamatory accusations published by Defendants.

74.     Defendants disseminated and published their false and defamatory accusations by sending them to Puma's stockholders and by publishing them on Puma's website, in a manner that achieved widespread exposure to a global internet audience.

75.     Defendants acted with actual malice, showing intentional or reckless disregard for the falsity of their accusations about Dr. Eshelman. Defendants' disregard for the truth is demonstrated by their actions and omissions including but not limited to the following:

- It is well documented in the public record that Defendants' accusations are false. For example, in a publicly-available criminal indictment, filed on July 24, 2008 in *United States of America v. Maria "Anne" Kirkman Campbell aka Anne Kirkman Campbell*, CR-03-CO-0437-M, in the United States District Court for the Northern District of Alabama, a United States Attorney identified PPD as a victim of the fraud committed by Kirkman Campbell. Upon information and belief, before they published the defamatory investor presentation, Defendants reviewed publicly available sources demonstrating that their statements about Dr. Eshelman were false.

- The publicly available Congressional testimony of Dr. Eshelman and others demonstrates that Defendants' accusations are false. For example, Dr. Eshelman testified that PPD personnel discovered certain irregularities at the Kirkman Campbell site and reported

them to Aventis.[3] In addition, Dr. Eshelman testified that – based on the testimony of the head of the institutional review board who worked on the Ketek® study – he understood that PPD personnel had reported potential issues to the institutional review board. *Id.* Dr. Eshelman also made clear that he was not involved in Kirkman Campbell's fraud in any way, explaining: "It is not my recollection that I knew in detail at the time about Dr. Kirkman Campbell nor is it my recollection that I understood and appreciated the magnitude of the overall issue. ... In fact, I did not have all the facts at my disposal at that time. Had I known what I know now, in retrospect, I would have picked up the phone and I would have called. ... someone at Aventis at a high level of authority and expressed my concerns about this. ... I think under the conditions we absolutely did our job in trying to identify departures from GCP and data integrity issues and to some extent, fraud." *Id.*

- As demonstrated by the fact that Defendants included hyperlinks to Dr. Eshelman's Congressional testimony in the defamatory investor presentation, Defendants were actually aware that their accusations were false before they published the defamatory investor presentation.

- The publicly-available Congressional testimony of others – including Paul Chew, President of U.S. Research and Development for Sanofi-Aventis Pharmaceuticals and Sharon Hill Price, the CEO of Copernicus Group institutional review board – corroborates Dr. Eshelman's testimony.

- Despite the fact that Defendants had actual knowledge of numerous publicly-available sources showing that Dr. Eshelman was *not* responsible for any fraud, they deliberately and intentionally ignored important sources and recklessly disregarded others.

- Because Defendants knew that Dr. Eshelman had not been responsible for any fraud, they deliberately and carefully crafted the presentation to avoid using the words "committed," "directed," or "condoned," and instead stated that Dr. Eshelman was "*involved in* clinical trial fraud." However, because Defendants wanted to ensure that readers would conclude that Dr. Eshelman's so-called "involvement" in the clinical trial fraud was as that of a perpetrator rather than a victim, they placed the statement among numerous statements that, taken together, convey their intended defamatory meaning clearly and unambiguously. For example, it would make no sense to say that someone "demonstrates a lack of integrity" because he was a victim of fraud. The statement only makes sense if the "involvement" in fraud was that of a perpetrator. Nor are victims typically "forced to testify." Indeed, Dr. Eshelman was not "forced" to testify, but cooperated fully in bringing Kirkman Campbell's misconduct to light. Likewise, it would make no sense for Dr. Eshelman to be "replaced as CEO of PPD in 2009" simply because he had been a victim of fraud; the accusation conveys one and only one meaning, that Dr. Eshelman was "replaced" because he had culpable "involvement" in fraud. This too, is false, not

---

[3] *See* https://www.youtube.com/watch?v=mzOBlX7hLMs; https://www.youtube.com/watch?v=GeM9ZDMBc0M; https://www.youtube.com/watch?v=FhEOyN8ceAE.

Case 7:16-cv-00018-D   Document 1   Filed 02/02/16   Page 19 of 24

only because Dr. Eshelman's only so-called "involvement" was that of a victim, but also because Dr. Eshelman was not "replaced" at all. Rather, it was at Dr. Eshelman's behest that PPD hired a new CEO as a part of a process preparing for Dr. Eshelman's retirement. Finally, Defendants wrote, "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company." This statement, like others in the investor presentation, is only logical if Dr. Eshelman's purported "involvement" was that of a perpetrator, rather than of a victim.

