IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:16-CV-18-D

FILED IN OPEN COURT
ON MMS 3/8/19
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

FREDRIC N. ESHELMAN, )
)
Plaintiff, )
)
v. ) **ORDER**
)
PUMA BIOTECHNOLOGY, INC., )
)
Defendant. )

On February 13, 2019, Fredric N. Eshelman ("Eshelman" or "plaintiff") moved to exclude the testimony and opinion of Puma Biotechnology, Inc.'s ("Puma" or "defendant") expert witness [D.E. 335] and filed a memorandum in support [D.E. 336]. On February 20, 2019, Puma responded in opposition [D.E. 345]. On March 8, 2019, the court held a hearing concerning the motion. As explained below, the court grants Eshelman's motion to exclude and excludes the testimony and related exhibits.

I.

On October 29, 2015, Eshelman, a pharmacist and venture capitalist, submitted a proposal to Puma's shareholders to increase the size of Puma's board of directors from five to nine seats, while nominating himself and three other people to the additional four seats. Puma opposed Eshelman's proposal. Eshelman alleges that Puma defamed him in statements that Puma made in January 2016 concerning Eshelman in opposing Eshelman's proposal. See Compl. [D.E. 5]. Specifically, one of Puma's slides stated that "Eshelman's misrepresentations are no surprise given his history," that Eshelman was the CEO of PPD "when it managed a clinical trial during the development of the antibiotic drug Ketek," that "[f]raud was uncovered in this trial by the FDA's

Office of Criminal Investigation," that "[a]s [CEO] of PPD, Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008," and that "Eshelman was replaced as CEO for PPD in 2009." [D.E. 181-24] 16–18 (emphasis omitted); [D.E. 171] ¶ 49. Another slide stated that "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company; particularly a company that is in the process of seeking FDA approval." Id. On February 3, 2016, Eshelman filed suit against Puma alleging, inter alia, libel per se. See Compl. [D.E. 5].

On September 28, 2018, the court granted in part and denied in part Eshelman's motion for partial summary judgment and denied Puma's motion for summary judgment [D.E. 304]. On October 29, 2018, the court entered an order explaining the court's rulings on the parties' motions for summary judgment [D.E. 306]. The court held that Puma's allegedly defamatory statements concern Eshelman and that Puma published the allegedly defamatory statements. See id. at 20. Moreover, the court held that two of Puma's statements were defamatory per se. See id. at 23–24. The trial will begin on March 11, 2019.

At the trial, the jury will be asked two questions. First, "When read in the context of the entire presentation, were defendant Puma Biotechnology, Inc.'s statements that plaintiff Fredric N. Eshelman was 'replaced as CEO of PPD' after being 'involved in clinical trial fraud' false?" Second, "Did defendant Puma Biotechnology, Inc. act with actual malice when it accused plaintiff Fredric N. Eshelman of being 'replaced as CEO of PPD' after being 'involved in clinical trial fraud'?" If the jury answers each question yes, then the jury will be asked, "What amount of compensatory damages is plaintiff Fredric N. Eshelman entitled to recover from defendant Puma Biotechnology, Inc.?" In determining compensatory damages, the jury will be instructed, inter alia:

If you determine that defendant Puma Biotechnology, Inc.'s statements were false

2

and made with actual malice, then plaintiff Fredric N. Eshelman is entitled to be awarded compensation for presumed damages even without proof of actual damages or economic harm. Presumed damages are damages that are assumed, without proof, to have occurred to plaintiff Fredric N. Eshelman as a result of the publication by defendant Puma Biotechnology, Inc. of the defamatory statements. Presumed damages include matters such as loss of reputation or standing in the community, mental or physical pain and suffering, inconvenience, or loss of enjoyment which cannot be definitively measured in monetary terms.

