**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

| | |
|---|---|
| FREDRIC N. ESHELMAN,         ) | |
| ) | |
| *Plaintiff,*     ) | |
| ) | |
| v.     ) | **Case No. 7:16-cv-00018-D** |
| ) | |
| PUMA BIOTECHNOLOGY, INC.     ) | |
| ) | |
| *Defendant.*     ) | |
|     ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DR. ESHELMAN'S**
**MOTION FOR ATTORNEYS' FEES UNDER N.C. GEN. STAT. § 1D-45**

A unanimous jury has now found—by clear and convincing evidence—that Puma Biotechnology, Inc. ("Puma") acted with actual malice when it falsely accused Dr. Fredric Eshelman of being replaced as CEO after being involved in clinical trial fraud. Although Puma defended its actions and stood by its false accusations for more than three years, the jury resoundingly rejected Puma's defenses and rendered a significant verdict: $15.85 million in compensatory damages and $6.5 million in punitive damages.

The Court should award Dr. Eshelman $3,075,897.85 in attorneys' fees pursuant to N.C. Gen. Stat. § 1D-45 because—over years of hard-fought litigation involving hundreds of court filings, more than 454,300 pages of documents, and 22 depositions from Boston to Los Angeles—Puma concealed key documents and maliciously denied facts Puma knew to be true (only to stipulate to those facts on the eve of trial or admit them at trial) and otherwise engaged in vexatious and malicious litigation tactics because of ill will toward Dr. Eshelman (as evidenced most recently by the trial testimony of Alan Auerbach), and because at trial Mr. Auerbach contradicted stipulated facts, his own prior sworn deposition testimony, and his own emails.

**ARGUMENT**

I.     **The "Malicious" Standard for Awarding Fees Under North Carolina Law Is Lower Than the "Actual Malice" Standard That Has Already Been Proven by Clear and Convincing Evidence.**

North Carolina law provides that "[t]he court shall award reasonable attorney fees against a defendant who asserts a defense in a punitive damages claim that the defendant knows or should have known to be frivolous or malicious." N.C. Gen. Stat. § 1D-45.

While a "frivolous" defense in a punitive-damages claim certainly entitles a plaintiff to his reasonable attorneys' fees—the language of the statute says a court "***shall***" award fees in such a circumstance—section 1D-45 does ***not*** require that a defense be "frivolous" before attorneys' fees must be awarded. Rather, under the plain language of the statute, it is sufficient for the defense to be "malicious." N.C. Gen. Stat. § 1D-45 ("frivolous ***or*** malicious").[1] If the North Carolina General Assembly had wanted to require a showing of frivolity for an award of attorneys' fees under section 1D-45, it could have easily drafted the statute to say "frivolous ***and*** malicious," in the conjunctive rather than "frivolous ***or*** malicious" in the disjunctive. Indeed, that is precisely what the General Assembly wrote in a different attorneys' fee statute that is not applicable here. *See* N.C. Gen. Stat § 75-16.1 (allowing a trial judge to award reasonable attorneys' fees to a prevailing party in an unfair or deceptive trade practices claim, if "the party instituting the action knew, or should have known, the action was frivolous ***and*** malicious").

The General Assembly's selection of the word "or" must be given effect and presumed to impose a different, lower standard under section 1D-45 than the one applicable under section 75-16.1. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 170; William N. Eskridge, Jr., Phillip P. Frickey, Elizabeth Garrett, & James J. Brudney, Cases and Materials on Legislation and Regulation: Statutes and the Creation of Public Policy (5th ed. 2014) at 1198 ("presumption of meaningful variation"); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally

---

[1] Emphasis added unless otherwise noted.

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

Notably, the "malicious" standard under section 1D-45 is also lower than the constitutional "actual malice" standard that Dr. Eshelman has already proven by clear and convincing evidence. For example, although the Court instructed the jury that "a defendant's . . . ill will towards the plaintiff [] does not constitute evidence of actual malice" for purposes of proving the defamation claim [D.E. 386 at 18], a defense is "malicious" for purposes of awarding attorneys' fees when "it is wrongful and done intentionally without just cause or excuse *or as a result of ill will*." *Fed. Point Yacht Club Ass'n, Inc. v. Moore*, No. COA15-92, 2015 WL 8755698, at *10 (N.C. Ct. App. Dec. 15, 2015) (affirming award of attorneys' fees to plaintiff under N.C. Gen. Stat. § 1D-45 and other statutes); *see also Bryan v. Bryan*, No. 11-cv-141, 2013 WL 1010481, at *1 (W.D.N.C. Mar. 14, 2013) (awarding attorneys' fees to plaintiff under N.C. Gen. Stat. § 1D-45).

In addition, while the constitutional actual malice standard requires a showing that a defendant actually knew or recklessly disregarded the falsity of its statements [D.E. 386 at 18], there is no "recklessness" requirement for an award of attorneys' fees; rather, attorneys' fees "shall" be awarded under section 1D-45 if a defendant "should have known" its defense was frivolous or malicious. N.C. Gen. Stat. § 1D-45.

## II. Puma Asserted Defenses That It Knew or Should Have Known Were Frivolous or Malicious.

### For Years, Puma Refused to Admit Facts in its Possession, Only to Stipulate to Those Facts Just Before Trial.

On the eve of trial after three years of litigation, Puma stipulated in the Joint Pretrial Order that this Court has jurisdiction to decide the punitive damages claim [D.E. 359 at 1, I.B.], and further stipulated to numerous other facts showing that Dr. Eshelman's punitive damages claim was meritorious because Puma had acted with actual malice. *See* Appendix 1; Joint Pretrial Order [D.E. 359].

For example, Puma stipulated that "[b]efore publishing the Presentation, Mr. Auerbach read the entire transcript of the February 12, 2008 Congressional hearing titled "Ketek Clinical Study Fraud: What

Did Aventis Know?" [*Id.* ¶ 97.] That hearing transcript contained the testimony of Special Agent Robert West, Ann Marie Cisneros, and Dr. Eshelman, and included testimony that PPD discovered certain irregularities at the Kirkman-Campbell site and reported them to Aventis and to the Institutional Review Board, and testimony that Dr. Kirkman-Campbell was indicted and prosecuted for her fraud. (PX-15.) Puma also stipulated in the Joint Pretrial Order that "Puma Purposefully Avoided Numerous Sources That Would Have Rebutted Its Accusations About Dr. Eshelman" [D.E. 359 ¶ 124], and that "[n]o one at Puma reached out to Ann Marie Cisneros or Special Agent Robert West before Puma published the presentation" [*id.*]. Puma also stipulated that "Mr. Auerbach never bothered to look for Dr. Kirkman-Campbell's indictment even though the indictment is publicly available and his staff would have pulled it for him if he asked." [*Id.* ¶ 126.] That indictment identified PPD as a victim of—not a co-conspirator in—Dr. Kirkman-Campbell's fraud. (PX-1.)

Puma also stipulated further that "Dr. Eshelman served as the Executive Chairman of PPD's board of directors from 2009-2011, when PPD was sold to two private equity firms." [D.E. 359 ¶ 19.] This fact fundamentally rebuts Puma's false accusation that Dr. Eshelman had been "replaced" by PPD in 2009 after being involved in clinical trial fraud. Puma also stipulated that Mr. Auerbach received and read Dr. Eshelman's retraction demand and passed it along to Puma's Board. [D.E. 359 ¶¶ 144-146.] That retraction demand specifically directed its readers to Dr. Kirkman-Campbell's criminal indictment identifying PPD as a victim of her fraud. (PX-185.) Yet, as Puma also ultimately stipulated in the Joint Pretrial Order, Puma refused to retract its statements and publicly filed a letter from its attorney, stating, "Puma stands by the truth of the statements contained in the Investor Presentation" and that "Puma has uncovered additional . . . information about you and your past activities" which Puma threatened to publish "if you persist with further public statements or filings about Puma, its Board, and its management." [D.E. 359 ¶¶ 144-146.]

Each of the above stipulated facts was based on documents and information that Puma has possessed ***since before this case was filed***, including: (1) over 45,000 pages of business records showing that Puma has an extensive business relationship with PPD and other North Carolina companies; (2) the

2008 Congressional hearing transcript (PX-15); (3) a November 2015 Latham & Watkins presentation that Puma's own attorneys presented, informing Mr. Auerbach and the entire Puma Board of Directors that Dr. Eshelman was the Executive Chairman of PPD from 2009-2011 (PX-314); (4) Dr. Eshelman's retraction demand (PX-185) specifically notifying Mr. Auerbach and Puma of Dr. Kirkman-Campbell's indictment (PX-1); and (5) the knowledge of Mr. Auerbach. At the outset of this case, Dr. Eshelman brought a punitive-damages claim based on the above facts, which were within Puma's possession when the Complaint was filed, and which Puma ultimately stipulated to on the eve of trial. (*See* Compl. ¶¶ 83-84 [D.E. 5].) Yet, rather than saving everyone the time and expense of years of litigation, Puma repeatedly and maliciously defended the punitive damages claim by denying facts that it knew were true.

For example, in its Answer, Puma flatly denied that it had "ignored information available to them that rebutted their false statements" (Puma's Answer ¶ 84(a) [D.E. 86]) even though Puma had the 2008 Congressional hearing transcript, the Latham & Watkins Presentation, and the retraction demand letter directing them to Dr. Kirkman-Campbell's indictment—undisputed facts that Puma finally admitted in the Joint Pretrial Order on the eve of trial. In its Answer, Puma also denied that "[e]ven after Dr. Eshelman directed Defendants to the criminal indictment showing that Defendants' statements are false, Defendants refused to retract their false statements" [*id.* ¶ 84(e)], even though it eventually stipulated that it had in fact received and rejected Dr. Eshelman's retraction demand. [D.E. 359 ¶¶ 144-146.]

Puma also denied the Complaint's allegation that Mr. Auerbach intentionally set out to convey "that Dr. Eshelman had been involved in clinical trial fraud and that he was fired as CEO of PPD as a result." (Puma's Answer ¶ 31 [D.E. 86].) But Mr. Auerbach's own email—which Puma possessed before this litigation began—shows that this denial was also baseless: On January 6, 2016, the day after Puma published the defamatory Investor Presentation, Mr. Auerbach emailed a copy of the defamatory Investor Presentation to a Bank of America analyst, writing: "The guy was involved in clinical trial fraud. . . . Now you know why he [w]as fired as CEO of PPD." (PX-183.)

5

*Puma Concealed Facts During Discovery.*

But Puma did not merely maliciously deny the facts in its possession. It actively attempted to conceal them—and forced Dr. Eshelman to incur substantial fees to discover them—by withholding documents and information and repeatedly taking positions in discovery that "lack[ed] merit." *See, e.g.,* D.E. 40 (court order denying motion to stay discovery while the motion to dismiss was pending, which "lack[ed] merit"); D.E. 57 (court order compelling Puma to produce documents relating to Puma's contacts with North Carolina); D.E. 246 (court order sanctioning Puma, compelling Puma to produce board materials, and reopening the depositions of Messrs. Auerbach and Zavrl); D.E. 295 (court order denying Puma's objections to the sanctions order).

