IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 7:16-cv-00018-D |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF ELIZABETH M. LOCKE, P.C.

1.      My name is Elizabeth ("Libby") M. Locke, and I am a founding partner of the law firm Clare Locke LLP.  I also serve as the co-lead trial counsel for Plaintiff Dr. Fredric N. Eshelman in the above-captioned case.  I submit this Declaration based on my personal knowledge in support of Dr. Eshelman's Motion for Attorneys' Fees.

2.      I am competent to make this declaration.  To the best of my knowledge, information and belief, all of the facts stated in this declaration are true and correct.  My declaration is based on a review of Clare Locke's time records and the invoices sent to Dr. Eshelman for this case, my personal knowledge and familiarity with the work performed by Clare Locke professionals at my direction and under my supervision, and my review of the record in this case.

*Background*

3.      Clare Locke is a boutique law firm in the Washington, D.C. metropolitan area with a primary focus on defamation matters and complex commercial litigation.  We litigate defamation cases in trial and appellate courts throughout the country.  We have a national practice.  In addition to North Carolina, we have worked on matters either in or involving clients across the country, including in Washington, D.C., Virginia, Maryland, Illinois, New York, New Jersey, Connecticut,

Massachusetts, California, Florida, Texas, Oklahoma, Washington, Oregon, Indiana, Colorado, Ohio, Nevada, Arizona, Idaho, Georgia, Louisiana, Tennessee, and Alabama. Our practice has also been sought out by international clients who have faced reputational attacks here in the United States. We have represented individuals and companies from numerous countries including the United Kingdom, Canada, France, Israel, China, Zambia, the Democratic Republic of Congo, Dubai, the Bahamas, St. Kitts, and Honduras. We have extensive experience representing clients against national print, broadcast, and online media outlets, including the *New York Times*, the *Wall Street Journal*, the *Washington Post*, *Rolling Stone*, *Bloomberg*, *Mother Jones*, the *Huffington Post*, the *New York Daily News*, *Forbes*, Simon & Schuster, NBC, ABC, CBS, The Oprah Winfrey Show, and the Dr. Oz Show.

4.     Although our Firm just celebrated its fifth anniversary last month, our Firm and its attorneys have earned a national reputation for the quality of the legal services we provide to our clients in defamation actions. For example, *Chambers USA* has recognized the other founding partner and my co-managing partner of Clare Locke, Thomas A. Clare, and me as among the most accomplished lawyers in our field. Both Tom and I are ranked as Band 1 global defamation/reputation management providers since 2016 in Chambers & Partners High Net Worth directory for the private wealth market. For his part, Tom is also ranked in the Chambers USA Guide for First Amendment litigation. We are particularly proud of these rankings and designations because many of the law firms ranked by Chambers for First Amendment litigation employ more than 350 lawyers, compared to our small boutique firm that currently employs nine lawyers. Separate from our Chambers rankings, Tom has been named a BTI Consulting Client-Service All-Star MVP six times, including multiple years in a row (2013-2017, and 2019). And Clare Locke's work and matters have been regularly featured in the news, including most recently

on ABC's *20/20*, CNN, and in *The Washington Post*, *The Wall Street Journal*, *The New York Times*, and *The American Lawyer*.

5.     Notwithstanding our small size, we routinely litigate against, or have matters adverse to, national Am Law 100 and 200 firms—most recently against Williams & Connolly, Kirkland & Ellis, Wilmer Hale, Gibson Dunn & Crutcher, Davis Wright Tremaine, and Ballard Spahr.  Although we charge clients lower hourly rates than these other firms against whom we litigate, we maintain the highest standards for our legal work.  And our results prove that we have the experience and skill to go toe-to-toe with these top-notch firms.

6.     I often call our Firm a Kirkland "spin-off."  Every Clare Locke partner spent the first years of their respective practices at Kirkland & Ellis LLP.  And while the Firm promotes many of the values that are common to large litigation powerhouses—*e.g.,* rigorous hiring criteria, producing high-quality work product, and delivering zealous, sophisticated advocacy for our clients—we also have the ability to staff cases in a manner that is more efficient than larger law firms.