- Auerbach intentionally disregarded the truth (and caused Puma to intentionally disregard the truth) because he wanted to discredit Dr. Eshelman in the proxy contest so he could keep Dr. Eshelman off Puma's board of directors.

- Because Auerbach and Puma knew their accusations were false, they purposefully and deliberately avoided contacting Dr. Eshelman about their accusations before publishing them in the investor presentation.

- After Dr. Eshelman demanded a retraction and specifically directed Defendants to the criminal indictment that proves Defendants' accusations are false, Defendants refused to retract their false accusations and instead doubled down on them and further defamed Dr. Eshelman with statements Defendants sent to stockholders and published on Puma's website on January 27, 2016.

76. Defendants made these accusations with the intent to harm, and out of hostility toward, Dr. Eshelman.

77. As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's reputation has been impugned.

78. As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's relationships with other members of the pharmaceutical profession, other directors with whom Dr. Eshelman serves, investors, potential investors, portfolio companies, potential portfolio companies, and others have been undermined.

79. As a result of the false and defamatory accusations published by Defendants, confidence in Dr. Eshelman's integrity and fitness as a member of the pharmaceutical profession and as a director, leader, and investor in healthcare and the pharmaceutical sector has been undermined.

80. As a result of the false and defamatory accusations published by Defendants, Dr.

Case 7:16-cv-00018-D   Document 1   Filed 02/02/16   Page 20 of 24

Eshelman's business and investments have been adversely affected in an amount yet to be determined.

81.     As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman has been forced to make an expenditure of money to remedy the defamation.

82.     In view of the foregoing, Dr. Eshelman is entitled to actual, presumed, and punitive damages in an amount to be specifically determined at trial.

### DEFENDANTS' CONDUCT WARRANTS PUNITIVE DAMAGES

83.     Dr. Eshelman repeats and realleges each of the foregoing paragraphs as if set forth fully herein.

84.     Defendants' conduct warrants the imposition of punitive damages. The factors justifying punitive damages include, at a minimum, the following:

a.     Defendants ignored information available to them that rebutted their false statements;

b.     Defendants acted with knowledge that their statements were false;

c.     Auerbach deliberately published, and caused Puma to publish, statements they knew to be false because Auerbach wanted to discredit Dr. Eshelman and defeat Dr. Eshelman in the proxy contest so Auerbach could keep Dr. Eshelman off Puma's board of directors;

d.     Defendants knew that publishing such an investor presentation would have damaging impact on Dr. Eshelman; and

e.     Even after Dr. Eshelman directed Defendants to the criminal indictment showing that Defendants' statements are false, Defendants refused to retract their false statements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Dr.

Eshelman's favor, and against Defendants, as follows:

      (1)    awarding Dr. Eshelman compensatory damages in an amount to be determined;

      (2)    awarding Dr. Eshelman punitive damages in an amount to be determined;

      (3)    awarding Dr. Eshelman all expenses and costs, including attorneys' fees; and

      (4)    such other and further relief as the Court deems appropriate.

A JURY TRIAL IS DEMANDED.

(SIGNATURE PAGE FOLLOWS)

Dated:  February 2, 2016

Respectfully Submitted,

*Andrew K. McVey*

Andrew K. McVey
North Carolina State Bar No. 20217
(Local Civil Rule 83.1 Counsel)
Murchison, Taylor & Gibson PLLC
16 North Fifth Avenue
Wilmington, NC 28401-4537
Telephone: 910-763-2426
Email: amcvey@murchisontaylor.com

Thomas A. Clare (of counsel)
Elizabeth M. Locke (of counsel)
Megan L. Meier (of counsel)
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com
*Attorneys for:*
*Dr. Fredric Eshelman*

23

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

Fredric N. Eshelman, being duly sworn, deposes and says that he is the Plaintiff in the foregoing action, that he has read the foregoing Complaint and knows the contents thereof, that the same is true of his own knowledge, except as to those matters and things therein stated on information and belief, and as to those, he believes them to be true.

_____
Fredric N. Eshelman

Sworn to and subscribed before me
this _2nd_ day of February, 2016.

Celeste B. Kroll

Celeste B. Kroll

Exp. 8-8-17

CELESTE B KROLL
NOTARY PUBLIC
NEW HANOVER COUNTY, NC