Presumed damages arise by inference of law and are not required to be specifically proved by evidence. This means that you need not have proof that plaintiff Fredric N. Eshelman suffered loss of reputation or standing in the community, mental or physical pain and suffering, inconvenience or loss of enjoyment in order to award him damages for such harm because such harm is presumed by the law when a defendant publishes a libelous statement with actual malice.

On February 13, 2019, Eshelman moved to exclude the testimony and opinion of Puma's expert witness, Dr. Anil Shivdasani ("Shivdasani"), and to prohibit Puma from introducing Shivdasani's expert report and two articles written by Shivdasani [D.E. 335]. On February 20, 2019, Puma responded in opposition [D.E. 345].

Shivdasani is the Wells Fargo Distinguished Professor of Finance and the Director of the Wells Fargo Center for Corporate Finance at the Kenan-Flagler Business School at the University of North Carolina at Chapel Hill. See [D.E. 361] 8; [D.E. 361-3] ¶ 1. Shivdasani received a master's degree and a Ph.D. in finance from Ohio State University. See [D.E. 361] 9. He has published articles in peer-reviewed journals, notably a Journal of Financial Economics article from 2007 entitled "Financial Fraud, Director Reputation, and Shareholder Wealth." See id. at 12; [D.E. 335-3]. Puma retained Shivdasani "to opine on whether certain statements made by Puma in its proxy presentations have harmed [Eshelman's] reputation and business opportunities." [D.E. 361-3] ¶ 7.

Shivdasani's corporate finance research, in part, has focused on "issues related to corporate boards, corporate directors, senior management teams and specifically with an emphasis on the role

3

of reputation and the impact of reputation in corporate governance." See [D.E. 361] 11. In "Financial Fraud, Director Reputation, and Shareholder Wealth," Shivdasani explored the effect of financial fraud allegations on outside directors. See [D.E. 335-3]. Specifically, Shivdasani's study considered outside directors of companies facing shareholder class action lawsuits alleging financial misrepresentation in violation of Rule 10b-5. See id. at 8. Shivdasani concluded that outside directors of companies facing such shareholder class action lawsuits experienced "almost no evidence of abnormal turnover from the board of firms accused of fraud," but that they experienced "a large and significant decline in the number of other board appointments." Id. at 31–32. Shivdasani also found a relationship between company valuation and such allegations of fraud concerning outside directors. These metrics—shareholder class action lawsuits alleging financial misrepresentations in violation of Rule 10b-5, future board appointment opportunities, and company valuation—are the only data that Shivdasani considered in assessing reputational harm. Cf. [D.E. 361] 52–61. Shivdasani published a shorter article based on this study in the "Financial Times." See [D.E. 335-2].

Shivdasani seeks to testify at trial about the methodology, known as the "event study methodology," underlying his opinions. See [D.E. 361] 17–20.[1] In his deposition, Shivdasani testified that he collects large data sets, conducts statistical analyses of the data sets, and assesses the effect of certain events in "a rigorous scientific manner." Id. at 17. In this case, Shivdasani collected publicly-available data concerning Eshelman and the companies with which he worked as a director. See id. at 24–32. He then compared the data before and after Puma made and published the allegedly defamatory statements in January 2016. See id. at 28. Based on his study, Shivdasani

---

[1] On February 28, 2019, the parties conducted a "for trial" deposition of Shivdasani. See [D.E. 361].

4

opined in his expert report that (1) "the rate at which Eshelman received new inquiries and proposals for new investment opportunities increased" after Puma made the allegedly defamatory statements, (2) Eshelman suffered no diminished future board opportunities after Puma made the allegedly defamatory statements, (3) the value and stock price of the public company on which Eshelman served on the board of directors did not decrease after Puma made the allegedly defamatory statements, and (4) the data are inconsistent with Eshelman's assertion that "he suffered reputational or financial harm as a result of Puma's allegedly defamatory statements." [D.E. 361-3] ¶ 10.