For example, one of Puma's first malicious defenses to the punitive damages claim (and the entire case) was that this Court lacked jurisdiction because, Puma claimed, it "has no presence in the state [of North Carolina]." [D.E. 21 at 6.] After Puma made that representation to the Court, Dr. Eshelman's counsel served requests for documents evidencing Puma's contacts with North Carolina. (Meier Decl. ¶ 21.) Puma refused to produce the documents and filed a Motion to Stay Discovery, which the Court denied because it "lack[ed] merit." (Meier Decl. ¶ 22; D.E. 34; Court Order [D.E. 40].) Only after Dr. Eshelman filed a Motion to Compel and the Court ordered Puma to produce documents relating to the jurisdictional question [D.E. 44, 45, and 57] did Puma produce over *45,000 pages* of documents evidencing Puma's contacts with PPD and other North Carolina companies. (Meier Decl. ¶ 22.) And only after forcing Dr. Eshelman to expend substantial resources obtaining and reviewing jurisdictional discovery and briefing the jurisdictional question did Puma eventually stipulate to personal jurisdiction just before trial in the Joint Pretrial Order. [D.E. 359 at 1, I.B.]

Another example: although Plaintiff's counsel served document requests for Puma's board materials relating to Dr. Eshelman at the beginning of the case, and although Puma's counsel repeatedly represented that Puma had produced all responsive board materials, Puma successfully concealed responsive board materials until after the close of discovery and after summary judgment had been briefed. (Meier Decl. ¶ 27; Mot. to Compel Board Materials and for Sanctions [D.E. 160].) Puma would have gotten

6

away with this conduct altogether if its board member Frank Zavrl had not let the cat out of the bag at his deposition at the close of discovery, when he testified that—contrary to Puma's counsel's repeated representations—Dr. Eshelman had come up at *numerous* Puma Board meetings and that there were written board materials presented in connection with such meetings.[2] (Meier Decl. ¶ 28; Sept. 27, 2017 Dep. of Frank Zavrl ("Zavrl Dep. I") 86:18-97:1.) But even at that point, Puma refused to produce all of its responsive board materials, forcing Dr. Eshelman to engage in further motions practice to obtain them.

After Magistrate Judge Jones sanctioned Puma, compelled Puma to produce all responsive board materials, and ordered Puma to pay the expenses associated with the re-opening of the depositions of Messrs. Zavrl and Auerbach [D.E. 246], Puma remained defiant and objected to the order, requiring Dr. Eshelman to incur fees for yet another round of briefing on board materials that Puma should have produced at the outset of the case. [D.E. 249, 250, 252, 253, 263, 264.] Even though, on September 18, 2018, the Court affirmed the sanctions order compelling Puma to pay the expenses associated with reopening the depositions in California [D.E. 295], Puma remained in defiance of that sanctions order and did not pay the court-ordered expenses until *after trial*, on March 26, 2019.[3] (Meier Decl. ¶ 34.) Puma's improperly withheld board materials included the November 2015 Latham & Watkins presentation to Puma's Board (PX-314), which shows that Puma knew—*before* this case was filed and *before* Puma falsely accused Dr. Eshelman of being "replaced" by PPD in 2009 because of "involvement in fraud"—that Dr. Eshelman had actually served as PPD's Executive Chair from 2009-2011. That fact should have ended the matter and resulted in an apology and retraction before the Complaint was filed. Yet Puma maliciously and improperly concealed that fact for years, forcing Dr. Eshelman to incur years of attorneys' fees for discovery and motions practice.

---

[2] Indeed, although Puma ultimately designated Mr. Zavrl as its corporate representative at trial, it never disclosed him in its initial disclosures or its interrogatory responses as someone with relevant knowledge. (Puma's July 15, 2016 Initial Disclosures; Puma's July 8, 2016 Response to Interrogatory No. 3, failing to identify Mr. Zavrl as an individual with whom Puma had communicated with concerning Dr. Eshelman).

[3] That was not the only time Puma engaged in sanctionable conduct. As the Court indicated verbally during the March 8, 2019 pretrial conference, Puma will be sanctioned for failing to disclose its applicable insurance policy as required under Federal Rule of Civil Procedure 26(a).

***Puma's Malicious Denials Continued at Summary Judgment.***

Puma also persisted in its malicious defense of the punitive damages claim at the summary judgment phase, denying numerous facts that were proven by Puma's own documents and which Puma eventually stipulated to in the Joint Pretrial Order. *See* Appendix 2. These facts include evidence of the company's malice toward Dr. Eshelman, and knowledge the company possessed about Dr. Eshelman before it published the defamatory statements.

For example, although Puma knew by November 2015 that Dr. Eshelman had served as the Executive Chair of PPD from 2009-2011—and ultimately stipulated to that fact in the Joint Pretrial Order (D.E. 359 ¶ 19)—at summary judgment (at which point Puma was ***still*** improperly withholding the Latham & Watkins presentation) (Meier Decl. ¶ 33), Puma denied it. (Pl.'s SMF ¶ 24 [D.E. 171]; Puma's Opp. Statement to Pl.'s SMF ¶ 24 [D.E. 226].)

As another example, although Puma ultimately stipulated in the Joint Pretrial Order that Ms. Ohanesian had sent emails referring to Dr. Eshelman as "quite annoying," and a "fool" [D.E. 359 ¶¶ 54-55], Puma refused to admit that fact at summary judgment. (Pl.'s SMF ¶ 38 [D.E. 172]; Puma's Opp. Statement to Pl.'s SMF ¶ 38 [D.E. 226].)

Puma not only refused to admit facts demonstrating Puma's actual malice and warranting the imposition of punitive damages, but also affirmatively moved for summary judgment with respect to punitive damages and actual malice, forcing Dr. Eshelman to incur substantial fees to brief those issues and oppose Puma's motion, even though the facts within Puma's possession at that time (discussed above) show that Puma knew or should have known that its position was baseless and there was clearly enough evidence on the question of malice to submit the case to a jury for adjudication.

***Puma Did Not Make A Good-Faith Effort to Resolve the Case at the Mediation.***

After the Court denied Puma's meritless motion for summary judgment, the parties agreed to mediate this case. Dr. Eshelman and his counsel spent a considerable amount of time preparing for the mediation, hopeful that Puma would finally come to its senses and make a reasonable settlement offer to resolve the dispute without the need to incur additional attorneys' fees and costs proving facts that were not

in dispute.  (Locke Decl. ¶ 34.)  Of course, the case did not settle and Dr. Eshelman was forced to expend substantial time and resources to litigate the case through trial.

### *Without Any Evidentiary Basis, Puma Refused to Stipulate to Factual Contentions, Forcing Dr. Eshelman to Incur Additional Fees to Prove Those Facts at Trial.*

Puma's malicious litigation conduct continued after its meritless motion for summary judgment was denied and after mediation had failed.  Without any evidentiary basis for doing so, Puma refused to admit dozens of factual contentions, forcing Dr. Eshelman to incur additional fees to prove those facts at trial.  *See* Appendix 2.

For example, even though there was no basis to do so, Puma refused to stipulate to the proposed stipulated facts that, in November 2015, Puma's outside counsel presented the Latham & Watkins presentation to Puma's Board (which notified the Board that Dr. Eshelman had been Executive Chair of PPD from 2009-2011) and Ms. Ohanesian sent articles to Mr. Auerbach showing the same thing.  (Meier Decl. ¶ 48; D.E. 359 ¶¶ (cc) – (ee).)  Puma also refused to stipulate to the fact that, before publishing the presentation, Mr. Auerbach read the *WilmintonBiz* article (PX-195) stating that Dr. Eshelman had "named" General Grange as his replacement and "joked that he didn't think he had been fired."  (Meier Decl. ¶ 48; D.E. 359 ¶ (ff).)

Dr. Eshelman's counsel also asked Puma to stipulate that Mr. Auerbach had used profanity when discussing Dr. Eshelman, verbally expressing the sentiment that he wanted to "F*** him up" and that Mr. Auerbach sent an email on December 23, 2015, reading "Im just getting warmed up.  I'm gonna f*** this Eshelman guy up.  Bad."  (Meier Decl. ¶ 49.)  Ms. Ohanesian had already testified under oath to the first fact and Puma had already produced the email in discovery, knew that it was true and authentic, and even **put the email on its own exhibit list**.  (DX-16.)  But Puma refused to stipulate to these proposed stipulated facts, forcing Plaintiff to move them into the factual contentions in the Joint Pretrial Order and to spend time proving them at trial.  (Meier Decl. ¶ 49; D.E. 359 ¶¶ (nn), (ss).)

Similarly, Puma refused to stipulate to the fact that Mr. Auerbach read the Congressional hearing transcripts, and to the existence of certain testimony in those transcripts that rebuts Puma's false

9

accusations, to the contents of the Defamatory Investor Presentation at the heart of this case, and to Mr. Auerbach's own sworn deposition testimony. (Meier Decl. ¶ 50; D.E. 359 ¶¶ (uu) – (mmm).) These denials were baseless and malicious, as evidenced by the fact that Puma listed the Congressional hearing transcripts and the Defamatory Investor Presentation on its exhibit list (DX-5, DX-6, DX-4), and that, at trial, Mr. Auerbach was forced to admit—or was impeached concerning—the very things he had previously testified to at his depositions but which Puma refused to stipulate to in the Joint Pretrial Order. Puma also refused to stipulate to the facts regarding what happened on the Ketek clinical trial (Meier Decl. ¶ 51; D.E. 359 ¶¶ (a) – (x)), even though Special Agent West and Ann Marie Cisneros had already testified to those facts during their depositions, and even though Puma did not present a shred of evidence at trial to rebut the testimony of Special Agent West or Ms. Cisneros. In sum, although Puma had no basis to dispute Dr. Eshelman's proposed stipulated facts, it further drove up the cost of this litigation by refusing to stipulate to those facts, forcing Dr. Eshelman to move those facts into the factual contentions in the Pretrial Order and to spend time at trial establishing facts that were not really in dispute.

### At Trial, Puma's CEO Alan Auerbach Repeatedly Contradicted the Stipulated Facts and His Own Prior Sworn Deposition Testimony.

The Court will recall that at trial Puma's CEO Alan Auerbach repeatedly contradicted the stipulated facts and his own prior sworn deposition testimony and stubbornly attempted to throw Puma's counsel under the bus for stipulating to facts with which he wanted to take issue, requiring the Court to remind the jury on more than one occasion as to the meaning and significance of stipulated facts.[4] For example, although Mr. Auerbach testified at his deposition—and even though the parties stipulated in the Joint Pretrial Order—that Mr. Auerbach had read the entire 2008 Congressional hearing transcript before publishing the Defamatory Investor Presentation (D.E. 359 ¶ 97), at trial, Mr. Auerbach tried to distance himself from the damning testimony contained in that transcript, claiming that he did not remember reading

---

[4] Plaintiff's counsel has made a diligent effort to obtain the trial transcripts from the court reporter but has been informed that the transcript will not be available until April 11-17, 2019. Therefore, references to trial testimony in this brief are based on counsel's best good-faith recollection of Mr. Auerbach's testimony and Plaintiff's counsel's impeachment of that testimony, and likely will need to be updated or supplemented, and may even need to be corrected, once counsel has received and had an opportunity to review the trial transcripts.

it. Similarly, Mr. Auerbach claimed that he did not specifically recall the November 2015 Latham & Watkins presentation detailing Dr. Eshelman's service as PPD's Executive Chair from 2009-2011. But Puma's own minutes from that board meeting—which Puma improperly concealed until after discovery had closed—confirm that Mr. Auerbach was not only present at the board meeting where Latham & Watkins gave that presentation, but he chaired it. (PX-296 at 1.)