7.     In most instances, Tom and I assign one associate and one junior partner to a particular matter to complete the day-to-day demands of any given case.  And this is the primary reason for our robust vetting process for employment candidates.  We rely on the experienced lawyers in our Firm to staff cases and provide premier legal services in impactful cases.  Although Tom and I typically argue dispositive motions, depose the key witnesses, and have an active role in the critical aspects of litigation, we manage our caseload by providing strategy and constant support and guidance to our more junior lawyers.

8.     While most of my time is dedicated to supervising complex defamation cases and reputation counseling, recent high-profile victories have required me to expend significant time

3

meeting with clients (or potential clients) in crisis and analyzing prospective libel and slander claims. This pre-litigation counseling and analysis takes a lot of time. Not all disputes involving reputational attacks are suitable for litigation; indeed, most are not. And Tom and I spend a considerable amount of time counseling clients and evaluating the risks associated with litigation to ensure that if we file defamation claims, we have a meaningful, realistic chance of success for our clients. Although Clare Locke's small size has allowed the Firm the flexibility to take on cases that are not suitable for larger, more expensive law firms in our market, the opportunity cost for taking on an expansive case such as this is considerable. It consumes the Firm's limited resources relative to the firms it litigates against, and it also limits the number of counseling matters we are able handle at any given time. This opportunity cost is crystallized where, as here, the Firm did not increase its hourly rates during the three years of litigation.[1]

9.      In addition to the opportunity cost of not taking on counseling matters as described above, it is also important to understand that there are few firms that are willing and/or able to take on a plaintiff-side defamation litigation matter. It has been my experience, having practiced in this area for more than a decade, that few Am Law 100 or 200 firms are able to take on these kinds of cases because individual plaintiffs are often not in a position to afford high hourly rates, and, more importantly, larger firms often have legal conflicts. As there is increasing corporate consolidation and ownership of the media, large firms often have legal conflicts (or at minimum positional conflicts where they handle defense-side work) that preclude this kind of plaintiff-side work.

10.      Plaintiff-side firms, for their part, are also often unwilling to take on defamation cases because they do not readily lend themselves to pure contingency-fee agreements. Defamation actions, more so than many other types of contract or tort-based claims, have more

---

[1] For the first few months of this case, Ms. Meier's rate was $565; her hourly rate increased to $585 when she was elected to the partnership in June 2016.

substantive and procedural hurdles to overcome before they may be submitted to a jury for adjudication. For example, defamation claims often have only a one-year (or at most a two-year) statute of limitations, which requires a plaintiff to make a determination regarding whether to bring claims relatively soon after the publication of the falsehoods—sometimes long before the full extent of the plaintiff's economic damages is known. In addition, many states (approximately half) have anti-SLAPP statutes, or "Strategic Lawsuits Against Public Participation," that impose heightened pleading and evidentiary burdens (often akin to a summary judgment standard) before a plaintiff may seek or obtain discovery. And where a plaintiff successfully overcomes a SLAPP motion, there is often, as there was in this case, an immediate appeal (whether proper or not) of the denial of a SLAPP motion. In the age of internet defamation, it is also easy for a case to be dismissed or have other negative consequences imposed if the appropriate venue and jurisdiction is not selected.

11. Apart from these procedural hurdles, there are also substantive ones. The First Amendment and state common law—that is highly protective of speech—impose various defenses and protections not seen in other contexts. For example, whether the statement is opinion, capable of a defamatory meaning, hyperbole, or immune from defamation liability due to numerous privileges (like the fair report or judicial proceedings privileges). And, of course, a public figure is obligated to prove the defendant acted with actual malice by clear and convincing evidence— and prove at summary judgment that there is enough circumstantial evidence that a jury could reach such a conclusion. Moreover, the value of an individual's reputation is exceedingly difficult to quantify, which is why, for example, the North Carolina pattern jury instructions recognize that "[d]etermining the amount of presumed damages is not a task [that] can [be] complete[d] with mathematical precision and is one which unavoidably includes an element of speculation." [D.E.

386].

12.     As a result of all of these reasons (and others), defamation cases are not easily adjudicated to jury verdict, and many firms will not litigate them at all—much less on a purely contingent basis.  Given these reasons, Clare Locke most often charges clients on a pure hourly basis, as it did in this case.