In Shivdasani's "for trial" deposition, Shivdasani discussed his professional and academic credentials and his research involving corporate valuation and governance. See [D.E. 361] 8–16. Shivdasani testified that some of his academic research focused on reputational harm as it relates to career trajectories and corporate valuation. See id. at 15–16. Shivdasani described the methodology that he employs in his studies. See id. at 17–21. After being offered as an expert, Shivdasani described the process by which he evaluated Eshelman's case and ultimately developed his opinion that Eshelman suffered no reputational harm as a result of Puma's allegedly defamatory statements. See id. at 21–34. He summarized the basic premise underlying his work: "[R]eputation is a major consideration in the career trajectory of corporate directors [and] . . . adverse events and events of fraud result in a decline in career opportunities for corporate directors." Id. at 36.

Shivdasani testified that he considered various data in his analysis before and after Puma published the allegedly defamatory statements in January 2016, including whether Eshelman received or lost executive positions, how shareholders voted on Eshelman's appointments to new executive positions, how many business opportunities were communicated to Eshelman, and whether the stock prices of companies in which Eshelman served as a director changed. See id. at 38–39. Shivdasani opined that, based on his review of the data, Eshelman did not suffer any reputational

5

harm as a result of Puma's publication of allegedly defamatory statements in January 2016. See id. at 48–50; id. at 50 ("I found no evidence of reputational harm for Dr. [Eshelman] as a result of Puma's statement."). Shivdasani conceded, however, that he did not consider other evidence in determining whether Eshelman suffered any harm as a result of Puma's allegedly defamatory statements, including mental pain and suffering, inconvenience, humiliation, or loss of enjoyment. See id. at 52–54. Shivdasani also conceded that he did not talk about Eshelman's reputation with anyone in the pharmaceutical industry or with anyone who knew Eshelman. See id. at 58.

II.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702; Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 6748518, at *5 (E.D.N.C. Dec. 22, 2011) (unpublished). The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.10 (1993); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). A district court has broad latitude in determining the admissibility of proposed expert testimony. See United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994).

Expert testimony is appropriate when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). A district court may permit a witness qualified as an expert to testify where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 589; United States v. Forrest, 429 F.3d 73, 80 (4th Cir. 2005). The trial court

6

must perform the special gatekeeping obligation of ensuring that expert testimony meets both requirements. Kumho Tire, 526 U.S. at 147.

To be relevant, the proposed expert testimony must be helpful to the trier of fact. See Daubert, 509 U.S. at 591–92. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993); see United States v. Lespier, 725 F.3d 437, 449 (4th Cir. 2013); Persinger v. Norfolk & W. Ry., 920 F.2d 1185, 1188 (4th Cir. 1990); Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986). When expert testimony, "stripped of its technical gloss," does no more than "state the obvious," the testimony is not helpful to the jury. Persinger, 920 F.2d at 1188.

"[T]he test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quotation omitted); see Kumho Tire, 526 U.S. at 141–42. A witness may qualify to render expert opinions by knowledge, skill, experience, training, or education. See Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 147. "In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). Factors that may bear on the reliability of the expert's testimony include (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application, and (4) whether the theory or technique enjoys general acceptance within

7

the relevant community. See Kumho Tire, 526 U.S. at 149–50; Daubert, 509 U.S. at 593–94; United States v. Crisp, 324 F.3d 261, 265–66 (4th Cir. 2003). When proposed expert testimony pertains to damages, the testimony should be excluded when it "consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 145 (4th Cir. 1994) (quotation omitted); see Silicon Knights, Inc., 2011 WL 6748518, at *7–12.

A.