Mr. Auerbach also testified at trial that he did not intend to state that Dr. Eshelman had been fired or that he was culpably involved in fraud. But, as set forth above, his own emails (PX-183) directly contradict that assertion. In a January 7, 2016, email to Puma's board, Mr. Auerbach stated, "Of note, Eshelman, when he was CEO of PPD, was involved in clinical trial fraud." (PX-207.)

Mr. Auerbach also seemed to have selective amnesia on the witness stand: While he was able to recall the results of the proxy contest down to multiple decimal points, he repeatedly claimed memory loss when testifying about the magnitude of his own compensation, whether Latham & Watkins had presented the PowerPoint presentation detailing Dr. Eshelman's background at a board meeting, much of his prior testimony during his depositions, and a variety of documents that were in his possession that he testified about earlier in the case during his depositions, including, for example, the *WilmingtonBiz* article (that Puma's own counsel highlighted during opening statement to the jury that Mr. Auerbach had testified during his deposition that he had read in full before drafting the defamatory Investor Presentation).

Throughout his testimony, Mr. Auerbach was also unable to conceal his hostility towards Dr. Eshelman. Mr. Auerbach flatly refused to refer to the Plaintiff as "Dr.," and when faced with pointed questions concerning his misconduct, he would instead refer to Dr. Eshelman's unsuccessful proxy contest, or insist that Dr. Eshelman misrepresented his stock ownership even though Ms. Ohanesian acknowledged that "someone made a mistake" and removed a decimal point when referring to the percentage of outstanding shares Dr. Eshelman owned. (Sept. 20, 2017 Dep. of Mariann Ohanesian ("Ohanesian Dep.") 57:5-11.) When presented with the defamatory Investor Presentation slide 12 and 13, on which the defamatory statements appeared, Mr. Auerbach interrupted counsel and demanded to talk about Slide 11, where Puma continued to falsely claim that Dr. Eshelman had misrepresented his Puma stock ownership.

***Puma's Malicious Litigation Conduct Entitles***
***Dr. Eshelman to His Reasonable Attorneys' Fees.***

Puma's baseless denials, belated stipulations, and gamesmanship at trial are precisely the type of malicious litigation conduct that require an award of attorneys' fees under North Carolina law. *See* N.C. Gen. Stat. § 1D-45 ("The court **shall** award reasonable attorney fees against a defendant who asserts a defense in a punitive damages claim that the defendant knows or should have known to be frivolous or malicious."). An award of attorneys' is required where the defendant has made **"naked, general denials to Plaintiff's Complaint and persisted in defending against Plaintiff's action . . . only to later stipulate and admit [relevant facts] . . . after Plaintiff had already incurred substantial attorneys' fees and costs."** *Fed. Point Yacht Club*, 2015 WL 8755698, at \*7-8 (upholding attorneys' fee award to plaintiff). That is precisely what happened here. The fact that Mr. Auerbach repeatedly contradicted the stipulated facts in the Joint Pretrial Order, his own prior sworn deposition testimony, and his own emails, is an additional and independent basis requiring an award of attorneys' fees in this case. *See Bryan*, 2013 WL 1010481, at \*1 (finding that "an award of attorneys' fees is **required**" under section 1D-45 where "[d]uring the trial, Defendant knowingly and intentionally committed perjury while on the stand"); *see also* Meier Decl. ¶¶ 35-37.

During trial, Mr. Auerbach testified that Ivan Farman and Bradley Wolff, Bank of America analysts, told him that PPD insiders informed them that Dr. Eshelman was somehow "forced out" of the company he founded. But Mr. Auerbach's testimony contradicts sworn testimony he had given in the past—and it constitutes perjury for at least four reasons. **First**, during Mr. Auerbach's September 19, 2017 Rule 30(b)(6) deposition, counsel for Dr. Eshelman asked whether Mr. Auerbach ever found a source that said Dr. Eshelman was replaced as CEO after being involved in clinical trial fraud. (Sept. 19, 2017 Dep. of Alan Auerbach 30(b)(6) ("Auerbach 30(b)(6) Dep.") 52:10-12.) And each time Mr. Auerbach stated that "it wasn't the point" he was trying to make: "We didn't find a source that didn't say that. We weren't looking for it. I can't say if it exists or it doesn't exist because we weren't looking for it." (*Id.* 107:19-23.) Never once in the extended back and forth on this topic—or in any of his three depositions—did

Mr. Auerbach mention the so-called conversation with Messrs. Farman or Wolff that he described at trial. **Second**, throughout discovery and even before Dr. Eshelman filed this lawsuit, Mr. Auerbach repeatedly stated that the defamatory Investor Presentation was based on information that was in the public record, while on the witness stand Mr. Auerbach suggested that Messrs. Farman and Wolff were his non-public sources for the claim that Dr. Eshelman had been fired. **Third**, PPD's general counsel Judd Hartmann's testimony on this point was unequivocal: Dr. Eshelman was not "replaced" as CEO of PPD. **Fourth**, the parties spent more than three years litigating the falsity of Puma's accusation about Dr. Eshelman's transition from CEO at PPD. If Puma had information from PPD concerning Dr. Eshelman being forced out of the company, this information would be critical to its defense in this case. Puma made no mention of this conversation in its verified responses to Dr. Eshelman's discovery requests which directly asked Puma to disclose its communications concerning PPD or Dr. Eshelman. (Meier Decl. ¶ 37.) And Puma was required under Rule 26 to disclose the identity of all individuals with relevant testimony concerning Dr. Eshelman's claims and its respective defense. Nevertheless, Puma waited to disclose this "smoking gun evidence," until the third day of trial.

But this was not the only misrepresentation Mr. Auerbach made on the stand. The Court deemed inadmissible Mr. Auerbach's emails discussing his reaction to Dr. Eshelman's books & records request. [D.E. 306 at 8.] During his direct examination, Mr. Auerbach took advantage of the Court's ruling and falsely testified that he would have been happy to fly across the country to meet with Dr. Eshelman to discuss his concerns and was sincere in his offer to do so. These statements were patently false, and Mr. Auerbach took liberties with the truth, knowing full well that the jury would likely never see the very document at the heart of an intense privilege fight in this case, which clearly and unequivocally contradicted his assertions. [*Id.* at 25-26.]

An award of attorney's fees "is intended to address costs that arise in the course of litigation of a particular case while punitive damages are intended to punish a litigant for conduct that had already occurred by the time that the litigation had commenced." *Lacey v. Kirk*, 767 S.E.2d 632, 650 (2014). And, as set forth above, a defense is "malicious" for purposes of awarding attorneys' fees when "it is wrongful

and done intentionally without just cause or excuse *or as a result of ill will*." *Fed. Point Yacht Club*, 2015 WL 8755698, at *10; *see also Bryan*, 2013 WL 1010481, at *1. There is ample evidence that the ill will and hostility that Puma exhibited toward Dr. Eshelman during the proxy contest carried over into how Puma instructed its attorneys to conduct this litigation. For example, in response to Dr. Eshelman's first demand of Puma, Puma's CEO Alan Auerbach *instructed Puma's attorneys*: "Tell him to go fuck himself . . . Also tell him to make sure his affairs are in order. I hear a tire iron to the cranium is a painful way to die." [D.E. 306 at 8.] Puma's subsequent "response" to Dr. Eshelman's retraction demand request—a securities filing Mr. Auerbach approved attaching a letter in which Puma's *attorney* publicly threatened to "seek all available sanctions against you and your counsel" and to publish "additional . . . information" about Dr. Eshelman's [unidentified] "past activities"—demonstrates that Puma had no qualms about instructing its attorneys to go on the attack against Dr. Eshelman. And attack they did. After the Court denied Puma's meritless Motion to Dismiss, Puma filed meritless retaliatory counterclaims against Dr. Eshelman. Although those retaliatory counterclaims were dismissed entirely, Puma succeeded in inflicting pain on Dr. Eshelman by forcing him to incur attorneys' fees for briefing on claims that never should have been brought in the first place.

As set forth above and in Puma's numerous motions and oppositions in this case that were rejected for lacking merit, Puma's overarching litigation strategy in this case has been to drive up Dr. Eshelman's fees and costs as much as possible, without ever really caring about the fact that Puma's accusations about Dr. Eshelman were false. Indeed, when testifying under oath at his re-opened deposition about the first Puma board meeting after Dr. Eshelman filed the Complaint, Mr. Zavrl could not recall anyone asking "about the possibility that Puma's statements about Dr. Eshelman were wrong," "or being particularly concerned about it." Feb. 6, 2018 Dep. of Frank Zavrl ("Zavrl Dep. II") 288:17-25 ("Q: At the February 2016 board meeting, did Puma's board have any discussion whatsoever about the possibility that Puma's statements about Dr. Eshelman were wrong? [Objection] A: I don't remember a specific – I don't have a recollection of somebody asking that question or – or being particularly concerned about it."). If Puma had actually been concerned about the truth, it would not have asserted defenses that it knew or should have

known were malicious as a result of its ill will toward Dr. Eshelman. However, because Puma chose to assert defenses that were "wrongful and done . . . as a result of ill will" even though it knew "or should have known" that its denials were baseless, Dr. Eshelman is entitled to his reasonable attorneys' fees. *Fed. Point Yacht*, 2015 WL 8755698, at *10; N.C. Gen. Stat. § 1D-45.

### III. Dr. Eshelman Is Entitled to All of His Reasonable Attorneys' Fees for This Litigation.

Although section 1D-45 provides for an award of reasonable attorneys' fees "in a punitive damages claim," the Court should award Dr. Eshelman his reasonable attorneys' fees for this entire litigation. Dr. Eshelman's attorneys' fees cannot be "apportioned" to work related to punitive damages and work unrelated to punitive damages because this is a case "where all of plaintiff's claims arise from the same nucleus of operative facts and each claim was 'inextricably interwoven' with the other claims." *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 449, 553 S.E.2d 431 (N.C. Ct. App. 2001) (holding that it was unnecessary and unrealistic to apportion attorneys' fees).[5] Specifically, Puma's "actual malice" was required to be proven for **both** Dr. Eshelman's punitive damages claim and his libel claims. Indeed, as the Court instructed the jury, "the law permits you to award . . . punitive damages because you have [already] found by clear and convincing evidence that the defendant Puma Biotechnology, Inc. acted with actual malice." [D.E. 387 at 12.] In addition, the Court agreed with Plaintiff's counsel that all the evidence submitted in the liability and compensatory damages phase of the trial should be—and was—admitted for purposes of the jury considering whether and what amount to award for punitive damages. Moreover, the element of "falsity" in a defamation claim is inextricably intertwined with "actual malice." As the Court instructed the jury, "actual malice" means that the defendant "either knew that the statements were *false* or acted with reckless disregard of whether the statements were *false*." [D.E. 386 at 18.] Accordingly, there can be no actual malice with respect to statements that are not false, and facts relating to falsity are therefore inextricably intertwined with facts relating to actual malice.

---

[5] In such cases it is reasonable that most of the attorneys' time was directed at all claims, as opposed to on a claim-by-claim basis. *See Laschkewitsch v. Legal & Gen. Am., Inc.*, No. 5:15-CV-251-D, 2017 WL 4976442, at *3 (E.D.N.C. Nov. 1, 2017), *aff'd*, 725 F. App'x 252 (4th Cir. 2018), *cert. denied,* 139 S. Ct. 484, 202 L. Ed. 2d 382 (2018), *reh'g denied*, No. 18-5931, 2019 WL 660257 (U.S. Feb. 19, 2019).