13.     Clare Locke's hourly rates for Dr. Eshelman's matter are reflected below:

| Professional | Class | Rate |
|---|---|---|
| Thomas A. Clare, P.C. | Attorney, 1995 | $710 |
| Elizabeth M. Locke, P.C. | Attorney, 2005 | $610 |
| Megan L. Meier | Attorney, 2008 | $585[2] |
| Joseph Oliveri | Attorney, 2008 | $565 |
| Daniel P. Watkins | Attorney, 2012 | $400 |
| Audrey Rabenberg | Attorney, 2016 | $325 |
| Steven Harrison | Attorney, 2017 | $325 |

14.     Clare Locke and Dr. Eshelman agreed on the foregoing rate schedule in January 2016, less than two years after Tom and I started the Firm in March of 2014, and before the Firm had achieved its most high-profile success—a $3 million jury verdict on behalf of our client, University of Virginia Associate Dean Nicole Eramo, in a public figure defamation action against *Rolling Stone* magazine arising out of the now-retracted *A Rape on Campus* article. But in 2019, Clare Locke commands hourly rates that are considerably higher than what the Firm charged Dr. Eshelman—from 1.5 to 1.75 times greater depending on the complexity and significance of the case.

---

[2] For the first few months before Ms. Meier became a partner in June 2016, Dr. Eshelman was billed a lower rate of $565 per hour for her time.

15.     Demand for Clare Locke's legal services has increased in Washington, D.C., and throughout the country, following a string of legal victories—both inside and outside the courtroom—beginning shortly after filing the complaint in this case.

16.     As co-lead trial counsel for Dr. Eshelman, I have assumed responsibility for submissions to the Court and reviewed and substantively edited pleadings filed with the Court, from the Complaint to the post-judgment motions.  Below, I set forth my relevant professional qualifications and those of Clare Locke attorneys Thomas A. Clare, P.C., Joseph Oliveri, Steven Harrison, and Audrey Rabenberg.

17.     After graduating from Georgetown University Law Center, *cum laude*, in 2005, I clerked on the U.S. Court of Appeals for the Fifth Circuit before joining Kirkland & Ellis LLP as a litigation associate.  I worked at Kirkland & Ellis for nine years and was elevated to a partner of the firm in 2011.  In 2014, I left Kirkland to start Clare Locke LLP with Thomas A. Clare, P.C., and we have experienced incredible success in a relatively short period of time.

18.     In the last five years, the Firm and I, personally, have litigated defamation matters throughout the country and provided strategic reputation counseling for clients across the globe. Prior to this case, in November 2016 I served as co-lead trial counsel in our defamation action against *Rolling Stone* magazine described above.  That case was significant because it was one of the highest-profile, public-figure defamation actions to be litigated to verdict in the last decade.  In September of 2018, I also represented former Alaska Governor and Republican Vice-Presidential nominee Sarah Palin as lead appellate counsel before the U.S. Court of Appeals for the Second Circuit in connection with Ms. Palin's defamation lawsuit against the New York Times.  Outside of the courtroom, my clients include CEOs, hedge fund managers, members of the U.S. Congress and state-level politicians, high-profile journalists, movie producers and photographers, and other

7

high-profile or high-net worth individuals who face reputational attacks by virtue of their public profile.

19. Earlier in my career I was an adjunct professor at the George Washington University Law School, where I taught first year law students their fall and spring semester research, writing and oral advocacy classes: *Legal Research & Writing* and *Introduction to Advocacy*. In addition, I am an Adjunct Professor at Georgetown University Law Center where I teach *Law In A New Media World*, and I have been a guest lecturer for trial advocacy and First Amendment courses at Georgetown University Law Center, Columbia Law School, and The Columbus Law School at Catholic University. I routinely speak on industry panels concerning libel laws and the First Amendment. A copy of my biography from the firm's website is attached as **Exhibit A**.

20. Thomas A. Clare, P.C. is the other named, managing partner at Clare Locke. He graduated from the University of Notre Dame Law School in 1995, where he was Editor-in-Chief of the *Notre Dame Law Review*. Following law school, he served as a law clerk to the Honorable Kenneth F. Ripple on the U.S. Court of Appeals for the Seventh Circuit. When Tom completed his clerkship, he joined Kirkland & Ellis as an associate in 1996. In 2001, he was elected to the partnership. At the time he left Kirkland & Ellis to start Clare Locke, he was an equity partner.