The court first considers Shivdasani's expert testimony. See [D.E. 361]. As for relevance, some of Shivdasani's opinions are within the common experience of lay jurors, and Shivdasani merely tells the jurors what to conclude about alleged harm to reputation in the community based on accomplishments and opportunities that Eshelman had before and after the alleged defamatory statements. See Lee v. Anderson, 616 F.3d 803, 808–09 (8th Cir. 2010) ("Opinions that merely tell the jury what result to reach are not admissible."); SMD Software, Inc. v. Emove, Inc., No. 5:08-CV-403-FL, 2014 WL 1807809, at *1 (E.D.N.C. May 7, 2014) (unpublished). For example, Shivdasani's opinion that companies would not offer board or executive positions to Eshelman if Puma's accusations of clinical trial fraud harmed his reputation is within the common experience of lay jurors. At trial, Puma can present evidence about Eshelman's professional accomplishments and opportunities before and after Puma allegedly made the defamatory statements without using an expert witness. Puma can argue to the jury what it contends such evidence reflects concerning alleged loss of reputation in the community. This aspect of Shivdasani's proposed expert testimony, which merely tells the jury what to conclude, is not helpful to the jury.

Additionally, some of Shivdasani's opinions improperly evaluate the state of mind of third parties deciding whether to hire or retain Eshelman as a director or executive or deciding what

8

responsibilities to assign to Eshelman as a director or executive. Such testimony is not helpful to the jury. See CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 890 (6th Cir. 1996), abrogated on other grounds by Morales v. Am. Honda Motor Co., 151 F.3d 500 (6th Cir. 1998); Eghnayem v. Bos. Sci. Corp., 57 F. Supp. 3d 658, 670 (S.D. W. Va. 2014) (collecting cases); Brown v. Novartis Pharm. Corp., No. 7:08-CV-130-FL, 2012 WL 9082913, at *12 (E.D.N.C. Jan. 9, 2012) (unpublished), memorandum and recommendation adopted in relevant part, 2012 WL 9082901 (E.D.N.C. Sept. 20, 2012) (unpublished).

Finally, Shivdasani's model, which is based on research studying the effect of public disclosure of "shareholder class action lawsuits alleging financial misrepresentation" in violation of Rule 10b-5, does not fit the facts of this case. [D.E. 335-3] 4; cf. Silicon Knights, Inc., 2011 WL 6748518, at *7–18 (excluding expert testimony concerning damages that did not fit the facts of the case). Neither Puma nor Shivdasani adequately explains how Shivdasani's research concerning the relationship between shareholder class action lawsuits alleging financial misrepresentation in violation of Rule 10b-5 and the stock price of a company with a director named in such a shareholder class action lawsuit applies to Eshelman's situation in this case. See Daubert, 509 U.S. at 591 (noting that one consideration in evaluating expert testimony is "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"); Pharmanetics, Inc. v. Aventis Pharm., Inc., No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *11 (E.D.N.C. May 4, 2005) (unpublished), aff'd, 182 F. App'x 267 (4th Cir. 2006) (per curiam) (unpublished). For example, Shivdasani fails to show how being named as a defendant in a shareholder class action lawsuit alleging financial misrepresentation in violation of Rule 10b-5 applies to being accused of clinical trial fraud in a corporate SEC filing opposing a proposal in a proxy contest. Shivdasani assumes that the dates on which Puma presented the allegedly defamatory

9

statements are analogous to a "press release alerting investors to the allegations [of fraud contained in a class action lawsuit]" without providing any explanation for the validity of this assumption. [D.E. 361-3] ¶ 32 n.56. Additionally, Shivdasani fails to consider relevant facts when opining that Puma's allegedly defamatory statements did not cause Eshelman to suffer any harm to his reputation in the community. See [D.E. 361] 52–61 (ignoring facts relevant for determining general defamation damages). Here, Shivdasani's testimony is not sufficiently tied to the facts of this dispute to be relevant. Accordingly, Shivdasani's expert opinion would not be helpful to the jury in understanding the evidence or determining a fact in issue.