Indeed, that is why Dr. Eshelman's claim for punitive damages in the Complaint expressly repeated and realleged each of factual allegations made in support of his libel claims. [Compl. ¶ 83 D.E. 5.] Because the Complaint expressly incorporates "all the allegations of conduct comprising the substance of his other claims in support of his claim for punitive damages," it is not practical or necessary to limit Dr. Eshelman's attorneys' fee award to fees that can be directly apportioned to the punitive damages claim—just like it was not practical or necessary to reintroduce testimony or evidence at trial in the punitive damages phase that had previously been introduced during the liability phase. *Phillips v. Pitt Cty. Mem'l Hosp., Inc.*, 775 S.E.2d 882, 885 (N.C. Ct. App. 2015) (holding that apportionment of fees between the punitive damages claim and the underlying claims was impractical and unnecessary because the complaint alleged and incorporated by reference all of the allegations of conduct comprising the substance of the underlying claims in support of the claims for punitive damages and because the claims arose from a common legal and factual nucleus).

Finally, Dr. Eshelman's fee award should not be reduced on account of the fact that the jury already awarded compensatory damages of $15.85 million and punitive damages of $6.5 million. Doing so would constitute an abuse of discretion and reversible error. *Lacey*, 767 S.E.2d at 651, *writ denied*, *review denied*, 771 S.E.2d 321 (2015) (holding that trial court abused its discretion when it reduced an attorneys' fee award based on the fact that the plaintiffs were the recipients of a large punitive damages award).

## IV.      The Fees Dr. Eshelman Seeks Are Reasonable.

Turning to the reasonableness of the specific amounts requested, the starting point for courts in this district for determining a reasonable award of attorneys' fees is the lodestar method, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). There is a strong presumption that the "lodestar figure" represents a reasonable fee. *Id.* at 321. The Fourth Circuit has held that essentially two determinations are necessary under the lodestar method: (1) what constitutes a 'reasonable hourly rate' for the services of counsel; and (2) the number of hours that were reasonably expended on the litigation. *Id.* at 320.

Dr. Eshelman seeks a total of $3,075,897.85 in attorneys' fees for prosecuting this action. (Sanford Decl. ¶ 6; Locke Decl. ¶ 44.) But this is a significant discount from the $3,660,214.95 in fees that Dr. Eshelman incurred, as set forth below:

**TABLE 1 – GROSS HOURS BILLED**

| January 2016 – March 15, 2019 | | | |
|---|---|---|---|
| **Clare Locke Attorneys** | **Hours Billed** | **Rate** | **Value** |
| Thomas A. Clare, P.C. | 298.50 | $710 | $211,935.00 |
| Elizabeth M. Locke, P.C. | 613.20 | $610 | $374,052.00 |
| Megan Meier | 1595.75 | $585[6] | $930,398.75 |
| Joseph Oliveri | 120.75 | $565 | $68,223.75 |
| Daniel Watkins | 2122.65 | $400 | $849,060.00 |
| Audrey Rabenberg | 836.75 | $325 | $271,943.75 |
| Steven Harrison | 711.75 | $325 | $231,318.75 |
| Attorneys < 120[7] | 125.50 | various | $44,305.00 |
| | | | |
| Law Clerks | 318.15 | $300 | $95,445.00 |
| Paralegals | 2,272.50 | blended rate of $229.19 | $520,741.25 |
| | | | |
| Andrew McVey | 142.10 | $280-$310 | $42,521.50 |
| Contract Attorneys | 471.40 | $43.00 | $20,270.20 |
| | | | |
| **Total Gross Hours & Fees** | **9,629** | | **$3,660,214.95** |

Although the fees set forth above represent the time Dr. Eshelman's legal team spent working on this case, in an exercise of sound billing judgment, Dr. Eshelman's counsel have identified several categories of fees to exclude from this application. (Sanford Decl. ¶¶ 7-10; Locke ¶¶ 45-47.) Specifically,

---

[6] *See* Locke Decl. ¶ 8 n. 1.
[7] Dr. Eshelman is not seeking reimbursement for fees corresponding to lawyers that spent fewer than 120 hours working on this case. Because of Clare Locke's size and limited capacity, from time to time, lawyers who are not specifically assigned as primary attorneys on cases may assist with discrete tasks and discuss strategy or otherwise provide support.

he is not seeking to be reimbursed for (1) time billed by Clare Locke professionals before Puma filed its Motion to Dismiss; (2) time billed by Clare Locke attorneys who spent fewer than 120 hours working on Dr. Eshelman's case; or (3) time billed by Clare Locke's law clerks. (*Id.*) Additionally, counsel for Dr. Eshelman marked down the fees that he incurred throughout this case. By taking into account the work completed and the efficiency of those tasks and attempting to remove time for duplicated efforts, the Firm voluntary elected not to bill Dr. Eshelman $383,835.85 in labor fees. (Locke Decl. ¶ 45; Sanford Decl. ¶¶ 7, 52.) Clare Locke invoiced Dr. Eshelman regularly throughout this case and Dr. Eshelman does not seek reimbursement for any fees that he has not incurred. (Locke Decl. ¶¶ 45-46.) The categories of fees excluded from this Motion are set forth below:

### TABLE 2 – EXCLUDED FEES

| | |
|---|---|
| Attorney and Paralegal Hours Billed before April 4, 2016 | $60,731.25 |
| Attorneys < 120 Hours | $44,305 |
| Law Clerks | $95,440 |
| Voluntary Below-the-Line Write-Off | $383,835.85 |
| **Total Excluded Fees** | **$584,317.10** |

Clare Locke subtracted these excluded fees ($584,317.10) from the gross amount of fees he incurred ($3,660,214.95) to identify the amount of fees for which he currently seeks reimbursement: **$3,075,897.85**. (Locke Decl. ¶ 47.) This includes 6,202.35 hours charged by Clare Locke attorneys, 2,244.55 hours by Clare Locke paralegals, 142.10 hours from local counsel Andrew McVey, and 471.4 hours billed by contract attorneys in connection with document review. (Sanford Decl. ¶ 90.)

### TABLE 3 – TOTAL REQUESTED FEES

| | |
|---|---|
| Gross Fees | $3,660,214.95 |
| Excluded Fees | ($584,317.10) |
| Total Requested Fees | $3,075,897.85 |

### A.  Dr. Eshelman's Attorneys' Hourly Rates Are Reasonable

***First***, with regard to Clare Locke's billing practices, an attorney's usual billing rate is presumptively the reasonable rate, provided that the rate is in line with those prevailing in the community

for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Id.* The rates charged by Dr. Eshelman's counsel and paralegals are presumptively reasonable because they actually reflect a substantial discount from their standard billing rates, as detailed in the Declarations of Elizabeth M. Locke, P.C. and Megan L. Meier.

Clare Locke is a boutique law firm with 9 lawyers that has a recognized national defamation law practice. (Sanford Decl. ¶ 41; Locke Decl. ¶¶ 3-4.) As a specialty boutique, however, it competes with large law firms and other boutique law firms focused on media law or complex litigation. (Locke Decl. ¶¶ 3-5.) For example, Ms. Locke and Mr. Clare are each ranked in Band 1 by *Chambers USA High Net Worth* in the area of Defamation and Reputation Management. (Sanford Decl. ¶ 40.) Conversely, the law firms ranked in Band 1 for First Amendment Litigation—firms like Davis Wright Tremaine LLP—each employ more than 350 lawyers. (Locke Decl. ¶ 4.) As such, the relevant community of attorneys of reasonable comparable skill, experience, and reputation, are media law practice groups in larger law firms. (Sanford Decl. ¶¶ 31, 51.) Clare Locke's rates for this matter were lower than large law firms but may be higher than rates charged by some comparably-sized, general service firms with local or regional practices. Dr. Eshelman has not been able to locate any survey data that address a practice of this nature. However, courts in the Southern District of New York have recognized the nature of specialty boutiques in related areas, such as intellectual property law, and have been willing to award fees at rates for such firms that are far higher than what Clare Locke seeks here. *See, e.g., Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54, 56 (S.D.N.Y. 2000) (approving rates of more than $500 per partner for the Pryor, Cashman boutique firm more than two decades ago).

**Second,** as an additional indication of their reasonableness, Clare Locke's rates are lower than the rates in the "LSI-Laffey" Matrix, originally promulgated by the U.S. Attorney's Office "'to indicate . . . [the] rates to which the government will not object,'" *McKesson Corp. v Islamic Republic of Iran*, No. 82-220, 2013 WL 1224808, at *5 (quoting *Novak v. Capital Mgmt. & Dev. Corp.*, 496 F. Supp. 2d 156, 159 (D.D.C. 2007)), and referenced by courts in the District of Columbia as one barometer of market rates, including for firms that are much smaller than Clare Locke. (Sanford Decl. ¶ 35.) *See Heller v. District of*

*Columbia*, 832 F. Supp. 2d 32, 48–49 (D.D.C. 2011); *Queen Anne's Conservation Ass'n v. U.S. Dept. of State*, 800 F. Supp. 2d 195, 200–01 (D.D.C. 2011); *Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 947 (D.C. 2012); *Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 988-89 (D.C. 2007). But the reasonableness of Clare Locke's fees is even more underscored considering that "[t]he specialized knowledge, skills, and work product of Clare Locke's lawyers' command market rates at the high end of Washington, D.C.'s legal marketplace." *Id.*

A table comparing Clare Locke's billable rates to the operative LSI-Laffey Rates is below.

| Attorney | Billable Rate | LSI-Laffey Rate | Discount |
|---|---|---|---|
| Thomas A. Clare, P.C. | $710 | $894 | $184 |
| Elizabeth M. Locke, P.C. | $610 | $742 | $132 |
| Megan L. Meier | $585 | $658 | $73 |
| Joe Oliveri | $565 | $658 | $93 |
| Daniel P. Watkins | $400 | $455 | $55 |
| Audrey Rabenberg | $325 | $371 | $46 |
| Steven Harrison | $325 | $371 | $46 |

With respect to paralegal rates, Dr. Eshelman's paralegals charged a blended hourly rate of $229.15, which is approximately $27 higher than the LSI-Laffey Matrix Rate. (Sanford Decl. ¶ 50.)

Under the LSI-Laffey Matrix, the prevailing rate for paralegals in Washington, D.C. for the current time period is $202. This amount is approximately $27 lower than the $229.20 rate that Dr. Eshelman seeks reimbursement. But Clare Locke's paralegals have years of experience providing support in defamation cases throughout the country. (Locke Decl. ¶¶ 26-28.) Clare Locke's senior paralegal, Ise Tiapula, has worked for elite law firms for approximately thirteen years. (Locke Decl. ¶ 27.) This is her fourth multimillion-dollar litigation trial or arbitration in three years. (*Id.*) This particularized experience positions Ms. Tiapula in the highest tier of paralegals practicing in Washington, D.C. Given these considerations, Clare Locke's rate of $229.20 for paralegal time is reasonable. Clare Locke's paralegals' specialized training and specific expertise—*e.g.,* animation skills and the presentation of graphics saved significant amounts because Dr. Eshelman's trial team was able to manage every aspect of trial in-house. (Locke Decl. ¶¶ 26-28.)