21. Tom has twenty-three years of experience handling complex litigation and defamation matters for clients. He has served as an instructor and lecturer for various litigation training programs and CLE programs in Washington, D.C., he has spoken at federal judicial conferences, and he has periodically taught classes at the University of Notre Dame Law School. Mr. Clare is also an adjunct professor of law at Georgetown University Law Center where he teaches *Law In A New Media World*, a course focused on emerging trends in defamation and

privacy law. Tom is a member of the Virginia Bar, and he regularly practices in the Fourth Circuit and other federal courts around the country. While at Kirkland & Ellis, Tom was featured on The National Law Journal's "Defense Hot List" following the successful outcome he achieved as trial counsel for Nationwide Insurance Company in the first, precedent-setting Hurricane Katrina insurance coverage case to go to trial. Tom is best known, however, for representing high-profile clients who are targeted in hostile media investigations or are the subject of false statements in the press. Tom, while at Kirkland and now at Clare Locke, has handled defamation matters for Fortune 100 companies and prominent individuals, including CEOs, hedge-fund managers, university presidents, professional athletes and sports teams, celebrities, journalists, military officials, and other high-profile individuals. Tom was also co-lead trial counsel for Nicole Eramo in her defamation action against *Rolling Stone* described above.

22. Megan Meier became a partner at Clare Locke in June 2016. After graduating from the University of Michigan Law School in 2008, she started her career at Kirkland & Ellis. She worked at Kirkland until joining Clare Locke in 2014, just one week after Tom and I founded the Firm. Megan has been critical to Clare Locke's success, and she manages matters in federal and state courts. In 2018, Megan's work led to an unprecedented and highly-publicized $3.375 settlement, retraction, and public apology from the Southern Poverty Law Center based on false statements the organization made concerning one of Clare Locke's valued clients, Maajid Nawaz. Tom and I selected Megan to be the day-to-day manager of the discovery and motions practice in this case, providing her strategic guidance throughout the litigation.

23. Joseph Oliveri is a partner at Clare Locke whose practice focuses primarily on defamation at the trial and appellate levels. In 2008, Joe graduated, with highest honors, from The George Washington University of Law School. He was Order of the Coif and the Managing editor

of The George Washington Law Review. After clerking on the United States Court of Appeals for the Fifth Circuit, Joe joined Kirkland & Ellis, where he was elected to the partnership before joining Clare Locke. He is a seasoned and accomplished litigator—he played a key role in the 2016 victory against *Rolling Stone*—and he spends most of his practice representing individuals and companies facing high-profile reputational attacks.

24.     Audrey Rabenberg is a 2016 graduate of the University of Notre Dame Law School, who started her legal career at Clare Locke. She was a summer associate with Clare Locke in 2015, and she worked as an associate at Clare Locke where she provided critical support during pre-trial discovery.

25.     Steven Harrison—a 2017 graduate of the University of Notre Dame Law School—also started his career at Clare Locke, first as a summer associate in 2016, and then joining the firm as an associate in 2017. Steven Harrison is now in his second year of practice since graduating from law school, but his experience in the short time he has been with the Firm is significant given his seniority. Dr. Eshelman's matter is the second trial he has played a significant role in since joining the firm—as he was one of two associates who was involved in a week-long arbitration involving a dispute against a party represented by Gibson Dunn & Crutcher. Mr. Harrison has experience working on high profile cases, and he was instrumental in Clare Locke securing an unprecedented $3.375 million settlement, retraction, and public video apology from the Southern Poverty Law Center for statements in the organization's *Field Guide to Anti-Muslim Extremists*.

26.     Several paralegals also assisted with this case, primarily to assist with cite-checking, and document and transcript management. The paralegals monitored filings in this case and conducted factual research regarding witnesses and the underlying facts of this case. In addition to that more traditional paralegal work, our paralegals also provided trial support more

traditionally outsourced to an expert vendor—including preparing advanced graphics and utilizing trial software for demonstratives and displaying documentary evidence and witness deposition testimony for the jury.