As for reliability, Shivdasani's methodology is not sufficiently reliable based on a review of the Daubert factors in this case. The first Daubert factor, whether an expert's methodology can be and has been tested, weighs against admissibility. Shivdasani's approach in this case, while based in objective data, is subjective. See O'Neill v. Windshire-Copeland Assocs., 372 F.3d 281, 285 (4th Cir. 2004); Myers v. Ill. Cent. R.R., 629 F.3d 639, 645 (7th Cir. 2010). Numerous variables may contribute to an individual's professional or business opportunities, and Shivdasani does not convincingly demonstrate that applying his model in this case causally ties professional or business opportunities to reputational harm in the community from Puma's allegations that Eshelman engaged in clinical trial fraud. Shivdasani essentially concedes this point in a footnote in his expert report. See [D.E. 335-1] ¶ 27 n.40 ("It bears mention that, even if Eshelman had experienced a meaningful decline in business opportunities, that alone would not constitute sufficient evidence of reputational harm caused by Puma's statements. It is possible that new investment opportunities might decline due to factors unrelated to Puma's statements."). If, when Shivdasani's model shows reputational harm by decreased professional or business opportunities, this decrease can be attributed to factors besides the variable being studied (i.e., the allegations of clinical trial fraud in a securities filing

10

opposing Eshelman's position in a proxy contest), then Shivdasani's model does not adequately control other variables (e.g., the possibility that Eshelman has a "confrontational management style"), and Shivdasani's methodology cannot be independently tested or verified. Id. By hedging, Shivdasani has created an analysis that cannot be reliably reproduced or independently verified.

The second Daubert factor, whether the expert's theory or technique has been subjected to peer review and publication, also weighs against admissibility. Although the event study methodology has been subjected to peer review and publication, the application of that methodology does not fit the facts of this case. Likewise, the third Daubert factor, the error rate of the expert's methodology, weighs against admissibility in this case. The fourth Daubert factor, the existence and maintenance of standards and controls, similarly weighs against admissibility. Because Shivdasani concedes that other variables confound the analysis, his methodology is not sufficiently controlled to be reliable.

Additional factors weigh against admissibility. First, the "analytical gap between the data and the opinion proffered" is substantial. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); E.E.O.C. v. Freeman, 778 F.3d 463, 466–68 (4th Cir. 2015). Simply put, there are numerous steps omitted in the chain of inferences that connects Shivdasani's data and Shivdasani's opinion that Puma's allegedly defamatory statements caused Eshelman to suffer no reputational harm in the community. Shivdasani's opinion "is connected to existing data only by the ipse dixit" of Shivdasani. Gen. Elec. Co., 522 U.S. at 146. Shivdasani also fails to adequately consider alternate explanations. See Claar v. Burlington N. R.R., 29 F.3d 499, 502 (9th Cir. 1994).

After considering the factors related to reliability, Puma has failed to show that Shivdasani's opinion is the product of reliable methodology. See, e.g., Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 297–300 (4th Cir. 1998). Accordingly, the court grants Eshelman's motion to exclude the opinion

11

and testimony of Shivdasani.

B.

As for Shivdasani's expert report, the court grants Eshelman's motion to exclude it as an exhibit. See United States v. Summers, 666 F.3d 192, 202 (4th Cir. 2011); SMD Software, Inc. v. Emove, Inc., No. 5:08-CV-403-FL, 2014 WL 12634915, at *3 (E.D.N.C. May 5, 2014) (unpublished); Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 634 (E.D.N.C. 2008). Similarly, the court grants Eshelman's motions to exclude both of Shivdasani's articles. See Yates v. Ford Motor Co., No. 5:12-CV-752-FL, 2015 WL 3463559, at *9–11 (E.D.N.C. May 30, 2015) (unpublished); SMD Software, Inc., 2014 WL 12634915, at *3.

III.

In sum, the court GRANTS Eshelman's motion to exclude [D.E. 335] and excludes the testimony and opinion of Shivdasani, Shivdasani's expert report, and Shivdasani's articles.

SO ORDERED. This 8 day of March 2019.

JAMES C. DEVER III
United States District Judge