Moreover, every single Clare Locke attorney relevant to Dr. Eshelman's Motion has charged him hourly rates that are lower than those set forth in the LSI-Laffey Matrix. (Sanford Decl. ¶ 36.) For instance, Clare Locke charged Dr. Eshelman $400 per hour for the services of seventh-year associate Daniel Watkins. (Sanford Decl. ¶¶ 6, 36.) Mr. Watkins has worked approximately 2,122.65 hours on this case. Dr. Eshelman would have incurred an additional $112,500.45 if Clare Locke had billed Mr. Watkins's work at the LSI-Laffey Rate. If Ms. Meier's rates[8] were as high as the proposed LSI-Laffey Rate, the fees charged for her work would have increased by $116,489.75.[9]

The D.C. Circuit has explained that the Laffey Matrix "is probably a ***conservative*** estimate" of legal fees in Washington, D.C. *See Salazar v. District of Columbia*, 809 F.3d 58, 65 (D.C. Cir. 2015) (emphasis in original). Nonetheless, Clare Locke's rates for each of its attorneys falls below the schedule set forth in the Laffey Matrix. (Sanford Decl. ¶ 36.) By way of comparison, Puma hired Latham & Watkins lawyer Daniel Schechter to draft Puma's threatening response to Dr. Eshelman's retraction demand letter. Recent bankruptcy filings establish that Latham & Watkins partners who joined the firm after the time Mr. Schechter joined the firm billed hourly rates as high as $1,295.00 per hour. *In re: Rentech WP U.S. Inc.*, *et al.*, Case No. 17-12958 (D. Delaware 2017) (Second Monthly Application of Latham & Watkins LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors, dated February 15, 2018) (Joseph Kronsnoble, who joined the firm in 1991, billed at a rate of $1,295.00 per hour as of the date of filing). The billable rate of Clare Locke's co-founding partner Thomas A. Clare, P.C. is slightly more than 50% of the standard rates charged by Latham & Watkins attorneys with similar experience.

Moreover, courts in two other jurisdictions have confirmed the reasonableness of the rates and fees charged by Clare Locke attorneys. First, the United States District Court for the Eastern District of Virginia

---

[8] Mr. Watkins's rate of $400 is $53 lower than LSI-Laffey rate. $53 multiplied by the 2,122.65 hours he worked totals $112,500.45 in additional fees. Ms. Meier's rate of $585 per hour is $73 lower than the relevant LSI-Laffey rate for her seniority. $73 per hour multiplied by the 1,595.75 hours Ms. Meier worked on this case totals $116,489.75.
[9] During the first few months of this case, Ms. Meier's rate was $565 per hour. When she became a partner in June of 2016, her rate increased to $585 per hour.

awarded $4,137,345.00 in legal fees in a case in which Mr. Clare served as lead counsel and Ms. Locke also was trial counsel. *Vienna Metro LLC, v. Pulte Home Corp.*, Case No. 1:10-cv-00502 (E.D. Va. filed Aug. 24, 2011) [D.E. 263]. The court found Mr. Clare's hourly rates of $700 (in 2011) and Ms. Locke's hourly rate of $550 (in 2011 when she was a fifth-year associate) to be reasonable in that case and awarded the full amount of fees requested by the plaintiff. *Id.* at 12.

Similarly, in 2017 a state court in Alexandria, Virginia, granted Clare Locke's fee petition after a successful motion for summary judgment related to a business dispute. *Clare Locke v. Ribiero, et al.*, No. CL16001154 (Va. Cir. Ct. May 10, 2017). In that case, the court determined that the same rates that Dr. Eshelman seeks in this case—$610 per hour for Ms. Locke and $565 per hour for Mr. Oliveri—were reasonable given the attorneys' respective reputations, experience, and ability.

For its part, Puma retained Wilkinson Walsh + Eskovitz to defend against Dr. Eshelman's defamation claims, and the firm served as lead litigation counsel until the parties completed summary judgment briefing. Like Clare Locke, Wilkinson Walsh is a Washington, D.C.-area boutique law firm that focuses on complex litigation. Earlier this year, Benchmark Litigation named Wilkinson Walsh "Boutique Firm of the Year". Although Dr. Eshelman has asked Puma to disclose the rates and overall fees that Wilkinson Walsh charged in connection with this case, Puma has declined Dr. Eshelman's requests. Upon information and belief, based on Clare Locke's understanding and experience in the D.C. legal market and its knowledge of Wilkinson Walsh lead partner Brant Bishop's approximate billing rate when Mr. Clare and Ms. Locke were partners with Mr. Bishop at Kirkland & Ellis before Mr. Bishop left for Wilkinson Walsh, Mr. Bishop's and his co-counsel's rates at Wilkinson Walsh are likely higher—for lawyers with the same number of years' experience—than the rates Clare Locke attorneys charged. In light of Puma's refusal to provide this information to Dr. Eshelman or the Court, the Court should reach an adverse inference that Puma paid hourly rates for Wilkinson Walsh attorneys that were equal to or greater than the rates—on a lawyer to lawyer basis—Dr. Eshelman paid to Clare Locke.

**B. Dr. Eshelman's Counsel Expended A Reasonable Number of Hours.**

Once a reasonable hourly rate has been identified, the Court must determine "the number of hours reasonably expended on the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The party seeking an award of attorneys' fees must "state the amount sought or provide a fair estimate of it." Fed. R. Civ. P. 54(d)(2)(B)(iii). The goal in shifting fees is "to do rough justice, not to achieve auditing perfection." *Silicon Knights, Inc. v. Epic Games, Inc.,* 917 F. Supp. 2d 503, 521 (E.D.N.C. 2012) (quoting *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011)). As detailed in the declarations of Ms. Locke and Mr. Sanford, Dr. Eshelman seeks recovery for **8,918.25** hours, including time for its lawyers and paralegals at Clare Locke, its local North Carolina counsel, and hours spent by contract attorneys utilized during discovery. (Sanford Decl. ¶ 91.)

In *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978), the Fourth Circuit adopted a 12-factor test for evaluating the lodestar reasonable rate and reasonable hours. *See id.* (adopting twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). The factors the Court should consider as set forth by the *Barber* court are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* "[A] court need not list each Johnson/Barber factor or comment on those factors that do not apply." *Silicon Knights*, 917 F. Supp. 2d at 520 (citing *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 86 F.3d 364, 376 (4th Cir. 1996)). The relevant *Johnson/Barber* factors support an award of Dr. Eshelman's requested fees.

**1. The Time and Labor Required in This Matter Was Substantial.**

The time and labor required in prosecuting any defamation case is substantial, given the complexity of the issues that arise in such claims—there is a robust body of law around defamation actions because they implicate the First Amendment and they often (as this case did) involve questions regarding the

23

appropriate jurisdiction, venue, and choice of law to adjudicate claims that involved parties from different states, witnesses and documents located throughout the country. (Sanford Decl. ¶¶ 52-54.) This case was especially complex, lasting over three years, involving the collection, review, and production of hundreds of thousands of pages of documents from parties in California, North Carolina, New York, Tennessee, and Massachusetts. This case also involved substantial motions practice, including multiple motions to dismiss, motions to compel, motions for protective orders, motions to stay, motions for summary judgment, multiple rounds of supplemental briefing, and numerous motions *in limine*. The parties conducted 22 depositions, in California, North Carolina, Boston, and Tennessee. (Meier Decl. ¶ 18.)

The time and labor required in this case was also driven upward by Puma's vexatious litigation tactics, which are summarized above and evident from the Court's docket. (Meier Decl. ¶ 25.) During discovery and dispositive motion practice—and even during trial—Puma concealed and refused to admit facts evidencing its actual malice towards Dr. Eshelman, even though such evidence had been in Puma's possession since before this case began over three years ago. Although Plaintiff's counsel spent a substantial amount of time conferring with Puma's counsel to attempt to resolve many of their pre-trial disputes, Puma repeatedly refused to comply with its discovery obligations until Dr. Eshelman incurred the attorneys' fees to secure the Court's intervention and Puma's belated compliance. (Meier Decl. ¶ 26.) Plaintiff's counsel's diligence and persistence during discovery, pre-trial motions practice, and in negotiating the Joint Pretrial Order was certainly time-consuming, but it paid valuable dividends in defining—and narrowing—the disputed issues for trial and achieving an excellent result. (Meier Decl. ¶ 46.) As detailed in the Declarations, the time expended pursuing Dr. Eshleman's claims was necessary, reasonable, and ultimately validated by the jury's verdict.

**2. This Case Presented Novel and Difficult Questions.**

As a defamation case involving a public figure, this case presented novel and difficult questions, particularly with respect to the constitutional "actual malice" standard arising under the First Amendment jurisprudence. (Sanford Decl. ¶ 77.) This standard presents novel and difficult questions. The parties submitted extensive pretrial briefing about the types of evidence that are relevant to the actual malice

inquiry and the appropriate instruction to be given to the jury with respect to actual malice. [D.E. 311, 313, 315, 316, 322, 347, 349, 352.] Indeed, the actual malice inquiry is a novel one that is addressed so rarely in North Carolina courts that, as this Court acknowledged, the North Carolina Pattern Instruction on actual malice is insufficient and needed to be completely rewritten based on a thorough review of federal case law and Supreme Court precedent.

### 3. This Case Required a High Level of Skill.

In determining the level of skill necessary, courts have looked to the nature of the claims themselves, the level of skill from the opposing counsel, and the overall aggressiveness from both sides. *Irwin Indus. Tool Co. v. Worthington Cylinders Wis., LLC,* 747 F. Supp. 2d 568, 596 (W.D.N.C. 2010). Each of these factors weigh in favor of Dr. Eshelman. Dr. Eshelman's counsel's skill is commensurate with the complexity of this case and the difficulties in prevailing at trial on a public-figure defamation case. (Sanford Decl. ¶¶ 15, 19, 28.) Puma's former counsel Wilkinson Walsh (and Latham & Watkins, the firm Puma used to reject Dr. Eshelman's demand for a retraction of the defamatory Investor Presentation), and its current counsel Hedrick & Gardner are excellent trial lawyers with top credentials and extensive experience in complex litigation. As set forth in above, Puma was extraordinarily aggressive in litigating this case, attacking Dr. Eshelman with meritless counterclaims, moving to dismiss on multiple grounds including under California's anti-SLAPP statute, taking an interlocutory appeal of the denial of its anti-SLAPP motion, repeatedly denying facts it knew to be true, concealing key documents, filing numerous pretrial motions that were denied, affirmatively seeking summary judgment with respect to actual malice and punitive damages, and seeking to attack Dr. Eshelman with inadmissible and irrelevant side shows (that were properly excluded by the Court after Plaintiff's counsel briefed and filed motions *in limine*). Successfully navigating these issues and the aggressiveness from Puma's counsel required a high level of skill. (*Id.*)

### 4. Dr. Eshelman's Attorneys Lost the Opportunity to Work on Other Matters at Higher Rates.

Given the significant time spent litigating this case, Dr. Eshelman's attorneys were limited in their ability to work on other cases or projects. (Locke Decl. ¶¶ 8-9; Meier Decl. ¶ 7.) As discussed above, Clare Locke did not increase the rates from what it charged Dr. Eshelman in 2016. Yet the hourly rates it has been able to command over the past three years has risen swiftly given the Firm's history of success, its public profile, and the sheer volume of demand for skilled defamation counsel at a time when trust in the media is at an all-time low and defamation proliferates on social media. (Locke Decl. ¶ 15.) Indeed, the attorneys at Clare Locke who litigated this case are now able to—and have in fact—commanded rates that are greater than one and a half times their then-prevailing rates at the time this case began. (Locke Decl. ¶ 14.) Clare Locke's growing "reputation as a premier law firm with an expertise in First Amendment issues" has only made its services in higher demand. Therefore, "the attorneys' opportunity costs include the higher rates they would have otherwise charged in other cases and projects." *Irwin Indus. Tool Co.*, 747 F. Supp. 2d at 596.