27.     Ms. Ise Tiapula is a paralegal at Clare Locke who was the managing paralegal on this case, her fourth multimillion-dollar litigation trial or arbitration in three years. Before joining Clare Locke, Ms. Tiapula worked at large law firms handling complex litigation for more than 9 years. She was a critical member of Clare Locke's trial team and her audio-visual capabilities permitted the Firm to conduct many presentation tasks in-house, thus saving Dr. Eshelman significant costs associated with graphics professionals. Ms. Tiapula's particularized experience positions her in the highest tier of paralegals practicing in Washington, D.C., making the request of $229.15 per hour more than reasonable in this case.

28.     In the lead up to trial, Ms. Tiapula worked closely with Clare Locke litigation paralegal Ms. Kayla Cardoza. Ms. Cardoza, too, has many years' experience supporting litigation teams that are preparing for trial, including in-house for a national property and auto insurer. Ms. Cardoza recently completed additional training, and Clare Locke's trial team relied heavily on her expertise designing visual aids and utilizing specialized software to aid the jury in viewing graphics, documentary evidence, and deposition testimony.

29.     Clare Locke billed Dr. Eshelman at the 2016 rates set forth above throughout the duration of this case, even though its hourly rates increased significantly since that time. Clare Locke attorneys record their time in billing entries that are compiled together with applicable expenses, and subsequently invoiced to Dr. Eshelman for payment. Over the last three years, Dr. Eshelman has scrutinized and paid the invoices Clare Locke has issued in a timely fashion. To date, Dr. Eshelman is not—and to my recollection has never been—delinquent in paying Clare

Locke's invoices.

30.     In addition to the facts set forth in this declaration and the declarations of Ms. Meier and Mr. McVey, Dr. Eshelman has retained Bruce W. Sanford as an expert to opine on the reasonableness of fees that Dr. Eshelman incurred.  Mr. Sanford is considered one of the country's leading First Amendment attorneys.  During his career, he has defended hundreds of libel cases for publishers, media companies, and corporations.  A graduate of New York University School of Law, Mr. Sanford is a partner at BakerHostetler LLP in Washington, D.C.  Mr. Sanford authored the leading legal treatise in the field of defamation: *Libel and Privacy* (2004).  According to the Reporter's Committee for Freedom of the Press, a leading organization dedicated to protecting First Amendment freedoms and the newsgathering rights of journalists, Mr. Sanford's reputation in the field of First Amendment litigation is peerless.  The American Journalism Review has described him as one of the most accomplished press lawyers in the nation, and The National Law Journal has included him among its list of the 100 most influential lawyers in America.

31.     I have come to know Mr. Sanford's work, having litigated against him in the past. He is not just a worthy adversary; his skill, experience, and knowledge of First Amendment jurisprudence is unparalleled among the media defense bar.

32.     Throughout his career, Mr. Sanford has gathered knowledge concerning the hourly rates for attorneys' fees, specifically in defamation cases, charged by national and local counsel. He has represented parties in the midst of fee litigation, and federal and state courts have relied on his extensive knowledge of appropriate fee awards in defamation cases.  Mr. Sanford's declaration confirms that the hourly rates charged to, and the total fees incurred by, Dr. Eshelman in this litigation were reasonable and necessary.

12

## The Litigation

33.     Clare Locke filed this lawsuit on behalf of Dr. Eshelman on February 6, 2016 and has represented Dr. Eshelman without interruption on this matter since its inception.

34.     But even before filing this lawsuit, Clare Locke was mindful of the costs associated with this important case.  During each step of the way, counsel for Dr. Eshelman attempted to narrow the scope of the parties' dispute, pursue settlement negotiations where possible,[3] and suggest approaches of discovery that limits, rather than expands, Dr. Eshelman's attorneys' fees. For example, some of the measures Clare Locke took to limit the hours and fees include:

- Billing rates that are reduced from Clare Locke's current hourly rates for each of the Clare Locke attorneys who worked on this matter;

- Attempting to engage in informal discovery to narrow the scope of formal discovery;

- Judiciously staffing the case, and limiting primary responsibilities to one partner, one associate, and one paralegal;

- Employing contract attorneys who bill at a significantly lower rates than Care Locke's most junior lawyers to assist with document review; and

- After Puma refused to narrow the issues voluntarily, successfully petitioning the Court for relief and filing a number of motions *in limine* to substantially lower the scope and length of trial, in an attempt to be a good steward of the Court's time.