### 5. The Customary Fee for Such Work Is Commensurate with the Amount Dr. Eshelman Is Seeking.

As explained above, Dr. Eshelman's counsel's fall within the range of customary rates for federal litigation in the Washington, D.C. area. (Sanford Decl. ¶ 36.) Dr. Eshelman requests reimbursement for attorneys' fees that are actually ***below*** the customary rates that Clare Locke charges its clients for similar litigation and are therefore presumptively reasonable. (Sanford Decl. ¶ 37.) As explained above, two courts in Virginia have recently held that the standard rates charged by Clare Locke's lawyers—which are higher than those currently at issue—were reasonable. *Vienna Metro LLC, v. Pulte Home Corp.*, Case No. 1:10-cv-00502 (E.D. Va. filed Aug. 24, 2011) [D.E. 263]; *Clare Locke v. Ribiero, et al.*, No. CL16001154 (Va. Cir. Ct. May 10, 2017).

### 6. Dr. Eshelman's Contemporary Payment of These Hourly Fees Further Supports the Reasonableness.

Dr. Eshelman's counsel charged Dr. Eshelman an hourly rate for this matter based on the time spent by each of its attorneys and paralegals. Dr. Eshelman paid these rates to Clare Locke throughout the litigation, favoring a finding of the fees' reasonableness. *Aventis Cropscience, N.V. v. Pioneer Hi-Bred Int'l, Inc.*, No. 00-cv-463, 2010 WL 2306677 at *4 (M.D.N.C. June 8, 2010); Sanford Decl. ¶¶ 12, 31-51; Locke Decl. ¶¶ 30, 32.

### 7. The Amount Involved and the Results Obtained Justify a Significant Fee Award.

The jury returned a substantial verdict in this case to compensate Dr. Eshelman for the reputational harm he suffered and to punish Puma for its wrongful conduct. With the verdict, Plaintiff's counsel overcame the extraordinarily high bar imposed by the First Amendment in public-figure defamation cases and restored Dr. Eshelman's good name and well-earned reputation. The outcome of the trial is perhaps the best evidence justifying a significant fee award.

### 8. Dr. Eshelman Engaged Highly-Skilled Defamation Attorneys with Strong Experience and an Excellent Reputation to Litigate a Case That Many Firms Would Not Take on.

As described above and in the Declarations, Dr. Eshelman's attorneys are highly skilled and experienced, and have an excellent national reputation for high-stakes defamation litigation. Clare Locke has achieved multimillion-dollar awards and settlements for defamation clients, and during the pendency of this case, the firm secured a multimillion-dollar jury verdict on another public-figure defamation case in the Western District of Virginia against *Rolling Stone* magazine. (Locke Decl. ¶ 14.) Given the high-stakes nature of this case—in which a loss would have further harmed Dr. Eshelman's reputation by vindicating Puma's false accusations about him—Dr. Eshelman selected elite defamation attorneys that were capable of delivering the correct result, notwithstanding the extraordinary difficulty of prevailing in a public-figure defamation case in which the constitutional actual malice standard applies. (Sanford Decl. ¶ 24.)

The legal landscape surrounding defamation law is full of procedural pitfalls and burdens of proof that make winning a case incredibly difficult. "Perhaps no area of tort law confronts plaintiffs with more obstacles to victory than defamation law." (Sanford Decl. ¶ 23.) The complexities surrounding the actual

malice standard and the vagaries related to quantifying reputational harm make an hourly billing arrangement—as is the case here—"understandable and reasonable." (Sanford Decl. ¶¶ 52-54.) Moreover, the concept of reputational harm is "not readily reducible to pecuniary terms," and juries have wide latitude in apportioning damages. All of these facts make a contingency arrangement untenable. Many plaintiff-side firms, like Clare Locke, simply will not take on a defamation case on a contingency basis precisely because the prospective economic award is so difficult to quantify. (Locke Decl. ¶¶ 10-12.) And there are few Am Law 100 or 200 firms who are willing or able to file such a case—often because their representation of media defendants create either actual legal or potential positional conflicts, and because their less flexible hourly rate structure price them out of the market for individuals (even high net worth individuals) to pursue these kinds of claims and litigate them through jury verdict. (Locke Decl. ¶ 9.) Accordingly, the Court should not reduce any of the fees Dr. Eshelman paid, and now seeks reimbursement for under North Carolina law, in this petition for this years-fought litigation to regain his reputation.

## **CONCLUSION**

For the foregoing reasons, Dr. Eshelman respectfully requests that this Court award Dr. Eshelman his reasonable attorneys' fees in the total amount of $3,075,897.85 pursuant to N.C. Gen. Stat. section 1D-45.

This 8th day of April 2019.

Respectfully Submitted,

*/s/ Megan L. Meier*
Andrew K. McVey
North Carolina State Bar No. 20217
(Local Civil Rule 83.1 Counsel)
Murchison, Taylor & Gibson PLLC
16 North Fifth Avenue
Wilmington, NC 28401-4537
Telephone: 910-763-2426
Email: amcvey@murchisontaylor.com

Thomas A. Clare, P.C. (of counsel)
Elizabeth M. Locke, P.C. (of counsel)
Megan L. Meier (of counsel)
Daniel P. Watkins (of counsel)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com
Email: daniel@clarelocke.com
*Attorneys for Dr. Fredric Eshelman*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the forgoing document will be filed with the Clerk of Court using the CM/ECF system on April 8, 2019, which will send notification of such filing to the following:

David L. Levy
Hedrick Gardner Kincheloe & Garofalo, LLP 6000 Fairview Rd., Suite 1000
Charlotte, NC 28210
Telephone: (704) 319-5429
Facsimile: (704) 602-8178
Email: DLevy@hedrickgardner.com

Devlin K. Horton
Hedrick Gardner Kincheloe & Garofalo, LLP
300 North Third Street, Suite 420
Wilmington, NC 48401
Telephone: (901) 679-4801
Email: dhorton@hedrickgardner.com

Dated: April 8, 2019                                    By: */s/ Megan L. Meier*
                                                            Megan L. Meier

**APPENDIX 1: Facts that Puma denied but then ultimately stipulated to.**

| No. | Stipulated Fact | Puma's Previous Denial |
|---|---|---|
| 1. | The Court has jurisdiction of the parties and of the subject matter. [D.E. 359 § I. B.] | Puma's Answer at 9, ¶¶ 8-10 [D.E. 86]; Puma's Motion to Dismiss for Lack of Jurisdiction ("MTD") [D.E. 20]; Puma's Mem. in Supp. of its MTD [D.E. 21]; Reply in Supp. of MTD [D.E. 31]; Response in Supp. re MTD [D.E. 69]; Mem. in Supp. of Mot. to Certify Court's Denial of MTD [D.E. 99]; Puma's Opp. to Mot. to Compel Jurisdictional Discovery [D.E. 46]; Opp. to Dr. Eshelman's Mot. for Leave to Suppl. Opp. to Mot. to Dismiss for Lack of Jurisdiction [D.E. 48]. |
| 2. | From 1990 to 2009, Dr. Eshelman served as CEO of PPD. [D.E. 359 § I. B.]<br><br>Dr. Eshelman served as the Executive Chairman of PPD's board of directors from 2009-2011, when PPD was sold to two private equity firms. [D.E. 359 ¶¶ 18-19.] | Puma's Opp. Statement to Pl.'s SMF ¶ 24 [D.E. 226]. |
| 3. | Dr. Eshelman was the founding chairman of Furiex Pharmaceuticals, Inc. ("Furiex"), and served as the Chairman of the board of directors of Furiex from 2009 to 2014. [D.E. 359 ¶ 20.] | Puma's Opp. Statement to Pl.'s SMF at ¶¶ 25-26 [D.E. 226]. |
| 4. | In 2014, Dr. Eshelman founded Eshelman Ventures, LLC, a company focused on investing in healthcare companies. [D.E. 359 ¶ 22.] As of October 28, 2015, Dr. Eshelman had served as the Non-Executive Chairman of the Medicines Company and on the boards of the following companies: AeroMD Inc.; Cellective Biotherapy, Inc.; Dignify Therapeutics, Inc.; Eyenovia, Inc.; GI Therapeutics, Inc.; Innocrin Pharmaceuticals, Inc.; Medikidz USA, Inc.; Meryx, Inc. and Neoantigenics LLC.<br>As of October 28, 2015, Dr. Eshelman also served on the advisory board of Auven Therapeutics. [D.E. 359 ¶ 50.] | Puma's Opp. Statement to Pl.'s SMF ¶ 27, 29-30 [D.E. 226]; Puma's Answer ¶ 17 [D.E. 86]. |
| 5. | On November 12, 2015, Ms. Ohanesian sent an email to two NASDAQ employees calling Dr. Eshelman "quite annoying." [D.E. 359 ¶ 54.] | Puma's Opp. Statement to Pl.'s SMF ¶ 37 [D.E. 226]. |

| | | |
|---|---|---|
| 6. | On November 17, 2015, Ms. Ohanesian sent an email to the same two NASDAQ employees calling Dr. Eshelman a "fool." [D.E. 359 ¶ 55.] | Puma's Opp. Statement to Pl.'s SMF ¶ 38 [D.E. 226]. |
| 7. | On November 1, 2001, Aventis Pharmaceuticals Inc. ("Aventis") hired PPD to monitor study 3014. [D.E. 359 ¶ 62.] | Puma's Answer ¶ 23 [D.E. 86]. |
| 8. | Puma purposefully avoided numerous sources that would have rebutted its accusations about Dr. Eshelman. [D.E. 359 at 18.] | Puma's Answer ¶ 84(a) [D.E. 86]. |
| 9. | Mr. Auerbach never bothered to look for Dr. Kirkman-Campbell's indictment, even though it is publicly available, and Mr. Auerbach's staff would have pulled it for him if he asked. [D.E. 359 ¶ 126.] | Puma's Answer at ¶ 84(a) [D.E. 86]. |
| 10. | On January 20, 2016, Dr. Eshelman sent Puma a retraction demand, requesting an apology and retraction of Puma's defamatory presentation. [D.E. 359 ¶ 144.] | Puma's Answer at ¶¶ 2-3 [D.E. 86]. |
| 11. | On January 27, 2016, Puma filed a Form 14A with the SEC. The filing attached a letter from Puma's outside counsel, Latham & Watkins, to Dr. Eshelman. [D.E. 359 ¶ 146.] | Puma's Answer at ¶ 36 [D.E. 86]. |