35.     As evidenced by the Court's docket and as described in the Memorandum in Support of Dr. Eshelman's Motion for Attorneys' Fees and Ms. Meier's Declaration, from the

---

[3] Dr. Eshelman and counsel spent more than $75,000 in preparation for the parties' agreed settlement mediation that proved unsuccessful.

Case 7:16-cv-00018-D   Document 405-2   Filed 04/08/19   Page 13 of 22

outset, Puma refused to admit facts that we have since learned were in Puma's possession from before the case was filed—a tactic that persisted for years and drove up the cost of this litigation.

36.     The jurisdictional discovery and dispute described in our memorandum—which would not have been necessary if Puma had stipulated to jurisdiction at the outset of the case rather than only after years of litigation—cost Dr. Eshelman approximately $221,000 in attorneys' fees.

37.     Discovery was a substantial undertaking in this case for several reasons. *First*, in our experience successfully litigating public-figure defamation cases requiring a showing of actual malice, it is critical to obtain broad discovery of the circumstantial evidence bearing on the information available to the defendant and the defendant's motives because actual malice is a subjective inquiry into a defendant's state of mind. In response to our document requests, Puma produced over 454,300 pages of documents. Where, as in this case, the defendant is a corporation, that inquiry was made even more burdensome because there were several people at Puma involved in the process of discussing and responding to Dr. Eshelman and researching, drafting, approving, and publishing the Investor Presentation, including Alan Auerbach, Mariann Ohanesian, and Puma's Board of Directors (including Frank Zavrl).

38.     *Second*, Puma is in California and key information was in the possession of third parties who live in various states across the country. While Mr. Auerbach, Ms. Ohanesian, and Mr. Eyler were deposed in California, Puma director Frank Zavrl was deposed in Boston where he lives and then—when the Court reopened his deposition—was deposed in California (at Puma's request because he was there for a board meeting). Special Agent West, Ann Marie Cisneros, and Judd Hartman—the witnesses with knowledge about what happened on the Ketek clinical trial— were deposed in Tennessee and North Carolina. Phillip Gross was deposed in Boston where he lives.

39. *Third*, as evidenced by the Court's docket and discovery orders and as further described in the Memorandum in Support of Dr. Eshelman's Motion for Attorneys' Fees and Ms. Meier's Declaration the cost of discovery in this case was driven up by the fact that Puma refused to comply with its discovery obligations without court intervention, concealed key documents, and denied facts it knew to be true, only to stipulate or admit to those facts after years of litigation.

40. For example, as evidenced on the Court's docket and described in the Memorandum in Support of Dr. Eshelman's Motion for Attorneys' Fees and Ms. Meier's Declaration, Puma's improper withholding of the responsive board materials (including the Latham & Watkins presentation) required a time-consuming meet-and-confer process, multiple rounds of discovery briefing, the re-opening of two depositions in California, and supplemental briefing on summary judgment. Dr. Eshelman incurred $122,673 in attorneys' fees in connection with reopening the depositions and submitting supplemental summary judgment briefing.

41. In the years leading up to trial, Puma's litigation strategy followed the same general pattern: refusals to comply with discovery obligations and baseless denials of facts, followed by costly meet-and-confer letters and/or motions practice, culminating in belated admissions and disclosures. (Meier Decl. *passim*.) In all, Dr. Eshelman incurred attorneys' fees totaling $1,368,147 in connection with discovery.

42. Dr. Eshelman's legal team performed more than 7,000 hours of work on this litigation through March of 2019, and paralegals worked an additional 2,272 hours. This Petition does not seek reimbursement for any of the time that was not actually billed to Dr. Eshelman. Dr. Eshelman has also excluded the fees he incurred before Puma filed responsive pleadings to his Complaint.

43.     From the beginning of this case, Clare Locke associated with Andrew McVey, a partner at Murchison, Taylor & Gibson PLLC, who served as local counsel.  Mr. McVey billed at an hourly rate of $280 in 2016, $290 in 2017, $300 in 2018, and $310 in 2019.  Dr. Eshelman paid a total of $42,521.50 for 142.1 hours of Mr. McVey's labor.