**APPENDIX 2: Factual contentions that Puma refused to stipulate, requiring Dr. Eshleman to spend time proving at trial.**

| No. | Dr. Eshelman's Contentions | Contention Proven at Trial |
|-----|----------------------------|----------------------------|
| 1. | In a February 27, 2002 email to Aventis and during a March 4, 2002 teleconference with Aventis, PPD personnel including Ann Marie Cisneros reported issues they had discovered at Dr. Kirkman-Campbell's trial site. [D.E. 359 § II.A.1.(a).] | PX-4. |
| 2. | Ms. Cisneros was a PPD employee and acted on behalf of PPD when she monitored Dr. Kirkman-Campbell's site, when she reported the issues, she identified at Dr. Kirkman-Campbell's site to the IRB, and when she reported those issues to Aventis via email and teleconference. [D.E. 359 § II.A.1.(b).] | Ann Marie Cisneros Testimony. |
| 3. | Aventis submitted the data from Ketek clinical trial to the FDA. [D.E. 359 § II.A.1.(d).] | West Tr. 68:8-69:1. |
| 4. | Ms. Cisneros never had any interactions with Dr. Eshelman, never attended a meeting with Dr. Eshelman, and never had any substantive communications of any kind with Dr. Eshelman. [D.E. 359 § II.A.1.(f).] | Ann Marie Cisneros Testimony. |
| 5. | Nowhere in any of her Congressional testimony did Ms. Cisneros mention Dr. Eshelman's name or claim that she had communicated with him in any way about Dr. Kirkman-Campbell, the Ketek clinical trial, or otherwise. [D.E. 359 § II.A.1.(g).] | Ann Marie Cisneros Testimony; PX-15; DX-4. |
| 6. | PPD employees cooperated voluntarily with Special Agent West's investigation and participated in interviews with Special Agent West without lawyers present, even though they had not been subpoenaed. [D.E. 359 § II.A.1.(h).] | West Tr. 54:21-55:3. |
| 7. | Special Agent West had no issues with PPD throughout the entire investigation. [D.E. 359 § II.A.1.(i).] | West Tr. 54:25. |
| 8. | Unlike Special Agent West and his team of federal investigators, PPD did not have the authority to interview Dr. Kirkman-Campbell's patients or employees or to show up at Dr. Kirkman-Campbell's house with a search warrant. [D.E. 359 § II.A.1.(k).] | West Tr. 136:11-137:17. |
| 9. | According to Special Agent West, it was "difficult to tell what [ was] going on" at Dr. Kirkman-Campbell's | West Tr. 139:7-139:20. |

| | | |
|---|---|---|
| | site from the documentation alone. [D.E. 359 § II.A.1.(l).] | |
| 10. | Although it was not required, PPD's "Dr. Reynolds took it upon himself to analyze the blood and come up with some statistical analysis of…blood-swapping" and provided that information to the FDA, which the FDA "would not have learned…except for PPD," thereby helping Special Agent West determine that Dr. Kirkman-Campbell had committed fraud. Special Agent West credited PPD as "the main reason why Kirkman-Campbell pled guilty." [D.E. 359 § II.A.1.(m).] | West Tr. 54:15-55:19. |
| 11. | When conducting the investigation of Dr. Kirkman-Campbell, Special Agent West kept his eyes open for whether any other companies or other doctors should also be investigated for fraud. [D.E. 359 § II.A.1.(n).] | West Tr. 33:5-10. |
| 12. | In the course of his investigation into the Ketek clinical trial, Special Agent West never heard of Dr. Eshelman and never saw any documents that had Dr. Eshelman's name on them. [D.E. 359 § II.A.1.(o).] | West Tr. 69:10-19. |
| 13. | Special Agent West's investigation did not uncover any evidence showing that Dr. Eshelman had been involved in clinical trial fraud, and never recommended any action by the FDA's Office of Criminal Investigation against Dr. Eshelman. [D.E. 359 § II.A.1.(p).] | West Tr. 69:10-19. |
| 14. | Special Agent West recommended that the Office of Criminal Investigation open an investigation into Aventis—but not PPD—because PPD: [D]id exactly what they were supposed to do . . . [t]here was no indication whatsoever that PPD committed any violations of the Food, Drug, and Cosmetic Act or any violations of any other title. They reported the information to Aventis. Aventis is the ones [sic] that took it upon themselves to submit the data to the FDA. It wasn't PPD. It was Aventis. They're the sponsors. They're the ones in charge. So no, we – there was no – throughout the entire investigation, there was no indication that PPD was complicit | West Tr. 68:12-69:1. |

| | | |
|---|---|---|
| | with anyone and there was no need for—to conduct a criminal investigation on PPD.<br><br>[D.E. 359 § II.A.1.(q).] | |
| 15. | As a result of his investigation, Special Agent West determined that "PPD didn't disregard any information. They took it and provided it to Aventis." [D.E. 359 § II.A.1.(r).] | West Tr. 190:5-8. |
| 16. | Special Agent West concluded that "PPD behaved appropriately on the Ketek study" because:<br><br>[T]hey were given a task by Aventis. They performed the task. When they had issues, they raised them to Aventis, which they were supposed to do. Aventis is the ones that made the decisions on whether or not to keep Campbell in the clinical trial. And they – they did. Aventis made that decision. They didn't withdraw Campbell's data . . . even though there was suspicious activity. Maybe – PPD is not there to uncover fraud. They're not criminal investigators. But they reported the information to Aventis. Aventis decided not to withdraw her data. They submitted to the FDA. And then we came in and determined that it was actually fraud, with the help of PPD, and we prosecuted. So I think—there's no other word except that they—they acted appropriately.<br><br>[D.E. 359 § II.A.1.(s).] | West Tr. 55:23-56:21. |
| 17. | Special Agent West concluded that "PPD conducted themselves appropriately during the entire clinical trial. Not just with Kirkman-Campbell, but with the entire clinical trial of all 1900, 2000 PIs." [D.E. 359 § II.A.1.(t).] | West Tr. 54:13-55:19; 55:23-25. |
| 18. | Special Agent West testified: "If I had evidence that PPD was involved or complicit with Campbell or any other PI, I would have nailed them to the cross." [D.E. 359 § II.A.1.(u).] | West Tr. 186:10-187:3. |

| | | |
|---|---|---|
| 19. | The reason why Special Agent West never stated or implied to Congress that PPD or Dr. Eshelman had been involved in fraud was because: "they weren't involved." [D.E. 359 § II.A.1.(w).] | West Tr. 213:15-22. |
| 20. | In 2009, Dr. Eshelman was promoted from CEO and Vice Chairman of PPD's board to Executive Chairman of PPD's board, where he was responsible for supervising PPD's new CEO, who reported to Dr. Eshelman. [D.E. 359 § II.A.1.(y).] | DX-53; Judd Hartman Testimony. |
| 21. | Dr. Eshelman's attorney, Martin Seidel, made a mistake in the calculation of Dr. Eshelman's shares, calculating them to be 3% of Puma's shares, rather than .3% of Puma's shares. [D.E. 359 § II.A.1.(z).] | M. Ohanesian Tr. 57:5-19. |
| 22. | On or around October 28, 2015, Mr. Auerbach received and read Dr. Eshelman's preliminary consent solicitation statement, notifying him that Dr. Eshelman: (1) had been appointed as the Non-Executive Chairman of The Medicines Company (a publicly traded company) on August 28, 2015; (2) then served on the boards of nine private companies; (3) was the Chairman of the Board of Furiex from 2009 to 2014; and (4) was the Executive Chairman of PPD from 2009 to 2011. [D.E. 359 § II.A.1.(aa).] | DX-3; Alan Auerbach Testimony. |
| 23. | On November 2, 2015, Ms. Ohanesian received an email from Robert Flamm—an employee of the Public Relations Firm Russo Partners—which contained three articles concerning Dr. Eshelman. The three articles included in Mr. Flamm's email were: (1) an October 18, 2011 article regarding the buyout of PPD referring to "Executive Chairman Fredric Eshelman"; (2) a December 13, 2011 article stating that PPD's then-CEO Raymond Hill had resigned as CEO and that "Founder Fred Eshelman has also agreed to serve as senior advisor to the new board of directors through next year;" and (3) a July 7, 2014 article stating that Dr. Eshelman had served as PPD's "Executive Chairman from July 2009 until its sale to private equity in 2011." Ms. Ohanesian sent those articles to Alan Auerbach. [D.E. 359 § II.A.1.(cc).] | M. Ohanesian Tr. 98:10-21; 100:7-11; PX-217. |
| 24. | On November 12, 2015, Puma's Board of Directors and Mr. Auerbach learned that Dr. Eshelman had been the CEO of Pharmaceutical Product Development, Inc. ("PPD") from July 1990 until July 2009, and that Dr. Eshelman had been the executive chairman of PPD from July 2009 until PPD's | PX-314; Alan Auerbach Testimony. |

| | | |
|---|---|---|
| | acquisition in December 2011. [D.E. 359 § II.A.1.(dd).] | |
| 25. | During a meeting of Puma's Board of Directors on November 12, 2015, Puma's outside counsel, Charles K. Ruck of Latham & Watkins, reviewed a PowerPoint presentation with Puma's Board, highlighting, among other things, the "key events leading up to the Consent Solicitation, Eshelman's proposals, including his proposal to increase the size of the Board and to appoint Eshelman and three other nominees selected by Eshelman to the Board." One of the "key events leading up to the Consent Solicitation" that outside counsel presented to Mr. Auerbach and Puma's Board of Directors was that Dr. Eshelman had been the Executive Chair of PPD from July of 2009 until PPD's acquisition in 2011. Mr. Auerbach testified unequivocally that "Latham & Watkins, Puma's outside counsel, told the board of directors in th[e November 12, 2015] presentation that Dr. Eshelman was the executive chairman of Pharmaceutical Product Development, Inc., PPD, from July 2009 until its acquisition in December 2011[.]"[D.E. 359 § II.A.1.(ee).] | Auerbach Testimony; PX-314. |
| 26. | Before publishing the Presentation, Mr. Auerbach read an article published by *WilmingtonBiz*, titled "CEO Shift Helps PPD Globalize." The article contains the following statements: <br><br> Fred Eshelman, PPD founder and chief executive officer for the past two decades, turned more than a few heads May 19, when he announced he would step down as CEO on July 1. He named retired Brig. Gen. David L. Grange as his replacement. Grange, a member of PPD's board of directors since 2003, recently served as the CEO of the McCormick Foundation in suburban Chicago. <br><br> Eshelman said that he and Ernest Mario, PPD's non-executive board chairman, looked no further in selecting a replacement as both were impressed with Grange's grasp of the nature of PPD's global business, his knowledge of the company's | DX-12; Alan Auerbach Testimony. |

| | | |
|---|---|---|
| | managers as well as the market for the company's products.<br><br>As he answered a somewhat pointed question during a video conference after the announcement, Eshelman joked that he didn't think he had been fired. "This is not a deletion, but an addition to our talent pool," Eshelman said. He was echoed by Mario, who responded that Eshelman has been "a fabulous CEO" and their "partnership and relationship has been terrific since 1993."<br><br>"We as board and with Fred for several years talked about when he would step down as CEO," Mario said. "It's been a thoughtful process, transparent and open." Mario, who will become the lead independent director of the board, said that since he and Eshelman are both changing positions, there was a need to "bring in the type of talent to expand the talent we have … preparing the way down the road for the next transition."<br><br>[D.E. 359 § II.A.1.(ff).] | |
| 27. | On November 19, 2015, Puma published a Form 14A, claiming that "Holder [Dr. Eshelman] misrepresented his ownership position in the Company as more than 3% and less than 5% in an effort to bully the Company into accepting his demands for material non-public information." [D.E. 359 § II.A.1.(ii).] | PX-162. |
| 28. | On November 23, 2015, Puma published a Form 14A claiming that "Eshelman had claimed to own at least 3% of Puma."  [D.E. 359 § II.A.1.(jj).] | DX-29. |
| 29. | On December 4, 2015, Puma published a Form 14A, claiming that Dr. Eshelman "[m]isleads shareholders," that his approach was "[u]ntruthful," and that "Eshelman and his counsel repeatedly misrepresent his stock ownership (3%-5% which would have represented approximately 1.0-15 million shares) in an attempt to gain access to confidential Company documents."  [D.E. 359 § II.A.1.(kk).] | DX-31. |