44.     Dr. Eshelman asks the Court to award $3,075,897.85 to reimburse his attorneys' fees and return him to the position that he was prior to trial.  But the gross value of fees that Dr. Eshelman has incurred is significantly higher. In total, Dr. Eshelman's legal professionals billed $3,660,214.95 in fees in connection with this case.  A summary of those fees is set forth below:

### TABLE 1 – GROSS HOURS BILLED

| January 2016 – March 15, 2019 | | | |
|---|---|---|---|
| Clare Locke Attorneys | Hours Billed | Rate | Value |
| Thomas A. Clare, P.C. | 298.50 | $710 | $211,935.00 |
| Elizabeth M. Locke, P.C. | 613.20 | $610 | $374,052.00 |
| Megan Meier | 1595.75 | $585[4] | $930,398.75 |
| Joseph Oliveri | 120.75 | $565 | $68,223.75 |
| Daniel Watkins | 2122.65 | $400 | $849,060.00 |
| Audrey Rabenberg | 836.75 | $325 | $271,943.75 |
| Steven Harrison | 711.75 | $325 | $231,318.75 |
| Attorneys < 120[5] | 125.50 | various | $44,305.00 |
|  |  |  |  |
| Law Clerks | 318.15 | $300 | $95,445.00 |
| Paralegals | 2,272.50 | blended rate of $229.15 | $520,741.25 |

---

[4] For the first few months of this case, Ms. Meier's rate was $565; her hourly rate increased to $585 when she was elected to the partnership in June 2016 (*see* infra n. 1).

[5] Dr. Eshelman is not seeking reimbursement for fees corresponding to lawyers that spent fewer than 120 hours working on this case.  Because of Clare Locke's size and limited capacity, from time to time, lawyers who are not specifically assigned as primary attorneys on cases may assist with discrete tasks and discuss strategy or otherwise provide support.

| | | | |
|---|---|---|---|
| Andrew McVey | 142.10 | $280-$310 | $42,521.50 |
| Contract Attorneys | 471.40 | $43.00 | $20,270.20 |
| | | | |
| **Total Gross Hours & Fees** | **9,629** | | **$3,660,214.95** |

45.     I was the partner primarily responsible for reviewing each month's bill.  Upon preparing Dr. Eshelman's invoice each month, I looked at the specific work performed by each attorney and paralegal and compared their individual time and the total amount of time and fees the Firm billed to Dr. Eshelman.  Frequently I would provide a "below the line" percentage discount—from 10-20%—on the Firm's fees for attorney labor.  I did so to exercise sound billing judgment, taking into account the overall work accomplished for the client that particular month, the efficiency with which the Firm's attorneys and paralegals completed those tasks, the extent to which any time was spent due to any technological errors, any wins or setbacks in the case, any administrative work performed by our paralegals, any time associated with an attorney doing background reading or research to get up to speed on the case, and a variety of other factors.  Over the course of the case, the Firm voluntarily elected not to bill Dr. Eshelman a total of $383,835.85 in fees associated with attorney and paralegal time.

46.     ***Moreover,*** Dr. Eshelman is not seeking several categories of fees from the total amount of attorneys' fees that he has actually incurred.  Specifically, Dr. Eshelman does not request reimbursement for: (1) $60,731.25 in fees he incurred for work that lawyers and paralegals completed before Puma filed its Motion to Dismiss on April 4, 2016; (2) $44,305 in fees associated with Clare Locke attorneys who worked fewer than 120 hours on this litigation; and (3) $95,445 in fees for work completed by Clare Locke's law clerks.  These exclusions, together with the amount the Firm voluntarily elected not to bill Dr. Eshelman, have reduced Dr. Eshelman's total

fees by a total of $584,317.10 ("Excluded Fees"), or approximately 16%:

**TABLE 2 – EXCLUDED FEES**

| | |
|---|---|
| Attorney and Paralegal Hours Billed before April 4, 2016 | $60,731.25 |
| Attorneys < 120 Hours | $44,305 |
| Law Clerks | $95,445 |
| Voluntary Below-the-Line Write-Off | $383,835.85 |
| **Total Excluded Fees** | **$584,317.10** |

47.     Clare Locke subtracted these Excluded Fees ($584,317.10) from his Gross Fees ($3,660,214.95) to identify the amount of fees ($3,075,897.85) for which he now seeks reimbursement.  This calculation is depicted in Table 3:

**TABLE 3 – TOTAL REQUESTED FEES**

| | |
|---|---|
| Gross Fees | $3,660,214.95 |
| Excluded Fees | ($584,317.10) |
| Total Requested Fees | $3,075,897.85 |

48.     The fees set forth above were necessary to successfully prosecute Dr. Eshelman's defamation claims against Puma.  Multiple cases in other jurisdictions have upheld the reasonableness of Clare Locke's attorneys' rates and the overall fees that they have charged. Nearly eight years ago, the U.S. District Court for the Eastern District of Virginia deemed Mr. Clare's $700 hourly rate to be reasonable, and the court also awarded attorneys' fees for work that I completed as a fifth-year associate billing $500 per hour.  *See Vienna Metro LLC v. Pulte Home Corporation*, Case No. 1:10-cv-00502 [D.E. 263] (E.D. Va. filed Aug. 24, 2011).

49.     A separate Virginia state circuit court awarded the full amount of fees requested in a Clare Locke motion for attorneys' fees; specifically finding that my hourly rate of $610—the same amount Dr. Eshelman seeks here—was reasonable.  *See Clare Locke v. Ribiero, et al.* No.

CL16001154 (Va. Cir. Ct. May 10, 2017).

I declare under penalty of perjury under the laws of the United States that the foregoing is correct.

Executed this 8th day of April 2019, in Alexandria, Virginia.

By: _____

Elizabeth M. Locke, P.C.

# Exhibit A



libby@clarelocke.com
Direct Dial: (202) 628-7402

---

### ADMISSIONS

Supreme Court of the United States
Commonwealth of Virginia
District of Columbia

---

### EDUCATION

Georgetown University Law Center,
  J.D., *cum laude*, 2005
New York University,
  B.A. *cum laude*,
  Politics and Economics, 2001

---

### TEACHING

Adjunct Professor,
  George Washington University
Guest Lecturer,
  Georgetown University Law
  Center, *Law In A New Media World
  Trial Practice*
Guest Lecturer,
  Catholic University School of Law,
  *Trial Practice*

---

### PUBLICATIONS AND PRESENTATIONS

CLE Program,
  *Managing a Hostile Press*
Panelist, Georgetown Law Center
  *Actual Malice and the Private Plaintiff*
Featured Speaker,
  IFRA 2012 Fall Meeting

# Elizabeth M. Locke, P.C.

Libby is a highly accomplished defamation lawyer and commercial litigator who devotes her practice to representing clients facing high-profile reputational attacks and litigating complex business disputes.

Libby has extensive experience representing clients in defamation matters adverse to national print, broadcast, and online media outlets—and she routinely advises clients who are dealing with the media in crisis situations. She has litigated high-profile libel and slander cases and—both in and outside of the litigation process—has obtained prominent corrections, retractions, and apologies for her clients. In the courtroom, Libby was lead trial counsel for Nicole Eramo in a defamation action against *Rolling Stone* magazine, securing a $3 million jury verdict for the false and defamatory article about an alleged gang-rape at the University of Virginia. She is also actively litigating matters against CNN, Bloomberg, Katie Couric, and Anderson Cooper. Outside the courtroom, some of Libby's biggest defamation "wins" are stories the public will never hear about; she has killed flawed articles and broadcast segments in outlets including *The New York Times, Vanity Fair* and *The Dr. Oz Show.*

As a former partner at one of the nation's premier law firms, Libby also has extensive experience handling complex business disputes in state and federal courts around the country. Libby has litigated class actions, mass actions, data breaches, agent compensation issues, hurricane and catastrophe coverage issues, associational standing cases, efforts by the media to intervene and unseal confidential documents and information, internal leak investigations, securities matters, RICO, and construction matters. As a former law clerk on the U.S. Court of Appeals for the Fifth Circuit and mentee of senior appellate litigation partners at Kirkland, Libby has extensive experience handling appeals and amicus briefs in the federal Courts of Appeals, the United States Supreme Court and the Virginia Supreme Court.

Libby is ranked in the category of global defamation/reputation management providers in the inaugural *Chambers HNW 2016* directory for the private wealth market. In 2014 and 2016, she was named a "Rising Star" by Super Lawyers magazine. Libby and her work are regularly featured in the news, including most recently on ABC's *20/20,* CNN, and in *The Washington Post.*