| 30. | Mr. Auerbach used profanity when discussing Dr. Eshelman, verbally expressing the sentiment that he wanted to "F*** him up." [D.E. 359 § II.A.1.(nn).] | Alan Auerbach Testimony; M. Ohanesian Tr. 165:16-166:10. |
|-----|---|---|
| 31. | Puma's Board had a meeting in the fourth quarter of 2015 during which the Board discussed Dr. Eshelman's Consent Solicitation. Puma's outside counsel, Latham & Watkins, was also in attendance. Mr. Auerbach was the only person who presented any information regarding Dr. Eshelman. Mr. Auerbach told Puma's Board that Dr. Eshelman was "not a major shareholder." "[T]here was no discussion about the possibility of supporting Dr. Eshelman's consent solicitation." [D.E. 359 § II.A.1.(oo).] | Alan Auerbach Testimony; PX-296; PX-297. |
| 32. | Puma's Board claimed that Dr. Eshelman's consent solicitation was an "unnecessary waste of time and a complete distraction of the company." [D.E. 359 § II.A.1.(pp).] | Alan Auerbach Testimony. |
| 33. | On December 23, 2015, Mr. Auerbach wrote an email to two Bank of America analysts, Ivan Farman and Bradley Wolff: "Im just getting warmed up. I'm gonna f*** this Eshelman guy up. Bad." [D.E. 359 § II.A.1.(ss).] | PX-181; DX-16. |
| 34. | On December 26, 2015, Mr. Auerbach wrote, "I never received my consent from Eshelman for his proxy. I am guessing that he sent it via snail mail with a snail that just got run over by a truck but is still limping along." [D.E. 359 § II.A.1.(tt).] | PX-180. |
| 35. | The 2008 Congressional hearing transcript that Mr. Auerbach read before writing the defamatory investor Presentation included testimony from Dr. Eshelman that PPD had "turned up the suspicion of blood splitting," that "Dr. Reynolds reviewed all of these cases, and I believe that Dr. Reynolds talked to someone at Aventis. I can't swear to that, but I believe that is true. I do know that the issue of blood splitting was discussed between the two companies." [D.E. 359 § II.A.1.(uu).] | PX-15; DX-6; Alan Auerbach Testimony. |
| 36. | The 2008 Congressional hearing transcript that Mr. Auerbach read before writing the defamatory investor Presentation included testimony from Special Agent West that when he "approached Dr. Campbell at her clinic and asked to speak with her, the first thing that came out of her mouth was I will not speak with you | PX-15; DX-6; Alan Auerbach Testimony. |

| | | |
|---|---|---|
| | unless I speak with Aventis personnel first." [D.E. 359 § II.A.1.(vv).] | |
| 37. | The 2008 Congressional hearing transcript that Mr. Auerbach read before writing the defamatory investor Presentation included the following:<br><br>MR. LOVELAND. The decision-making process that Aventis used to evaluate the warnings that Mrs. Cisneros and other PPD folks raised was illogical, ineffective. [D.E. 359 § II.A.1.(ww).] | PX-15; DX-6; Alan Auerbach Testimony. |
| 38. | The 2008 Congressional hearing transcript that Mr. Auerbach read before writing the defamatory investor Presentation included the following:<br><br>DR. BURGESS. But surely a big company like Aventis that is in the practice of doing these types of investigations, if there is a graphite titration, they should be able to pick that up, correct?<br><br>MR. LOVELAND. They hire PPD to pick it up, and PPD picked it up. PPD sent signals to Aventis. They were loud signals, they were bright signals, and they were repetitive signals. Aventis should have known. [D.E. 359 § II.A.1.(xx).] | PX-15; DX-6; Alan Auerbach Testimony. |
| 39. | The 2008 Congressional hearing transcript that Mr. Auerbach read before writing the defamatory investor Presentation included testimony from Special Agent West that he was convinced that Aventis should be criminally investigated "based on what I was observing, not only in Kirkman-Campbell's clinical trial, but also my interviews of PPD personnel, along with Aventis personnel. And I felt at the time that it was sort of like blatant disregard for information that they were receiving from the field and providing to the FDA." [D.E. 359 § II.A.1.(yy).] | PX-15; DX-6; Alan Auerbach Testimony. |
| 40. | In the 2007 Congressional hearing that Mr. Auerbach was aware of before writing the defamatory investor Presentation, Ms. Cisneros identified the PPD employees who had diligently reported Dr. Kirkman-Campbell's fraud or were otherwise on notice of Dr. Kirkman-Campbell's fraud. She did not identify or mention Dr. Eshelman. [D.E. 359 § II.A.1.(zz).] | DX-5; PX-135;<br>Alan Auerbach Testimony. |
| 41. | In her February 13, 2007 written statement to Congress, Ms. Cisneros underlined the word | DX-5; PX-135. |

| | | |
|---|---|---|
| | "Aventis" in the following sentence: "what brings me here today is my disbelief at Aventis' statements that it did not know that fraud was being committed. Mr. Chairman, I knew it, PPD knew it, and <u>Aventis</u> knew it." [D.E. 359 § II.A.1.(aaa).] | |
| 42. | In the Presentation, Mr. Auerbach edited Ms. Cisneros's statement to omit the reference to Aventis. [D.E. 359 § II.A.1.(bbb).] | DX-5; PX-135; PX-42; Alan Auerbach Testimony. |
| 43. | Although Ms. Cisneros had identified the specific employees of PPD who "diligently reported the fraud" or were otherwise on notice of the fraud and never mentioned Dr. Eshelman, in the Presentation, Puma identified only a single member of **PPD management**—Dr. Eshelman—and then claimed that "[Dr.] Eshelman denied . . . that fraud had occurred . . . despite Cisneros' e-mail to **PPD management** summarizing fraudulent practices and 'red flags,'" while omitting the names of the individuals Ms. Cisneros had identified to Congress. [D.E. 359 § II.A.1.(ccc).] | DX-5; PX-135; PX-42; Alan Auerbach Testimony. |
| 44. | Although Mr. Auerbach knew that Ms. Cisneros had left PPD shortly after the March 2002 teleconference with Aventis and had no knowledge of what happened after the teleconference with Aventis, Mr. Auerbach likewise omitted that information from the Presentation. [D.E. 359 § II.A.1.(ddd).] | PX-15; DX-6; PX-42; Alan Auerbach Testimony. |
| 45. | The final version of the Presentation that Puma published contains no references or hyperlinks to any of the various articles (that were in Mr. Auerbach's possession before the Presentation was published) regarding Dr. Eshelman's promotion from CEO of PPD to Executive Chair of PPD's Board in 2009. [D.E. 359 § II.A.1.(eee).] | PX-42. |
| 46. | The final version of the Presentation that Puma published does not disclose that Puma itself hired PPD to provide services related to regulatory compliance and pharmaceutical development—the same type of services that PPD rendered to Aventis during the Ketek clinical trial. [D.E. 359 § II.A.1.(fff).] | PX-42. |
| 47. | In the slides leading up to Slide 12 where Puma asserted that "Eshelman Continues to Demonstrate a Lack of Integrity" and "Eshelman's misrepresentations are no surprise given his history," Puma claimed that "[t]hroughout this process, | PX-42; M. Ohanesian 57:5-19. |

| | | |
|---|---|---|
| | *Eshelman* has been . . . misleading in his interactions with us, including by misrepresenting his stock ownership" and that "*Eshelman* represented to Puma that he owned more than 3% and less than 5% . . . of Puma stock. When he filed his consent solicitation statement, it was revealed that this was not even close to the truth[.]" Before publishing these statements, Puma knew that an *attorney*—not Dr. Eshelman—had "made a *mistake in the calculation*" of Dr. Eshelman's shares "and it was not 3 to 5 percent; it was .3 percent" and that Dr. Eshelman himself had never personally made any representations to Puma about his shares. [D.E. 359 § II.A.1.(ggg).] | |
| 48. | By January 6, 2016, Puma learned that shareholders owning more than 80% of Puma's stock had revoked consents or affirmatively withheld consent to Dr. Eshelman's Consent Solicitation. [D.E. 359 § II.A.1.(hhh).] | PX-41; PX-200; Alan Auerbach Testimony. |
| 49. | When asked, "In researching the statements in the investor presentation, did you find any sources that said Dr. Eshelman was replaced as CEO of PPD because he had been forced to testify before Congress regarding PPD's involvement in the clinical trial?", Mr. Auerbach testified under oath as Puma's corporate representative, "That wasn't the point we were making" and did not identify a single source that said Dr. Eshelman was replaced as CEO of PPD because he had been forced to testify before Congress regarding PPD's involvement in the clinical trial. [D.E. 359 § II.A.1.(iii).] | Alan Auerbach Testimony. |
| 50. | During his deposition as Puma's corporate representative, Mr. Auerbach was asked: "In the course of working on the investor presentation, did you find any sources saying that Dr. Eshelman had been involved in clinical trial fraud?" He responded, "We weren't looking for any sources. That wasn't our point." [D.E. 359 § II.A.1.(jjj).] | Alan Auerbach Testimony. |
| 51. | On January 8, 2016, Mr. Auerbach emailed the defamatory Presentation to Bank of America analysts Ivan Farman and Bradley Wolff, writing, "I am not sure if you guys saw the presentation that we filed with the SEC yesterday as our updated investor presentation regarding the Eshelman matter. It is quite interesting reading especially the discussion on Eshelman that starts on slide 11." Mr. Wolff replied to Mr. Auerbach's email: "Don't mess with the the | PX-182. |

| | | |
|---|---|---|
| | [sic] bull if you can't take the horns." Mr. Auerbach replied:<br><br>The guy was involved in a clinical trial fraud. For the antibiotic Ketek one of the sites fabricated patient data. Yes[,] that's right[,] they fabricated the data. There were no patients. Eshelman ran PPD who was the CRO involved in the trial. FDA's Criminal Investigation office found out about it and Eshelman had to testify in front of Congress regarding the fraud. He denied any knowledge of it. The whistleblower in the case, who was a former PPD employee, said that not only did they know about the fraud but that they ignored her when she brought up her concerns. Seriously? This guy wants to be involved with public companies? Now you know why he [w]as fired as CEO of PPD and why he disappeared for 6 years.<br><br>[D.E. 359 § II.A.1.(lll).] | |
| 52. | While testifying as a corporate representative of Puma, Mr. Auerbach claimed that the only thing intended to be conveyed in the Presentation by pairing the bullet regarding Dr. Eshelman being "forced" to testify in 2008 about PPD's involvement in clinical trial and a sub-bullet saying that Dr. Eshelman had been "replaced" as CEO of PPD in 2009 was "a timeline" and that "[w]e were not trying to make a point that Eshelman was fired from PPD because of what happened with Ketek." [D.E. 359 § II.A.1.(mmm).] | Alan Auerbach Testimony. |
| 53. | In his January 20, 2016 letter to Puma, Dr. Eshelman expressly notified Puma that a United States Attorney had identified PPD as a victim of Dr. Kirkman-Campbell's fraud in the criminal indictment filed on July 24, 2008. [D.E. 359 § II.A.1.(nnn).] | PX-185; PX -188;<br>Alan Auerbach Testimony. |
| 54. | The indictment of Dr. Kirkman-Campbell is publicly available online via PACER. That indictment alleges that Dr. Kirkman-Campbell "devised a scheme and artifice to defraud Aventis and PPD, and to obtain money and property from Aventis and PPD by means | PX-1; West Tr. 37:3-9; 39:2-5. |

| | of false and fraudulent pretenses and representations." [D.E. 359 § II.A.1.(ooo).] | |
|---|---|---|