IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 7:16-cv-00018-D |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DECLARATION OF MEGAN L. MEIER</u>

1.      My name is Megan L. Meier, and I am a partner in the law firm Clare Locke LLP.  My business address is 10 Prince St., Alexandria, Virginia 22314.

2.      I served as trial counsel for Dr. Fredric N. Eshelman in this case, and I submit this Declaration based on my personal knowledge in support of his Motion for Attorneys' Fees based on my personal knowledge.  I am personally familiar with the work performed by the attorneys and other professionals at Clare Locke in connection with this case.

3.      I received my B.A. from the University of Michigan in 2003.  I graduated with a J.D. from the University of Michigan Law School in 2008.  I started my legal career at Kirkland & Ellis LLP, where I remained for six years.  At Kirkland & Ellis, I worked on assorted defamation matters with the founding partners of Clare Locke (who were then partners at Kirkland & Ellis), as well as other complex commercial litigation including securities litigation, high-profile business disputes involving publicly-traded companies, and insurance litigation.  I joined Clare Locke as a senior associate in 2014, the week after the firm was founded.  I became a partner at Clare Locke in June 2016.

4.      As a partner at Clare Locke, I am responsible for managing matters in a variety of federal and state jurisdictions across the country, from pre-suit counseling to verdict and, to a lesser extent, appeal.

5.      I recently represented—and helped achieve a confidential settlement on behalf of—a client

in a multi-million dollar dispute with a space tourism company (represented by Williams & Connolly LLP) that warranted that it had the rights from the Russian Federal Space Agency to provide private space tourists with a flight around the moon.[1]   Last year, I spearheaded an unprecedented and highly-publicized $3.375 million settlement, retraction, and public apology from the Southern Poverty Law Center (represented by Ballard Spahr LLP) based on false statements in the organization's *Field Guide to Anti-Muslim Extremists*.[2] I also played a key role on the trial team in the 2016 *Rolling Stone* defamation litigation, which resulted in a $3 million jury verdict in favor of our client.[3]

6.      Periodically, I teach continuing legal education courses on the law of defamation and the First Amendment.  *Super Lawyers* magazine has selected me as a "Rising Star" from 2016 through 2019.

7.      From the time I made partner until today, my rate in connection with this matter has been $585.[4]  Although this was the hourly rate Clare Locke charged Dr. Eshelman for my time after I became a partner in 2016, in the intervening years, my rate has increased because of our high-profile wins, which have substantially increased the demand for our legal services.  Nevertheless, we have continued to bill Dr. Eshelman at the rate of $585 per hour for my time.  I spent 1,555.25 hours on this case from April 4, 2016 – March 15, 2019, which represents 27% of my working hours over that 154-week period.[5]  This case

---

[1] Virginia Lawyers Weekly, *Space Tourist's Fraud and Breach Claims Survive Dismissal* (Jan. 9, 2018), *available at* https://valawyersweekly.com/2018/01/09/space-tourists-fraud-and-breach-claims-survive-dismissal/.

[2] Jack Crowe, *SPLC Apologizes, Pays Settlement to Islamic Reformer It Wrongly Labeled 'Anti-Muslim Extremist'*, NATIONAL REVIEW, (June 18, 2018), *available at* https://www.nationalreview.com/news/maajid-nawaz-splc-apologizes-settles-extremist-label/ ("It's a shame that it took impending litigation for the Southern Poverty Law Center to finally set the record straight and admit it was wrong all along," Megan Meier, a partner at Clare Locke — the law firm that represented Nawaz, said in a statement provided to National Review. "Quilliam and Mr. Nawaz do admirable work, and we are honored to have restored their reputations and achieved this victory on their behalf.")

[3] T. Rees Shapiro, *Jury Awards $3 Million in Damages to U-Va. Dean for Rolling Stone Defamation*, WASH. POST (Nov. 7, 2016), *available at* https://www.washingtonpost.com/local/education/jury-to-deliberate-damages-to-u-va-dean-in-rolling-stone-defamation-lawsuit/2016/11/07/e2aa2eb0-a506-11e6-ba59-a7d93165c6d4_story.html?utm_term=.2332faa08aa2; Julia Horowitz & Jill Disis, *Jury awards $3 million to UVA Administrator in Rolling Stone Defamation Case*, CNN BUSINESS (Nov. 7, 2016), *available at* https://money.cnn.com/2016/11/07/media/rolling-stone-defamation-jury-award/index.html.

[4] For the few months before I became a partner, Dr. Eshelman was billed a lower rate of $565 per hour for my time.

[5] The calculation of this percentage omits six weeks of maternity leave and four weeks for vacation over that 154-week period and is based on an assumption of a forty-hour workweek.  (154 weeks – 6 weeks of

precluded me from working as many hours as I otherwise would have worked on matters for other clients at the significantly higher hourly rate that I now command.

8.  I worked on nearly every aspect of this case, including (1) researching and drafting the complaint; (2) researching and briefing oppositions to Puma's numerous dispositive motions; (3) managing the discovery process, including by serving and responding to written discovery, repeatedly meeting and conferring with Puma's counsel, drafting and responding to numerous motions to compel, conducting and assisting with depositions; (4) managing the pretrial process, including by drafting and negotiating the stipulated facts and the rest of the Joint Pretrial Order, drafting and/or revising motions *in limine* and oppositions to same, revising and negotiating the joint proposed jury instructions and verdict forms, preparing witnesses, and drafting witness examination outlines; and (5) at trial, examining witnesses, selecting and presenting key video deposition testimony and exhibits, and assisting my partners with the strategy and management of the presentation of evidence to the jury.

### *Clare Locke's Efforts to Keep Dr. Eshelman's Attorneys' Fees Low*

9.  We attempted to limit the attorneys' fees incurred in this case in several ways.

10.  Where appropriate, I delegated work to attorneys who have lower billing rates than me. Mr. Watkins is an accomplished litigator and served as the senior associate on this case. After graduating from the University of Virginia School of Law, Mr. Watkins joined the law firm Williams Mullen Clark & Dobbins ("Williams Mullen") in October 2012. For the next four years, he worked in the litigation section, serving as the lead associate on numerous complex litigation cases in the Eastern District of Virginia and various state courts in Virginia and Maryland. Mr. Watkins tried numerous cases—as first and second chair—and he provided litigation support and managed discovery in dozens of federal cases and high-stakes criminal cases. From time to time, Mr. Watkins' practice included briefing intricate appellate issues and in 2015, he argued before the United States Court of Appeals for the Fourth Circuit. In addition to this

---

maternity leave – 4 weeks for vacation = 144 weeks; 144 weeks x 40 hours = 5760 working hours; 1555.25 hours on this matter / 5760 working hours = 27%.)

litigation work, his practice involved high-profile matters relating to reputation and crisis management. Some of Mr. Watkins' work has been featured in various national and international publications and he has developed a reputation as a formidable trial lawyer. He has been named a Rising Star by *Super Lawyers Magazine* every year since 2016 and has taught multiple CLE courses related to commercial litigation and various emerging issues in the law. Mr. Watkins joined Clare Locke in June 2016. He has represented public officials and high-profile individuals in defamation actions and has provided reputation counseling to individuals and corporations.

11.     On this case, Mr. Watkins defended the depositions of Dr. Eshelman's proposed nominees to Puma's Board of Directors and managed discovery and briefing relating to Puma's damages expert, Dr. Anil Shivdasani. He also helped manage written discovery, met and conferred with opposing counsel, supervised junior associates and paralegals, and participated in the mediation and settlement negotiations. Mr. Watkins provided substantial support to me in deposing Special Agent Robert West and to Mr. Clare in preparing Dr. Eshelman to testify at his deposition and at trial. Mr. Watkins also assisted with written discovery and pretrial briefing.

12.     Junior associates Steven Harrison (Notre Dame Law School, 2017) and Audrey Rabenberg (Notre Dame Law School, 2016) also assisted with written discovery and depositions. Mr. Harrison provided substantial assistance in reviewing and organizing the factual record, drafted the statements of undisputed facts in support of summary judgment briefing, conducted research, drafted assorted pretrial motions and briefs, assisted me in researching and drafting proposed jury instructions, assisted Ms. Locke in preparing to cross-examine Mr. Auerbach, and assisted Mr. Clare in preparing the opening statement and closing argument for trial.

13.     Puma produced over 450,000 pages of documents in this case. In order to cost-effectively process these documents, we engaged contract attorneys through Lexolution, LLC to assist with document review. The contract attorneys spent 471.40 hours reviewing documents at a rate of $43 per hour, for a

total of $20,270.20.[6]

14.    Clare Locke's attorneys and paralegals recorded their time and descriptions of the work they completed at or shortly after the time they performed the work.  Personally, I use an electronic billing timer to account for my work contemporaneously as I perform it.  Other attorneys at Clare Locke take notes regarding their work and enter their time and work descriptions into our billing platform on a regular basis.

15.    We submitted monthly invoices to Dr. Eshelman throughout the duration of this case.  I assisted Ms. Locke in reviewing invoices before they were sent to Dr. Eshelman.  In an exercise of billing judgment and based on our observations of the work performed and the amount of time that was appropriate to spend, we frequently wrote certain time down or gave Dr. Eshelman below-the-line discounts on the amount of fees billed for labor.  Dr. Eshelman's fee request does not seek reimbursement of any fees that were not actually billed to Dr. Eshelman.

### *Discovery*

16.    Much of the time-consuming and labor-intensive work on this case was done behind the scenes during discovery, a process which I primarily managed.

17.    I tried to contain costs at the outset of the case by negotiating a Joint Protective Order under which the parties agreed not to produce privilege logs with respect to documents that were being withheld on the basis of attorney-client privilege plus some other objection besides privilege.  I did this because there were voluminous privileged communications that occurred during the course of the proxy contest that had nothing to do with this case, and I did not believe that it was a good use of either parties' money for their attorneys to spend countless hours logging irrelevant privileged documents.  Puma agreed to that concept in the Joint Protective Order, which the Court entered on September 26, 2016.  [D.E. 59.]  Later however, Puma filed a motion seeking to compel us to prepare a privilege log of every privileged document relating to the proxy contest (including documents that had nothing to do with this case), forcing us to spend time briefing an issue that the parties had already spent time negotiating and agreeing to in the Joint Protective

---

[6] Lexolution, LLC Invoices for Contract Attorneys (Ex. 1).

Order.  [D.E. 74, 117, 118.]  The Court agreed with our position and denied Puma's Motion.  [D.E. 122.]

18.　　Because the events, parties, and third parties with knowledge about this case were scattered across the United States, discovery required numerous third-party subpoenas and depositions in several states, including North Carolina, California, Massachusetts, and Tennessee.  All told, the parties conducted twenty-two depositions.

19.　　In addition, Puma filed counterclaims against Dr. Eshelman which substantially broadened the scope of discovery until they were dismissed.  Based on Puma's counterclaims, we served interrogatories and document requests targeted at establishing the truth of the statements Dr. Eshelman had made about Puma.[7]

20.　　Discovery in this case involved:

| Served by Puma | Served by Dr. Eshelman |
|---|---|
| 20 Interrogatories | 10 Interrogatories<br>(2 of which related to Puma's counterclaims against Dr. Eshelman) |
| 52 Requests for Production | 117 Requests for Production<br>(50 of which related to Puma's counterclaims against Dr. Eshelman) |
| 336 Requests for Admission | 170 Requests for Admission |
| 9 Depositions | 13 Depositions |
| 13 Subpoenas | 22 Subpoenas |
| 454,321 Pages of Documents | 32,359 Pages of Documents |

21.　　Because Puma denied facts showing its actual malice and this Court's jurisdiction, we needed to pursue discovery to establish those facts.  At the beginning of the case, we served interrogatories and requests for documents evidencing Puma's actual malice and Puma's contacts with North Carolina.[8]

22.　　Puma refused to provide responses and filed a Motion to Stay Discovery, which the Court denied because it "lack[ed] merit."[9]  Only after I met and conferred with Puma's counsel and drafted and filed a Motion to Compel Jurisdictional Discovery and the Court ordered Puma to produce documents

---

[7] Feb. 24, 2017 Email from M. Meier to P. Sampson attaching Irogs 6-7 and RFPs 63-112 (Ex. 2).
[8] June 3, 2016 Email from M. Meier to P. Sampson, serving Dr. Eshelman's Irogs 1-5 and RPFs 1-62 (Ex. 3), at RFPs 14-18.
[9] Court Order [D.E. 40]; *see also* June 3, 2016 Letter from B. Bishop to M. Meier (Ex. 4) (refusing to respond to discovery requests while Puma's motions to dismiss remained pending); [D.E. 34].

relating to the jurisdictional question did Puma produce over 45,000 pages of documents evidencing Puma's contacts with PPD and other North Carolina contacts.[10]

23.    In an additional effort to keep Dr. Eshelman's attorneys' fees low, I delegated primary responsibility for reviewing the jurisdictional documents and drafting a supplemental brief (in opposition to Puma's motion to dismiss for lack of personal jurisdiction) to Mr. Watkins.  After Mr. Watkins and I spent substantial time seeking, obtaining and reviewing jurisdictional discovery and briefing the jurisdictional question, Puma ultimately stipulated, in the Joint Pretrial Order filed just before trial, that this Court did, in fact, have jurisdiction.[11]

24.    In drafting our interrogatories and document requests to Puma, we also focused on obtaining evidence to help establish Puma's actual malice, including, for example:

- the identity of the people who worked on or published the Investor Presentation and a detailed description of his or her participation (Irogs 1-2);

- the identity of "each person with whom Puma has communicated regarding Dr. Eshelman or PPD" and a description of "the circumstances and content of such communications" (Irog 3);

- the steps undertaken by Puma to assess the truth or falsity of Puma's statements about Dr. Eshelman (Irog 4);

- all documents reviewed in assessing the truth or falsity of Puma's statements about Dr. Eshelman in the Investor Presentation (RFPs 28-33, 35);

- documents relating to Dr. Eshelman, the Ketek clinical trial, PPD, Aventis Pharmaceuticals, Inc., Dr. Kirkman-Campbell, and the Investor Presentation (RFPs 1-13);

- the details of "every meeting, conversation, or call from July 2015 to the present in which Mr. Auerbach or Ms. Ohanesian participated and during which Dr. Eshelman or the Ketek clinical trial was mentioned, referenced, or discussed" (Irog 9);

- meeting minutes, presentations, and other materials associated with board meetings during which Dr. Eshelman was mentioned, discussed, or referenced (RFPs 19-25).[12]

25.    Puma objected to every one of our discovery requests, including with a host of meritless

---

[10] July 22, 2016 10:44 am Email from M. Meier to P. Sampson re Puma's Improper Objections to RFPs 14-18 (Ex. 5); [D.E. 57].
[11] See D.E. 20, 21, 22, 25, 28, 29, 31, 48, 49, 52, 55, 62, 63, 69, 359.
[12] June 3, 2016 Email from M. Meier to P. Sampson, serving Dr. Eshelman's Irogs 1-5 and RPFs 1-62 (Ex. 3); June 28, 2017 Email from M. Meier to P. Sampson, serving Dr. Eshelman's Irogs 9-10 (Ex. 6).

7

specific objections and boilerplate general objections that made it impossible to tell what documents and information Puma was withholding.[13]

26. Because of Puma's objections, I drafted numerous detailed letters and emails regarding Puma's discovery deficiencies, and I repeatedly met and conferred telephonically with Puma's prior counsel.[14] This was a very time-consuming process in which Puma generally gave evasive answers about what evidence it was withholding, occasionally withdrew meritless objections—but only after lengthy written and telephonic meet-and-confers—and, on several occasions, refused to comply with its discovery obligations until ordered to do so by the Court.

27. Despite my efforts, Puma withheld responsive documents and information until after discovery had closed. For example, although Puma initially objected to the requests for Puma's board meeting materials, Puma later represented that it would ***not*** withhold such documents from production merely because they did not expressly reference Dr. Eshelman or the Proxy Contest.[15] After further follow-up, Puma's counsel represented in writing that "[w]e have produced or logged all documents that we determined were responsive to [RFPs 19-25]."[16] Puma's counsel later confirmed that representation, writing that Puma had "produced documents responsive to RFPs 19-25. To the extent [Puma] did not produce [a document], it is because no such documents were located."[17] I learned later that those representations were false.

28. I did not discover that Puma's representations about its board materials were false until I

---

[13] *See* July 8, 2016 Puma's Resp. to RFPs 1-62 (Ex. 7); July 8, 2016 Puma's Responses to Irogs 1-5 (Ex. 8); July 28, 2017 Puma's Resp. to Irogs 9-10 (Ex. 9).

[14] *See, e.g.*, July 27, 2016 Letter from M. Meier to P. Sampson (Ex. 10) (setting forth numerous deficiencies in Puma's responses to interrogatories and requests for production, with supporting legal authorities); Sept. 27, 2016 Email from M. Meier to P. Sampson (and other emails in chain) (Ex. 11) ("I hope that Puma will reconsider its refusal to withdraw a single one of the meritless objections I brought to your attention in writing on July 27 and during our lengthy telephonic meet-and-confer on August 4….Puma…appears to be hiding the ball with respect to what it is withholding, not only regarding its contacts with North and PPD, but also regarding its actual malice toward Dr. Eshelman."); Nov. 23, 2016 Email from M. Meier to P. Sampson (and other emails in chain) (Ex. 12); Dec. 19, 2016 Letter from M. Meier to P. Sampson (Ex. 13).

[15] Aug. 3, 2016 Letter from P. Sampson at 10-11 (Ex. 14); [D.E. 160-2].

[16] July 10, 2017 Email from P. Sampson at 2 [D.E. 160-3].

[17] July 19, 2017 Email from P. Sampson at 1 [D.E. 160-4].

deposed Puma board member Frank Zavrl, who testified that slides had been presented at numerous board meetings where Dr. Eshelman had come up.[18] Immediately after Mr. Zavrl's deposition on September 27, 2017, I again asked Puma's counsel for the board materials.

29.  Two weeks later, after discovery had closed and depositions had concluded, Puma produced heavily-redacted versions of certain board meeting minutes and isolated slides from presentations to Puma's board. Although the minutes and slides are electronically-created documents that contain Dr. Eshelman's name, to this day, Puma has provided no explanation regarding how it missed the documents in its prior electronic searches or why the board materials were not produced (even in redacted form) until after the close of discovery.

30.  Following further good-faith efforts to resolve the dispute without the Court's intervention,[19] we filed a Motion to Compel, which the Court granted, ordering Puma to produce the board materials, reopening the depositions of Mr. Auerbach and Mr. Zavrl, and sanctioning Puma by ordering it to bear the costs of reopening the depositions. *See Eshelman v. Puma Biotechnology, Inc.*, 7:16-CV-18-D, 2018 WL 327559 (E.D.N.C. Jan. 8, 2018) [D.E. 160, 161, 246].

31.  Puma then objected to the sanctions order, requiring Clare Locke to invest additional time on yet another round of briefing on the issue before Judge Dever ultimately overruled Puma's objection to the sanctions order.  [D.E. 254, 295.]

32.  On January 22, 2018, Puma produced some meeting minutes and slide decks, as well as a supplemental privilege log explaining some minimal redactions. That privilege log did ***not*** indicate that Puma was withholding any documents it should have produced under the Court's order. But the minutes for the November 12, 2015 meeting revealed that a "presentation regarding the Consent Solicitation" was distributed to Puma's board in advance of that meeting.  [D.E. 253, Ex. 1 at PUMA00453900.]

33.  Only after I again repeatedly followed up did Puma finally produce that November 2015 presentation, which was responsive to RFPs that we had served almost two years earlier, and which proved

---

[18] Zavrl Dep. 126:1-24 [D.E. 161-1].
[19] Oct. 16-18, 2017 Emails Between M. Meier and P. Sampson [D.E. 160-5].

that Puma's own attorneys had informed the board, before the Investor Presentation was published, that Dr. Eshelman had served as PPD's Executive Chairman from 2009-2011. (November 2015 Latham & Watkins presentation (PX-314).) That document became a key piece of evidence at trial and was used in Ms. Locke's cross-examination of Mr. Auerbach. Because Puma had withheld that key piece of evidence until after the close of discovery and after summary judgment had been briefed, we had to devote additional time to writing supplemental briefs in support of our summary judgment briefing.

34. Puma remained in defiance of the Court's sanctions order and did not pay the court-ordered expenses of reopening Mr. Auerbach's and Mr. Zavrl's depositions until March 26, 2019, only **after** the Court orally stated on March 8, 2019 that it would grant another motion for sanctions against Puma after trial.

35. Although we had served an interrogatory at the beginning of the case asking Puma to identify the documents Mr. Auerbach had reviewed in assessing the truth or falsity of the Investor Presentation, Puma's response—which was verified "under penalty of perjury" by Mr. Auerbach himself— did **not** identify the Latham & Watkins presentation (PX-315) or the *WilmingtonBiz* article (PX-195) as documents Mr. Auerbach had reviewed in assessing the truth or falsity of the Investor Presentation, even though Mr. Auerbach admitted at his deposition that he had reviewed the *WilmingtonBiz* article and even though the minutes from the board meeting where the Latham & Watkins presentation was given indicate that Mr. Auerbach was indeed present and chaired the meeting.[20] Indeed, Puma's own trial counsel relied on the *WilmingtonBiz* article during opening statements, telling the jury that it was an article that Mr. Auerbach reviewed before publishing the Investor Presentation.

36. We later learned that Puma's interrogatory responses were deficient in other ways. For example, Mr. Auerbach verified under penalty of perjury that "the Investor Presentation was **only** published or disseminated by Puma in the sense that it was filed with the SEC in connection with the proxy solicitation

---

[20] July 8, 2016 Puma's Resp. to Irog 4 (Ex. 8); Auerbach Dep. at 44:2-45:11 (testifying about the *WilmingtonBiz* article) [D.E. 171-2]; Nov. 2015 Board Meeting Minutes (PX-314).

filings and, consistent with SEC rules, posted on the Investor section of Puma's website."[21]  But we later learned that Mr. Auerbach had personally disseminated the Investor Presentation to Bank of America analysts Ivan Farman and Bradley Wolff (PX-182) and instructed that the Investor Presentation be sent to Vanguard.  (Ohanesian 30(b)(6) Dep. at 72:21-72:25 [D.E. 175, Ex. J-1].)

37.     Another example: At trial, Mr. Auerbach testified under oath that Mr. Farman and Mr. Wolff had told him that the current CEO of PPD had told them that Dr. Eshelman had been fired as the CEO of PPD.  I was very surprised to hear that story for the first time at trial because, although we had served interrogatories seeking the identities of people with whom Mr. Auerbach had discussed Dr. Eshelman and the details of those conversations, Mr. Auerbach had verified and signed interrogatory responses—under penalty of perjury—that did not even identify Mr. Farman or Mr. Wolff, let alone provide any details about the alleged conversation he later testified about at trial.[22]  And although Mr. Auerbach was asked numerous questions at his depositions about the sources he relied on in researching the Investor Presentation, and was specifically asked about his communications with Mr. Farman and Mr. Wolff, he never mentioned the alleged conversation with Mr. Farman and Mr. Wolff during any of his three depositions in this case.  Moreover, Puma never identified Mr. Farman or Mr. Wolff in its Rule 26(a) Initial Disclosures as individuals likely to have discoverable information that may be used to support Puma's positions.[23]

38.     As the Court is already aware, that was not the only deficiency in Puma's initial disclosures.  As set forth in Dr. Eshelman's Motion for Sanctions for Puma's Failure to Identify its Insurance Policies [D.E. 363], Puma served initial disclosures on July 15, 2016, identifying several insurance policies with limits totaling $35 million, which it later produced.  Three years later and just three business days before trial, Puma sent a portion of a different insurance policy—which had never before been identified or produced—and indicated that "the total of the applicable limits is $6 million."  This

---

[21] July 8, 2016 Puma's Resp. to Irog 1 (Ex. 8) (emphasis added).
[22] July 8, 2016 Puma's Resp. to Irog 3 (Ex. 8); Puma's July 28, 2017 Resp. to Irog 9 (Ex. 9).
[23] July 15, 2016 Puma's Initial Disclosures (Ex. 15).

belated disclosure made us realize that the mediation and previous settlement discussions had been based on a false premise, impeded ongoing settlement discussions, and required us to divert scarce time and attention away from trial preparation in an effort to get to the bottom of what had happened and to obtain accurate information about Puma's insurance policies to meaningfully evaluate settlement of the case.

39.    We also served Requests for Admissions relating to the authenticity of various documents, including Puma's securities filings in connection with the proxy contest that we had downloaded from Puma's website.[24] But Puma refused to unqualifiedly admit to the authenticity of its own securities filings, even though it later put its securities filings on its own trial exhibit list.[25]

### *Summary Judgment*

40.    Discovery closed on September 22, 2017, and the parties were required to file any motions for summary judgment by October 27, 2017.  The majority of the time that we spent working between those two dates was dedicated to preparing Dr. Eshelman's Motion for Partial Summary Judgment and compiling the Statement of Material Facts and voluminous exhibits to support the Motion.  [D.E. 169, 170, 171, 172, 173, 174, 175.]

41.    Puma's Motion for Summary Judgment was similarly voluminous.  [D.E. 177, 178, 179, 180, 181, 182, 183, 184, 185, 186.]  In its Motion for Summary Judgment, Puma argued, among other things, that it did ***not*** act with actual malice and that punitive damages were unwarranted.  [D.E. 178.]  It took a substantial amount of time to respond to Puma's factual assertions and Motion.

42.    In seeking summary judgment and opposing Dr. Eshelman's Motion for Partial Summary Judgment, Puma disputed evidence of Puma's actual malice toward Dr. Eshelman.  [D.E. 225, 226.]  However, Puma eventually stipulated to a great many of those facts in the Joint Pretrial Order.  *See* Appendix 2.

43.    Initially, the Court scheduled a hearing on all outstanding motions—including the parties'

---

[24] Aug. 17, 2017 Dr. Eshelman's Requests for Admissions 1-170 (Ex. 16).
[25] Sept. 18, 2017 Puma's Resps. to RFAs 1-170 (Ex. 17); DX-29, DX-31, DX-34.

motions for summary judgment—for September 21, 2018. [D.E. 288.] We spent a substantial amount of time preparing for that hearing before it was removed from the Court's docket due to issues stemming from Hurricane Florence. [D.E. 302.]

### *Joint Pre-Trial Order and Motions in Limine*

44.      After the Court denied Puma's Motion for Summary Judgment, we began preparing for trial in earnest.

45.      With strategic consultation from my partners Tom Clare and Libby Locke, and in order to streamline and properly define the scope of the trial, I invested a substantial amount of time working on—and supervising Mr. Watkins, Mr. Harrison, and our paralegals in working on—our pretrial disclosures and other filings.

46.      In particular, I spent a fair amount of time drafting and negotiating the detailed factual stipulations and contentions in the Joint Pretrial Order, and I believe that those detailed factual stipulations saved substantial time preparing for and during trial by helping to properly narrow the scope of the case.

47.      Even though Puma eventually stipulated to 152 facts, there are dozens of facts that Puma refused to stipulate that we had to spend time preparing to prove and, in fact, proving at trial. These facts are identified as "contentions" in the parties' Joint PreTrial Order. [D.E. 359.]

48.      For example, Puma refused to stipulate that, in November 2015, Puma's outside counsel presented the Latham & Watkins presentation to Puma's Board (which notified the Board that Dr. Eshelman had been Executive Chair of PPD from 2009-2011) and that Ms. Ohanesian had sent articles to Mr. Auerbach showing the same information. [D.E. 359 at II.A.1.cc, dd, and ee.] Puma also refused to stipulate that, before publishing the presentation, Mr. Auerbach read the *WilmingtonBiz* article (PX-195) stating that Dr. Eshelman had "named" General Grange as his replacement and "joked that he didn't think he had been fired." [D.E. 359 at II.A.1.ff.] These are two pieces of evidence that Mr. Auerbach testified to and admitted on the witness stand—that he read the *WilmingtonBiz* article and that Latham & Watkins had presented the PowerPoint presentation to him and the rest of Puma's Board of Directors before Puma published the Investor Presentation.

49.     Puma also refused to stipulate that Mr. Auerbach had used profanity when discussing Dr. Eshelman, verbally expressing the sentiment that he wanted to "F*** him up" and that Mr. Auerbach sent an email on December 23, 2015, reading "Im just getting warmed up. I'm gonna f*** this Eshelman guy up. Bad." Ms. Ohanesian had already testified under oath at her deposition to the first fact and Puma had already produced the email in discovery, knew that it was true and authentic, and even put the email on its own exhibit list. (DX-16.)

50.     Puma refused to stipulate to the fact that Mr. Auerbach read the Congressional hearing transcripts, and to the existence of certain testimony in those transcripts that rebuts Puma's false accusations, to the contents of the Investor Presentation at the heart of this case, and to Mr. Auerbach's own sworn deposition testimony. (D.E. 359 at II.A.1.uu-mmm.) But Puma itself put the Congressional hearing transcripts and the Investor Presentation on its exhibit list. (DX-4, DX-5, DX-6.) And at trial, Mr. Auerbach was forced to admit—or was impeached with respect to—the very things he had previously testified to at his depositions, but which Puma refused to stipulate to in the Joint Pretrial Order.

51.     Puma also refused to stipulate to the facts concerning the Ketek clinical trial (D.E. 359.II.A.1.a-x), even though Special Agent West and Ann Marie Cisneros had already testified to those facts during their depositions, and even though Puma did not present any evidence at trial to rebut the testimony of Special Agent West or Ms. Cisneros.

52.     In addition to the stipulations and contentions in the Joint Pretrial Order, the parties filed more than a dozen motions *in limine*. [D.E. 311, 312, 313, 315, 316, 317, 318, 320, 322, 324, 326, 331, 333, and 335.] Clare Locke focused on excluding irrelevant and inadmissible evidence concerning Puma's proposed damages expert [D.E. 335], references to Dr. Eshelman's political affiliation [D.E. 333], references to unrelated litigation [D.E. 324, 326] and hearsay articles [D.E. 331]. Puma attempted to exclude evidence concerning Mr. Auerbach's motive for defaming Dr. Eshelman [D.E. 313], the securities fraud verdict against Mr. Auerbach and Puma [D.E. 316], and the testimony of Special Agent Robert West, among other things. [D.E. 315.]

53.     Although briefing on the motions *in limine* was a time-consuming process, we prevailed

on eleven out of twelve of the parties' opposed motions, which validated our position on the proper scope of the case and positioned us well heading into the trial.

54.     Mr. Harrison and I also spent a substantial amount of time researching, drafting, and negotiating with counsel for Puma the joint proposed jury instructions and verdict form. This was a much heavier lift than it would have been in a straightforward tort or breach of contract case because North Carolina's pattern jury instructions on defamation include statements of the law that are unconstitutional or otherwise materially incorrect or insufficient. As such, we took care to research and draft appropriate instructions and verdict forms reflecting accurate statements of the law and the proper scope of the case, and I conferred with opposing counsel regarding those instructions and verdict forMs. Puma's counsel objected to the use of these jury instructions and verdict form, which required Clare Locke to prepare to argue those issues.

55.     In addition to these efforts, we invested time drafting detailed examination outlines, preparing witnesses, selecting appropriate designations of video deposition testimony, and preparing demonstrative slides to aid in the efficient presentation of evidence to the jury.

   a.   Although our pretrial efforts were time-consuming, they helped us be good stewards of the Court's and jury's time and secure a substantial victory at trial.

I declare under penalty of perjury under the laws of the United States that the foregoing is correct.

Executed this 8th day of April 2019, in Alexandria, Virginia.

By: *Megan L. Meier*
Megan L. Meier

# Exhibit 1


**DISTINGUISHED CONTRACT LEGAL STAFFING**

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/14/2017 | DC22835 |

**Bill To**

Clare Locke LLP
Attn: Megan Meier, Esq.
902 Prince Street
Alexandria, VA 22314

| | | Lexolution Job # | Week Ended |
|---|---|---|---|
| | | 3416 | 4/9/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|---|---|---|---|
| Eshelman Matter | | | |
| | | | |
| Rene Adamo-Hourly Pay | 23.00 | 43.00 | 989.00 |
| Richard Corcoran-Hourly Pay | 22.80 | 43.00 | 980.40 |
| Corey Thomas-Hourly Pay | 20.80 | 43.00 | 894.40 |

| **Total** | $2,863.80 |
|---|---|
| **Payments/Credits** | $0.00 |
| **Balance Due** | $2,863.80 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| Contractor | Rene Adamo | | | | | | | Timecard | 102644 |
| Company | Clare Locke LLP | | | | | | | Reports To | |
| Status | Sent to Back Office | | | | | | | Assignment | 374453 |
| Approved By | Daniel Watkins | | | | | | | Job Order | 3416, ClareLocke/Eshelman/Document Review |
| Date | 4/10/17 | | | | | | | Week Ending | 4/9/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Monday | | | | 0 | 0 | 0 | |
| Tuesday | | | | 0 | 0 | 0 | |
| Wednesday | 10:00 AM | 5:36 PM | 0:30 | 7.1 | 0 | 0 | |
| Thursday | 08:30 AM | 5:00 PM | 0:30 | 8 | 0 | 0 | |
| Friday | 08:36 AM | 5:00 PM | 0:30 | 7.9 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | | Hours |
| --- | --- | --- |
| Hourly Pay | | 23 |

**Billable Expenses**

| Total | 0 |
| --- | --- |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contractor** | Richard Corcoran | | | | **Timecard** | | 102626 |
| **Company** | Clare Locke LLP | | | | **Reports To** | | |
| **Status** | Sent to Back Office | | | | **Assignment** | | 374454 |
| **Approved By** | Daniel Watkins | | | | **Job Order** | | 3416, ClareLocke/Eshelman/Document Review |
| **Date** | 4/10/17 | | | | **Week Ending** | | 4/9/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | | | | 0 | 0 | 0 | |
| Tuesday | | | | 0 | 0 | 0 | |
| Wednesday | 10:00 AM | 6:00 PM | 0:30 | 7.5 | 0 | 0 | |
| Thursday | 08:48 AM | 3:48 PM | 0:12 | 6.8 | 0 | 0 | |
| Friday | 08:30 AM | 5:30 PM | 0:30 | 8.5 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 22.8 |

**Billable Expenses**

| Total | 0 |
|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contractor | Corey Thomas | | | | Timecard | | 102629 |
| Company | Clare Locke LLP | | | | Reports To | | |
| Status | Sent to Back Office | | | | Assignment | | 374455 |
| Approved By | Daniel Watkins | | | | Job Order | | 3416, ClareLocke/Eshelman/Document Review |
| Date | 4/10/17 | | | | Week Ending | | 4/9/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | | | | 0 | 0 | 0 | |
| Tuesday | | | | 0 | 0 | 0 | |
| Wednesday | 10:00 AM | 5:54 PM | 1:00 | 6.9 | 0 | 0 | |
| Thursday | 08:30 AM | 3:18 PM | | 6.8 | 0 | 0 | |
| Friday | 09:12 AM | 4:54 PM | 0:36 | 7.1 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 20.8 |

**Billable Expenses**

| Total | 0 |
|---|---|


**DISTINGUISHED CONTRACT LEGAL STAFFING**

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/21/2017 | DC22850 |

| Bill To |
|---------|
| Clare Locke LLP<br>Attn: Megan Meier, Esq.<br>902 Prince Street<br>Alexandria, VA 22314 |

| Lexolution Job # | Week Ended |
|------------------|-----------|
| 3416 | 4/16/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|-----------------|-------|-----------|--------|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 40.00 | 43.00 | 1,720.00 |
| Richard Corcoran-Hourly Pay | 40.00 | 43.00 | 1,720.00 |
| Corey Thomas-Hourly Pay | 39.60 | 43.00 | 1,702.80 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| **Total** | $5,142.80 |
|-----------|-----------|
| **Payments/Credits** | $0.00 |
| **Balance Due** | $5,142.80 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contractor | Rene Adamo | | | | Timecard | 102851 | |
| Company | Clare Locke LLP | | | | Reports To | | |
| Status | Sent to Back Office | | | | Assignment | 374453 | |
| Approved By | Daniel Watkins | | | | Job Order | 3416, ClareLocke/Eshelman/Document Review | |
| Date | 4/18/17 | | | | Week Ending | 4/16/17 | |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:30 AM | 6:00 PM | 0:30 | 9 | 0 | 0 | |
| Tuesday | 08:30 AM | 6:30 PM | 0:30 | 9.5 | 0 | 0 | |
| Wednesday | 09:00 AM | 6:30 PM | 1:00 | 8.5 | 0 | 0 | |
| Thursday | 08:30 AM | 6:30 PM | 1:00 | 9 | 0 | 0 | |
| Friday | 09:00 AM | 1:00 PM | | 4 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

| Billable Expenses | |
|---|---|
| Total | 0 |

| Contractor | Richard Corcoran | | | | Timecard | 102769 |
|---|---|---|---|---|---|---|
| Company | Clare Locke LLP | | | | Reports To | |
| Status | Sent to Back Office | | | | Assignment | 374454 |
| Approved By | Daniel Watkins | | | | Job Order | 3416, ClareLocke/Eshelman/Document Review |
| Date | 4/18/17 | | | | Week Ending | 4/16/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:36 AM | 5:30 PM | 0:30 | 8.4 | 0 | 0 | |
| Tuesday | 09:48 AM | 5:48 PM | 0:30 | 7.5 | 0 | 0 | |
| Wednesday | 08:48 AM | 5:30 PM | 1:00 | 7.7 | 0 | 0 | |
| Thursday | 08:48 AM | 5:48 PM | 0:30 | 8.5 | 0 | 0 | |
| Friday | 08:42 AM | 5:06 PM | 0:30 | 7.9 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

**Billable Expenses**

Total 0

| Contractor | Corey Thomas | | | | | | | Timecard | 102914 |
| Company | Clare Locke LLP | | | | | | | Reports To | |
| Status | Sent to Back Office | | | | | | | Assignment | 374455 |
| Approved By | Daniel Watkins | | | | | | | Job Order | 3416, ClareLocke/Eshelman/Document Review |
| Date | 4/18/17 | | | | | | | Week Ending | 4/16/17 |

## Daily Hours

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:36 AM | 5:30 PM | 0:42 | 8.2 | 0 | 0 | |
| Tuesday | 08:36 AM | 5:54 PM | 0:48 | 8.5 | 0 | 0 | |
| Wednesday | 08:48 AM | 6:06 PM | 0:42 | 8.6 | 0 | 0 | |
| Thursday | 09:00 AM | 5:12 PM | 0:30 | 7.7 | 0 | 0 | |
| Friday | 10:30 AM | 5:36 PM | 0:30 | 6.6 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

## Billable Time

| Type | Hours |
|---|---|
| Hourly Pay | 39.6 |

## Billable Expenses

Total 0


**DISTINGUISHED CONTRACT LEGAL STAFFING**

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/28/2017 | DC22903 |

| Bill To |
|---------|
| Clare Locke LLP<br>Attn: Megan Meier, Esq.<br>902 Prince Street<br>Alexandria, VA 22314 |

| | Lexolution Job # | Week Ended |
|---|---|---|
| | 3416 | 4/23/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|---|---|---|---|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 40.00 | 43.00 | 1,720.00 |
| Richard Corcoran-Hourly Pay | 40.00 | 43.00 | 1,720.00 |
| Corey Thomas-Hourly Pay | 39.10 | 43.00 | 1,681.30 |

*Please make all payments to:*
***Lexolution, LLC***
***405 Park Avenue, 16th floor***
***New York, NY 10022***

***Questions? (212) 370-9400 T; (212) 370-9401 F***
*clientservices@lexolution.net*

| **Total** | **$5,121.30** |
|---|---|
| **Payments/Credits** | **$0.00** |
| **Balance Due** | **$5,121.30** |

| Contractor | Rene Adamo |
| --- | --- |
| Company | Clare Locke LLP |
| Status | Sent to Back Office |
| Approved By | Daniel Watkins |
| Date | 4/25/17 |

| | |
| --- | --- |
| Timecard | 103286 |
| Reports To | |
| Assignment | 374453 |
| Job Order | 3416, ClareLocke/Eshelman/Document Review |
| Week Ending | 4/23/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Monday | 08:30 AM | 5:30 PM | 0:30 | 8.5 | 0 | 0 | |
| Tuesday | 08:30 AM | 6:00 PM | 0:30 | 9 | 0 | 0 | |
| Wednesday | 09:30 AM | 6:00 PM | 0:30 | 8 | 0 | 0 | |
| Thursday | 08:30 AM | 6:00 PM | 0:30 | 9 | 0 | 0 | |
| Friday | 08:30 AM | 2:00 PM | | 5.5 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
| --- | --- |
| Hourly Pay | 40 |

**Billable Expenses**

| Total | |
| --- | --- |
| | 0 |

| | | | | | Timecard | | | | 103191 |
|---|---|---|---|---|---|---|---|---|---|
| Contractor | Richard Corcoran | | | | Reports To | | | | |
| Company | Clare Locke LLP | | | | Assignment | | | | 374454 |
| Status | Sent to Back Office | | | | Job Order | | | | 3416, ClareLocke/Eshelman/Document Review |
| Approved By | Daniel Watkins | | | | Week Ending | | | | 4/23/17 |
| Date | 4/25/17 | | | | | | | | |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 09:00 AM | 5:48 PM | 0:30 | 8.3 | 0 | 0 | |
| Tuesday | 08:30 AM | 5:42 PM | 0:30 | 8.7 | 0 | 0 | |
| Wednesday | 08:36 AM | 5:48 PM | 0:30 | 8.7 | 0 | 0 | |
| Thursday | 08:54 AM | 5:30 PM | 0:30 | 8.1 | 0 | 0 | |
| Friday | 09:36 AM | 4:18 PM | 0:30 | 6.2 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

**Billable Expenses Total** 0

| | | | | | | |
|---|---|---|---|---|---|---|
| Contractor | Corey Thomas | | | Timecard | 103261 | |
| Company | Clare Locke LLP | | | Reports To | | |
| Status | Sent to Back Office | | | Assignment | 374455 | |
| Approved By | Daniel Watkins | | | Job Order | 3416, ClareLocke/Eshelman/Document Review | |
| Date | 4/25/17 | | | Week Ending | 4/23/17 | |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:36 AM | 4:30 PM | 0:42 | 7.2 | 0 | 0 | |
| Tuesday | 08:42 AM | 5:00 PM | 0:30 | 7.8 | 0 | 0 | |
| Wednesday | 08:48 AM | 6:06 PM | 0:30 | 8.8 | 0 | 0 | |
| Thursday | 08:36 AM | 4:30 PM | 0:30 | 7.4 | 0 | 0 | |
| Friday | 09:06 AM | 5:00 PM | | 7.9 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 39.1 |

| | |
|---|---|
| Billable Expenses Total | 0 |



# Invoice

| Date | Invoice # |
|------|-----------|
| 5/5/2017 | DC22957 |

| Bill To |
|---------|
| Clare Locke LLP<br>Attn: Megan Meier, Esq.<br>902 Prince Street<br>Alexandria, VA 22314 |

| | Lexolution Job # | Week Ended |
|--|-----------------|------------|
| | 3416 | 4/30/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|-----------------|-------|-----------|--------|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 3.00 | 43.00 | 129.00 |
| Corey Thomas-Hourly Pay | 3.10 | 43.00 | 133.30 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| Total | $262.30 |
|-------|---------|
| **Payments/Credits** | $0.00 |
| **Balance Due** | $262.30 |

| Contractor | Rene Adamo | | | | Timecard | 103637 |
| Company | Clare Locke LLP | | | | Reports To | |
| Status | Sent to Back Office | | | | Assignment | 374453 |
| Approved By | Daniel Watkins | | | | Job Order | 3416, ClareLocke/Eshelman/Document Review |
| Date | 4/25/17 | | | | Week Ending | 4/30/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|-----|-----|-----|-------|-----|-----|-----|-------|
| Monday | 08:30 AM | 11:30 AM | | 3 | 0 | 0 | |
| Tuesday | | | | 0 | 0 | 0 | |
| Wednesday | | | | 0 | 0 | 0 | |
| Thursday | | | | 0 | 0 | 0 | |
| Friday | | | | 0 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|------|-------|
| Hourly Pay | 3 |

| Billable Expenses Total | 0 |
|---|---|

| Contractor | Corey Thomas | Timecard | 103641 |
| Company | Clare Locke LLP | Reports To | |
| Status | Sent to Back Office | Assignment | 374455 |
| Approved By | Daniel Watkins | Job Order | 3416: ClareLocke/Eshelman/Document Review |
| Date | 4/25/17 | Week Ending | 4/30/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|-----|-----|-----|-------|-----|-----|-----|-------|
| Monday | | | | 0 | 0 | 0 | |
| Tuesday | 08:54 AM | 12:00 PM | | 3.1 | 0 | 0 | |
| Wednesday | | | | 0 | 0 | 0 | |
| Thursday | | | | 0 | 0 | 0 | |
| Friday | | | | 0 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|------|-------|
| Hourly Pay | 3.1 |

**Billable Expenses Total** 0



# Invoice

| Date | Invoice # |
|------|-----------|
| 6/2/2017 | DC23162 |

| Bill To |
|---------|
| Clare Locke LLP<br>Attn: Megan Meier, Esq.<br>902 Prince Street<br>Alexandria, VA 22314 |

| Lexolution Job # | Week Ended |
|------------------|------------|
| 3416 | 5/28/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|-----------------|-------|-----------|--------|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 40.00 | 43.00 | 1,720.00 |

| | |
|--|--|
| **Total** | $1,720.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,720.00 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contractor | Rene Adamo | | | | Timecard | | 105387 |
| Company | Clare Locke LLP | | | | Reports To | | |
| Status | Sent to Back Office | | | | Assignment | | 374453 |
| Approved By | Daniel Watkins | | | | Job Order | | 3416, ClareLocke/Eshelman/Document Review |
| Date | 5/30/17 | | | | Week Ending | | 5/28/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:00 AM | 8:00 PM | 2:00 | 10 | 0 | 0 | |
| Tuesday | 07:30 AM | 8:00 PM | 1:30 | 11 | 0 | 0 | |
| Wednesday | 07:00 AM | 6:30 PM | 3:00 | 8.5 | 0 | 0 | |
| Thursday | 07:30 AM | 7:00 PM | 4:00 | 7.5 | 0 | 0 | |
| Friday | 08:00 AM | 11:00 AM | | 3 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

| | |
|---|---|
| Billable Expenses | 0 |
| Total | |


**DISTINGUISHED CONTRACT LEGAL STAFFING**

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/26/2017 | DC23107 |

**Bill To**

Clare Locke LLP
Attn: Megan Meier, Esq.
902 Prince Street
Alexandria, VA 22314

| | Lexolution Job # | Week Ended |
|---|---|---|
| | 3416 | 5/21/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|-----------------|-------|-----------|--------|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 40.00 | 43.00 | 1,720.00 |

| | |
|---|---|
| **Total** | $1,720.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,720.00 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| | |
|---|---|
| Contractor | Rene Adamo |
| Company | Clare Locke LLP |
| Status | Sent to Back Office |
| Approved By | Lexolution |
| Date | 5/24/17 |

| | |
|---|---|
| Timecard | 104843 |
| Reports To | |
| Assignment | 374453 |
| Job Order | 3416, ClareLocke/EShelman/Document Review |
| Week Ending | 5/21/17 |

## Daily Hours

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:42 AM | 8:00 PM | 1:18 | 10 | 0 | 0 | |
| Tuesday | 08:00 AM | 8:00 PM | 4:00 | 8 | 0 | 0 | |
| Wednesday | 07:30 AM | 4:30 PM | 1:00 | 8 | 0 | 0 | |
| Thursday | 07:00 AM | 5:30 PM | 1:30 | 9 | 0 | 0 | |
| Friday | 08:00 AM | 12:30 PM | | 4.5 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | 5:00 PM | 5:30 PM | | 0.5 | 0 | 0 | |

## Billable Time

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

| | |
|---|---|
| Billable Expenses Total | 0 |



# Invoice

| Date | Invoice # |
|---|---|
| 6/2/2017 | DC23162 |

| Bill To |
|---|
| Clare Locke LLP<br>Attn: Megan Meier, Esq.<br>902 Prince Street<br>Alexandria, VA 22314 |

| | Lexolution Job # | Week Ended |
|---|---|---|
| | 3416 | 5/28/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|---|---|---|---|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 40.00 | 43.00 | 1,720.00 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| Total | $1,720.00 |
|---|---|
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,720.00 |

| | | | | Timecard | | | 105387 |
|---|---|---|---|---|---|---|---|
| Contractor | Rene Adamo | | | | | | |
| Company | Clare Locke LLP | | | Reports To | | | |
| Status | Sent to Back Office | | | Assignment | | | 374453 |
| Approved By | Daniel Watkins | | | Job Order | | | 3416, ClareLocke/Eshelman/Document Review |
| Date | 5/30/17 | | | Week Ending | | | 5/28/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 08:00 AM | 8:00 PM | 2:00 | 10 | 0 | 0 | |
| Tuesday | 07:30 AM | 8:00 PM | 1:30 | 11 | 0 | 0 | |
| Wednesday | 07:00 AM | 6:30 PM | 3:00 | 8.5 | 0 | 0 | |
| Thursday | 07:30 AM | 7:00 PM | 4:00 | 7.5 | 0 | 0 | |
| Friday | 08:00 AM | 11:00 AM | | 3 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

| | |
|---|---|
| Billable Expenses | |
| Total | 0 |



# Invoice

| Date | Invoice # |
|------|-----------|
| 6/9/2017 | DC23215 |

**Bill To**

Clare Locke LLP
Attn: Megan Meier, Esq.
902 Prince Street
Alexandria, VA 22314

| Lexolution Job # | Week Ended |
|------------------|------------|
| 3416 | 6/4/2017 |

| Contractor Name | Hours | Rate/hour | Amount |
|-----------------|-------|-----------|--------|
| Eshelman Matter | | | |
| Rene Adamo-Hourly Pay | 40.00 | 43.00 | 1,720.00 |

| | |
|---|---|
| **Total** | $1,720.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,720.00 |

*Please make all payments to:*
*Lexolution, LLC*
*405 Park Avenue, 16th floor*
*New York, NY 10022*

*Questions? (212) 370-9400 T; (212) 370-9401 F*
*clientservices@lexolution.net*

| | | | | | | |
|---|---|---|---|---|---|---|
| Contractor | Rene Adamo | | | Timecard | | 105737 |
| Company | Clare Locke LLP | | | Reports To | | 374453 |
| Status | Approved - Sent to Backoffice | | | Assignment | | 3416, ClareLocke/Eshelman/Document Review |
| Approved By | Daniel Watkins | | | Job Order | | |
| Date | 6/7/17 | | | Week Ending | | 6/4/17 |

**Daily Hours**

| Day | In | Out | Break | Reg | OT | DT | Notes |
|---|---|---|---|---|---|---|---|
| Monday | 06:30 AM | 8:30 PM | 1:00 | 13 | 0 | 0 | |
| Tuesday | 06:30 AM | 9:00 PM | 3:00 | 11.5 | 0 | 0 | |
| Wednesday | 06:30 AM | 10:30 PM | 0:30 | 15.5 | 0 | 0 | |
| Thursday | | | | 0 | 0 | 0 | |
| Friday | | | | 0 | 0 | 0 | |
| Saturday | | | | 0 | 0 | 0 | |
| Sunday | | | | 0 | 0 | 0 | |

**Billable Time**

| Type | Hours |
|---|---|
| Hourly Pay | 40 |

**Billable Expenses**
**Total**          0

# Exhibit 2

**From:** Megan Meier <megan@clarelocke.com>
**Date:** Friday, February 24, 2017 at 4:13 PM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>
**Cc:** "Millen, Press" <pmillen@wcsr.com>, "Brant W. Bishop" <bbishop@wilkinsonwalsh.com>, "Lori A. McGill" <lalvinomcgill@wilkinsonwalsh.com>, Aurash Jamali <ajamali@wilkinsonwalsh.com>, Sean Eskovitz <seskovitz@wilkinsonwalsh.com>, Tom Clare <tom@clarelocke.com>, Libby Locke <libby@clarelocke.com>, Audrey Rabenberg <audrey@clarelocke.com>, Daniel Watkins <daniel@clarelocke.com>
**Subject:** Service of Interrogatories and Requests for Production

Counsel:

Please see the attached discovery requests, which are being served via email and in Word pursuant to our stipulated joint discovery plan.

Megan Meier | Partner
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454






20170224 Irogs          20170224 RFPs          20170224 Irogs          20170224 RFPs
6-7 to...a.docx          63-112...a.docx         6-7 to Puma.pdf         63-112...ma.pdf

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| *Plaintiff, Counterdefendant,* | ) | **Case No. 7:16-cv-00018-D** |
| | ) | |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| *Defendant,* | ) | |
| *Counterclaimant.* | ) | |

## DR. FREDRIC ESHELMAN'S SECOND SET OF INTERROGATORIES (NOS. 6-7) TO PUMA BIOTECHNOLOGY, INC.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Dr. Fredric Eshelman issues the following Interrogatories, to be answered separately, fully, in writing, and under oath by Counterclaimant Puma Biotechnology, Inc. within thirty (30) days of service. These Interrogatories shall be read, interpreted, and responded to in accordance with the definitions and instructions set forth below.

### INTERROGATORIES

### INTERROGATORY NO. 6

Identify every Person who directly or indirectly participated in developing, researching, drafting, writing, editing, editing data in, fact-checking, presenting, publishing, promoting, disseminating, distributing, or making public statements, press releases, or disclosures about the Neratinib enrollment rates, the Kaplan-Meier curves for Neratinib, or the Neratinib clinical trials, and for each such Person, provide his or her title, employer, and a detailed description of his or her participation.

**INTERROGATORY NO. 7**

Identify all electronic and paper media in your possession, custody, or control that were used in making public statements, press releases, or disclosures about about the Neratinib enrollment rates, the Kaplan-Meier curves for Neratinib, or the Neratinib clinical trials, whether in developing, researching, drafting, writing, editing, producing, fact-checking, presenting, publishing, promoting, financing, funding, distributing, or disseminating the public statements, press releases, or disclosures (including any computer, email account, smartphone, iPhone, iPad, or other portable electronic device, any flash drive or external or electronic-storage device or media, any video equipment or device, any server, and any hard copy files), and for each such medium, describe the protocol being used (including any search terms) to locate potentially responsive documents in that medium, and any criteria being used to exclude from production any documents containing search terms.

**DEFINITIONS**

1.    "Puma," "you," and "your" mean Puma Biotechnology, Inc., a counterclaimant in the above-captioned action.

2.    "Complaint" means the complaint the Plaintiff filed on February 2, 2017, in the U.S. District Court for the Eastern District of North Carolina, naming Puma as a defendant.

3.    "Counterclaim" means the counterclaim Puma filed on February 21, 2017 in the U.S. District Court for the Eastern District of North Carolina, naming Dr. Eshelman as a counterdefendant.

4.    "Neratinib" means Neratinib/PB272, a drug candidate.

5.    "Plaintiff" refers to the Dr. Fredric Eshelman.

6.    "Person" means any natural person or any corporation, legal, or governmental entity or association.

7.    "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever made, including, but not limited to, correspondence, conversations, meetings, dialogues, discussions, interviews, consultations, and other understandings between or among two or more Persons, whether face-to-face, or by telephone, videoconference, fax letter, email, website, social-media service, or any other means.

8.    "Investor Presentation" means the January 2016 Presentation titled "Continued Focus on Developing Shareholder Value," a copy of which was attached as "Exhibit A" to the Complaint.

9.    "November 30, 2015 Presentation" means the November 2015 Presentation titled "Puma Biotechnology, Inc. Consent Solicitation: Information for Investors" filed by Dr.

3

Eshelman with the SEC, a copy of which was attached as "Exhibit A" to the Answer and Counterclaims.

10.    "December 10, 2015 Presentation" means the December 2015 Presentation titled "~~Developing~~ Destroying Shareholder Value" filed by Dr. Eshelman with the SEC, a copy of which was attached as "Exhibit B" to the Answer and Counterclaims.

11.    "January 4, 2016 Letter" means the January 2016 Letter that Dr. Eshelman wrote to Puma investors attached thereto were slides; the January 4, 2016 Letter was filed with the SEC, a copy of which was attached as "Exhibit C" to the Answer and Counterclaims.

12.    "Consent Solicitation" means Dr. Eshelman's October 28, 2015 proposals to Puma's shareholders and all actions undertaken in response to or relating to those proposals.

13.    "News Release" means the public news release issued by Puma on January 8, 2016.

14.    "Document" is an all-inclusive with the broadest possible meaning accorded to it under case law and the Federal Rules of Civil Procedure, and means the original (or a true and accurate copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining, or otherwise) of any writing or record (whether in tangible, electronic, or any other form) in your actual or constructive possession, custody, or control, including all documents you have provided to your counsel. "Document" shall include, but is not limited to, an electronic or computerized data compilation (including email and other computer-readable files) whether printed, stored, or displayed, or otherwise, and any preliminary versions, drafts or revisions, ESI, communication, memorandum, letter, correspondence, email, cellular telephone or internet message, blog post, Internet post, social media post or message, report, note, message slip, telephone log or record,

journal, calendar, electronic organizer entry, writing, drawing, spreadsheet, presentation, ledger, minutes, financial report or record, draft, fax, contract, invoice, record of purchase or sale, graph, chart, photograph, video or audio recording, metadata related to video or audio recordings, transcript index, directory, or any other written, printed, typed, punched, taped, filmed or graphic matter however produced, stored, or reproduced. "Document" also includes the file, folder tabs, and labels with or containing any Documents, and any metadata associated with any Document.

15. "Relating to" and/or "reflecting" mean relating to, reflecting, concerning, referring to, constituting, embodying, connected to, in connection with, comprising, regarding, evidencing, describing, identifying, stating, analyzing, containing information concerning, and/or in any way pertaining to the subject matter of this action.

16. The terms "State," "Explain," and "Describe" mean to set forth a complete and detailed statement of all information, circumstances, and facts concern, refer to, relate to, reflect, comprise, or bear upon the matter concerning which information is requested.

17. The term "Identify" means: (a) when referring to a natural individual, state the full name, address, telephone number, and email address of such a person; (b) when used in reference to a corporation or other business association or legal entity, state its full corporate or entity name, and any names under which it does business; (c) when used in reference to a Communication, if any part of the Communication was written, identify the document or documents which refer to, relate to, or evidence the Communication, and to the extent that the Communication was on-written, identify the Persons participating in the Communication, and State the date and substance of the Communication.

# INSTRUCTIONS

1.      Words shall have the definitions set forth above, regardless of whether they are capitalized.

2.      To bring within the scope of these Interrogatories all information that might otherwise be construed to be outside of their scope, the following rules of construction apply: (a) the singular shall include the plural and vice versa; (b) the masculine, feminine, or neuter pronoun shall not exclude other genders; (c) the connectives "and" and "or" shall be read either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories all responses that might otherwise be construed to be outside their scope; (d) the terms "any," "all," "each," or "every" shall be read to mean any, all, each, and every; (e) the word "including" shall be read to mean including without limitation; (f) the present tense shall be construed to include the past tense and vice versa; and (g) references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

3.      You must answer each Interrogatory fully, completely, in writing, and under oath, and must sign your answers.  Your response shall include all information known to you or otherwise in your possession, custody, or control, regardless of location, including in the possession, custody, or control of any current or former attorney(s), consultant(s), expert(s), and agent(s).  If you cannot completely answer any Interrogatory after the exercise of reasonable diligence, you shall furnish as complete an answer as you can, and you shall explain in detail the reasons you cannot give a full answer, including a statement as to what is needed in order to give a complete answer.

4.      If you object to any part of an Interrogatory, you must set forth your basis for the objection and respond to all parts of the Interrogatory to which you do not object.

5.     If in the course of responding to these Interrogatories you encounter any ambiguity in the Interrogatories, in a definition, or in an instruction relevant to the Interrogatories, explain what you find to be ambiguous and what construction you used in providing your answer.

6.     If you object to any Interrogatory on the grounds that responding is unduly burdensome, describe the undue burden.

7.     If any information called for by any Interrogatory herein is withheld because you claim that such information is protected from discovery by the attorney work-product doctrine or by any privilege or protection from disclosure, provide a description of the basis of the claimed privilege and all information necessary for the Court and Plaintiff to assess the claim of privilege in accordance with applicable federal and local rules, including: (a) the applicable subject matter; (b) the applicable date; and (c) the identity of any person(s) who authored, made, received, or otherwise learned of the information.

8.     No paragraph of these Interrogatories shall be construed with reference to any other paragraph for purposes of limitation.

9.     The specificity of any request herein shall not be construed to limit the generality or reach of any other request herein.

10.     These Interrogatories are continuing in nature, up to and during the course of trial. In the event that you obtain additional information that is responsive to these Interrogatories, you shall promptly supplement your response to each such Interrogatory.

7

This 24th day of February 2017.                        Respectfully Submitted,

/s/ Megan L. Meier
Andrew K. McVey
North Carolina State Bar No. 20217
(Local Civil Rule 83.1 Counsel)
Murchinson, Taylor & Gibson PLLC
16 North Fifth Avenue
Wilmington, NC 28401-4537
Telephone: 910-763-2426
Email: amcvey@murchisontaylor.com

Thomas A. Clare (of counsel)
Elizabeth M. Locke (of counsel)
Megan L. Meier (of counsel)
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314
Telephone (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com
*Attorneys for:*
*Dr. Fredric Eshelman*

8

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Dr. Fredric N. Eshelman's Second Set of Interrogatories (Nos. 6–7) to Puma Biotechnology, Inc. was served on February 24, 2017 to the following via email:

Pressly M. Millen
Womble Carlyle Sandridge & Rice, PLLC
Post Office Box 831
Raleigh, NC 27602
Telephone: (919) 755-2100
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
Email: bbishop@wilkinsonwalsh.com
Email: lalvinomcgill@wilkinsonwalsh.com
Email: psampson@wilkinsonwalsh.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
1158 26th Street, Suite 883
Santa Monica, CA 90402
Telephone: (424) 316-4000
Facsimile: (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Dated: February 24, 2017
By: /s/ Megan L. Meier
Megan L. Meier

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:16-cv-00018-D**

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| *Plaintiff, Counterdefendant* | ) | **Case No. 7:16-cv-00018-D** |
| | ) | |
| *v.* | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| *Defendant,* | ) | |
| *Counterclaimant.* | ) | |

## FREDRIC N. ESHELMAN'S SECOND SET OF REQUESTS (NOS. 63-112) FOR THE PRODUCTION OF DOCUMENTS TO PUMA BIOTECHNOLOGY, INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Fredric N. Eshelman hereby submits his First Set of Requests for the Production of Documents ("Requests for Production," "Requests," or "RFPs") to Counterclaimant Puma Biotechnology, Inc. Dr. Eshelman requests that Puma produce the following documents electronically via FTP site (or comparable technology) accessible to megan@clarelocke.com, libby@clarelocke.com, tom@clarelocke.com, dustin@clarelocke.com, and amcvey@murchisontaylor.com, or by producing the documents in electronic format on a disc sent to Clare Locke LLP, 902 Prince Street, Alexandria, Virginia, 22314, or at such other place and time as agreed by counsel. In accordance with Rule 34 of the Federal Rules of Civil Procedure, Puma shall submit separate responses to the following requests within thirty (30) days of service. These Requests for Production shall be read, interpreted, and responded to in accordance with the definitions and instructions set forth below.

**DEFINITIONS**

1. "Puma," "you," and "your" mean Puma Biotechnology, Inc., a counterclaimant in the above-captioned action, and each of its present and former affiliates, subsidiaries, agents, assigns, representatives, employees, predecessors, successors, attorneys, and any person acting or purporting to act on Puma's behalf or for Puma's benefit. The terms "Puma," "you," and "your" include but are not limited to any website, social media feed, or other digital content or platform that Puma directly or indirectly owns, operates, or controls, including, but not limited to, pumabiotechnology.com and the webpages that may be accessed from that website including investor.pumabiotechnology.com, investor.pumabiotechnology.com/consent-revocation, and http://investor.pumabiotechnology.com/sites/pumabiotechnology.investorhq.businesswire.com/files/doc_library/file/010716_PBYI_Investor_Presentation.pdf.

2. "Board," "Puma's Board," "the Puma Board," "Puma's Board of Directors," and "the Board" mean the Board of Directors of Puma Biotechnology, Inc., including Frank Zavrl; Troy Wilson, Adrian Senderowicz, Jay M. Moyes, and Alan Auerbach.

3. "Latham & Watkins" means Latham & Watkins LLP, counsel for the Defendant, and each of its present and former partners, directors, associates, paralegals, employees, affiliates, subsidiaries, agents, assigns, representatives, predecessors, and successors.

4. "Complaint" means the complaint Dr. Eshelman filed on February 2, 2016 in the U.S. District Court for the Eastern District of North Carolina, naming Puma as a defendant.

5. "Counterclaim" means the counterclaim Puma filed on February 21, 2017 in the U.S. District Court for the Eastern District of North Carolina, naming Dr. Eshelman as a counterdefendant.

6. "PPD" means Pharmaceutical Product Development, Inc. and each of its present and former affiliates, subsidiaries, agents, assigns, representatives, employees, predecessors, successors, attorneys, and any person acting or purporting to act on Puma's behalf or for Puma's benefit.

7. "Investor Presentation" means the January 2016 Presentation titled "Continued Focus on Developing Shareholder Value," a copy of which was attached as "Exhibit A" to the Complaint.

8. "November 30, 2015 Presentation" means the November 2015 Presentation titled "Puma Biotechnology, Inc. Consent Solicitation: Information for Investors" filed by Dr. Eshelman with the SEC, a copy of which was attached as "Exhibit A" to the Answer and Counterclaims.

9. "December 10, 2015 Presentation" means the December 2015 Presentation titled "Developing Destroying Shareholder Value" filed by Dr. Eshelman with the SEC, a copy of which was attached as "Exhibit B" to the Answer and Counterclaims.

10. "January 4, 2016 Letter" means the January 2016 Letter that Dr. Eshelman wrote to Puma investors attached thereto were slides; the January 4, 2016 Letter was filed with the SEC, a copy of which was attached as "Exhibit C" to the Answer and Counterclaims.

11. "Consent Solicitation" means Dr. Eshelman's October 28, 2015 proposals to Puma's shareholders and all actions undertaken in response to or relating to those proposals.

12. "News Release" means the public news release issued by Puma on January 8, 2016.

13. "Neratinib" means Neratinib/PB272, a drug candidate.

14. "Neratinib Clinical Trial" means any clinical trial of Neratinib.

3

15.     "Person" means any natural person or any business, legal, or governmental entity or association.

16.     "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever made, including, but not limited to correspondence, conversations, dialogues, discussions, interview, consultations, and other understandings between or among two or more persons, whether face-to-face, or by telephone, fax, letter, email, website, social-media service, or any other means.

17.     "ESI" means electronically stored information.

18.     "Document" is an all-inclusive term with the broadest possible meaning accorded to it under case law and the Federal Rules of Civil Procedure, and means the original (or a true and accurate copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining, or otherwise) of any writing or record (whether in electronic, tangible, or any other form) in your actual or constructive possession, custody, or control, including all documents you have provided to your counsel.  "Document" shall include, but is not limited to, an electronic or computerized data compilation (including email and other computer-readable files), whether or not printed, stored, or displayed, and any preliminary versions, drafts, or revisions thereof, ESI, communication, memorandum, letter, correspondence, electronic mail, text message, blog post, Internet post, report, note, message slip, telephone log or record, diary, journal, calendar, electronic organizer entry, writing, drawing, spreadsheet, presentation, ledger, minutes, financial report or record, draft, facsimile, contract, invoice, record of purchase or sale, graph, chart, photograph, video or audio recording, transcript, index, directory, or any other written, printed, typed, punched, taped, filmed, or graphic matter however produced, stored, or reproduced.  "Document" also includes

4

the file, folder tabs, and labels appended to or containing any documents, *__as well as any__*

*__metadata applicable to any document__*.

19.     The terms "relating to" and/or "reflecting" mean relating to, reflecting, concerning, referring to, constituting, embodying, connected to, in connection with, comprising, regarding, evidencing, describing, identifying, stating, analyzing, containing information concerning, and/or in any way pertaining to the subject matter of this action.

### INSTRUCTIONS

1.     Words shall have the definitions set forth above, *__regardless of whether they are capitalized or not__*.

2.     To bring within the scope of these Requests for Production all information that might otherwise be construed to be outside of their scope, the following rules of construction apply: (a) the singular shall include the plural and vice versa; (b) the masculine, feminine, or neuter pronoun shall not exclude other genders; (c) the connectives "and" and "or" shall be read either disjunctively or conjunctively as necessary to bring within the scope of these Requests for Production all responses that might otherwise be construed to be outside their scope; (d) the terms "any," "all," "each," or "every" shall be read to mean any, all, each, and every; (e) the word "including" shall be read to mean including without limitation; (f) the present tense shall be construed to include the past tense and vice versa; and (g) references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

3.     These Requests for Production call for the production of documents that are in your actual or constructive possession, custody, or control, regardless of location, including in

the possession, custody, or control of any current or former attorney(s), consultant(s), expert(s), and agent(s).  If a copy of a requested document is not identical to any other copy of the same document, by reason of alterations, marginal notes, comments, etc., all non-identical copies shall be produced.  All documents that are physically attached to each other when located for production shall be left so attached.

4.      If any document called for hereby was formerly in your possession, custody, or control and has been lost or destroyed, that document is to be identified in writing by: (a) addressor, addressee, and/or person who prepared or authorized the document; (b) date of preparation or transmittal; (c) subject matter; (d) number of pages, attachments, or appendices; (e) all persons to whom distributed; (f) date of loss or destruction; and (g) if destroyed, the manner of destruction, reason for destruction, persons authorizing destruction, and persons destroying the document.

5.      All documents are to be produced in their entirety, without abbreviation or expurgation, including both back and front thereof, with all attachments or other matters affixed thereto.

6.      You shall produce responsive documents as they have been kept in the usual course of business.  If there is no document responsive to any particular category, you shall so state in writing.

7.      Your responses shall include all information known to you or otherwise available to you, including information within the knowledge or possession of Puma's attorneys, investigators, employees, or other agents.  Where a complete answer to a particular Request for Production is not possible, the Request for Production should be answered to the extent possible and a statement should be made indicating why only a partial answer is given.

6

8.      If you object to any part of a Request for Production, you must set forth your basis for the objection and respond to all parts of the Request for Production to which you do not object.

9.      If in the course of responding to these Requests for Production you encounter any ambiguity in the Requests for Production, in a definition, or in an instruction relevant to the Requests for Production, explain what you find to be ambiguous and what construction you used in providing your answer.

10.     If production of any requested document is objected to on the grounds that production is unduly burdensome, describe the undue burden.

11.     If any information called for by any Request for Production herein is withheld because you claim that such information is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or by any privilege or protection from disclosure, provide a description of the basis of the claimed privilege or protection and all information necessary for the Court and Dr. Eshelman to assess the claim of privilege or protection in accordance with applicable law, including: (a) the type of document; (b) the general subject matter of the document; (c) the date of the document; and (d) such other information as is sufficient to identify the document, including, where appropriate, the author, addressees, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

12.     No paragraph of these Requests for Production shall be construed with reference to any other paragraph for purposes of limitation.

13.     The specificity of any request herein shall not be construed to limit the generality or reach of any other request herein.

7

14.     These Requests for Production are continuing in nature, up to and during the course of trial.  In the event that you obtain additional documents that are responsive to these Requests for Production, you shall supplement your response to each such Request for Production and produce the additional documents promptly.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 63

The transcript and recording of the December 23, 2013 conference call held by Puma, referred to in paragraph 14 of Puma's counterclaim.

### REQUEST FOR PRODUCTION NO. 64

All communications regarding the December 23, 2013 conference call held by Puma, referred to in paragraph 14 of Puma's counterclaim.

### REQUEST FOR PRODUCTION NO. 65

All data relating to the statement of Puma's management—during the December 23, 2013 conference call (referred to in paragraph 14 of Puma's counterclaim)—that response rates in Neratinib clinical trials had been in the 40-49 percent range.

### REQUEST FOR PRODUCTION NO. 66

 All documents and data related to the response rates in the Neratinib clinical trials.

### REQUEST FOR PRODUCTION NO. 67

Documents sufficient to show when and where the December 23, 2013 conference call transcript was publicly available, and when and why it was removed from the public record.

### REQUEST FOR PRODUCTION NO. 68

All communications reflecting the decision to post or remove the December 23, 2013 conference call transcript from the internet.

8

**REQUEST FOR PRODUCTION NO. 69**

All documents relating to the stockholder class action filed in June 2015, referred to in paragraph 14 of Puma's counterclaim.

**REQUEST FOR PRODUCTION NO. 70**

All documents relating to any settlement or potential settlement of the stockholder class action filed in June 2015, referred to in paragraph 14 of Puma's counterclaim.

**REQUEST FOR PRODUCTION NO. 71**

All pleadings and orders filed in connection with the stockholder class action filed in June 2015, referred to in paragraph 14 of Puma's counterclaim.

**REQUEST FOR PRODUCTION NO. 72**

All documents requested, subpoenaed, or produced in the stockholder class action filed in June 2013, referred to in paragraph 14 of Puma's counterclaim.

**REQUEST FOR PRODUCTION NO. 73**

All draft and final Kaplan-Meier curves for Neratinib and all data reflected in those curves.

**REQUEST FOR PRODUCTION NO. 74**

All communications relating to the Kaplan-Meier curves for Neratinib or the data reflected in those curves.

**REQUEST FOR PRODUCTION NO. 75**

All documents and data relating to Neratinib or Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 76**

All communications about or related to Neratinib clinical trials, from before, during, and after commencement of such clinical trials through the present.

9

**REQUEST FOR PRODUCTION NO. 77**

All data obtained from Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 78**

All drafts and versions of all press releases and securities filings relating to and/or reflecting Neratinib's clinical trials, the data gathered from such clinical trials, and/or expectations of such clinical trials.

**REQUEST FOR PRODUCTION NO. 79**

All documents relating to and/or reflecting Puma press releases relating to and/or reflecting Neratinib's clinical trials, the data gathered from such clinical trials, and/or expectations of such clinical trials.

**REQUEST FOR PRODUCTION NO. 80**

All documents you consulted in preparing, producing, editing, writing, fact-checking, researching, or developing any public or private statements relating to and/or reflecting Neratinib clinical trials, the data gathered from such clinical trials, or expectations of such clinical trials.

**REQUEST FOR PRODUCTION NO. 81**

All documents containing any edits to, comments on, notes regarding, or advice regarding Puma press releases or securities filings relating to and/or reflecting Neratinib's clinical trials, the data gathered from such clinical trials, expectations of such clinical trials.

**REQUEST FOR PRODUCTION NO. 82**

All documents relating to Puma's decisions regarding filing a new drug application for Neratinib.

**REQUEST FOR PRODUCTION NO. 83**

All communications relating to Puma's decisions regarding filing a new drug application for Neratinib.

10

**REQUEST FOR PRODUCTION NO. 84**

All documents reflecting any accusations of lack of experience, incompetence, or errors in judgment on the part of any of the members of Puma's board of directors either before or since joining Puma's board of directors.

**REQUEST FOR PRODUCTION NO. 85**

Documentation of Puma's Board members' experience with mergers and acquisitions, oncology, corporate governance, corporate oversight, drug development and regulation, and investment.

**REQUEST FOR PRODUCTION NO. 86**

Documents, communications, notes from meetings about, or any other thing showing decision processes, orders, or ultimate decisions regarding blinding or unblinding data in the Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 87**

All documents relating to and/or reflecting Puma press releases or securities filings relating to Neratinib's clinical trials.

**REQUEST FOR PRODUCTION NO. 88**

All documents containing any edits to, comments on, notes regarding, or advice regarding Puma press releases relating to and/or reflecting Neratinib's clinical trials.

**REQUEST FOR PRODUCTION NO. 89**

All text messages relating to Neratinib or the Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 90**

All of Alan Auerbach's text messages relating to Neratinib or the Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 91**

Puma's board of directors' text messages relating to Neratinib or the Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 92**

All minutes, notes, handouts, and presentations from meetings of Puma's board of directors during which Neratinib or the Neratinib clinical trials were discussed.

**REQUEST FOR PRODUCTION NO. 93**

All documents relating to and all communications about the selection of Puma's board of directors and the possibility of selecting candidates who did not ultimately serve on Puma's board of directors.

**REQUEST FOR PRODUCTION NO. 94**

All transcripts from Puma conference calls related to or about Neratinib, Neratinib clinical trials, data related to Neratinib, the processes of Neratinib clinical trials, expectations of Neratinib clinical trials, results from Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 95**

All transcripts from Puma conference calls related to or about Puma's board of directors or the selection of Puma's board of directors.

**REQUEST FOR PRODUCTION NO. 96**

All data from ExteNET related to Neratinib.

**REQUEST FOR PRODUCTION NO. 97**

All drafts and versions—including the final version—and any metadata attached to such drafts or versions, of Puma's presentations to the American Society of Clinical Oncology related to Neratinib.

**REQUEST FOR PRODUCTION NO. 98**

All documents reflecting requests made to Puma by shareholders, governmental agencies, media, or competitors related to Neratinib or Puma's board of directors.

**REQUEST FOR PRODUCTION NO. 99**

All documents reflecting responses Puma made to requests made by shareholders, governmental agencies, media, or competitors related to Neratinib or Puma's board of directors.

**REQUEST FOR PRODUCTION NO. 100**

All notes regarding, drafts or versions of, recordings of, or other documents related to any presentation Puma gave regarding Neratinib or its board of directors, including the San Antonio Breast Cancer meeting and the American Society of Clinical Oncology annual meeting.

**REQUEST FOR PRODUCTION NO. 101**

Documents related to Alan Auerbach's compensation, including and how Alan Auerbach's compensation was affected around July 23, 2014.

**REQUEST FOR PRODUCTION NO. 102**

Documents related to Charles Eyler's compensation and how Charles Eyler's compensation was affected around July 23, 2014.

**REQUEST FOR PRODUCTION NO. 103**

Documents explaining Puma's executive cash bonus program and each instance when a Puma executive received a cash bonus.

**REQUEST FOR PRODUCTION NO. 104**

All drafts and versions of Puma's disclosures to any governmental agency, any financial institution, shareholders, potential shareholders.

13

**REQUEST FOR PRODUCTION NO. 105**

All communications related to Puma's disclosures to any governmental agency, any financial institution, shareholders, potential shareholders.

**REQUEST FOR PRODUCTION NO. 106**

All communications with any person who provided Puma with any information or documents relating to Neratinib.

**REQUEST FOR PRODUCTION NO. 107**

All communications with Glass Lewis and Institutional Shareholder Services, Inc. relating to Neratinib or the Neratinib clinical trials.

**REQUEST FOR PRODUCTION NO. 108**

Documentation of the harm Puma alleges it suffered as a result of Dr. Eshelman's statements in the November 30, 2015 Presentation; December 10, 2015 Presentation; and January 4, 2016 Letter.

**REQUEST FOR PRODUCTION NO. 109**

All communications with any of Puma's top ten stockholders during the consent solicitation.

**REQUEST FOR PRODUCTION NO. 110**

All records of any communications with any of Puma's top ten stockholders during the consent solicitation, including phone records, notes of calls or meetings, calendar entries reflecting the scheduling of calls or meetings, recordings or transcripts, and any other electronic or written medium documenting the fact that the communication occurred.

**REQUEST FOR PRODUCTION NO. 111**

All documents that Puma contend support, establish, demonstrate, or show that Dr. Eshelman made any of the allegedly defamatory statements in the November 30, 2015

14

Presentation; December 10, 2015 Presentation; and January 4, 2016 Letter with any degree of culpability.

**REQUEST FOR PRODUCTION NO. 112**

      All documents relating to and/or reflecting any communication by, between, or among, you, any person identified in your response to any of Dr. Eshelman's Interrogatories, and/or any other person relating to (a) the subject matter(s) of the Answer to Complaint, Affirmative Defenses, and Counterclaims.

**REQUEST FOR PRODUCTION NO. 113**

      All documents referenced in, identified by, or relied upon in preparing your Answer, Affirmative Defenses, and Counterclaims.

This 24th day of February 2017.          Respectfully Submitted,

                                 /s/ Megan L. Meier
                                 Andrew K. McVey
                                 North Carolina State Bar No. 20217
                                 (Local Civil Rule 83.1 Counsel)
                                 Murchinson, Taylor & Gibson PLLC
                                 16 North Fifth Avenue
                                 Wilmington, NC 28401-4537
                                 Telephone: 910-763-2426
                                 Email: amcvey@murchisontaylor.com

                                 Thomas A. Clare (of counsel)
                                 Elizabeth M. Locke (of counsel)
                                 Megan L. Meier (of counsel)
                                 CLARE LOCKE LLP
                                 902 Prince Street
                                 Alexandria, VA 22314
                                 Telephone (202) 628-7400
                                 Email: tom@clarelocke.com
                                 Email: libby@clarelocke.com
                                 Email: megan@clarelocke.com
                                 *Attorneys for:*
                                 *Dr. Fredric Eshelman*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Dr. Fredric N. Eshelman's Second Set of Requests (Nos. 63–112) for the Production of Documents to Puma Biotechnology, Inc. was served on February 24, 2017 to the following via email:

Pressly M. Millen
Womble Carlyle Sandridge & Rice, PLLC
Post Office Box 831
Raleigh, NC 27602
Telephone: (919) 755-2100
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
Email: bbishop@wilkinsonwalsh.com
Email: lalvinomcgill@wilkinsonwalsh.com
Email: psampson@wilkinsonwalsh.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
1158 26th Street, Suite 883
Santa Monica, CA 90402
Telephone: (424) 316-4000
Facsimile: (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Dated: February 24, 2017                    By: /s/ Megan L. Meier
                                                Megan L. Meier

16

# Exhibit 3

**From:** **Megan Meier** megan@clarelocke.com 📎

MM

**Subject:** Service of RFPs and Interrogatories
**Date:** June 3, 2016 at 4:47 PM
**To:** Paul Sampson psampson@wilkinsonwalsh.com
**Cc:** Brant W. Bishop bbishop@wilkinsonwalsh.com, Lori Alvino McGill lalvinomcgill@wilkinsonwalsh.com, Sean Eskovitz seskovitz@wilkinsonwalsh.com, ajamali@wilkisonwalsh.com, pmillen@wcsr.com, Tom Clare tom@clarelocke.com, Libby Locke libby@clarelocke.com, Dustin Pusch dustin@clarelocke.com, Andrew K. McVey AMcvey@murchisontaylor.com

Paul:

Please see the attached interrogatories and requests for production to Puma, which I am serving via email as Word versions pursuant to the agreement of the parties.

    

20160603 RFPs 1-62 to    20160603 Irogs 1-5 to
Puma FINAL.docx          Puma FINAL.docx

Megan Meier | Senior Associate
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
## No. 7:16-cv-00018-D

| | |
|---|---|
| FREDRIC N. ESHELMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALAN H. AUERBACH and PUMA | ) |
| BIOTECHNOLOGY, INC. | ) |
| | ) |
| Defendants. | ) |

## FREDRIC N. ESHELMAN'S FIRST SET OF REQUESTS (NOS. 1-62) FOR THE PRODUCTION OF DOCUMENTS TO PUMA BIOTECHNOLOGY, INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Fredric N. Eshelman hereby submits his First Set of Requests for the Production of Documents ("Requests for Production," "Requests," or "RFPs") to Defendant Puma Biotechnology, Inc. Dr. Eshelman requests that Puma produce the following documents electronically via FTP site (or comparable technology) accessible to megan@clarelocke.com, libby@clarelocke.com, tom@clarelocke.com, dustin@clarelocke.com, and amcvey@murchisontaylor.com, or by producing the documents in electronic format on a disc sent to Clare Locke LLP, 902 Prince Street, Alexandria, Virginia, 22314, or at such other place and time as agreed by counsel. In accordance with Rule 34 of the Federal Rules of Civil Procedure, Puma shall submit separate responses to the following requests within thirty (30) days of service. These Requests for Production shall be read, interpreted, and responded to in accordance with the definitions and instructions set forth below.

**DEFINITIONS**

1.      "Puma," "you," and "your" mean Puma Biotechnology, Inc., a defendant in the above-captioned action, and each of its present and former affiliates, subsidiaries, agents, assigns, representatives, employees, predecessors, successors, attorneys, and any person acting or purporting to act on Puma's behalf or for Puma's benefit.  The terms "Puma," "you," and "your" include but are not limited to any website, social media feed, or other digital content or platform that Puma directly or indirectly owns, operates, or controls, including, but not limited to, pumabiotechnology.com and the webpages that may be accessed from that website including investor.pumabiotechnology.com, investor.pumabiotechnology.com/consent-revocation, and http://investor.pumabiotechnology.com/sites/pumabiotechnology.investorhq.businesswire.com/files/doc_library/file/010716_PBYI_Investor_Presentation.pdf.

2.       "Board," "Puma's Board," "the Puma Board," and "the Board" mean the Board of Directors of Puma Biotechnology, Inc.

3.      "Latham & Watkins" means Latham & Watkins LLP, counsel for the Defendant, and each of its present and former partners, directors, associates, paralegals, employees, affiliates, subsidiaries, agents, assigns, representatives, predecessors, and successors.

4.      "Complaint" means the complaint Dr. Eshelman filed on February 2, 2016 in the U.S. District Court for the Eastern District of North Carolina, naming Puma as a defendant.

5.      "PPD" means Pharmaceutical Product Development, Inc. and each of its present and former affiliates, subsidiaries, agents, assigns, representatives, employees, predecessors, successors, attorneys, and any person acting or purporting to act on Puma's behalf or for Puma's benefit.

6.     "Investor Presentation" means the January 2016 Presentation titled "Continued Focus on Developing Shareholder Value," a copy of which was attached as "Exhibit A" to the Complaint.

7.     "Proxy Contest" means Dr. Eshelman's October 28, 2015 proposals to Puma's shareholders and all actions undertaken in response to or relating to those proposals.

8.     "News Release" means the public news release issued by Puma on January 8, 2016.

9.      "Person" means any natural person or any business, legal, or governmental entity or association.

10.     "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever made, including, but not limited to correspondence, conversations, dialogues, discussions, interview, consultations, and other understandings between or among two or more persons, whether face-to-face, or by telephone, fax, letter, email, website, social-media service, or any other means.

11.     "ESI" means electronically stored information.

12.     "Document" is an all-inclusive term with the broadest possible meaning accorded to it under case law and the Federal Rules of Civil Procedure, and means the original (or a true and accurate copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining, or otherwise) of any writing or record (whether in electronic, tangible, or any other form) in your actual or constructive possession, custody, or control, including all documents you have provided to your counsel.  "Document" shall include, but is not limited to, an electronic or computerized data compilation (including email and other computer-readable files), whether or not printed, stored,

3

or displayed, and any preliminary versions, drafts, or revisions thereof, ESI, communication, memorandum, letter, correspondence, electronic mail, text message, blog post, Internet post, report, note, message slip, telephone log or record, diary, journal, calendar, electronic organizer entry, writing, drawing, spreadsheet, presentation, ledger, minutes, financial report or record, draft, facsimile, contract, invoice, record of purchase or sale, graph, chart, photograph, video or audio recording, transcript, index, directory, or any other written, printed, typed, punched, taped, filmed, or graphic matter however produced, stored, or reproduced. "Document" also includes the file, folder tabs, and labels appended to or containing any documents, ***as well as any metadata applicable to any document***.

13. The terms "relating to" and/or "reflecting" mean relating to, reflecting, concerning, referring to, constituting, embodying, connected to, in connection with, comprising, regarding, evidencing, describing, identifying, stating, analyzing, containing information concerning, and/or in any way pertaining to the subject matter of this action.

## INSTRUCTIONS

1. Words shall have the definitions set forth above, ***regardless of whether they are capitalized or not***.

2. To bring within the scope of these Requests for Production all information that might otherwise be construed to be outside of their scope, the following rules of construction apply: (a) the singular shall include the plural and vice versa; (b) the masculine, feminine, or neuter pronoun shall not exclude other genders; (c) the connectives "and" and "or" shall be read either disjunctively or conjunctively as necessary to bring within the scope of these Requests for Production all responses that might otherwise be construed to be outside their scope; (d) the terms "any," "all," "each," or "every" shall be read to mean any, all, each, and every; (e) the

word "including" shall be read to mean including without limitation; (f) the present tense shall be construed to include the past tense and vice versa; and (g) references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

3.      These Requests for Production call for the production of documents that are in your actual or constructive possession, custody, or control, regardless of location, including in the possession, custody, or control of any current or former attorney(s), consultant(s), expert(s), and agent(s).  If a copy of a requested document is not identical to any other copy of the same document, by reason of alterations, marginal notes, comments, etc., all non-identical copies shall be produced.  All documents that are physically attached to each other when located for production shall be left so attached.

4.      If any document called for hereby was formerly in your possession, custody, or control and has been lost or destroyed, that document is to be identified in writing by: (a) addressor, addressee, and/or person who prepared or authorized the document; (b) date of preparation or transmittal; (c) subject matter; (d) number of pages, attachments, or appendices; (e) all persons to whom distributed; (f) date of loss or destruction; and (g) if destroyed, the manner of destruction, reason for destruction, persons authorizing destruction, and persons destroying the document.

5.      All documents are to be produced in their entirety, without abbreviation or expurgation, including both back and front thereof, with all attachments or other matters affixed thereto.

5

6. You shall produce responsive documents as they have been kept in the usual course of business. If there is no document responsive to any particular category, you shall so state in writing.

7. Your responses shall include all information known to you or otherwise available to you, including information within the knowledge or possession of Puma's attorneys, investigators, employees, or other agents. Where a complete answer to a particular Request for Production is not possible, the Request for Production should be answered to the extent possible and a statement should be made indicating why only a partial answer is given.

8. If you object to any part of a Request for Production, you must set forth your basis for the objection and respond to all parts of the Request for Production to which you do not object.

9. If in the course of responding to these Requests for Production you encounter any ambiguity in the Requests for Production, in a definition, or in an instruction relevant to the Requests for Production, explain what you find to be ambiguous and what construction you used in providing your answer.

10. If production of any requested document is objected to on the grounds that production is unduly burdensome, describe the undue burden.

11. If any information called for by any Request for Production herein is withheld because you claim that such information is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or by any privilege or protection from disclosure, provide a description of the basis of the claimed privilege or protection and all information necessary for the Court and Dr. Eshelman to assess the claim of privilege or protection in accordance with applicable law, including: (a) the type of document; (b) the general subject

matter of the document; (c) the date of the document; and (d) such other information as is sufficient to identify the document, including, where appropriate, the author, addressees, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

12.     No paragraph of these Requests for Production shall be construed with reference to any other paragraph for purposes of limitation.

13.     The specificity of any request herein shall not be construed to limit the generality or reach of any other request herein.

14.     These Requests for Production are continuing in nature, up to and during the course of trial.  In the event that you obtain additional documents that are responsive to these Requests for Production, you shall supplement your response to each such Request for Production and produce the additional documents promptly.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1

All documents relating to Dr. Eshelman.

### REQUEST FOR PRODUCTION NO. 2

All documents relating to PPD.

### REQUEST FOR PRODUCTION NO. 3

All drafts and versions of the Investor Presentation.

### REQUEST FOR PRODUCTION NO. 4

All documents relating to and/or reflecting the Investor Presentation.

### REQUEST FOR PRODUCTION NO. 5

All documents containing any edits to, comments on, notes regarding, or advice regarding the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 6**

All emails relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 7**

All text messages relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 8**

All of Alan Auerbach's text messages relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 9**

All of Marianne Ohanesian's text messages relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 10**

All documents relating to the Proxy Contest.

**REQUEST FOR PRODUCTION NO. 11**

All documents relating to Aventis Pharmaceuticals, Inc.

**REQUEST FOR PRODUCTION NO. 12**

All documents relating to the Ketek clinical trial.

**REQUEST FOR PRODUCTION NO. 13**

All documents relating to Dr. Maria Anne Kirkman Campbell.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show all contractual or business relationships that Puma had with any North Carolina Person in 2015 and/or 2016.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show all tax benefits Puma gained, earned, or utilized from North Carolina for the fiscal year 2015.

**REQUEST FOR PRODUCTION NO. 16**

All documents relating to and/or reflecting any accounts receivable Puma accrued or collected on account of a North Carolina Person in fiscal year 2015 and/or 2016.

**REQUEST FOR PRODUCTION NO. 17**

All documents relating to and/or reflecting any accounts payable Puma accrued on account of or paid to a North Carolina Person in fiscal year 2015 and/or 2016.

**REQUEST FOR PRODUCTION NO. 18**

All documents relating to and/or reflecting any marketing materials Puma directed towards, distributed in, or made available in North Carolina in 2015 and/or 2016.

**REQUEST FOR PRODUCTION NO. 19**

All draft and final agendas of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 20**

All draft and final minutes of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 21**

All documents containing any edits to, comments on, notes regarding, or advice regarding the minutes of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 22**

All draft and final transcripts of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 23**

All recordings of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 24**

All documents, materials, and/or presentations utilized, distributed, or presented in connection with any meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 25**

All call logs and meeting invitations relating to all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**REQUEST FOR PRODUCTION NO. 26**

The web browser histories (reflecting all websites visited) from May 18, 2015 through the present on the computer(s) and smart phone(s) of every person who had any role in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation or Puma's other statements about Dr. Eshelman.

**REQUEST FOR PRODUCTION NO. 27**

The web search histories (reflecting all searches conducted and search terms employed) from May 18, 2015 through the present on the computer(s) and smart phone(s) of every person who had any role in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation or Puma's other statements about Dr. Eshelman.

**REQUEST FOR PRODUCTION NO. 28**

All documents and websites viewed, reviewed, relied upon, printed and/or utilized by Puma in drafting, substantiating, assessing, analyzing, examining, investigating, scrutinizing, exploring, probing, confirming, or evaluating the truth, falsity, accuracy, or inaccuracy of Puma's statements about Dr. Eshelman and/or PPD in the Investor Presentation or Puma's other statements about Dr. Eshelman.

**REQUEST FOR PRODUCTION NO. 29**

All documents relating to and/or reflecting any act by Puma to assess, analyze, examine, investigate, scrutinize, explore, probe, confirm, or evaluate the truth, falsity, accuracy, or inaccuracy of the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 30**

All documents relating to and/or reflecting any act by Puma's attorneys to assess, analyze, examine, investigate, scrutinize, explore, probe, confirm, or evaluate the truth, falsity, accuracy, or inaccuracy of the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 31**

All documents Puma reviewed in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 32**

All documents Puma's attorneys reviewed in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 33**

All documents that Puma contends support, establish, demonstrate, or show that Dr. Eshelman perpetrated, committed, or otherwise had culpable involvement in fraud in connection with the Ketek clinical trial.

**REQUEST FOR PRODUCTION NO. 34**

All documents containing the information to which Puma referred in Latham & Watkins' January 27, 2016 letter to Dr. Eshelman, in which Puma claimed "Puma has uncovered additional, public, and true information about [Dr. Eshelman] and [Dr. Eshelman's] past activities which would be relevant to [the] shareholder proposal and prior comments in this regard."

**REQUEST FOR PRODUCTION NO. 35**

All documents and materials made available to, presented to, and/or reviewed by Puma's Board in deciding to assert that Dr. Eshelman "was involved in clinical trial fraud that was uncovered by the FDA," as stated on page 13 of the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 36**

All communications with any person who provided Puma with any information or documents relating to Dr. Eshelman or PPD.

**REQUEST FOR PRODUCTION NO. 37**

All documents relating to and/or reflecting Puma's decision to publish the Investor Presentation on January 7, 2016.

**REQUEST FOR PRODUCTION NO. 38**

All documents relating to and/or reflecting your presentation, publication, posting, or dissemination of the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 39**

All documents relating to and/or reflecting any communication by, between, or among, you, any person identified in your response to any of Dr. Eshelman's Interrogatories, and/or any other person relating to (a) Dr. Eshelman; (b) PPD; (c) the Investor Presentation; (d) the subject matter(s) of the Complaint; and/or (e) the subject matter(s) of these Requests for Production.

**REQUEST FOR PRODUCTION NO. 40**

All documents referenced in, identified by, or relied upon in preparing your Motions to Dismiss, Answer, responses to Interrogatories, or other discovery requests.

**REQUEST FOR PRODUCTION NO. 41**

All documents relating to and/or reflecting Puma's January 8, 2016 News Release.

**REQUEST FOR PRODUCTION NO. 42**

All drafts and versions of Puma's January 8, 2016 News Release.

**REQUEST FOR PRODUCTION NO. 43**

All documents containing any edits to, comments on, or advice regarding Puma's January 8, 2016 News Release.

**REQUEST FOR PRODUCTION NO. 44**

All communications, documents, and invoices exchanged with Beau Heath and/or any person employed by Business Wire from May 18, 2015 to February 15, 2016.

**REQUEST FOR PRODUCTION NO. 45**

All contracts (and any amendments, exhibits, and addenda to such contracts) between Puma and Business Wire.

**REQUEST FOR PRODUCTION NO. 46**

All communications, documents, and invoices exchanged with Larry W. Miller and/or any person employed by Innisfree M&A from May 18, 2015 to February 15, 2016.

**REQUEST FOR PRODUCTION NO. 47**

All contracts (and any amendments, exhibits, and addenda to such contracts) between Puma and Innisfree M&A.

**REQUEST FOR PRODUCTION NO. 48**

All communications, documents, and invoices exchanged with Broadridge Financial Services, Inc. from May 18, 2015 to February 15, 2016.

**REQUEST FOR PRODUCTION NO. 49**

All contracts (and any amendments, exhibits, and addenda to such contracts) between Puma and Broadridge Financial Services, Inc.

**REQUEST FOR PRODUCTION NO. 50**

All communications, documents, and invoices exchanged with Mediant Communications LLC Financial Services, Inc. May 18, 2015 to February 15, 2016.

**REQUEST FOR PRODUCTION NO. 51**

All communications, documents, and invoices exchanged with or prepared by Latham & Watkins that relate to and/or reflect any work relating to the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 52**

All documents reflecting or containing the information set forth in Brant Bishop's April 28, 2016 email and letter to Thomas Clare. For the avoidance of doubt, this Request does not seek any emails exchanged with Puma's attorneys, but—to the extent that the information contained in Mr. Bishop's email and letter exists in documents not created by attorneys—this Request seeks production of those documents.

**REQUEST FOR PRODUCTION NO. 53**

All documents relating to or reflecting the relationship between Puma and PPD, including contracts, invoices, records of accounts receivable and accounts payable, and all documents reflecting any work performed by PPD for Puma or vice versa.

**REQUEST FOR PRODUCTION NO. 54**

All communications with PPD.

**REQUEST FOR PRODUCTION NO. 55**

All communications with any former employee of PPD.

**REQUEST FOR PRODUCTION NO. 56**

All communications with any current employee of PPD.

**REQUEST FOR PRODUCTION NO. 57**

All documents referenced by, identified by, or relied upon by any testifying expert you intend to present in this case.

**REQUEST FOR PRODUCTION NO. 58**

All documents, tangible materials, or demonstrative evidence that you intend to introduce or use as evidence at trial or any other hearing in this action.

**REQUEST FOR PRODUCTION NO. 59**

All documents containing any admission you contend any party to this lawsuit, or anyone acting on a party's behalf, made relevant to the issues raised by the claims or defenses in this action.

**REQUEST FOR PRODUCTION NO. 60**

An organizational chart of Puma Biotechnology, Inc.

**REQUEST FOR PRODUCTION NO. 61**

All documents reflecting any policy or procedure relating to document or data retention and/or preservation that Puma has recommended, adopted, implemented, or followed.

**REQUEST FOR PRODUCTION NO. 62**

Any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the above-captioned action or indemnify or reimburse for payments made to satisfy any judgment in the above-captioned matter.


This 3rd day of June 2016.                              Respectfully Submitted,

                                                        /s/ Megan L. Meier
                                                        Andrew K. McVey
                                                        North Carolina State Bar No. 20217
                                                        (Local Civil Rule 83.1 Counsel)
                                                        Murchinson, Taylor & Gibson PLLC
                                                        16 North Fifth Avenue
                                                        Wilmington, NC 28401-4537
                                                        Telephone: 910-763-2426
                                                        Email: amcvey@murchisontaylor.com

                                                        Thomas A. Clare (of counsel)
                                                        Elizabeth M. Locke (of counsel)
                                                        Megan L. Meier (of counsel)
                                                        CLARE LOCKE LLP
                                                        902 Prince Street
                                                        Alexandria, VA 22314
                                                        Telephone (202) 628-7400
                                                        Email: tom@clarelocke.com
                                                        Email: libby@clarelocke.com
                                                        Email: megan@clarelocke.com
                                                        *Attorneys for:*
                                                        *Dr. Fredric Eshelman*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Dr. Fredric N. Eshelman's First Set of Requests (Nos. 1–62) for the Production of Documents to Puma Biotechnology, Inc. was served on June 3, 2016 to the following via email and U.S. Mail:

Pressly M. Millen
Womble Carlyle Sandridge & Rice, PLLC
Post Office Box 831
Raleigh, NC 27602
Telephone: (919) 755-2100
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
Email: bbishop@wilkinsonwalsh.com
Email: lalvinomcgill@wilkinsonwalsh.com
Email: psampson@wilkinsonwalsh.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
1158 26th Street, Suite 883
Santa Monica, CA 90402
Telephone: (424) 316-4000
Facsimile: (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Dated: June 3, 2016                    By: /s/ Megan L. Meier
                                       Megan L. Meier

17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:16-cv-00018-D**

| | |
|---|---|
| FREDRIC N. ESHELMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALAN H. AUERBACH and PUMA | ) |
| BIOTECHNOLOGY, INC. | ) |
| | ) |
| Defendants. | ) |

**FREDRIC N. ESHELMAN'S FIRST SET OF INTERROGATORIES (NOS. 1-5) TO**
**PUMA BIOTECHNOLOGY, INC.**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Dr. Fredric N. Eshelman hereby propounds the following Interrogatories, to be answered separately, fully, in writing, and under oath by Defendant Puma Biotechnology, Inc. within thirty (30) days of service. These Interrogatories shall be read, interpreted, and responded to in accordance with the definitions and instructions set forth below.

**DEFINITIONS**

1.      "Puma," "you," and "your" mean Puma Biotechnology, Inc., a defendant in the above-captioned action, and each of its present and former affiliates, subsidiaries, agents, assigns, representatives, employees, predecessors, successors, attorneys, and any person acting or purporting to act on Puma's behalf or for Puma's benefit. The terms "Puma," "you," and "your" include but are not limited to any website, social media feed, or other digital content or platform that Puma directly or indirectly owns, operates, or controls, including, but not limited to, pumabiotechnology.com and the webpages that may be accessed from that website including investor.pumabiotechnology.com, investor.pumabiotechnology.com/consent-revocation, and

http://investor.pumabiotechnology.com/sites/pumabiotechnology.investorhq.businesswire.com/files/doc_library/file/010716_PBYI_Investor_Presentation.pdf.

2.     "Board," "Puma's Board," "the Puma Board," and "the Board" mean the Board of Directors of Puma Biotechnology, Inc.

3.     "Latham & Watkins" means Latham & Watkins LLP, counsel for the Defendant, and each of its present and former partners, directors, associates, paralegals, employees, affiliates, subsidiaries, agents, assigns, representatives, predecessors, and successors.

4.     "Complaint" means the complaint Dr. Eshelman filed on February 2, 2016 in the U.S. District Court for the Eastern District of North Carolina, naming Puma as a defendant.

5.     "PPD" means Pharmaceutical Product Development, Inc. and each of its present and former affiliates, subsidiaries, agents, assigns, representatives, employees, predecessors, successors, attorneys, and any person acting or purporting to act on Puma's behalf or for Puma's benefit.

6.     "Investor Presentation" means the January 2016 Presentation titled "Continued Focus on Developing Shareholder Value," a copy of which was attached as "Exhibit A" to the Complaint.

7.     "Proxy Contest" means Dr. Eshelman's October 28, 2015 proposals to Puma's shareholders and all actions undertaken in response to or relating to those proposals.

8.     "News Release" means the public news release issued by Puma on January 8, 2016.

9.     "Person" means any natural person or any business, legal, or governmental entity or association.

10.     "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever made, including, but not limited to correspondence, conversations, dialogues, discussions, interview, consultations, and other understandings between or among two or more persons, whether face-to-face, or by telephone, fax, letter, email, website, social-media service, or any other means.

11.     "ESI" means electronically stored information.

12.     "Document" is an all-inclusive term with the broadest possible meaning accorded to it under case law and the Federal Rules of Civil Procedure, and means the original (or a true and accurate copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining, or otherwise) of any writing or record (whether in electronic, tangible, or any other form) in your actual or constructive possession, custody, or control, including all documents you have provided to your counsel.  "Document" shall include, but is not limited to, an electronic or computerized data compilation (including email and other computer-readable files), whether or not printed, stored, or displayed, and any preliminary versions, drafts, or revisions thereof, ESI, communication, memorandum, letter, correspondence, electronic mail, text message, blog post, Internet post, report, note, message slip, telephone log or record, diary, journal, calendar, electronic organizer entry, writing, drawing, spreadsheet, presentation, ledger, minutes, financial report or record, draft, facsimile, contract, invoice, record of purchase or sale, graph, chart, photograph, video or audio recording, transcript, index, directory, or any other written, printed, typed, punched, taped, filmed, or graphic matter however produced, stored, or reproduced.  "Document" also includes the file, folder tabs, and labels appended to or containing any documents, ***as well as any metadata applicable to any document***.

13. The terms "relating to" and/or "reflecting" mean relating to, reflecting, concerning, referring to, constituting, embodying, connected to, in connection with, comprising, regarding, evidencing, describing, identifying, stating, analyzing, containing information concerning, and/or in any way pertaining to the subject matter of this action.

14. The terms "state," "explain," and "describe" mean to set forth a complete and detailed statement of all information, circumstances, and facts that concern, refer to, relate to, reflect, comprise, or bear upon the matter concerning which information is requested.

15. The terms "identify" and "identification" mean: (a) when used in reference to a natural individual, state his or her full name, address, and telephone number; (b) when used in reference to a corporation, state its full corporate name, any names under which it does business, and its place of incorporation; (c) when used in reference to a partnership, state its full name, any name under which it does business, the place or any certificate of partnership (or other similar document) filing, and the address of its principal place of business; (d) when used in reference to a document, state the document litigation number or Bates number, if applicable, otherwise the number of pages and the nature of the document (*e.g.*, letter, memorandum, etc.), its title, its date, the name or names of its authors and recipients, and its present location or custodian; (e) when used in reference to a communication, if any part of the communication was written, identify the document or documents which refer to, relate to, or evidence the communication, and, to the extent that the communication was non-written, identify the persons participating in or witnessing the communication, and state the date and substance of the communication.

4

# INSTRUCTIONS

1.      Words shall have the definitions set forth above, ***regardless of whether they are capitalized or not***.

2.      To bring within the scope of these Interrogatories all information that might otherwise be construed to be outside of their scope, the following rules of construction apply: (a) the singular shall include the plural and vice versa; (b) the masculine, feminine, or neuter pronoun shall not exclude other genders; (c) the connectives "and" and "or" shall be read either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories all responses that might otherwise be construed to be outside their scope; (d) the terms "any," "all," "each," or "every" shall be read to mean any, all, each, and every; (e) the word "including" shall be read to mean including without limitation; (f) the present tense shall be construed to include the past tense and vice versa; and (g) references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

3.      You must answer each Interrogatory fully, completely, in writing, and under oath, and must sign your answers.  Your response shall include all information known to you or otherwise in your possession, custody, or control, regardless of location, including in the possession, custody, or control of any current or former attorney(s), consultant(s), expert(s), and agent(s).  If you cannot completely answer any Interrogatory after the exercise of reasonable diligence, you shall furnish as complete an answer as you can, and you shall explain in detail the reasons you cannot give a full answer, including a statement as to what is needed in order to give a complete answer.

4.      If you object to any part of an Interrogatory, you must set forth your basis for the objection and respond to all parts of the Interrogatory to which you do not object.

5.     If in the course of responding to these Interrogatories you encounter any ambiguity in the Interrogatories, in a definition, or in an instruction relevant to the Interrogatories, explain what you find to be ambiguous and what construction you used in providing your answer.

6.     If you object to any Interrogatory on the grounds that responding is unduly burdensome, describe the undue burden.

7.     If any information called for by any Interrogatory herein is withheld because you claim that such information is protected from discovery by the attorney work-product doctrine or by any privilege or protection from disclosure, provide a description of the basis of the claimed privilege and all information necessary for the Court and Plaintiff to assess the claim of privilege in accordance with applicable federal and local rules, including: (a) the applicable subject matter; (b) the applicable date; and (c) the identity of any person(s) who authored, made, received, or otherwise learned of the information.

8.     No paragraph of these Interrogatories shall be construed with reference to any other paragraph for purposes of limitation.

9.     The specificity of any request herein shall not be construed to limit the generality or reach of any other request herein.

10.     These Interrogatories are continuing in nature, up to and during the course of trial. In the event that you obtain additional information that is responsive to these Interrogatories, you shall promptly supplement your response to each such Interrogatory.

## INTERROGATORIES

## INTERROGATORY NO. 1

Identify every person who directly or indirectly participated in researching, drafting, editing, discussing, fact-checking, presenting, publishing, or disseminating the Investor

Presentation and/or the News Release, and for each such person, provide a detailed description of his or her participation.

**INTERROGATORY NO. 2**

Identify every person who directly or indirectly participated in the proxy contest, including by conducting any research, due diligence, or investor outreach, or by communicating regarding the proxy contest, and for each such person, provide a detailed description of his or her participation.

**INTERROGATORY NO. 3**

Identify each person with whom Puma has communicated regarding Dr. Eshelman or PPD and describe the circumstances and content of such communications. For the avoidance of doubt, this interrogatory seeks information regarding Puma's internal communications regarding Dr. Eshelman or PPD as well as information regarding Puma's communications with any third parties regarding Dr. Eshelman or PPD.

**INTERROGATORY NO. 4**

Describe each act undertaken by Puma to assess, analyze, examine, investigate, explore, probe, confirm, or evaluate, directly or indirectly, the truth, falsity, accuracy, or inaccuracy of Puma's statements about Dr. Eshelman or PPD, including by identifying: (a) the date on which such act was undertaken; (b) the specific employee(s) or other person(s) who undertook such act; (c) all web searches conducted; (d) all websites viewed or visited; and (e) all documents reviewed or printed.

**INTERROGATORY NO. 5**

Identify the computer(s), email account(s), electronic-storage device(s), and other electronic devices or software you used in researching, drafting, editing, discussing, fact-checking, presenting, publishing, or disseminating the Investor Presentation, including any

7

computer, email account, smartphone, BlackBerry, iPhone, iPad, or other portable electronic device, any flash drive or external or electronic-storage device or media, any video equipment or device, and any server.

This 3rd day of June 2016.                         Respectfully Submitted,

                                                   /s/ Megan L. Meier
                                                   Andrew K. McVey
                                                   North Carolina State Bar No. 20217
                                                   (Local Civil Rule 83.1 Counsel)
                                                   Murchinson, Taylor & Gibson PLLC
                                                   16 North Fifth Avenue
                                                   Wilmington, NC 28401-4537
                                                   Telephone: 910-763-2426
                                                   Email: amcvey@murchisontaylor.com

                                                   Thomas A. Clare (of counsel)
                                                   Elizabeth M. Locke (of counsel)
                                                   Megan L. Meier (of counsel)
                                                   CLARE LOCKE LLP
                                                   902 Prince Street
                                                   Alexandria, VA 22314
                                                   Telephone (202) 628-7400
                                                   Email: tom@clarelocke.com
                                                   Email: libby@clarelocke.com
                                                   Email: megan@clarelocke.com
                                                   *Attorneys for:*
                                                   *Dr. Fredric Eshelman*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Dr. Fredric N. Eshelman's First Set of Interrogatories (Nos. 1–5) to Puma Biotechnology, Inc. was served on June 3, 2016 to the following via email and U.S. Mail:

Pressly M. Millen
Womble Carlyle Sandridge & Rice, PLLC
Post Office Box 831
Raleigh, NC 27602
Telephone: (919) 755-2100
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
Email: bbishop@wilkinsonwalsh.com
Email: lalvinomcgill@wilkinsonwalsh.com
Email: psampson@wilkinsonwalsh.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
1158 26th Street, Suite 883
Santa Monica, CA 90402
Telephone: (424) 316-4000
Facsimile: (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Dated: June 3, 2016                     By: /s/ Megan L. Meier
                                        Megan L. Meier

# Exhibit 4



WWW.WILKINSONWALSH.COM

——

A LIMITED LIABILITY PARTNERSHIP

1900 M STREET, NW
SUITE 800
WASHINGTON, D.C. 20036

June 3, 2016

VIA EMAIL

Megan L. Meier
Clare Locke LLP
902 Prince Street
Alexandria, VA 22314

Re: Eshelman v. Puma Biotechnology

Dear Megan:

We have your letter of May 6, 2016. Please note that, as you are aware, Puma Biotechnology has challenged personal jurisdiction, venue, and the viability of asserted claims, and has invoked the provisions of California's anti-SLAPP statute, in response to the complaint in this case. Puma Biotechnology accordingly does not believe it is now under an obligation to conduct discovery in this case, and pending resolution of its motions does not intend to do so. If Puma's motion were to be denied, it would respond to the points in your letter promptly after such a decision.

While we do not necessarily agree with all the assertions in your letter, we do understand and intend to advise Puma to continue to comply with its preservation obligations.

Sincerely,

*Brant W. Bishop, P.C.*

Brant W. Bishop, P.C.

# Exhibit 5

**From:** **Megan Meier** megan@clarelocke.com
**Subject:** Re: Puma's Improper Objections to RFPs 14-18
**Date:** July 22, 2016 at 10:44 AM
**To:** Paul Sampson psampson@wilkinsonwalsh.com
**Cc:** Tom Clare tom@clarelocke.com, Libby Locke libby@clarelocke.com, Andrew K. McVey amcvey@murchisontaylor.com, Brant W. Bishop bbishop@wilkinsonwalsh.com, Aurash Jamali ajamali@wilkinsonwalsh.com, Millen, Press PMillen@wcsr.com, Lori A. McGill lalvinomcgill@wilkinsonwalsh.com

Paul:

From your response, I understand Puma's answers to my questions to be:

(1) Is Puma agreeing to produce all documents responsive to RFPs 14-18 that relate to Puma's relationship with PPD?  <u>Puma's Answer</u>:  No.

(2) When will Puma be producing documents responsive to RFPs 14-18?  <u>Puma's Answer</u>:  Puma will not provide a date by which it will produce documents responsive to RFPs 14-18.

(3) Will Puma agree that Dr. Eshelman may submit a supplemental brief in opposition to Puma's motion to dismiss for lack of personal jurisdiction after Puma has produced documents responsive to RFPs 14-18?  <u>Puma's answer</u>:  No.

If I have misunderstood Puma's answers to any of these questions, please let me know immediately.

Megan Meier | Partner
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Jul 22, 2016, at 9:37 AM, Paul Sampson <psampson@wilkinsonwalsh.com> wrote:

Megan:

Sorry I couldn't get to you yesterday.  We had an emergency come up in a case that is going to trial soon.

We will produce documents responsive to RFPs 14-18 if they are related to the investor presentation from which Eshelman's claims in this case arise.  You have only asserted that specific jurisdiction exists and consciously decided not to argue that general jurisdiction exists.  Any documents that might be related to Puma's relationship with PPD or any other North Carolina company are only relevant to the claims in this case if they are related to the investor presentation.  That is the nature of our objections to RFPs 14-18.  We do not believe there will be many such documents, if any.

We don't agree to supplemental briefing of the motion to dismiss.  The briefing has been completed.  Eshelman did not assert the need for any jurisdictional discovery before a ruling on the motion, nor ask for supplemental submissions, nor reserve the position that it wanted to later change the basis for asserting jurisdiction to be general jurisdiction – despite the fact that we specifically highlighted that general jurisdiction was lacking.

We have collected and are processing for review documents within the scope of our responses.  We will give you further information when we have better clarity about when we can start to produce documents.  In the meantime, we will try to get you a draft confidentiality order to cover any documents that might have either side's confidential information.

Paul

Paul

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Thursday, July 21, 2016 12:05 PM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>
**Cc:** Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Andrew K.
McVey <amcvey@murchisontaylor.com>; Brant Bishop <bbishop@wilkinsonwalsh.com>;
Aurash Jamali <ajamali@wilkinsonwalsh.com>; Millen, Press <PMillen@wcsr.com>
**Subject:** Re: Puma's Improper Objections to RFPs 14-18

Paul:

Could you clarify your answers to my questions:

(1) Is Puma agreeing to produce all documents responsive to RFPs 14-18 that relate to Puma's
relationship with PPD?
(2) When will Puma be producing documents responsive to RFPs 14-18?
(3) Will Puma agree that Dr. Eshelman may submit a supplemental brief in opposition to Puma's
motion to dismiss for lack of personal jurisdiction after Puma has produced documents responsive
to RFPs 14-18?

Megan Meier | Partner
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Jul 21, 2016, at 11:54 AM, Paul Sampson <psampson@wilkinsonwalsh.com> wrote:

Megan:

To the extent that there were any North Carolina companies involved with the investor
presentation, then any non-privileged documents we locate related to their involvement with
the investor presentation would be included in what we are reviewing and will produce.

Paul

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Wednesday, July 20, 2016 6:14 PM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>
**Cc:** Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Andrew K.
McVey <amcvey@murchisontaylor.com>; Brant Bishop <bbishop@wilkinsonwalsh.com>;
Aurash Jamali <ajamali@wilkinsonwalsh.com>; Millen, Press <PMillen@wcsr.com>
**Subject:** Re: Puma's Improper Objections to RFPs 14-18

Paul:

Below, you wrote, "we are perfectly willing to withdraw our objections for documents that relate to *specific jurisdiction*—that is, documents that are related to Puma's Investor Presentation—to the extent they otherwise are responsive to RFPs 14 through 18." When will Puma be producing those documents? Also, please confirm that, with the above, Puma is agreeing to produce all documents responsive to RFPs 14-18 that relate to Puma's relationship with PPD as well as any North Carolina companies that had any involvement with the investor presentation.

Megan Meier | Partner
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Jul 19, 2016, at 6:21 PM, Megan Meier <megan@clarelocke.com> wrote:

Paul:

I understand from your response that Puma is withholding documents responsive to RFPs 14-18, including documents relevant to specific jurisdiction. Based on this understanding, we intend to file a motion for leave to submit a supplemental brief in opposition to Puma's motion to dismiss for lack of personal jurisdiction after Puma has produced all documents responsive to those RFPs.

Megan Meier | Senior Associate
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Jul 19, 2016, at 5:37 PM, Paul Sampson <psampson@wilkinsonwalsh.com> wrote:

Megan:

I was actually very surprised by your first email, since Eshelman has not asserted general jurisdiction and abandoned any such theory when he decided not to respond to Puma's arguments that general jurisdiction is lacking. Your second email appears to confirm that you hope to fish for documents that you could somehow use to assert for the first time a general jurisdiction theory. This would be improper, for the reasons given below.

In the motion to dismiss, Puma argued that the Court does not have "general jurisdiction" over Mr. Auerbach or Puma because "[t]he allegations in the Complaint and the facts in evidence fall far short of establishing the sort of 'affiliations with the State … [that] are so constant and pervasive as to render [either defendant] essentially at home in the forum State' so that it is proper 'to hear any and all claims against it.'" Docket No. ("Dkt.") 21 at 5 (quoting *Daimler AG v. Bauman*, 134 S.Ct. 746, 751 (2014)).

In support of its motion to dismiss, Puma submitted an affidavit showing that "Puma has no

offices, property, or employees in North Carolina, and neither pays taxes nor is registered to do business here." *Id.* at 6. The affidavit also put the lie to Eshelman's recklessly false allegation that Mr. Auerbach used to live and work in North Carolina. *Id.* at 6-7. And by pointing to the very filing you submitted with your client's sworn affidavit, Puma's submissions also debunked Eshelman's false assertion that Puma selected a North Carolina company to offer shares to the public. In any event, Eshelman did not proffer any evidence to counter Puma's affidavit and submission on general jurisdiction.

Under *Daimler* and other similar cases, there is no good faith basis to claim that Puma is subject to general jurisdiction in North Carolina. Indeed, that is what Eshelman implicitly acknowledged when he agreed that the Court lacks general jurisdiction by dropping all allegations against Mr. Auerbach, *see* Dkt. 27, and failing even to argue, much less proffer any evidence, that general jurisdiction was appropriate. Indeed, he said nothing to suggest that contrary evidence even exists. In fact, while Puma's grounds for dismissal included an argument that general jurisdiction was lacking and a separate argument that specific jurisdiction was lacking, Eshelman's response argued **only** that "this Court has **specific jurisdiction** over Puma." Dkt. 28 at 8 (emphasis added). Obviously, for specific jurisdiction, the "contacts with the State" that matter are the ones that are "the **basis for suit**." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (emphasis added). General jurisdiction, in contrast, "arise[s] from the defendant's general, more persistent, but unrelated contacts with the State." *Id.*

By eschewing any argument that the Court has general jurisdiction over Puma, Eshelman confined the theory of jurisdiction in this case to Puma's contacts with North Carolina that are the basis for the suit—that is, the events surrounding the January 2016 Investor Presentation. Given that Eshelman has pressed only specific jurisdiction theories, Puma's "unrelated contacts with the State"—to the extent there are any—are irrelevant to jurisdiction and to the case.

The documents requested by RFPs 14 through 18—documents, as you assert below, showing Puma's **general** "contractual and business relationships with North Carolina businesses and people (RFP 14), tax benefits Puma gained from North Carolina (RFP 15), accounts receivable Puma accrued or collected on account of North Carolina businesses and people (RFP 16), accounts payable Puma accrued on account of or paid to North Carolina business and people (RFP 17), and marketing materials Puma directed towards, distributed in, or made available in North Carolina (RFP 18)"—are irrelevant to the specific jurisdiction inquiry to the extent they are not related to the allegedly defamatory Investor Presentation. As a result, we stand by our objection that they are "not relevant to the parties' claims and defenses and [are] disproportional to the needs of the case."

Further, in opposing Puma's motion to dismiss, Eshelman "ma[de] no request for specific information" from Puma to establish general jurisdiction (or specific jurisdiction, for that matter), *Vision Media TV Grp., LLC v. Forte*, 724 F. Supp. 2d 1260, 1267 n.3 (S.D. Fla. 2010), even though, "[i]f a party needs jurisdictional discovery, that party has an obligation to request it in a timely manner," *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 139 (1st Cir. 2006) (internal quotation marks omitted); *see also United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280-81 (11th Cir. 2009) (denying jurisdictional discovery where "[plaintiff] never formally moved the district court for jurisdictional discovery, but, instead, buried such requests in its briefs as a proposed alternative to dismissing [defendant] on the state of the current record."). Nor has Eshelman "provide[d] the Court with some showing establishing the need for jurisdictional discovery." *Vision Media*, 724 F. Supp. 2d at 1267 n.3. Multiple courts have indicated that "a plaintiff

*Vision Media*, 724 F. Supp. 2d at 1207 n.3. Multiple courts have indicated that "a plaintiff seeking jurisdictional discovery should make a detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce." *City of Moundridge v. Exxon Mobil Corp.*, 244 F.R.D. 10 (D.D.C. 2007).

Given that Eshelman has already conceded that there is no general jurisdiction, the broad requests of RFPs 14 through 18 seem calculated just to impose burdens and expense on Puma. At most, they amount to a "fishing expedition in hopes that discovery will sustain the exercise of personal jurisdiction." *Atlantis Hydroponics, Inc. v. Int'l Growers Supply, Inc.*, 915 F. Supp. 2d 1365, 1380 (N.D. Ga. 2013) (internal quotation marks omitted); *see also Rich v. KIS Cal., Inc.*, 121 F.R.D. 254 (M.D.N.C. 1988) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery confined to issues of personal jurisdiction should it conclude that such discovery will be a fishing expedition.").

All that said, we are perfectly willing to withdraw our objections for documents that relate to **specific jurisdiction**—that is, documents that are related to Puma's Investor Presentation—to the extent they otherwise are responsive to RFPs 14 through 18. Indeed, that is the position we have effectively committed to already when (subject to our motion to dismiss) we agreed to provide responsive information to other requests related to events surrounding the Investor Presentation.

Please let me know if you would like to discuss.

Paul

---

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Monday, July 18, 2016 5:56 PM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>; Brant Bishop <bbishop@wilkinsonwalsh.com>
**Cc:** Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Andrew K. McVey <amcvey@murchisontaylor.com>
**Subject:** Re: Puma's Improper Objections to RFPs 14-18

Paul:

I'm following up regarding the below.

Is Puma withholding documents responsive to RFPs 14-18?

If so, will Puma agree to produce them and agree that Dr. Eshelman may submit a supplemental brief in opposition to Puma's motion to dismiss for lack of personal jurisdiction?

Please call my cell to discuss: 202-280-4454.

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street
Alexandria, Virginia 22314

Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Jul 18, 2016, at 12:35 PM, Megan Meier <[megan@clarelocke.com](mailto:megan@clarelocke.com)> wrote:

Paul:

A number of Puma's untimely objections are improper for reasons other than their untimeliness. It will take some time for me to address all of the deficiencies in Puma's responses and objections, but for now, I write to address Puma's defiance of the Court's June 21 order with respect to RFPs 14-18.

Dr. Eshelman's requests for production seek documents revealing the true extent of Puma's contacts with and purposeful availment of the state of North Carolina. For example, they seek documents showing Puma's contractual and business relationships with North Carolina businesses and people (RFP 14), tax benefits Puma gained from North Carolina (RFP 15), accounts receivable Puma accrued or collected on account of North Carolina businesses and people (RFP 16), accounts payable Puma accrued on account of or paid to North Carolina business and people (RFP 17), and marketing materials Puma directed towards, distributed in, or made available in North Carolina (RFP 18).

In response to these requests, Puma objected to providing responses "until the Court has ruled on its motion to dismiss." Puma already asked the Court to stay discovery until after the Court had ruled on Puma's motion to dismiss, and the Court denied that motion. Puma's objection flouts the Court's order. By raising it, Puma has improperly sought to grant itself the relief the Court expressly denied.

Puma's objections are troubling for another reason. In its Motion to Dismiss, Puma made a number of factual assertions for the purpose of giving the Court the impression that Puma has no material contacts with the state of North Carolina. If that impression was true and complete, Puma should have no trouble responding that the documents requested in RFPs 14-18 do not exist. Instead, Puma's objections suggest that Puma does have numerous material contacts with North Carolina that it chose not to disclose to the Court when moving to dismiss for lack of jurisdiction. Puma's efforts to delay the discovery of those contacts is improper, particularly in light of the pending jurisdictional motion and the Court's June 21 order.

Please let me know by 5:00pm today whether Puma will withdraw all objections to RFPs 14-18 and produce all documents responsive to those requests without further delay. You can reach me at any time today on my cell phone: 202-280-4454.

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.

# Exhibit 6

**From:** **Megan Meier** megan@clarelocke.com
**Subject:** Service of Interrogatories 9-10
**Date:** June 28, 2017 at 4:38 PM
**To:** Paul Sampson psampson@wilkinsonwalsh.com
**Cc:** Millen, Press pmillen@wcsr.com, **Brant Bishop** bbishop@wilkinsonwalsh.com, **Lori A. McGill** lalvinomcgill@wilkinsonwalsh.com, **Sean Eskovitz** seskovitz@wilkinsonwalsh.com, **Aurash Jamali** ajamali@wilkinsonwalsh.com, **Audrey Rabenberg** audrey@clarelocke.com, **Daniel Watkins** daniel@clarelocke.com



Paul:

Please see the attached interrogatories.

Megan Meier | Partner
**C L A R E  L O C K E  L L P**
10 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

This electronic message transmission contains information from the law firm of Clare Locke LLP, which may be confidential or privileged. The information is intended exclusively for the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you received this electronic transmission in error, please notify us immediately at admin@clarelocke.com.

  

20170628 Irog.   20170628 Irog.
9-10 to...a.docx   9-10 to...ma.pdf

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| *Plaintiff*, | ) | **Case No. 7:16-cv-00018-D** |
| | ) | |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## DR. FREDRIC ESHELMAN'S FOURTH SET OF INTERROGATORIES (NOS. 9-10) TO PUMA BIOTECHNOLOGY, INC.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Dr. Fredric Eshelman issues the following Interrogatories, to be answered fully, in writing, and under oath by Defendant Puma Biotechnology, Inc. within thirty (30) days of service. These Interrogatories shall be read, interpreted, and responded to in accordance with the definitions and instructions set forth below.

## INTERROGATORIES

### INTERROGATORY NO. 9

For every meeting, conversation, or call from July 2015 to the present in which Alan Auerbach or Mariann Ohanesian participated and during which Dr. Eshelman or the Ketek clinical trial was mentioned, referenced, or discussed (whether by name or otherwise), identify: (1) the date, time, and duration; (2) the medium (i.e., in-person meeting, in-person conversation, videoconference, telephone call, etc.); (3) all participants; and (4) the subject-matter.

**INTERROGATORY NO. 10**

Identify the Bates stamps of all documents responsive to Request for Production No. 34, "containing the information to which Puma referred in Latham & Watkins' January 27, 2016 letter to Dr. Eshelman, in which Puma claimed 'Puma has uncovered additional, public, and true information about [Dr. Eshelman] and [Dr. Eshelman's] past activities which would be relevant to [the] shareholder proposal and prior comments in this regard.'"

## DEFINITIONS

1. "Puma," "you," and "your" mean Puma Biotechnology, Inc., a defendant in the above-captioned action.

2. "Complaint" means the complaint the Plaintiff filed on February 2, 2017, in the U.S. District Court for the Eastern District of North Carolina, naming Puma as a defendant.

3. "Plaintiff" refers to the Dr. Fredric Eshelman.

4. "Person" means any natural person or any corporation, legal, or governmental entity or association.

5. "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever made, including, but not limited to, correspondence, conversations, meetings, dialogues, discussions, interviews, consultations, and other understandings between or among two or more Persons, whether face-to-face, or by telephone, videoconference, fax letter, email, website, social-media service, or any other means.

6. "Investor Presentation" means the January 2016 Presentation titled "Continued Focus on Developing Shareholder Value," a copy of which was attached as "Exhibit A" to the Complaint and is currently hosted at http://investor.pumabiotechnology.com/sites/pumabiotechnology.investorhq.businesswire.com/files/doc_library/file/010716_PBYI_Investor_Presentation.pdf.

7. "Document" is an all-inclusive with the broadest possible meaning accorded to it under case law and the Federal Rules of Civil Procedure, and means the original (or a true and accurate copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining, or otherwise) of any writing or record (whether in tangible, electronic, or any other form) in your actual or constructive possession, custody, or control, including all documents you have provided to your

3

counsel. "Document" shall include, but is not limited to, an electronic or computerized data compilation (including email and other computer-readable files) whether printed, stored, or displayed, or otherwise, and any preliminary versions, drafts or revisions, ESI, communication, memorandum, letter, correspondence, email, cellular telephone or internet message, blog post, Internet post, social media post or message, report, note, message slip, telephone log or record, journal, calendar, electronic organizer entry, writing, drawing, spreadsheet, presentation, ledger, minutes, financial report or record, draft, fax, contract, invoice, record of purchase or sale, graph, chart, photograph, video or audio recording, metadata related to video or audio recordings, transcript index, directory, or any other written, printed, typed, punched, taped, filmed or graphic matter however produced, stored, or reproduced. "Document" also includes the file, folder tabs, and labels with or containing any Documents, and any metadata associated with any Document.

8.    "Relating to" and/or "reflecting" mean relating to, reflecting, concerning, referring to, constituting, embodying, connected to, in connection with, comprising, regarding, evidencing, describing, identifying, stating, analyzing, containing information concerning, and/or in any way pertaining to the subject matter of this action.

9.    The terms "State," "Explain," and "Describe" mean to set forth a complete and detailed statement of all information, circumstances, and facts concern, refer to, relate to, reflect, comprise, or bear upon the matter concerning which information is requested.

10.    The term "Identify" means: (a) when referring to a natural individual, state the full name, address, telephone number, and email address of such a person; (b) when used in reference to a corporation or other business association or legal entity, state its full corporate or entity name, and any names under which it does business; (c) when used in reference to a Communication, if any part of the Communication was written, identify the document or

documents which refer to, relate to, or evidence the Communication, and to the extent that the Communication was on-written, identify the Persons participating in the Communication, and State the date and substance of the Communication.

11.     The term "Accessed" means viewed, displayed, visited, downloaded, printed and viewed on paper, or otherwise displayed on another's computer or other device.

## INSTRUCTIONS

1.     Words shall have the definitions set forth above, regardless of whether they are capitalized.

2.     To bring within the scope of these Interrogatories all information that might otherwise be construed to be outside of their scope, the following rules of construction apply: (a) the singular shall include the plural and vice versa; (b) the masculine, feminine, or neuter pronoun shall not exclude other genders; (c) the connectives "and" and "or" shall be read either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories all responses that might otherwise be construed to be outside their scope; (d) the terms "any," "all," "each," or "every" shall be read to mean any, all, each, and every; (e) the word "including" shall be read to mean including without limitation; (f) the present tense shall be construed to include the past tense and vice versa; and (g) references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

3.     You must answer these Interrogatories fully, completely, in writing, and under oath, and must sign your answers.  Your response shall include all information known to you or otherwise in your possession, custody, or control, regardless of location, including in the possession, custody, or control of any current or former attorney(s), consultant(s), expert(s), and agent(s).  If you cannot completely answer an Interrogatory after the exercise of reasonable diligence, you shall furnish as complete an answer as you can, and you shall explain in detail the reasons you cannot give a full answer, including a statement as to what is needed in order to give a complete answer.

4.     If you object to any part of an Interrogatory, you must set forth your basis for the objection and respond to all parts of the Interrogatory to which you do not object.

5.     If in the course of responding to these Interrogatories you encounter any ambiguity in an Interrogatory, in a definition, or in an instruction relevant to the Interrogatory, explain what you find to be ambiguous and what construction you used in providing your answer.

6.     If you object to an Interrogatory on the grounds that responding is unduly burdensome, describe the undue burden.

7.     If any information called for by an Interrogatory herein is withheld because you claim that such information is protected from discovery by the attorney work-product doctrine or by any privilege or protection from disclosure, provide a description of the basis of the claimed privilege and all information necessary for the Court and Plaintiff to assess the claim of privilege in accordance with applicable federal and local rules, including: (a) the applicable subject matter; (b) the applicable date; and (c) the identity of any person(s) who authored, made, received, or otherwise learned of the information.

8.     No paragraph of these Interrogatories shall be construed with reference to any other paragraph for purposes of limitation.

9.     The specificity of any request herein shall not be construed to limit the generality or reach of any other request herein.

10.     These Interrogatories are continuing in nature, up to and during the course of trial. In the event that you obtain additional information that is responsive to an Interrogatory, you shall promptly supplement your response to it.

This 28th day of June 2017.

Respectfully Submitted,

/s/ Megan L. Meier

Andrew K. McVey
North Carolina State Bar No. 20217
(Local Civil Rule 83.1 Counsel)
Murchinson, Taylor & Gibson PLLC
16 North Fifth Avenue
Wilmington, NC 28401-4537
Telephone: 910-763-2426
Email: amcvey@murchisontaylor.com

Thomas A. Clare (of counsel)
Elizabeth M. Locke (of counsel)
Megan L. Meier (of counsel)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com
*Attorneys for:*
*Dr. Fredric Eshelman*

8

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Dr. Fredric N. Eshelman's Fourth Set of Interrogatories (Nos. 9-10) to Puma Biotechnology, Inc. was served on June 28, 2017 to the following via email:

Pressly M. Millen
Womble Carlyle Sandridge & Rice, PLLC
Post Office Box 831
Raleigh, NC 27602
Telephone: (919) 755-2100
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
Email: bbishop@wilkinsonwalsh.com
Email: lalvinomcgill@wilkinsonwalsh.com
Email: psampson@wilkinsonwalsh.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
11726 San Vicente Blvd., Suite 600
Los Angeles, CA 90049
Telephone: (424) 316-4000
Facsimile: (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Dated: June 28, 2017                      By: /s/ Megan L. Meier
                                          Megan L. Meier

9

# Exhibit 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
## No. 7:16-cv-00018-D

| | |
|---|---|
| FREDRIC N. ESHELMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALAN H. AUERBACH and PUMA | ) |
| BIOTECHNOLOGY, INC. | ) |
| | ) |
| Defendants. | ) |

## DEFENDANT PUMA BIOTECHNOLOGY, INC.'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS (NOS. 1-62) FOR THE PRODUCTION OF DOCUMENTS

Defendant Puma Biotechnology, Inc. ("Puma") responds as follows to Plaintiff's First Set of Requests (Nos. 1-62) for the Production of Documents ("Requests for Production," "Requests," or "RFPs").

## REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1

All documents relating to Dr. Eshelman.

**PUMA'S RESPONSE**.  Subject to and without waiving the objections and conditions set forth below, Puma will search for and produce relevant, non-privileged documents that are responsive to this request.

## REQUEST FOR PRODUCTION NO. 2

All documents relating to PPD.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 2 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Subject to and without waiving the foregoing objections and objections and conditions set

forth below, Puma will search for and produce any relevant, non-privileged documents relating to PPD and the Ketek clinical trial or fraud in relation to it.

**REQUEST FOR PRODUCTION NO. 3**

All drafts and versions of the Investor Presentation.

**PUMA'S RESPONSE**.  Subject to and without waiving the objections and conditions set forth below, Puma will search for and produce any relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 4**

All documents relating to and/or reflecting the Investor Presentation.

**PUMA'S RESPONSE**.  Subject to and without waiving the objections and conditions stated below, Puma will search for and produce any relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 5**

All documents containing any edits to, comments on, notes regarding, or advice regarding the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 5 to the extent it calls for the work product or advice of attorneys or communications to attorneys for the purposes of seeking advice, on the grounds that it is protected by the work product doctrine and the attorney-client privilege. Puma also objects to RFP No. 5 as duplicative of RFP No. 4.  See Puma's responses to RFP No. 4.

**REQUEST FOR PRODUCTION NO. 6**

All emails relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 6 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

2

**REQUEST FOR PRODUCTION NO. 7**

All text messages relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 7 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 8**

All of Alan Auerbach's text messages relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 8 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 9**

All of Marianne Ohanesian's text messages relating to Dr. Eshelman, PPD, and/or the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 9 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 10**

All documents relating to the Proxy Contest.

**PUMA'S RESPONSE**.  Subject to and without waiving the objections and conditions set forth below, Puma will search for and produce relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 11**

All documents relating to Aventis Pharmaceuticals, Inc.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 11 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the

case. Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce any relevant, non-privileged documents relating to Aventis Pharmaceuticals, Inc. and the Ketek clinical trial or fraud in relation to it.

**REQUEST FOR PRODUCTION NO. 12**

All documents relating to the Ketek clinical trial.

**PUMA'S RESPONSE**. Puma objects to RFP No. 12 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce any relevant, non-privileged documents relating to fraud in relation to the Ketek clinical trial.

**REQUEST FOR PRODUCTION NO. 13**

All documents relating to Dr. Maria Anne Kirkman Campbell.

**PUMA'S RESPONSE**. Subject to and without waiving the objections and conditions stated below, Puma will search for and produce relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show all contractual or business relationships that Puma had with any North Carolina Person in 2015 and/or 2016.

**PUMA'S RESPONSE**. Puma objects to RFP No. 14 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Further, Puma objects to providing responses to this request until the Court has ruled on its motion to dismiss on the ground that an appropriate scope of response to this request will be informed by the Court's ruling. Puma reserves any response and further objection to this request

until after the Court's ruling on its motion to dismiss and will meet and confer with Dr. Eshelman's counsel about further response after the Court issues its ruling on that motion.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show all tax benefits Puma gained, earned, or utilized from North Carolina for the fiscal year 2015.

**PUMA'S RESPONSE**. Puma objects to RFP No. 15 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Further, Puma objects to providing responses to this request until the Court has ruled on its motion to dismiss on the ground that an appropriate scope of response to this request will be informed by the Court's ruling. Puma reserves any response and further objection to this request until after the Court's ruling on its motion to dismiss and will meet and confer with Dr. Eshelman's counsel about further response after the Court issues its ruling on that motion.

**REQUEST FOR PRODUCTION NO. 16**

All documents relating to and/or reflecting any accounts receivable Puma accrued or collected on account of a North Carolina Person in fiscal year 2015 and/or 2016.

**PUMA'S RESPONSE**. Puma objects to RFP No. 16 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Further, Puma objects to providing responses to this request until the Court has ruled on its motion to dismiss on the ground that an appropriate scope of response to this request will be informed by the Court's ruling. Puma reserves any response and further objection to this request until after the Court's ruling on its motion to dismiss and will meet and confer with Dr. Eshelman's counsel about further response after the Court issues its ruling on that motion.

5

**REQUEST FOR PRODUCTION NO. 17**

All documents relating to and/or reflecting any accounts payable Puma accrued on account of or paid to a North Carolina Person in fiscal year 2015 and/or 2016.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 17 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Further, Puma objects to providing responses to this request until the Court has ruled on its motion to dismiss on the ground that an appropriate scope of response to this request will be informed by the Court's ruling.  Puma reserves any response and further objection to this request until after the Court's ruling on its motion to dismiss and will meet and confer with Dr. Eshelman's counsel about further response after the Court issues its ruling on that motion.

**REQUEST FOR PRODUCTION NO. 18**

All documents relating to and/or reflecting any marketing materials Puma directed towards, distributed in, or made available in North Carolina in 2015 and/or 2016.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 18 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Further, Puma objects to providing responses to this request until the Court has ruled on its motion to dismiss on the ground that an appropriate scope of response to this request will be informed by the Court's ruling.  Puma reserves any response and further objection to this request until after the Court's ruling on its motion to dismiss and will meet and confer with Dr. Eshelman's counsel about further response after the Court issues its ruling on that motion.

**REQUEST FOR PRODUCTION NO. 19**

All draft and final agendas of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**PUMA'S RESPONSE**. Puma objects to RFP No. 19 to the extent it purports to call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed during a meeting, call or conference, without regard to whether the documents themselves refer to those subjects. Puma further objects to RFP No. 19 on the ground that it is duplicative of RFP Nos. 1-5 and 10-11. See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 20**

All draft and final minutes of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**PUMA'S RESPONSE**. Puma objects to RFP No. 20 to the extent it purports to call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed during a meeting, call or conference, without regard to whether the documents themselves refer to those subjects. Puma objects to RFP No. 20 on the ground that it is duplicative of Nos. 1-5 and 10-11. See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 21**

All documents containing any edits to, comments on, notes regarding, or advice regarding the minutes of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

7

**PUMA'S RESPONSE**.  Puma objects to RFP No. 21 to the extent it calls for privileged information.  Puma objects to RFP No. 21 to the extent it purports to call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed during a meeting, call or conference, without regard to whether the documents themselves refer to those subjects.  Puma also objects to RFP No. 21 on the ground that it is duplicative of RFP Nos. 1-5 and 10-11.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 22**

All draft and final transcripts of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 21 to the extent it purports to call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed during a meeting, call or conference, without regard to whether the documents themselves refer to those subjects.  Puma objects to RFP No. 22 on the ground that it is duplicative of RFP Nos. 1-5 and 10-11.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 23**

All recordings of all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 23 on the ground that it is duplicative of RFP Nos. 1-5 and 10-11.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 24**

All documents, materials, and/or presentations utilized, distributed, or presented in connection with any meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**PUMA'S RESPONSE**. Puma objects to RFP No. 24 to the extent it purports to call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed during a meeting, call or conference, without regard to whether the documents themselves refer to those subjects. Puma objects to RFP No. 24 on the ground that it is duplicative of RFP Nos. 1-5 and 10-11. See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 25**

All call logs and meeting invitations relating to all meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis Pharmaceuticals Inc., the Ketek clinical trial, or the Proxy Contest was mentioned, referenced, or discussed.

**PUMA'S RESPONSE**. Puma objects to RFP No. 25 to the extent it purports to call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed during a meeting, call or conference, without regard to whether the documents themselves refer to those subjects. Puma objects to RFP No. 25 on the ground that it is duplicative of RFP Nos. 1-5 and 10-11.

**REQUEST FOR PRODUCTION NO. 26**

The web browser histories (reflecting all websites visited) from May 18, 2015 through the present on the computer(s) and smart phone(s) of every person who had any role in researching,

drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation or Puma's other statements about Dr. Eshelman.

**PUMA'S RESPONSE**. Puma objects to RFP No. 26 on the ground that the phrase "Puma's other statements about Dr. Eshelman" is vague and undefined. For purposes of responding to this RFP, Puma will disregard that phrase. Puma objects to RFP No. 26 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case, including the lack of any relevant limitation of website histories to websites related to any issue in this case. Puma also objects to RFP No. 26 on the ground that website histories dated after the filing of the Complaint in this matter on February 2, 2016 are not relevant to the claims in this case. Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce any relevant, non-privileged documents dated between May 18, 2015, and February 2, 2016, relating to the matters at issue in this litigation

**REQUEST FOR PRODUCTION NO. 27**

The web search histories (reflecting all searches conducted and search terms employed) from May 18, 2015 through the present on the computer(s) and smart phone(s) of every person who had any role in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation or Puma's other statements about Dr. Eshelman.

**PUMA'S RESPONSE**. Puma objects to RFP No. 27 on the ground that the phrase "Puma's other statements about Dr. Eshelman" is vague and undefined. For purposes of responding to this RFP, Puma will disregard that phrase. Puma objects to RFP No. 27 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case, including the lack of any relevant limitation of website

histories to websites related to any issue in this case. Puma also objects to RFP No. 27 on the ground that website histories dated after the filing of the Complaint in this matter on February 2, 2016 are not relevant to the claims in this case. Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce any relevant, non-privileged documents dated between May 18, 2015, and February 2, 2016, relating to the matters at issue in this litigation.

**REQUEST FOR PRODUCTION NO. 28**

All documents and websites viewed, reviewed, relied upon, printed and/or utilized by Puma in drafting, substantiating, assessing, analyzing, examining, investigating, scrutinizing, exploring, probing, confirming, or evaluating the truth, falsity, accuracy, or inaccuracy of Puma's statements about Dr. Eshelman and/or PPD in the Investor Presentation or Puma's other statements about Dr. Eshelman.

**PUMA'S RESPONSE**. Puma objects to RFP No. 28 on the ground that it is duplicative of RFP Nos. 26 and 27. See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 29**

All documents relating to and/or reflecting any act by Puma to assess, analyze, examine, investigate, scrutinize, explore, probe, confirm, or evaluate the truth, falsity, accuracy, or inaccuracy of the Investor Presentation.

**PUMA'S RESPONSE**. Puma objects to RFP No. 29 on the ground that it is duplicative of RFP Nos. 4 and 5. See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 30**

All documents relating to and/or reflecting any act by Puma's attorneys to assess, analyze, examine, investigate, scrutinize, explore, probe, confirm, or evaluate the truth, falsity, accuracy, or inaccuracy of the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 30 on the ground that it calls for the work product and advice of attorneys or communications to attorneys for the purposes of seeking advice, which are protected by the work product doctrine and the attorney-client privilege.

**REQUEST FOR PRODUCTION NO. 31**

All documents Puma reviewed in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 31 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Puma also objects to RFP No. 31 on the ground that it is duplicative of RFP Nos. 4 and 5. See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 32**

All documents Puma's attorneys reviewed in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 32 on the ground that it calls for the work product and advice of attorneys or communications to attorneys for the purposes of seeking advice, which are protected by the work product doctrine and the attorney-client privilege.

**REQUEST FOR PRODUCTION NO. 33**

All documents that Puma contends support, establish, demonstrate, or show that Dr. Eshelman perpetrated, committed, or otherwise had culpable involvement in fraud in connection with the Ketek clinical trial.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 33 on the ground that it is a request for contentions of a party that would vary the scope and timing of pretrial disclosures under the Court's rules and scheduling orders.  Puma also objects to RFP No. 33 on the ground that it is duplicative of RFP Nos. 1-5 and 10-12.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 34**

All documents containing the information to which Puma referred in Latham & Watkins' January 27, 2016 letter to Dr. Eshelman, in which Puma claimed "Puma has uncovered additional, public, and true information about [Dr. Eshelman] and [Dr. Eshelman's] past activities which would be relevant to [the] shareholder proposal and prior comments in this regard."

**PUMA'S RESPONSE**.  Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will produce relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 35**

All documents and materials made available to, presented to, and/or reviewed by Puma's Board in deciding to assert that Dr. Eshelman "was involved in clinical trial fraud that was uncovered by the FDA," as stated on page 13 of the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 35 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 36**

All communications with any person who provided Puma with any information or documents relating to Dr. Eshelman or PPD.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 36 to the extent it calls for the production of "communications" not contained in a document.  Puma also objects to RFP No. 36 on the ground that it is duplicative of RFP Nos. 1 and 2.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 37**

All documents relating to and/or reflecting Puma's decision to publish the Investor Presentation on January 7, 2016.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 37 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Puma objects to RFP No. 37 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 38**

All documents relating to and/or reflecting your presentation, publication, posting, or dissemination of the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 38 on the ground that it is duplicative of RFP Nos. 1-5.  See Puma's responses to those RFPs.

**REQUEST FOR PRODUCTION NO. 39**

All documents relating to and/or reflecting any communication by, between, or among, you, any person identified in your response to any of Dr. Eshelman's Interrogatories, and/or any other person relating to (a) Dr. Eshelman; (b) PPD; (c) the Investor Presentation; (d) the subject matter(s) of the Complaint; and/or (e) the subject matter(s) of these Requests for Production.

**PUMA'S RESPONSE**. Puma objects to RFP No. 39 to the extent it calls for the production of "communications" not contained in a document. Puma also objects to RFP No. 39 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce documents responsive to RFP No. 39 if (d) above is read in the conjunctive.

**REQUEST FOR PRODUCTION NO. 40**

All documents referenced in, identified by, or relied upon in preparing your Motions to Dismiss, Answer, responses to Interrogatories, or other discovery requests.

**PUMA'S RESPONSE**. Puma objects to RFP No. 40 to the extent it calls for the work product and advice of attorneys or communications to attorneys for the purposes of seeking advice, on the grounds that it is protected by the work product doctrine and the attorney-client privilege. As the parties agreed in the report filed with the Court, Puma will not produce or prepare privilege logs with respect to documents prepared by the counsel in this litigation in anticipation of this litigation or emails or other communications exchanged with the below counsel of record in this litigation.

Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma states that documents referenced in or relied upon in Puma's Motion to Dismiss were filed with or identified in Puma's Motion to Dismiss and Puma will search for and produce any other relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 41**

All documents relating to and/or reflecting Puma's January 8, 2016 News Release.

**PUMA'S RESPONSE**.  Subject to and without waiving the objections and conditions set forth below, Puma will search for and produce relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 42**

All drafts and versions of Puma's January 8, 2016 News Release.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 42 on the ground that it is duplicative of RFP No. 41.  See Puma's responses to RFP No. 41.

**REQUEST FOR PRODUCTION NO. 43**

All documents containing any edits to, comments on, or advice regarding Puma's January 8, 2016 News Release.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 40 to the extent it calls for the work product and advice of attorneys or communications to attorneys for the purposes of seeking advice, on the grounds that it is protected by the work product doctrine and the attorney-client privilege. Puma objects to RFP No. 43 on the ground that it is duplicative of RFP No. 41.  See Puma's responses to RFP 41.

**REQUEST FOR PRODUCTION NO. 44**

All communications, documents, and invoices exchanged with Beau Heath and/or any person employed by Business Wire from May 18, 2015 to February 15, 2016.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 44 to the extent it calls for the production of "communications" not contained in a document.  Puma also objects to RFP No. 44 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Subject to and without waiving the foregoing objections

and the objections and conditions set forth below, Puma will search for and produce any documents responsive to this request and relating to the Proxy Contest and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 45**

All contracts (and any amendments, exhibits, and addenda to such contracts) between Puma and Business Wire.

**PUMA'S RESPONSE**. Puma objects to RFP No. 45 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce documents responsive to RFP No. 45 that are related the provision of the Investor portion of the Puma website.

**REQUEST FOR PRODUCTION NO. 46**

All communications, documents, and invoices exchanged with Larry W. Miller and/or any person employed by Innisfree M&A from May 18, 2015 to February 15, 2016.

**PUMA'S RESPONSE**. Puma objects to RFP No. 46 to the extent it calls for the production of "communications" not contained in a document. Puma also objects to RFP No. 46 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents responsive to this request relating to the Proxy Contest and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 47**

All contracts (and any amendments, exhibits, and addenda to such contracts) between Puma and Innisfree M&A.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 47 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce documents responsive to RFP No. 47 that are related to the Proxy Contest and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 48**

All communications, documents, and invoices exchanged with Broadridge Financial Services, Inc. from May 18, 2015 to February 15, 2016.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 48 to the extent it calls for the production of "communications" not contained in a document.  Puma also objects to RFP No. 48 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents responsive to this request and relating to the Proxy Contest and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 49**

All contracts (and any amendments, exhibits, and addenda to such contracts) between Puma and Broadridge Financial Services, Inc.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 49 to the extent it calls for the production of "communications" not contained in a document.  Puma also objects to RFP No. 49 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents relating to the Proxy Contest and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 50**

All communications, documents, and invoices exchanged with Mediant Communications LLC Financial Services, Inc. May 18, 2015 to February 15, 2016.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 50 to the extent it calls for the production of "communications" not contained in a document.  Puma also objects to RFP No. 50 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents relating to the Proxy Contest and/or the Investor Presentation.

**REQUEST FOR PRODUCTION NO. 51**

All communications, documents, and invoices exchanged with or prepared by Latham & Watkins that relate to and/or reflect any work relating to the Investor Presentation.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 51 on the ground that it calls for the production of documents protected by the attorney-client privilege and/or work product doctrine.

**REQUEST FOR PRODUCTION NO. 52**

All documents reflecting or containing the information set forth in Brant Bishop's April 28, 2016 email and letter to Thomas Clare.  For the avoidance of doubt, this Request does not seek any emails exchanged with Puma's attorneys, but—to the extent that the information contained in Mr. Bishop's email and letter exists in documents not created by attorneys—this Request seeks production of those documents.

**PUMA'S RESPONSE**.  Subject to and without waiving the foregoing objections, Puma states that the information set forth in the identified email/letter was already provided to Dr. Eshelman's counsel in that letter.  To the extent that there is some other or additional documents

that this request is intended to seek, Puma will meet and confer with Dr. Eshelman's counsel to discuss those issues.

**REQUEST FOR PRODUCTION NO. 53**

All documents relating to or reflecting the relationship between Puma and PPD, including contracts, invoices, records of accounts receivable and accounts payable, and all documents reflecting any work performed by PPD for Puma or vice versa.

**PUMA'S RESPONSE**. Puma objects to RFP No. 53 on the ground that any relationship between Puma and PPD is not relevant to the parties' claims and defenses and the production of related documents would be disproportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 54**

All communications with PPD.

**PUMA'S RESPONSE**. Puma objects to RFP No. 54 to the extent it calls for the production of "communications" not contained in a document. Puma also objects to RFP No. 54 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents constituting communications with PPD and related to the Ketek clinical trial or fraud in relation to it.

**REQUEST FOR PRODUCTION NO. 55**

All communications with any former employee of PPD.

**PUMA'S RESPONSE**. Puma objects to RFP No. 55 to the extent it calls for the production of "communications" not contained in a document. Puma also objects to RFP No. 55 to the extent it calls for information that is not relevant to the parties' claims and defenses and is

disproportional to the needs of the case. Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents constituting communications with any former employee of PPD and relating to the Ketek clinical trial or fraud in relation to it.

**REQUEST FOR PRODUCTION NO. 56**

All communications with any current employee of PPD.

**PUMA'S RESPONSE**. Puma objects to RFP No. 56 to the extent it calls for the production of "communications" not contained in a document. Puma also objects to RFP No. 56 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Subject to and without waiving the foregoing objections and objections and conditions set forth below, Puma will search for and produce any documents constituting communications with any current employee of PPD and relating to the Ketek clinical trial or fraud in relation to it.

**REQUEST FOR PRODUCTION NO. 57**

All documents referenced by, identified by, or relied upon by any testifying expert you intend to present in this case.

**PUMA'S RESPONSE**. Puma objects to RFP No. 57 on the ground that it would vary the scope of expert disclosures, including the timing and content thereof, under Rule 26(a)(2) of the Federal Rules of Civil Procedure. Puma will provide documents related to expert disclosures on the timing established by the court or applicable rules and to the extent required under rules governing expert disclosures.

**REQUEST FOR PRODUCTION NO. 58**

All documents, tangible materials, or demonstrative evidence that you intend to introduce or use as evidence at trial or any other hearing in this action.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 58 on the ground that it would vary the scope and timing of pretrial disclosures under the Court's rules and scheduling orders.  Puma will provide documents or things that it intends to introduce or use as evidence to the extent and on the timing established by the court or applicable rules and to the extent required under rules governing pretrial disclosures.

**REQUEST FOR PRODUCTION NO. 59**

All documents containing any admission you contend any party to this lawsuit, or anyone acting on a party's behalf, made relevant to the issues raised by the claims or defenses in this action.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 59 on the ground that it would vary the scope and timing of pretrial disclosures under the Court's rules and scheduling orders.  To the extent not otherwise produced in response to other specific RFPs in these Requests, or otherwise provided to Dr. Eshelman, Puma will provide documents containing admissions of Dr. Eshelman on the timing established by the court or applicable rules and to the extent required under rules governing pretrial disclosures.

**REQUEST FOR PRODUCTION NO. 60**

An organizational chart of Puma Biotechnology, Inc.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 60 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case.  Puma will, however, meet and confer with counsel for Dr. Eshelman to determine what

organizational information may be reasonably related to the claims and defenses in this case and search for and produce an appropriate organizational chart.

**REQUEST FOR PRODUCTION NO. 61**

All documents reflecting any policy or procedure relating to document or data retention and/or preservation that Puma has recommended, adopted, implemented, or followed.

**PUMA'S RESPONSE**.  Puma objects to RFP No. 61 to the extent it calls for the advice of attorneys or communications to attorneys for the purposes of seeking advice, on the grounds that it is protected by the attorney-client privilege.  Subject to and without waiving the foregoing objections, Puma will produce relevant, non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 62**

Any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the above-captioned action or indemnify or reimburse for payments made to satisfy any judgment in the above-captioned matter.

**PUMA'S RESPONSE**.  Subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will produce relevant, non-privileged documents that are responsive to this request.

<div align="center">

**GENERAL OBJECTIONS AND CONDITIONS**

</div>

Puma objects to each Request:  (1) insofar as it calls for the production of documents not in Puma's possession, custody, or control; (2) insofar as it calls for the production of documents that were prepared for or in anticipation of litigation, constitute attorney work product, contain attorney-client communications, or are otherwise privileged; (3) insofar as it calls for the production of documents that are publicly available or otherwise equally available to the parties

and/or uniquely or equally available from third parties; (4) insofar as it calls for the production of documents that do not specifically refer to the events which are the subject matter of this litigation; and (5) insofar as it calls for the production of documents that are either not relevant to the claims or defenses of the parties or the production of which would not be proportional to the needs of this case.

Puma objects to each Request to the extent that it seeks information that may be protected by the attorney-client privilege, the work product doctrine, or any other privilege. The inadvertent production or disclosure of any privileged documents or information in response to these Requests shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or discovery now or hereafter requested or provided. Puma reserves the right not to produce documents that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

Puma reserves and does not waive the right to object, on any and all grounds, to (1) the evidentiary use of documents produced in response to these Requests; and (2) discovery requests relating to those documents. Puma submits these responses without conceding the relevancy or materiality of the subject matter of any request or of any document, or that any responsive materials exist.

Puma's responses and objections are not intended to be, and shall not be construed as, agreement with Dr. Eshelman's characterization of any facts, circumstances, or legal obligations. Puma reserves the right to contest any such characterization as inaccurate. Puma also objects to the Requests to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

The responses and objections contained herein are made on the basis of information now known to Puma and are made without waiving any further objections to or admitting the relevancy or materiality of any of the information requested. Puma's investigation, discovery, and preparation for proceedings are continuing and all answers are given without prejudice to Puma's right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof.

Puma will provide its responses based on terms as they are commonly understood, Puma's description in these responses of its understanding of the terms used, and consistent with the Federal Rules of Civil Procedure. Puma objects to and will refrain from extending or modifying any words employed in the Requests to comport with expanded definitions or instructions.

Puma will search for documents responsive to these Requests, subject to Puma's objections and conditions stated herein, by searching locations and custodians where, based on its reasonable investigation, it believes responsive information is likely to be found. To the extent Dr. Eshelman's requests purport to require more than this, Puma objects that the Requests are not proportional to the needs of the case and purport to require Puma to undertake a burden and expense out of proportion to the likely benefit.

Puma will produce relevant, non-privileged documents that are responsive to the Request and consistent with its other objections and conditions on a rolling basis as they become available.

Each of Puma's responses to individual Requests is explicitly made subject to and without waiving Puma's General Objections and Conditions, its Objections to Plaintiff's Definitions, and its Objections to Plaintiff's Instructions.

25

# OBJECTIONS TO PLAINTIFF'S DEFINITIONS

1.      Puma objects to the definition of "Puma," "you," and "your" to include anyone other than Puma Biotechnology, Inc., and in particular to Plaintiff's effort to broaden the scope of discovery obligations by expansive and erroneous definitions. Puma will respond to Plaintiff's requests by interpreting "you" to mean Puma Biotechnology, Inc.

2.      Puma objects to the definition of "PPD" to include anyone other than Pharmaceutical Product Development, Inc., and in particular to Plaintiff's effort to broaden the scope of discovery obligations by expansive and erroneous definitions. Puma further objects to the definition of "PPD" to include persons acting on Puma's behalf on the ground that such a definition is confusing, erroneous, and inappropriately attempts to expand the scope of discovery obligations by defining one entity (PPD) to include person's acting on behalf of another (Puma). Puma will respond to Plaintiff's requests by interpreting "PPD" to mean Pharmaceutical Product Development, Inc.

3.      Puma objects to the definition of "Proxy Contest" to include all actions undertaken in response to or relating to Dr. Eshelman's October 28, 2015 proposal to the extent it purports to require Puma to know or provide information related to actions taken by anyone other than Puma. Puma will respond to discovery requests referring to the Proxy Contest based on its understanding and awareness of the proposals and of actions taken by Puma or those acting on its behalf in response to Dr. Eshelman's October 28, 2015 proposals to Puma's shareholders.

4.      Puma objects to the definition of "Document" to the extent its use purports to require Puma to produce in discovery the original of documents. With respect to documents that Puma produces, it will provide appropriate copies of original documents. To the extent Dr. Eshelman believes originals of any individual and particular documents are required, Puma will

26

meet and confer with his counsel about such requests. Puma also objects to the definition of "Documents" to include "any metadata applicable to any document" on the ground that requiring every piece of conceivable metadata would be unduly burdensome and expensive and outweigh its benefit. Puma will confer with Plaintiff about appropriate metadata information to be provided in producing any documents in electronic form.

## OBJECTIONS TO PLAINTIFF'S INSTRUCTIONS

1.      Puma objects to Instruction No. 4 to the extent it purports to vary the requirements and options available to producing parties under Rule 34(E) of the Federal Rules of Civil Procedure.

2.      Puma objects to Instruction No. 6 to the extent it purports to vary the requirements and options available to producing parties under Rule 34(E) of the Federal Rules of Civil Procedure. Puma also objects to Instruction No. 6 on the ground that it purports to require Puma to provide narrative descriptions, which are beyond the scope of document requests under Rule 34.

3.      Puma objects to Instruction No. 7 on the ground that it purports to require Puma to provide narrative descriptions, which are beyond the scope of document requests under Rule 34. Puma objects to and will disregard Instruction No. 12. Read literally, Instruction No. 12 would disallow the reading of the Definition paragraphs to delimit Dr. Eshelman's Requests to information that is relevant to either parties' claims or defenses, and would therefore cause the requests to fall outside of the limits of permissible discovery under Rule 26(b). Puma will apply straightforward and common sense understanding of the Requests, giving effect to the objections and limitations stated in these responses.

DATED: July 8, 2016

Respectfully Submitted,

/s/ Pressly M. Millen
Pressly M. Millen, NCSB: 16178
Womble Carlyle Sandridge & Rice,
*a Professional Limited Liability Company*
Post Office Box 831
Raleigh, North Carolina 27602
Telephone:     (919) 755-2100
Facsimile:      (919) 755-6067
Email:  pmillen@wcsr.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
11726 San Vicente Boulevard, Suite 600
Los Angeles, CA 90049
Telephone:  (424) 316-4000
Facsimile:  (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone:     (202) 847-4000
Facsimile:      (202) 847-4005
Emails:
bbishop@wilkinsonwalsh.com
lalvinomcgill@wilkinsonwalsh.com
psampson@wilkinsonwalsh.com

*Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendant Puma Biotechnology, Inc.'s

Responses to Plaintiff's First Set of Requests (Nos. 1-62) for the Production of Documents was

served on July 8, 2016, to the following via email:

- Thomas A. Clare
  tom@clarelocke.com

- Elizabeth M. Locke
  libby@clarelocke.com

- Megan L. Meier
  megan@clarelocke.com

- Dustin A. Pusch
  dustin@clarelocke.com

- Andrew Kent McVey
  amcvey@murchisontaylor.com

DATED: July 8, 2016                          By: /s/ Paul J. Sampson
                                             Paul J. Sampson

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:16-cv-00018-D**

| | |
|---|---|
| FREDRIC N. ESHELMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALAN H. AUERBACH and PUMA | ) |
| BIOTECHNOLOGY, INC. | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT PUMA BIOTECHNOLOGY, INC.'S OBJECTIONS AND RESPONSES
TO FREDRIC N. ESHELMAN'S FIRST SET OF INTERROGATORIES (NOS. 1-5)**

Defendant Puma Biotechnology, Inc. responds to Dr. Eshelman's First Set of Interrogatories as follows, subject to the objections and conditions set forth below:

**INTERROGATORIES**

**INTERROGATORY NO. 1**

Identify every person who directly or indirectly participated in researching, drafting, editing, discussing, fact-checking, presenting, publishing, or disseminating the Investor Presentation and/or the News Release, and for each such person, provide a detailed description of his or her participation.

**ANSWER:**

Subject to and without waiving the objections and conditions set forth below, and reserving the right to supplement with further information, Puma responds as follows:

- The Investor Presentation was not presented by anyone of which Puma is aware. Additionally, other than the dissemination among those involved in preparing, reviewing, and filing the Investor Presentation, as discussed below, the Investor

Presentation was only published or disseminated by Puma in the sense that it was filed with the SEC in connection with proxy solicitation filings and, consistent with SEC rules, posted on the Investor section of Puma's website.

- The drafting of the Investor Presentation, in a Microsoft PowerPoint document, was done by Alan Auerbach, with consultation and advice from Latham & Watkins, based on information provided by or from those discussed below.

- Information about milestones in 2015 and regulatory activities expected for 2016 were provided by Alan Auerbach and checked by Alan Auerbach, Innisfree M&A and Latham & Watkins.

- Information about Puma's management team and board members was provided and checked by Alan Auerbach based on information about their background known to him and was checked by Mr. Auerbach and members of the board.

- Information about ISS's, Glass Lewis's, Egan Jones' and Proxy Mosaic's reactions to Dr. Eshelman's proposals was derived from reports prepared by each of those organizations, which, to Puma's understanding, were prepared after each of those organizations held conference calls with Dr. Eshelman and his advisors and with Puma's management (principally Alan Auerbach) and advisor Innisfree M&A. Alan Auerbach reviewed and checked those reports in connection with preparing the Investor Presentation.

- Information about Dr. Eshelman's interactions (or lack thereof) with the Company and the expense and time they occupied were provided and checked by Alan Auerbach and Mariann Ohanesian.

- Information about those persons Dr. Eshelman had nominated to the Board was provided by Dr. Eshelman in his proxy solicitation materials and by Alan Auerbach reviewing information available on the Internet about them. Latham & Watkins also provided some research on their prior work.

- Information about Dr. Eshelman's representations about his ownership of Puma stock was provided by Dr. Eshelman, through his attorneys, and was provided and reviewed for the presentation by Alan Auerbach and Mariann Ohanesian.

- Information about Dr. Eshelman's claims related to Adage Capital's supposed support was provided by Alan Auerbach based on conversations with Phill Gross of Adage Capital.

- Information about Dr. Eshelman's appearance and testimony before the Congress, the statements by members of Congress, PPD's management of the trials for Ketek and the fraud involved in it, and Dr. Eshelman's role at PPD at and after that time were provided by Dr. Eshelman in his Congressional testimony, by others who spoke in those hearings and documents related to them, and was reviewed on the Internet, including in video clips of Dr. Eshelman testifying and transcripts of testimony before the Congressional committee, and was reviewed and checked for the presentation by Alan Auerbach and Latham & Watkins.

- Statements of Puma's board's and management's opinions were prepared and reviewed by Alan Auerbach and Latham & Watkins and were reviewed by members of the Board.

- Statements about support shareholders had expressed for the Company, its Board and management were received from shareholders, including Adage Capital and

3

other large institutional shareholders of Puma, and were relayed to Innisfree M&A in connection with contact they had during the course of the proxy contest; that information was reviewed for the presentation by Alan Auerbach and Latham & Watkins.

- Legal provisions related to Forward-Looking Statements and additional information were provided and reviewed by Latham & Watkins.

- Information related to the sources of information in the Investor Presentation may also be set forth in response to Interrogatory No. 2, below.

- Final review of the presentation was performed by Alan Auerbach, Innisfree M&A and attorneys at Latham & Watkins, who provided their advice with regard to the same.

- The completed presentation was provided to Innisfree M&A for reference and to Latham & Watkins for filing with the SEC.

- The completed presentation was submitted to the SEC by attorneys at Latham & Watkins who, Puma understands, provided the document to RR Donnelley printing service for EDGAR submission to the SEC.

- The completed presentation was also provided for inclusion on the Investor portion of Puma's website, as required by SEC rules, by Mariann Ohanesian emailing the document to Beau Heath at Business Wire and requesting that it be loaded there.

- The News Release was prepared by Mariann Ohanesian and Alan Auerbach and reviewed by them and by Innisfree M&A and Latham & Watkins.

4

**INTERROGATORY NO. 2**

Identify every person who directly or indirectly participated in the proxy contest, including by conducting any research, due diligence, or investor outreach, or by communicating regarding the proxy contest, and for each such person, provide a detailed description of his or her participation.

**ANSWER**:

Puma objects to Interrogatory No. 2 to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case. Identifying every person who had any involvement whatsoever in any facet of the proxy contest, including aspects that did not involve any statements that Dr. Eshelman claims to have been defamatory, would be unduly burdensome and require extensive narrative descriptions about topics that are not relevant to the parties' claims or defenses and disproportional to the needs of the case.

Subject to and without waiving the foregoing objections and the objections and conditions set forth below, and reserving the right to supplement with further information, Puma responds as follows:

- Information related to the preparation of the Investor Presentation, which occurred during the course of the Proxy Contest, is provided in response to Interrogatory No. 1, above.

- Alan Auerbach was involved in the Proxy Contest as the individual from Puma who was principally responsible for speaking with investors, preparing proxy solicitation materials, with advice and consultation from Latham & Watkins and Innisfree M&A and input from Mariann Ohanesian.

5

- Mariann Ohanesian was involved in reviewing and assisting with the preparation and review of proxy solicitation materials, coordinating some logistics, and preparing press releases.

- Innisfree M&A was involved in providing strategic advice to Puma in relation to the Proxy Contest, in preparing written proxy solicitation materials, in communicating with certain Puma shareholders, and providing copies of the Consent Revocation Statement and consent revocation card to Broadridge Financial Services, Inc. for them to mail copies to the owners of Puma shares.

- Latham & Watkins attorneys and professionals were involved in the Proxy Contest in providing legal advice and legal services to Puma.

- Broadridge Financial Services, Inc. was involved in interfacing with Innisfree M&A with regard to the dissemination of the Consent Revocation Statement and consent revocation card to owners of Puma shares.

**INTERROGATORY NO. 3**

Identify each person with whom Puma has communicated regarding Dr. Eshelman or PPD and describe the circumstances and content of such communications. For the avoidance of doubt, this interrogatory seeks information regarding Puma's internal communications regarding Dr. Eshelman or PPD as well as information regarding Puma's communications with any third parties regarding Dr. Eshelman or PPD.

**ANSWER**:

Puma objects to Interrogatory No. 3 to the extent it calls for communications made with Puma's attorneys in anticipation of litigation, including claims and legal proceedings that Dr. Eshelman threatened and initiated against Puma and or its management, and that are therefore

6

protected by the attorney-client privilege and/or work product doctrine. Puma objects to Interrogatory No. 2 to the extent it calls for communications regarding PPD that are not related to the Ketek clinical trial or fraud in relation to it on the ground that such communications are not relevant to the parties' claims and defenses and attempting to identify persons with whom such communications were had would be unduly burdensome and disproportional to the needs of the case.

Subject to and without waiving the foregoing objections and the objections and conditions set forth below, and reserving the right to supplement with further information, Puma responds as follows:

- Information about communications involved in preparing the Investor Presentation are identified in response to Interrogatory No. 1, above. Such communications may have involved communications related to Dr. Eshelman or PPD in relation to the Ketek clinical trial or fraud in relation to it.

- After Eshelman contacted institutional holders of Puma's stock, some of those investors contacted Puma and spoke with Alan Auerbach. (Puma did not initiate contact with them in this context.) Mr. Auerbach does not remember at this point who all these investors were, but believes it included Adage Capital and will supplement to the extent the identities of other investors are determined or recalled. The substance of these calls was relatively brief and consisted of these institutional investors complaining about the distraction that Dr. Eshelman's proxy solicitation amounted to and/or expressed frustration about why Dr. Eshelman was carrying out this process. Some stated strongly that it was useless. To Mr. Auerbach's recollection, these conversations did not include any references to Dr. Eshelman's

involvement in Congressional hearings, about the Ketek fraud, or about Dr. Eshelman being replaced as CEO of PPD.

## INTERROGATORY NO. 4

Describe each act undertaken by Puma to assess, analyze, examine, investigate, explore, probe, confirm, or evaluate, directly or indirectly, the truth, falsity, accuracy, or inaccuracy of Puma's statements about Dr. Eshelman or PPD, including by identifying: (a) the date on which such act was undertaken; (b) the specific employee(s) or other person(s) who undertook such act; (c) all web searches conducted; (d) all websites viewed or visited; and (e) all documents reviewed or printed.

## ANSWER:

Subject to and without waiving the objections and conditions set forth below, and reserving the right to supplement with further information, Puma responds as follows:

Prior to the creation of the Investor Presentation, Alan Auerbach reviewed the testimony of Dr. Eshelman to Congress at the February 12, 2008 hearing by watching videos showing Dr. Eshelman testifying in his own words, as well as reviewing publications and transcripts of the statements made by him, by others, and by Congress during the hearing that were skeptical of Dr. Eshelman's testimony and critical of PPD and his stewardship at PPD. *See* United States Cong. House Comm. on Oversight and Investigations, *Ketek Clinical Study Fraud: What Did Aventis Know?*, Feb. 8, 2008, 110th Cong. 2nd sess., Washington: GPO, 2008 ("Congressional Hearing"). In particular, among other things and without limitation, Mr. Auerbach reviewed the following statements made at the Congressional Hearing:

- Statement by Representative Bart Stupak thanking PPD whistleblower employee Ann Marie Cisneros for agreeing to "shar[e] her experience with the Committee, despite attempts by her employer [PPD] to extort her silence."

- Statements by Cisneros that she was "called on two occasions by PPD lawyers who reminded [her] of the confidentiality agreement [she] signed, and advised [her] not to speak with the FDA without Aventis approval and PPD attorneys present."

- Statement by Dr. Eshelman excusing PPD's failure to inform the FDA of clinical fraud because "there was some debate over whether or not this was to the level of fraud."

- Statements by Representative Stupak, responding in exasperation to Dr. Eshelman's statements by detailing a litany of irregularities in the research, in light of which he asked "how would that not indicate fraud?":

  > [There were] errors on just about every informed consent, date modifications, initials different from signature, study coordinator entering date for subjects and principal investigator, blatantly forged signature on informed consent, medical records are very limited, use of different color ink on medical charts, overwrites, crossouts, inserts of diagnosis in different color ink, routine failure to give pregnancy tests to women of childbearing years, study investigator and coordinator unaware of the definitions of serious adverse events, no adverse events for the first 300 patients enrolled with drugs known to have adverse events, lab results indicating blood splitting, lack of proper diagnosis for study eligibility, husbands and wives being enrolled together, large number of patients randomized in the interactive voice response system in a short increment of time when the office was closed. I mean, how would that not indicate fraud?

- Dr. Eshelman's lack of disagreement with these points.

- Statement by Dr. Eshelman, in the face of intense questioning by Representative Stupak, that ultimately PPD's failures are his "responsibility."

Mr. Auerbach evaluated these statements against the background of his prior experience with Dr. Eshelman, including statements made by him or on his behalf in the context of seeking information from Puma and initiating legal proceedings with regard to Puma and his ownership interests therein.

9

Mr. Auerbach reviewed on the Internet news reports, reporting on a press release that PPD had put out, saying that PPD named David L. Grange to be chief executive, replacing Dr. Eshelman in that position.

**INTERROGATORY NO. 5**

Identify the computer(s), email account(s), electronic-storage device(s), and other electronic devices or software you used in researching, drafting, editing, discussing, fact-checking, presenting, publishing, or disseminating the Investor Presentation, including any computer, email account, smartphone, BlackBerry, iPhone, iPad, or other portable electronic device, any flash drive or external or electronic-storage device or media, any video equipment or device, and any server.

**ANSWER**:

Subject to and without waiving the objections and conditions set forth below, and reserving the right to supplement with further information, Puma responds as follows:

- Computers used by Puma:

  o Company-issued personal computer of Alan Auerbach;

  o Company-issued personal computers of Mariann Ohanesian; and

- Email accounts used by Puma:

  o ahauerbach@pumabiotechnology.com;

  o mohanesian@pumabiotechnology.com;

- Electronic storage devices used by Puma:

  o Hard disks on computers identified above;

  o Company servers through which Puma emails are routed;

- Software used by Puma:

10

- o Internet web browsers (Chrome) and related server side software involved in accessing information on the internet;

- o Microsoft PowerPoint for drafting the presentation;

- o Microsoft Outlook for email and server side Exchange software for emailing the presentation to some of those identified above.

## GENERAL OBJECTIONS AND CONDITIONS

Puma objects to each Interrogatory: (1) insofar as it calls for information not reasonably available to Puma; (2) insofar as it calls for disclosure of information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise privileged; (3) insofar as it calls for the production of information that is publicly available or otherwise equally available to the parties and/or uniquely or equally available from third parties; and (4) insofar as it calls for information that is not related to the subject matter of this litigation.

Puma objects to each Interrogatory to the extent that it seeks information that may be protected by the attorney-client privilege, the work product doctrine, or any other privilege. The inadvertent production or disclosure of any privileged documents or information in response to these Interrogatories shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or other discovery now or hereafter requested or provided. Puma reserves the right not to produce documents or information that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

Puma reserves and does not waive the right to object, on any and all grounds, to (1) the evidentiary use of documents or information produced in response to these Interrogatories; and (2) discovery requests relating to those documents or information. Puma submits these responses without conceding the relevancy or materiality of the subject matter of any request or any document or information, or that any responsive materials exist.

Puma's responses and objections are not intended to be, and shall not be construed as, agreement with Dr. Eshelman's characterization of any facts, circumstances, or legal obligations. Puma reserves the right to contest any such characterization as inaccurate. Puma also objects to the Interrogatories to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

The responses and objections contained herein are made on the basis of information now known to Puma and are made without waiving any further objections to or admitting the relevancy or materiality of any of the information requested. Puma's investigation, discovery, and preparation for proceedings are continuing and all answers are given without prejudice to Puma's right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. In the event Puma obtains additional information that is responsive to these Interrogatories, it will supplement its response to each such Interrogatory.

Puma provides its responses based on terms as they are commonly understood, Puma's description in these responses of its understanding of the terms used, and consistent with the Federal Rules of Civil Procedure. Puma objects to and will refrain from extending or modifying any words employed in the Interrogatories to comport with expanded definitions or instructions.

Puma provides the information responsive to these Interrogatories, subject to Puma's objections and conditions stated herein, based on its reasonable investigation about where

responsive information is likely to be found. To the extent Dr. Eshelman's requests purport to require more than this, Puma objects that the Requests are not proportional to the needs of the case and purport to require Puma to undertake a burden and expense out of proportion to the likely benefit.

Each of Puma's responses to individual Interrogatories is explicitly made subject to and without waiving Puma's General Objections and Conditions, its Objections to Plaintiff's Definitions, and its Objections to Plaintiff's Instructions.

## OBJECTIONS TO PLAINTIFF'S DEFINITIONS

1.      Puma objects to the definition of "Puma," "you," and "your" to include anyone other than Puma Biotechnology, Inc., and in particular to Plaintiff's effort to broaden the scope of discovery obligations by expansive and erroneous definitions. Puma will respond to Plaintiff's requests by interpreting "you" to mean Puma Biotechnology, Inc.

2.      Puma objects to the definition of "PPD" to include Puma objects to the definition of "PPD" to include anyone other than Pharmaceutical Product Development, Inc., and in particular to Plaintiff's effort to broaden the scope of discovery obligations by expansive and erroneous definitions. Puma further objects to the definition of "PPD" to include persons acting on Puma's behalf on the ground that such a definition is confusing, erroneous, and inappropriately attempts to expand the scope of discovery obligations by defining one entity (PPD) to include person's acting on behalf of another (Puma). Puma will respond to Plaintiff's requests by interpreting "PPD" to mean Pharmaceutical Product Development, Inc.

3.      Puma objects to the definition of "Proxy Contest" to include all actions undertaken in response to or relating to Dr. Eshelman's October 28, 2015 proposal to the extent it purports to require Puma to know or provide information related to actions taken by anyone other than Puma.

Puma will respond to discovery requests referring to the Proxy Contest based on its understanding and awareness of the proposals and of actions taken by Puma or those acting on its behalf in response to Dr. Eshelman's October 28, 2015 proposals to Puma's shareholders.

4.     Puma objects to the definition of "Document" to the extent its use purports to require Puma to produce in discovery the original of documents. With respect to documents that Puma produces, it will provide appropriate copies of original documents. To the extent Dr. Eshelman believes originals of any individual and particular documents are required, Puma will meet and confer with his counsel about such requests. Puma also objects to the definition of "Documents" to include "any metadata applicable to any document" on the ground that requiring every piece of conceivable metadata would be unduly burdensome and expensive and outweigh its benefit. Puma will confer with Plaintiff about appropriate metadata information to be provided in producing any documents in electronic form.

### OBJECTIONS TO PLAINTIFF'S INSTRUCTIONS

1.     Puma objects to and will disregard Instruction No. 8. Read literally, Instruction No. 8 would disallow the reading of the Definition paragraphs to delimit Dr. Eshelman's Interrogatories to information that is relevant to either parties' claims or defenses, and would therefore cause the Interrogatories to fall outside the limits of permissible discovery under Rule 26(b). Puma will apply straightforward and common sense understanding of the Interrogatories, giving effect to the objections and limitations stated in these responses.

DATED:  July 8, 2016

Respectfully Submitted,

/s/ Pressly M. Millen

Pressly M. Millen, NCSB: 16178
Womble Carlyle Sandridge & Rice,
*a Professional Limited Liability Company*
Post Office Box 831
Raleigh, North Carolina 27602
Telephone: (919) 755-2100
Facsimile:  (919) 755-6067
Email:  pmillen@wcsr.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
11726 San Vicente Boulevard, Suite 600
Los Angeles, CA 90049
Telephone:  (424) 316-4000
Facsimile:  (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone:  (202) 847-4000
Facsimile:  (202) 847-4005
Emails:
bbishop@wilkinsonwalsh.com
lalvinomcgill@wilkinsonwalsh.com
psampson@wilkinsonwalsh.com

*Attorneys for:*
*Puma Biotechnology, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Puma Biotechnology, Inc.'s Objections and Responses to Dr. Fredric N. Eshelman's First Set of Interrogatories (Nos. 1–5) to Puma Biotechnology, Inc. was served on July 8, 2016 to the following individuals via email:

- Thomas A. Clare
  tom@clarelocke.com

- Elizabeth M. Locke
  libby@clarelocke.com

- Megan L. Meier
  megan@clarelocke.com

- Dustin A. Pusch
  dustin@clarelocke.com

- Andrew Kent McVey
  amcvey@murchisontaylor.com


Dated: July 8, 2016                    By: /s/ Paul J. Sampson
                                       Paul J. Sampson

## VERIFICATION

I hereby declare under penalty of perjury that the facts stated in the foregoing Defendant Puma Biotechnology, Inc.'s Objections and Responses to Fredric N. Eshelman's First Set of Interrogatories (Nos. 1-5) are true and correct to the best of my knowledge, information, and belief.

Dated: July 8, 2016

_____
ALAN H. AUERBACH
Chief Executive Officer
Puma Biotechnology, Inc.

# Exhibit 9

**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:16-cv-00018-D**

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| *Plaintiff*, | ) | **Case No. 7:16-cv-00018-D** |
| | ) | |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## DEFENDANT PUMA BIOTECHNOLOGY, INC.'S RESPONSES TO DR. FREDRIC ESHELMAN'S FOURTH SET OF INTERROGATORIES (NOS. 9-10)

Defendant Puma Biotechnology, Inc. responds to Dr. Eshelman's Fourth Set of Interrogatories as follows.

## INTERROGATORY NO. 9

For every meeting, conversation, or call from July 2015 to the present in which Alan Auerbach or Mariann Ohanesian participated and during which Dr. Eshelman or the Ketek clinical trial was mentioned, referenced, or discussed (whether by name or otherwise), identify: (1) the date, time, and duration; (2) the medium (i.e., in-person meeting, in-person conversation, videoconference, telephone call, etc.); (3) all participants; and (4) the subject-matter.

## ANSWER

Puma objects to Interrogatory No. 9 to the extent it calls for communications made with Puma's attorneys in anticipation of litigation or in defense of Dr. Eshelman's claims, including claims and legal proceedings that Dr. Eshelman threatened and/or initiated against Puma and/or its management, and that are therefore protected by the attorney-client privilege. Puma also objects to Interrogatory No. 9 to the extent it calls for information that is not relevant to the parties' claims

and defenses and is disproportional to the needs of the case. Identifying every time Dr. Eshelman or the Ketek clinical trial were mentioned by Mr. Auerbach or Ms. Ohanesian; the exact date, time, and duration of such a conversation; the precise medium used during the conversation; and the exact subject matter would be impossible to state with certainty. Moreover, identifying post-complaint conversations would be disproportional to the needs of the case and unduly burdensome.

Subject to and without waiving the foregoing objections and the objections and conditions set forth below, and reserving the right to supplement with further information, Puma responds that Mr. Auerbach believes he discussed Dr. Eshelman and/or the Ketek clinical trials by telephone or in-person conversation with the following individuals between July 15, 2015, and February 2, 2016:

- Mariann Ohanesian (Puma Biotechnology, Inc.)

- Charles Ruck (Latham & Watkins LLP)

- Michele Johnson (Latham & Watkins LLP)

- Shayne Kennedy (Latham & Watkins LLP)

- Richard Kim (Latham & Watkins LLP)

- Larry Miller (Innisfree M&A Inc.)

- Scott Winter (Innisfree M&A Inc.)

- Emily Rogers (Innisfree M&A Inc.)

Puma responds that Ms. Ohanesian believes she discussed Dr. Eshelman and/or the Ketek clinical trials by telephone or in-person conversation with the following individuals between July 15, 2015, and February 2, 2016:

- Alan Auerbach

- Russ Shipman

- Ross Felder (Nasdaq)

- Benjamin Matone (Nasdaq)

- Sarah Slaviero (Nasdaq)

- Robert Flamm (Russo Partners LLC)

- Beau Heath (Business Wire)

- Larry Miller (Innisfree M&A Inc.)

- Scott Winter (Innisfree M&A Inc.)

- Emily Rogers (Innisfree M&A Inc.)

**INTERROGATORY NO. 10**

Identify the Bates stamps of all documents responsive to Request for Production No. 34, "containing the information to which Puma referred in Latham & Watkins' January 27, 2016 letter to Dr. Eshelman, in which Puma claimed 'Puma has uncovered additional, public, and true information about [Dr. Eshelman] and [Dr. Eshelman's] past activities which would be relevant to [the] shareholder proposal and prior comments in this regard.'"

**ANSWER**

Puma responds that the January 27, 2016 letter was referring to additional statements contained in the Congressional testimony linked to in the January 7, 2016 Investor Presentation that were not specifically called out in that presentation.

**GENERAL OBJECTIONS AND CONDITIONS**

Puma objects to each Interrogatory: (1) insofar as it calls for information not reasonably available to Puma; (2) insofar as it calls for disclosure of information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client

communications, or is otherwise privileged; and (3) insofar as it calls for information that is not related to the subject matter of this litigation.

Puma objects to each Interrogatory to the extent that it seeks information that may be protected by the attorney-client privilege, the work product doctrine, or any other privilege. The inadvertent production or disclosure of any privileged documents or information in response to these Interrogatories shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or other discovery now or hereafter requested or provided. Puma reserves the right not to produce documents or information that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

Puma reserves and does not waive the right to object, on any and all grounds, to (1) the evidentiary use of documents or information produced in response to these Interrogatories; and (2) discovery requests relating to those documents or information. Puma submits these responses without conceding the relevancy or materiality of the subject matter of any request or any document or information, or that any responsive materials exist.

Puma's responses and objections are not intended to be, and shall not be construed as, agreement with Dr. Eshelman's characterization of any facts, circumstances, or legal obligations. Puma reserves the right to contest any such characterization as inaccurate. Puma also objects to the Interrogatories to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

The responses and objections contained herein are made on the basis of information now known to Puma and are made without waiving any further objections to or admitting the relevancy

or materiality of any of the information requested. Puma's investigation, discovery, and preparation for proceedings are continuing and all answers are given without prejudice to Puma's right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof. In the event Puma obtains additional information that is responsive to these Interrogatories, it will supplement its response to each such Interrogatory.

Puma provides its responses based on terms as they are commonly understood, Puma's description in these responses of its understanding of the terms used, and consistent with the Federal Rules of Civil Procedure. Puma objects to and will refrain from extending or modifying any words employed in the Interrogatories to comport with expanded definitions or instructions.

Puma provides the information responsive to these Interrogatories, subject to Puma's objections and conditions stated herein, based on its reasonable investigation about where responsive information is likely to be found. To the extent Dr. Eshelman's requests purport to require more than this, Puma objects that the Requests are not proportional to the needs of the case and purport to require Puma to undertake a burden and expense out of proportion to the likely benefit.

Each of Puma's responses to individual Interrogatories is explicitly made subject to and without waiving Puma's General Objections and Conditions, its Objections to Plaintiff's Instructions.

## OBJECTIONS TO PLAINTIFF'S INSTRUCTIONS

1.     Puma objects to and will disregard Instruction No. 8. Read literally, Instruction No. 8 would disallow the reading of the Definition paragraphs to delimit Dr. Eshelman's Interrogatories to information that is relevant to either parties' claims or defenses, and would therefore cause the Interrogatories to fall outside the limits of permissible discovery under Rule

26(b). Puma will apply straightforward and common sense understanding of the Interrogatories,

giving effect to the objections and limitations stated in these responses.

This 28th day of July 2017.                    Respectfully Submitted,

                                               /s/ Paul J. Sampson
Pressly M. Millen                              Paul J. Sampson
Womble Carlyle Sandridge & Rice,               Brant W. Bishop
*a Professional Limited Liability Company*     Lori Alvino McGill
Post Office Box 831                            Wilkinson, Walsh + Eskovitz LLP
Raleigh, North Carolina 27602                  1900 M Street, NW, Suite 800
Telephone: (919) 755-2100                      Washington, DC 20036
Facsimile: (919) 755-6067                      Telephone: (202) 847-4005
Email: pmillen@wcsr.com                        Emails:
                                               psampson@wilkinsonwalsh.com
                                               bbishop@wilkinsonwalsh.com
                                               lalvinomcgill@wilkinsonwalsh.com

                                               Sean Eskovitz
                                               Wilkinson, Walsh + Eskovitz LLP
                                               11726 San Vicente Blvd., Suite 600
                                               Los Angeles, CA 90049
                                               Telephone: (424) 316-4000
                                               Facsimile: (202) 847-4005
                                               Email: seskovitz@wilkinsonwalsh.com

                                               *Attorneys for Puma Biotechnology, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant's Responses to Plaintiff's Fourth Set of Interrogatories (Nos. 9-10) was served on July 28, 2017, via email to the following individuals:

| | |
|---|---|
| Thomas A. Clare | Andrew Kent McVey |
| Elizabeth M. Locke | Murchison, Taylor & Gibson, PLLC |
| Megan L. Meier | 16 North Fifth Avenue |
| Dustin A. Pusch | Wilmington, NC 28401-4537 |
| Daniel P. Watkins | Telephone: (910) 763-2426 |
| Joseph Ronald Oliveri | Facsimile: (910) 763-6561 |
| 10 Princess Street | Email: amcvey@murchisontaylor.com |
| Alexandria, VA 22314 | |
| Telephone: (202) 628-7400 | |
| Emails: | |
| tom@clarelocke.com | |
| libby@clarelocke.com | |
| megan@clarelocke.com | |
| dustin@clarelocke.com | |
| daniel@clarelocke.com | |
| joe@clarelocke.com | |

Dated: July 28, 2017

/s/ Paul J. Sampson
Paul J. Sampson

## VERIFICATION

I hereby declare under penalty of perjury that the facts stated in the foregoing Defendant

Puma Biotechnology, Inc.'s Objections and Responses to Frederic N. Eshelman's Fourth Set of

Interrogatories (Nos. 9-10) are true and correct to the best of my knowledge, information, and

belief.

Dated: July 25, 2017

_____
ALAN H. AUERBACH
Chief Executive Officer
Puma Biotechnology, Inc.

# Exhibit 10



# C L A R E   L O C K E
### L L P

**MEGAN L. MEIER**
Megan@clarelocke.com
(202) 628-7403

902 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

July 27, 2016

*Via Email*

Paul J. Sampson
Wilkinson Walsh + Eskovitz
1900 M Street NW, Suite 800
(202) 847-4000
psampson@wilkinsonwalsh.com

<div align="center">Re:     <em>Eshelman v. Puma Biotechnology</em></div>

Paul:

I write regarding Puma's responses to Dr. Eshelman's First Set of Interrogatories (Irogs 1-5) and First Set of Requests for Production (RFPs 1-62).

In addition to the fact that Puma purported to raise a number of untimely objections that were already waived as a matter of law and defied a Court order in objecting to RFPs 14-18, there are a number of other issues with Puma's responses.

1. **Unspecific General Objections**. Puma relies on numerous unspecific general objections and conditions without specifying the interrogatories or document requests to which such objections apply. This is improper. Rule 33 requires that "[t]he grounds for objecting to an interrogatory *must* be stated with *specificity*." Fed. R. Civ. P. 33(b)(4). Rule 34 likewise requires that "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state *with specificity* the grounds for objecting to the request" and that "[a]n objection must state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2). General objections are highly disfavored in the Fourth Circuit. *See Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238 (E.D.N.C. 2010) (mere recitation of the familiar litany that a request is overly broad, burdensome, oppressive, and irrelevant does not constitute a specific objection); *Hager v. Graham*, 267 F.R.D. 486, 492 (N.D.W.Va. 2010) ("General objections to



discovery, without more, do not satisfy the burden of the responding party under the Federal Rules of Civil Procedure to justify objections to discovery because they cannot be applied with sufficient specificity to enable courts to evaluate their merits."). Puma must promptly withdraw all general objections and serve amended responses that comply with the Federal Rules of Civil Procedure, stating any objections with specificity and thereby making it clear whether Puma is withholding responsive documents on the basis of each objection.

2. **General Objection To The Production Of Documents That Do Not Specifically Refer To The Events Which Are The Subject Matter Of This Litigation**. Puma has raised a "general" objection to producing "documents that do not specifically refer to the events which are the subject matter of this litigation." I understand this to mean that you do not intend to review documents for possible production unless they contain at least one of a set of search terms. If my understanding is correct, that would be improper. While I agree that search terms can be employed to identify potentially responsive documents from certain categories of voluminous electronic information (e.g., email), there are other categories of documents that are likely to contain responsive documents but that would probably not be captured by running search terms across an electronic dataset. By way of example only, this includes hard copy documents, handwritten notes, Post-Its affixed to responsive documents, insurance policies, financial records, audio and video recordings, voice messages, text messages, organizational charts, and materials associated with meetings during which relevant topics were mentioned, referenced, or discussed. In light of the above considerations, please clarify the scope of your collection and review of potentially responsive documents. In addition, please withdraw this "general" objection and clarify, in response to each request, whether Puma is withholding responsive documents on the basis that it should not have to search for documents that do not specifically refer to the events that are the subject matter of this litigation.

3. **Unspecific "Relevance" Limitations And Objections In Response To Requests For Production**. In response to many of Dr. Eshelman's Requests for Production, Puma has responded that it will only produce "relevant" non-privileged documents that are responsive to the requests or has objected "to the extent that [the requests] call[] for information that is not relevant to the parties' claims and defenses." This is improper because it purports to limit the production of responsive documents to only those that are determined by Puma to be "relevant" based on undisclosed criteria, without stating "*with specificity* the grounds for objecting to the request," and thereby obscuring "whether any responsive materials are being withheld on the basis of that objection." Rule 34. Because Puma has failed to state its relevance limitations and objections with specificity as required under Rule 34, it is not clear whether Puma is withholding responsive documents on the basis that they are not "relevant" according to some undisclosed criteria. Therefore, any such objections and limitations based on "relevance" have been waived and Puma must produce all documents that are *responsive*, not merely those that Puma unilaterally determines to be *relevant*. Please confirm in writing that Puma will be doing so, or serve amended responses that: (1) remove all "relevance" qualifiers from Puma's responses; and (2) state with specificity the reasons for each relevance objection, thereby making clear whether any responsive materials are being withheld on the



basis of that relevance objection.

4. **"Duplicative" Objections**.  In response to numerous RFPs, Puma has objected that the request is "duplicative" and has referred Dr. Eshelman to Puma's responses to other RFPs.  Please confirm that Puma is not withholding any documents on the basis of its "duplicative" objections, and that it is only withholding documents on the basis of objections set forth in response to the RFPs that are specifically cross-referenced.

5. **Production of Metadata**.  Puma has objected to producing "any metadata applicable to any document" and stated that it would confer about the appropriate metadata information to be provided in producing any documents in electronic form.  We already agreed, in the Joint Discovery Plan, "to produce all documents and data electronically, as Bates-stamped images (where appropriate and not logistically prohibitive) and in native format **with all metadata intact**, along with load files associating the Bates-stamped images with their respective native files and metadata."  Please confirm that Puma still intends to comply with this agreement.

6. **Communications Not Contained in Documents.**  Numerous RFPs seek certain "communications" and Puma objected to the extent that these requests call for the production of "communications" not contained in documents.  Please confirm that Puma is not withholding any text messages, voice messages, instant messages, electronic data, or notes, transcriptions, or recordings of conversations on the basis of this objection.

7. **Evidence Of Puma's Actual Malice**.  One of the elements of defamation is that the defendant knew or recklessly disregarded that its accusations were false, *i.e.*, acted with actual malice.  Put simply, Puma's knowledge is a central issue in this case.  Defamation defendants almost never admit "to entertaining serious subjective doubt about the authenticity of [the statements they] publish[]."  *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002) (citation omitted).  Because of the fact that party testimony tends to be self-serving, courts have long recognized that defamation plaintiffs "will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself..."  *See Herbert v. Lando*, 441 U.S. 153, 170 (1979).  A defamation defendant "cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  To counter a defendant's self-serving protestations, courts have long permitted defamation plaintiffs to introduce circumstantial evidence to show the defendant's state of mind.  *See, e.g., Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence).  The United States Supreme Court has explained that such evidence can take a variety of forms.  In *Herbert*, the Court approvingly quoted in full Section 455 from the second edition of American Jurisprudence, Volume 50:

> The existence of actual malice may be shown in many ways.  As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and **all the relevant circumstances surrounding the transaction may be shown**, provided they are



not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, *circumstances indicating the existence of rivalry, ill will, or hostility between the parties*, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items and the nature of the one under consideration.

*Hebert*, 441 U.S. at 164, n. 12 (quoting 50 Am.Jur.2d § 455).

Puma has objected to producing – or has failed to produce – relevant and discoverable evidence regarding its actual malice. For example:

a. **Interrogatory No. 4** asks Puma to "[d]escribe each act undertaken by Puma to assess, analyze, examine, investigate, explore, probe, confirm, or evaluate, directly or indirectly, the truth, falsity, accuracy, or inaccuracy of Puma's statements about Dr. Eshelman or PPD, including by identifying: (a) the date on which such act was undertaken; (b) the specific employee(s) or other person(s) who undertook such act; (c) all web searches conducted; (d) all websites viewed or visited; and (e) all documents reviewed or printed." Puma has failed to provide most of the requested information, including: (1) the web searches Mr. Auerbach conducted and the date(s) on which he conducted them; (2) all websites Mr. Auerbach viewed or visited and the date on which he did so; and (3) the identity of all documents Mr. Auerbach reviewed or printed and the date on which he did so. In addition, Puma failed to identify what "news reports" Mr. Auerbach reviewed concerning PPD's press release. All of this information is highly relevant to actual malice, because it provides insight into Mr. Auerbach's thought process in terms of what he chose to research, what search results he chose to disregard, and what information he reviewed and then disregarded. Unless Puma has violated its obligation to preserve relevant data and documents, all of this information should be readily available to Puma in Mr. Auerbach's web browser history, search history, and files. Puma should promptly provide the requested information or explain in detail the circumstances under which it was deleted or destroyed.

b. **Internet Research About Dr. Eshelman**. Dr. Eshelman has requested documents relating to Puma's internet research about him, including web browser histories (**RFP 26**), web search histories (**RFP 27**), documents and websites viewed, reviewed, relied upon, printed, and/or utilized (**RFP 28**). Puma has objected that the phrase "Puma's other statements about Dr. Eshelman" is vague and undefined. These are plain words conveying an unambiguous meaning, and Puma has not explained what it purportedly finds vague about these words. In addition, Puma has objected to producing documents dated after the filing of the complaint in this case. This objection is meritless because, as the Supreme Court has explained, "*subsequent* statements of the defendant" and other "circumstances indicating the existence of rivalry, ill will, or hostility between the parties" are both relevant to the existence of actual malice. *Hebert*, 441 U.S. at 164, n. 12 (quoting 50 Am.Jur.2d § 455). In addition, Puma objected because of "the lack of any relevant limitation of website



histories to websites related to any issue in this case." Please clarify whether Puma intends to withhold or redact any documents on the basis of this objection.

c. **RFP 31** seeks "all documents Puma reviewed in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation." Puma objected "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case." As set forth above, Puma's editorial process is highly relevant to its actual malice and is therefore discoverable.

d. **RFP 12** seeks "all documents relating to the Ketek clinical trial." Puma objected "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case." But the very defamatory accusation at issue in this case is that Dr. Eshelman was involved in fraud in the Ketek clinical trial. As such, there is no basis for claiming that documents relating to that clinical trial are not relevant, and the objection should be withdrawn.

e. **Meeting Materials**. With respect to meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis, the Ketek clinical trial, or the proxy contest were mentioned, referenced, or discussed, Dr. Eshelman requested all related documents including draft and final agendas (**RFP 19**), draft and final minutes (**RFP 20**), documents containing edits to minutes (**RFP 21**), draft and final transcripts (**RFP 22**), recordings (**RFP 23**), documents, materials, and presentations utilized, distributed, or presented (**RFP 24**), and call logs and meeting invitations (**RFP 25**). Puma objected to each of these requests to the extent that they "call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed...without regard to whether the documents themselves refer to those subjects." This is not a valid basis for objecting. If Puma had meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis, the Ketek clinical trial, or the proxy contest was mentioned, referenced, or discussed, then all of the circumstances and documents relating to those meetings are relevant and discoverable. Puma cannot shield those documents from discovery just because they might not happen to contain a particular search term. A meeting invitation, for example, is unlikely to contain detailed information about what was discussed at the meeting, but would reveal important information about when the meeting was called, who was invited, and what materials were sent to participants to review before the meeting (if any). And, if Puma board members had a meeting during which they discussed Dr. Eshelman or the other topics listed above, but studiously avoided mentioning his name in the minutes or other materials related to the meeting, then that fact itself would be circumstantial evidence regarding Puma's state of mind in dealing with Dr. Eshelman, which would be relevant to actual malice.

f. **RFP 37** seeks "all documents relating to and/or reflecting Puma's decision to publish the Investor Presentation on January 7, 2016." Puma has objected to the extent that this request "calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case." To the contrary, in *Harte-Hanks*, the Supreme



Court held that circumstantial evidence of motive for publishing, while not alone sufficient to meet the actual malice standard, is relevant to the inquiry. *Harte-Hanks Comm's*, 491 U.S. at 668. The objection is therefore meritless and should be withdrawn.

g. **RFP 39** seeks "all documents relating to and/or reflecting any communication by, between, or among, you, any person identified in your response to any of Dr. Eshelman's Interrogatories, and/or any other person relating to (a) Dr. Eshelman; (b) PPD; (c) the Investor Presentation; (d) the subject matter(s) of the Complaint; and/or (e) the subject matter(s) of these Requests for Production." Puma objected "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case" and responded, "subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce documents responsive to RFP No. 39 if (d) above is read in the conjunctive." Please clarify what you mean by this. What responsive documents is Puma withholding?

8. **Information And Documents Relating To PPD And Aventis.**

   a. **Interrogatory 3** asks Puma to identify each person with whom Puma has communicated regarding Dr. Eshelman or PPD and describe the circumstances and content of such communications. Puma objected to identifying and describing communications "regarding PPD that are not related to the Ketek clinical trial or fraud in relation to it on the ground that such communications are not relevant to the parties' claims and defenses and attempting to identify the persons with whom such communications were had would be unduly burdensome and disproportional to the needs of the case." However, the circumstances and content of Puma's communications regarding PPD are relevant to Puma's actual malice, regardless of whether those communications are related to the Ketek clinical trial. The fact that Puma has a business relationship with PPD and engages in communications with and about PPD is circumstantial evidence that Puma knew that PPD had not been involved in fraud. Puma should withdraw its objection, identify each person with whom Puma has communicated regarding PPD, and describe the circumstances and content of such communications, regardless of whether those communications related specifically to the Ketek clinical trial. In addition, Puma failed to identify the specific individual or individuals from Adage Capital with whom Mr. Auerbach communicated regarding Dr. Eshelman. Puma should supplement its response and identify them without further delay.

   b. Dr. Eshelman also served several requests for documents relating to PPD and Aventis. For example, **RFP 2** seeks "all documents relating to PPD." **RFP 53** seeks "all documents relating to or reflecting the relationship between Puma and PPD, including contracts, invoices, records of accounts receivable and accounts payable, and all documents reflecting any work performed by PPD for Puma or vice versa." **RFP 54** seeks "all communications with PPD." **RFP 11** seeks "all documents relating to Aventis Pharmaceuticals, Inc." **RFP 55** seeks "all communications with any former employee of PPD." And **RFP 56** seeks "all



communications with any current employee of PPD."

Puma objected to these requests "to the extent [they] call[] for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case" and "on the ground that any relationship between Puma and PPD is not relevant to the parties' claims and defenses and the production of related documents would be disproportional to the needs of this case."

These objections are meritless and should be withdrawn. PPD and Aventis are the companies at the center of the defamatory accusation at issue in this case. The volume and content of Puma's communications and documents with and about PPD and Aventis would tend to reveal the nature and extent of Puma's business relationships with PPD and Aventis, which is important circumstantial evidence that Puma knew that Aventis and PPD – and by extension, PPD's CEO Dr. Eshelman – had *not* had culpable involvement in clinical trial fraud and that Puma's accusation to the contrary was false. In addition, because PPD is a North Carolina company, Puma's documents relating to PPD are relevant to the jurisdictional analysis. Puma should withdraw these objections and produce all documents relating to PPD and Aventis without further delay.

9. **Omissions Of Responsive Information**.

    a. **Interrogatory 1** requires Puma to "[i]dentify *every* person who directly or indirectly participated in researching, drafting, editing, discussing, fact-checking, presenting, publishing, or disseminating the Investor Presentation and/or the News Release, and for each such person, provide a detailed description of his or her participation." In responding, Puma admits that Latham & Watkins and Innisfree M&A were involved, but it fails to identify the individuals from those firms who had such involvement. Puma refers to "others who spoke in [Congressional] hearings" and "other large institutional shareholders of Puma" but it again fails to identify specific individuals. The identity of individuals likely to have discoverable information (along with the subjects of that information) is plainly discoverable. *See* Fed. R. Civ. P. 26(a)(1)(A)(i). Puma must supplement its response promptly to identify the specific individuals involved.

    b. **Interrogatory 2** asks Puma to "[i]dentify every person who directly or indirectly participated in the proxy contest, including by conducting any research, due diligence, or investor outreach, or by communicating regarding the proxy contest, and for each such person, provide a detailed description of his or her participation." Puma limited its answer to information related to the preparation of the defamatory investor presentation, and admitted that "Alan Auerbach was involved in the Proxy Contest as the individual from Puma who was *principally* responsible for speaking with investors [and] preparing proxy solicitation materials, with advice and consultation from Latham & Watkins and Innisfree M&A and input from Mariann Ohanesian." As requested in the interrogatory, Puma must "[i]dentify *every* person" involved, not merely those whom it deems to be



"principally" involved. Puma must supplement its response to identify other Puma employees who directly or indirectly participated in the proxy contest, the specific individuals from Latham & Watkins and Innisfree M&A, and the investors with whom Mr. Auerbach communicated regarding the proxy contest. In addition, as requested in the interrogatory, Puma must "provide a detailed description of [the] participation" of each such individual.

10. **Objections To The Timing Of Production**. In response to several RFPs, Puma objected that the request "would vary the scope and timing of pretrial disclosures under the Court's rules and scheduling orders." *See* **RFPs 33, 58, and 59**.

   a. **RFP 33** seeks "*documents* that Puma contends support, establish, demonstrate, or show that Dr. Eshelman perpetrated, committed, or otherwise had culpable involvement in fraud in connection with the Ketek clinical trial." Puma objected "on the ground that it is a request for *contentions* of a party that would vary the scope and timing of pretrial disclosures..." But the request seeks "documents," not "contentions." Nor does the request ask Puma to *identify* which documents support its contentions. The request only requires that, to the extent Puma currently has documents that support its contentions, it must produce them. If Puma later discovers documents that it believes support its contentions, it must supplement its document production at that time. Puma should withdraw this objection promptly.

   b. **RFP 58** seeks the production of "all documents, tangible materials, or demonstrative evidence that you intend to introduce or use as evidence at trial or any other hearing in this action." Like RFP 33, this request does not alter the timing of pretrial disclosures because it does not require Puma to *identify* its potential exhibits, but only to include them in its document production along with documents that are responsive to other RFPs. I recognize that you probably have not yet identified which documents you may use at trial, and this RFP does not require you to do so. Instead, this RFP requires only that – if you find a document that you do intend to use as a trial exhibit – you produce it, rather than withholding it from production in the unlikely event that it is not responsive to some other RFP.

   c. **RFP 59** seeks "all documents containing any admission you contend any party to this lawsuit, or anyone acting on a party's behalf, made relevant to the issues raised by the claims or defenses in this action." Puma objected that the request "would vary the scope and timing of pretrial disclosures" and responded that it "will provide documents containing admissions of Dr. Eshelman on the timing established by the court or applicable rules." Our Joint Discovery Plan does not provide any date for producing "documents containing admissions" of the parties. Please clarify Puma's position regarding when such documents would be due and the basis for that position.



11. **Clarification Regarding Miscellaneous Issues**.

    a.  <u>RFP 52</u> seeks "all documents reflecting or containing the information set forth in Brant Bishop's April 28, 2016 email and letter to Thomas Clare" and provides that "for the avoidance of doubt, this Request does not seek any emails exchanged with Puma's attorneys, but—to the extent that the information contained in Mr. Bishop's email and letter exists in documents not created by attorneys—this Request seeks production of those documents." Puma responded: "Subject to and without waiving the foregoing objections, Puma states that the information set forth in the identified email/letter was already provided to Dr. Eshelman's counsel in that letter. To the extent that there is some other or additional documents that this request is intended to seek, Puma will meet and confer with Dr. Eshelman's counsel to discuss those issues." I am writing to confer regarding this. As a general matter, Brant's email and letter made representations disclaiming the existence of certain contacts with North Carolina. Presumably, those representations were based on a review of business records in Puma's possession, custody, or control. If so, please confirm that Puma will produce those records.

    b.  <u>RFP 60</u> seeks an organizational chart of Puma Biotechnology, Inc. In response, Puma agreed to meet and confer to determine what organizational information may be reasonably related to the claims and defenses in this case and search for and produce an appropriate organizational chart. I am writing to confer regarding this issue. We are interested in an organizational chart that will clarify the positions and reporting relationships of Puma employees and directors with knowledge of the claims at issue, who sent, received, or were copied on the emails Puma will be producing, or who worked on documents that Puma will be producing.

<div align="center">*    *    *</div>

To make the meet-and-confer process easier and more streamlined, I'm providing this letter in Word so that you can interlineate Puma's responses to each issue I've raised. I find that this tends to save attorneys' time and clients' money by avoiding the burden of retyping questions and flipping back and forth between questions and answers appearing in two documents. I would greatly appreciate it if you would do likewise going forward.

Let's schedule a call to meet and confer regarding these issues early next week. I'm generally available on Monday afternoon and Tuesday. Please let me know what time works for you.

Regards,

Megan L. Meier

# Exhibit 11

**From:** **Megan Meier**  megan@clarelocke.com  📎

**Subject:** Eshelman's Amended Responses & Puma's Objections To Discovery

**Date:** September 27, 2016 at 10:30 AM

**To:** Paul Sampson  psampson@wilkinsonwalsh.com

**Cc:** Brant W. Bishop  bbishop@wilkinsonwalsh.com, Lori A. McGill  lalvinomcgill@wilkinsonwalsh.com, Sean Eskovitz  seskovitz@wilkinsonwalsh.com, Aurash Jamali  ajamali@wilkinsonwalsh.com, Millen, Press  pmillen@wcsr.com, Tom Clare  tom@clarelocke.com, Libby Locke  libby@clarelocke.com, Daniel Watkins  daniel@clarelocke.com, Audrey Rabenberg  audrey@clarelocke.com, Andrew K. McVey  AMcvey@murchisontaylor.com

Paul:

In response to the concerns you raised during our telephonic meet-and-confer on Thursday, I am serving the attached amended responses and objections to Requests for Production 11, 15, and 16 and to Interrogatory 9.

Although Dr. Eshelman's initial objections remain valid and Puma's requests are unduly broad and call for documents and information that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, we are serving these amended responses in the spirit of compromise and in order to avoid burdening the Court with pointless disputes over documents and information that have no material impact on the case.

I hope that Puma will reconsider its refusal to withdraw a single one of the meritless objections I brought to your attention in writing on July 27 and during our lengthy telephonic meet-and-confer on August 4. I urge you to read the cases set forth in my letter to you and to consult with your local counsel before we are forced to bring those disputes to the Court. If you do so, you will see that the Fourth Circuit does not tolerate the sort of boilerplate general objections that Puma has raised. In light of this, Dr. Eshelman did not raise general objections (except as to privilege), but stated only a limited number of specific objections, thereby making it clear what responsive materials were being withheld on the basis of his objections. Puma did not do so and appears to be hiding the ball with respect to what it is withholding, not only regarding its contacts with North Carolina and PPD, but also regarding its actual malice toward Dr. Eshelman.

As set forth in my letter, the United States Supreme Court has explained that circumstantial evidence is relevant to the actual malice inquiry, including "prior *or subsequent* defamations, *subsequent statements of the defendant,* circumstances indicating the existence of rivalry, ill will, or hostility between the parties," and so forth. *Hebert v. Lando,* 441 U.S. 153, 170 (1979). Just last week, another court in the Fourth Circuit denied Rolling Stone Magazine's motion for summary judgment in a defamation case, elaborating that broad categories of circumstantial evidence are relevant to actual malice, including the defendant's actions and words **after** publication of the defamatory statements. *See Eramo v. Rolling Stone*, Case. 3:15-cv-00023-GEV, Dkt. 188 (Sept. 22, 2016 W.D. Va.). Citing other authorities, the Western District of Virginia explained that "some types of evidence [] relate back and provide inferential evidence of defendant's knowing or reckless disregard of falsity at the time of publication" and that "[c]ircumstantial evidence showing reckless disregard may derive from the defendant's words or acts before, at, or after the time of the communication." In light of this and the other authorities cited in my letter, there can be no reasonable dispute that Puma's discovery responses contain a number of objections that are meritless.

As his recent order makes clear, Judge Dever will not hesitate to strike meritless objections and compel prompt certification of production. Before it comes to that, I am giving Puma another opportunity to withdraw its objections and serve amended responses in compliance with its discovery obligations. Please let me know by the end of this week if Puma will do so.



20160927 Eshelman's Amended R…15, and 16



20160927 Eshelman's Amended R…atory 9.pdf

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

# Exhibit 12

**From:** **Megan Meier** megan@clarelocke.com
**Subject:** Re: Eshelman's Amended Responses & Puma's Objections To Discovery
**Date:** November 23, 2016 at 12:07 PM
**To:** Paul Sampson psampson@wilkinsonwalsh.com
**Cc:** **Tom Clare** tom@clarelocke.com, **Libby Locke** libby@clarelocke.com, **Daniel Watkins** daniel@clarelocke.com, **Audrey Rabenberg** audrey@clarelocke.com, **Andrew K. McVey** AMcvey@murchisontaylor.com, **Brant W. Bishop** bbishop@wilkinsonwalsh.com, **Lori A. McGill** lalvinomcgill@wilkinsonwalsh.com, **Sean Eskovitz** seskovitz@wilkinsonwalsh.com, **Aurash Jamali** ajamali@wilkinsonwalsh.com, **Matthew Skanchy** mskanchy@wilkinsonwalsh.com

Paul:

I'm following up on my emails from more than a week ago (one below and one attached). I don't think I've received a response to either of those emails. Please respond by Monday at noon.

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454



Re/ Eshelman's
Amended R…covery.eml

On Nov 15, 2016, at 4:39 PM, Megan Meier <megan@clarelocke.com> wrote:

Paul:

Thank you for your response. Could you clarify a couple points about Puma's responses and objections to RFPs 2 and 12?

(1) Your email makes me think that Puma intends to produce the documents specified in the responses <u>notwithstanding</u> the objections, but Puma's responses say that documents will be produced only <u>subject to</u> the objections. If my interpretation of your email is correct, please serve amended responses changing "subject to" to "notwithstanding." If I am misunderstanding your email and Puma does not intend to produce the documents specified in its response because they are subject to Puma's objections, then my initial concern remains: Puma's responses do not make clear what Puma is intending to withhold and what it is intending to produce in response to RFPs 2 and 12.

(2) The responses to RFP 2 and 12 seem inconsistent to me. On the one hand, Puma's response to RFP 2 seems to say that Puma will produce all non-privileged documents relating to PPD and Ketek clinical trial <u>**regardless**</u> of whether they also relate to fraud, but RFP 12 seems to say that Puma is planning to withhold documents that do not relate to fraud. Could you serve amended responses that address this apparent inconsistency or—if I am misunderstanding something—clarify Puma's position?

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Nov 14, 2016, at 5:07 PM, Paul Sampson <psampson@wilkinsonwalsh.com> wrote:

Megan:

See our responses below (non-highlighted). As explained, Puma is modifying its objections and responses to RFPs 2, 12, 40, 61, and 62. The amended objections and responses for those RFPs are attached. Please let us know if you would like to discuss.

If you ultimately decide to seek Court intervention regarding any of the issues below, we intend to file a cross-motion asserting that your objections to providing a privilege log regarding documents responsive to Puma's RFPs 19, 20, 22-30, and 40 are improper. I believe we have fully hashed that issue out over email. But let me know if you think further discussion would be helpful.

Paul

Paul

---

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Friday, November 11, 2016 2:23 PM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>
**Cc:** Brant Bishop <bbishop@wilkinsonwalsh.com>; Lori A. McGill <lalvinomcgill@wilkinsonwalsh.com>; Sean Eskovitz <seskovitz@wilkinsonwalsh.com>; Aurash Jamali <ajamali@wilkinsonwalsh.com>; Millen, Press <pmillen@wcsr.com>; Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Daniel Watkins <daniel@clarelocke.com>; Audrey Rabenberg <audrey@clarelocke.com>; Andrew K. McVey <AMcvey@murchisontaylor.com>; Matthew Skanchy <mskanchy@wilkinsonwalsh.com>
**Subject:** Re: Eshelman's Amended Responses & Puma's Objections To Discovery

Paul:

I appreciate you taking the time to address some of the issues I raised regarding Puma's responses to RFPs and interrogatories. I believe there are only a handful of remaining issues to be resolved:

(1) Web searches/histories/websites/documents relating to Puma's other statements about Dr. Eshelman (RFPs 26-28), without a cutoff date of the filing of the complaint, which is relevant to Puma's actual malice as set forth in the cases I've cited. I understand that you've agreed to produce these materials through the filing of the complaint. Setting aside work done by attorneys, I can't imagine that there is much after that point. In light of that, would you withdraw that objection and produce all non-privileged documents responsive to these requests?

Puma stands by its earlier objection to producing documents responsive to this request after the filing of the complaint on February 2, 2016. First, the text of these RFPs clearly seeks information reviewed by Puma that informed its January 7, 2016 presentation, which, by definition, would exclude information reviewed after its publication. RFPs 26 and 27, for example, seek web browser histories and web search histories of persons who played a role in the Investor Presentation—presumably to understand what they reviewed as the presentation was being put together, not to pry into their post-complaint searches and browsing. And RFP 28 specifically requests, using past tense, "documents and websites" that Puma "viewed, reviewed, relied upon, printed and/or utilized" in evaluating the truth or accuracy of the statements in the offending Investor Presentation.

Second, as the cases we previously sited explain, the question of actual malice is determined "at the time of publication" of the allegedly defamatory statements. *New York Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964). Multiple cases within the Fourth Circuit are in accord with this principle. *See, e.g.*, *Backus v. City of Parkersburg*, 980 F. Supp. 2d 741, 747-48 (S.D. W. Va. 2013) (requiring that "the statements were published with knowledge at the time of publication that they were false or misleading or were published with a reckless and willful disregard of truth"); *Fitts v. Kolb*, 779 F. Supp. 1502, 1515 (D. S.C. 1991) (requiring that "the publisher of a falsehood knows it was false at the time it was published or had a reckless disregard of whether it was false or true"). Pursuant to this rule, "it is hornbook libel law that post-publication events have no impact whatever on actual malice . . . since the existence or non-existence of such malice must be determined as of the date of publication." *Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990).

I note that the allegedly defamatory statements were made in the January 7, 2016 presentation, and that Puma specifically laid out and linked to what it was relying on—Dr. Eshelman's testimony before Congress—in drawing its conclusions about him. Dr. Eshelman's complaint was filed on February 2, 2016. Shortly thereafter, Puma issued an internal hold notice requiring relevant individuals to preserve documents related to Dr. Eshelman's claims. The hold notice did not identify web browser histories as among the type of "document" to be preserved. On May 6, 2016, we received from you a letter asking Puma to collect and preserve, among other things, "web browser histories" of individuals involved in the drafting of the Investor Presentation. This letter was sent more than 90 days after the filing of the complaint, and exactly 120 days after the publication of the Investor Presentation. Google Chrome, the market's most popular web browser and the browser of choice at Puma, retains web browser history for only 90 days. Accordingly, the information sought in RFPs 26-28, to the extent they call for web browser histories or searches, no longer exists and did not exist at the time of your letter, and we have been unable to retrieve it. To the extent we identify documents or websites that are otherwise responsive to RFP 28 in our review of Puma's emails and other files, we will produce them.

(2) Documents reflecting the full nature and extent of Puma's relationship with PPD, which is also circumstantial evidence of Puma's actual malice (RFPs 2, 53-56, and Irog 3). To address your concerns about proportionality, I'd be willing to table these RFPs until after the depositions of the main person or people knowledgeable about Puma's business relationship with PPD. It could very well be that such a deposition or depositions would obviate the need for additional documents relating to PPD. Is that a compromise you'd consider?

We are okay with that compromise. I note that Puma's production on October 24, 2016, included many documents that are responsive to these requests. *See* Puma's Production Letter (Oct. 24, 2016) & PUMA00021601–00051441.

(3) Documents supporting Puma's contentions (RFP 33), documents that Puma intends to introduce as evidence (RFP 58), and documents containing any admission Puma contends Dr. Eshelman has made (RFP 59). I understand your objection to these requests to be one not of substance, but of timing: that Puma should not have to **identify** these documents until some later time. But these are RFPs, not interrogatories. All these RFPs require is that—in the unlikely event that there are documents that are responsive to these RFPs that are not responsive to some other RFPs—Puma produce them along with the rest of the documents it is producing. No need to identify them separately at this point. If, as I suspect, you are planning to produce these documents **notwithstanding** Puma's objections to these RFPs, I would appreciate it if you would let me know and modify Puma's responses accordingly, so that we don't have to bother the Court with this.

I agree that any documents that are responsive to these requests likely will be produced notwithstanding Puma's objections, but only because they are responsive to some other request. For that reason alone, our disagreement over these objections is unimportant. But Puma's objections to these requests are more than procedural, as you suggest; they are substantive as well. The requests purport to require Puma and its counsel to perform affirmative work—like identifying documents Puma intends to use at trial—as opposed to merely identifying documents that are responsive to a concrete request. Moreover, documents we may believe today that we will introduce at trial may ultimately be found to be useless or superseded by other documents or

facts, as Puma's investigation and preparation for trial continues. The court-imposed deadlines for identifying the types of documents requested by these RFPs allow for Puma to take into account various considerations during the course of preparing for trial—something these RFPs seek to take away. Puma accordingly stands by its objections.

(4) As we've discussed a couple times, the problem with Puma's general objections and unspecific "relevance" limitations and objections (RFPs 2, 12, 37, 40, 61, and 62) is that—in addition to violating the FRCP—we have no way of knowing **what** Puma is withholding on the basis of these objections or what it is unilaterally determining to be relevant.

Puma already removed its relevance objection to RFP 37. *See* Puma's Amended Responses & Objections (Oct. 5, 2016). With respect to RFPs 2, 12, 40, 61, and 62, Puma modifies its objections and responses as follows (and as reflected in the attached file):

· Puma agrees to remove its relevance objections to RFPs 40 and 62.

· Puma agrees to modify its objection and response to RFP 61 in an attempt to clarify its position and address your concerns.

· Puma agrees to delete the word "relevant" from the last sentence of its objections and responses to RFPs 2 and 12. As so modified, Puma objects to these RFPs "to the extent" they call for "information that is not relevant to the parties' claims and defenses" and are "disproportional to the needs of the case." The objections and responses then specifically provide a narrowing interpretation of the RFPs that Puma will respond to—*i.e.*, an interpretation that does not call for irrelevant information that is disproportional to the needs of the case. For example, while RFP 12 broadly calls for "All documents relating to the Ketek clinical trial," Puma objects on relevance and disproportionality grounds and provides a narrowing construction—that "Puma will search for and produce non-privileged documents relating to fraud in relation to the Ketek clinical trial." Puma's relevance objection is that documents related to the Ketek clinical trial but that do not relate to fraud in relation to it are irrelevant and searching for and producing them would be disproportional to the needs of the case. We believe the relevance objection is clear.

Please let us know if you have continued concerns with Puma's objections and responses to these RFPs.

We intend to file a motion with respect to these remaining issues early next week. Before we do so, I wanted to reach out to you one last time to see if we could resolve or narrow these issues before seeking the Court's intervention. Especially with respect to numbers 1, 3, and 4 above, I could be wrong, but I assume that Puma is not really planning to withhold much (if anything) on the basis of these objections. In light of that, I hope that you will consider withdrawing them to avoid unnecessarily burdening the Court. Please let me know by close of business Monday how you want to proceed (or if you need an extra day to get back to me).

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street

Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Oct 5, 2016, at 4:10 PM, Paul Sampson <[psampson@wilkinsonwalsh.com](mailto:psampson@wilkinsonwalsh.com)> wrote:

Megan:

I write in response to your email below and to clarify what you said about damages during our phone call on September 22, 2016.

### Dr. Eshelman's Amended Initial Disclosures

I first want to clarify your position on damages. In the verified complaint, your client said that "Defendants' false claims have been extremely damaging to Dr. Eshelman's reputation and business." ¶ 39. Regarding harm to his business, Dr. Eshelman claimed that Puma's statements have:

- · "impaired" his "ability to be elected as a director of the board or into a leadership position for other public companies," ¶ 41;

- · "harmed" his "general commercial relationships, have harmed his business standing, and have impaired his ability to enter into commercial relationships," ¶ 42; and

- · "impaired" his "ability to attract co-investors to invest alongside Eshelman Ventures, depriving Dr. Eshelman of business opportunities," ¶ 43.

*See also* ¶ 63 ("As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's business and investments have been adversely affected in an amount yet to be determined."); ¶ 80 (same).

Dr. Eshelman's amended initial disclosures, which you provided to us on September 19, 2016, appear to abandon any claim that Dr. Eshelman's business has suffered any actual harm by Puma's allegedly defamatory statements. Instead, Dr. Eshelman asserts only that his reputation has been harmed to the tune of $7.5 million, without providing any explanation of how he arrived at that figure. And during our meet-and-confer phone call on September 22, you confirmed that the only materials you are providing as required by Rule 26 of the Federal Rules of Civil Procedure are certain of Dr. Eshelman's business awards reflecting his reputation. Given that you have not provided any other "materials bearing on the nature and extent of injuries suffered," Fed. R. Civ. P. 26(a)(1)(A)(iii), we understand that you will not be presenting any evidence of actual harm to Mr. Eshelman's business in this case—*e.g.*, actual impairment of his ability to attract co-investors or be elected to corporate boards. Please let us know if we misunderstand your position.

### Dr. Eshelman's Objections to Puma's RFPs and Interrogatories

We have reviewed Dr. Eshelman's amended responses to Puma's RFP Nos. 11, 15, and 16 and to Puma's Interrogatory No. 9. We are satisfied with these amended responses and do not have further pushback at this time.

have further published at this time.

But your objections to RFP Nos. 19, 20, 22-30, and 40 remain improper to the extent they seek to withhold documents relating to the proxy contest. The federal rules provide that the parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). For purposes of discovery, "[r]elevancy is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *Jones v. Wet Seal Retail, Inc.*, 245 F.R.D. 724, 725 (D. Kan. 2007). "[T]he party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 243 (M.D.N.C. 2010). "Where a prima facie showing of discoverability has been made by the party seeking discovery, the burden shifts to the resisting party to show lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption of broad discovery." *Eramo v. Rolling Stone, LLC*, 314 F.R.D. 205, 209 (W.D. Va. 2016) (internal quotation marks omitted).

Dr. Eshelman's documents relating to the proxy contest are not of marginal relevance, but rather are crucial to Puma's defense. Puma will argue at trial that the January 7 presentation was an appropriate response—given publicly available information about Dr. Eshelman's involvement in the Ketek fraud (which he had not disclosed to Puma shareholders) and Puma's own experience dealing with him during the proxy contest—to Dr. Eshelman's proxy proposals. Dr. Eshelman's objections to these RFPs accordingly are improper.

You also have waived these objections. During our phone call on September 22, you conceded that you already have produced documents related to the proxy contest and don't object to continuing to do so, but you said you don't want to go through the hassle of creating a privilege log for the documents you claim are privileged. Since you expressly waived your relevance objection during our phone call, you cannot sua sponte decide to withhold a privilege log. In essence, you are arguing that Dr. Eshelman "should not have to produce a privilege log because he has already produced all non-privileged documents or those not subject to the work product doctrine." *MacEachern v. Quicken Loans, Inc.*, 2016 WL 3964814, at *4 (E.D. Mich. July 25, 2016). As the *MacEachern* court recognized, this argument "lacks merit as defendants, and if necessary, the court, must be able to assess the validity of the privilege claimed." *Id.*

Please withdraw these objections or we will file a motion to compel with the Court.

## Puma's Objections to Dr. Eshelman's RFPs and Interrogatories

We remain unconvinced by your citation of a recent decision in the Western District of Virginia. Perhaps if Puma's position was to produce documents only up until the day of the publication of the Investor Presentation on January 7, 2016, we would take your point. But Puma has agreed to produce documents from up until the time the Complaint was filed, on February 2, 2016, nearly a month later. Puma has thus already agreed to provide documents potentially reflecting "subsequent" statements during the month following the Investor Presentation.

For the reasons we provided in our August 3, 2016 letter, we also believe Puma's general objections—accompanied as they are with specific objections to each RFP or Interrogatory—are not improper, as you claim. Nonetheless, we are attaching amended responses and objections to RFP Nos. 1, 3, 4, 10, 13, 19-22, 24, 25, 31, 37, and 41. Please let us know if you are not satisfied with our amended responses and objections.

Finally, as you know, we are working diligently to comply with the Court's order requiring Puma to produce documents responsive to RFPs Nos. 14-18. It is possible that in working with Puma in this effort additional amendments to Puma's responses and objections to the RFPs and Interrogatories will become necessary. Puma will endeavor to make these amendments as promptly as possible.

Best regards,
Paul

---

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Tuesday, September 27, 2016 10:29 AM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>
**Cc:** Brant Bishop <bbishop@wilkinsonwalsh.com>; Lori A. McGill <lalvinomcgill@wilkinsonwalsh.com>; Sean Eskovitz <seskovitz@wilkinsonwalsh.com>; Aurash Jamali <ajamali@wilkinsonwalsh.com>; Millen, Press <pmillen@wcsr.com>; Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Daniel Watkins <daniel@clarelocke.com>; Audrey Rabenberg <audrey@clarelocke.com>; Andrew K. McVey <AMcvey@murchisontaylor.com>
**Subject:** Eshelman's Amended Responses & Puma's Objections To Discovery

Paul:

In response to the concerns you raised during our telephonic meet-and-confer on Thursday, I am serving the attached amended responses and objections to Requests for Production 11, 15, and 16 and to Interrogatory 9.

Although Dr. Eshelman's initial objections remain valid and Puma's requests are unduly broad and call for documents and information that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, we are serving these amended responses in the spirit of compromise and in order to avoid burdening the Court with pointless disputes over documents and information that have no material impact on the case.

I hope that Puma will reconsider its refusal to withdraw a single one of the meritless objections I brought to your attention in writing on July 27 and during our lengthy telephonic meet-and-confer on August 4. I urge you to read the cases set forth in my letter to you and to consult with your local counsel before we are forced to bring those disputes to the Court. If you do so, you will see that the Fourth Circuit does not tolerate the sort of boilerplate general objections that Puma has raised. In light of this, Dr. Eshelman did not raise general objections (except as to privilege), but stated only a limited number of specific objections, thereby making it clear what responsive materials were being withheld on the basis of his objections. Puma did not do so and appears to be hiding the ball with respect to what it is withholding, not only regarding its contacts with North

Carolina and PPD, but also regarding its actual malice toward Dr. Eshelman.

As set forth in my letter, the United States Supreme Court has explained that circumstantial evidence is relevant to the actual malice inquiry, including "prior *or subsequent* defamations, *subsequent statements of the defendant,* circumstances indicating the existence of rivalry, ill will, or hostility between the parties," and so forth. *Hebert v. Lando*, 441 U.S. 153, 170 (1979). Just last week, another court in the Fourth Circuit denied Rolling Stone Magazine's motion for summary judgment in a defamation case, elaborating that broad categories of circumstantial evidence are relevant to actual malice, including the defendant's actions and words **after** publication of the defamatory statements. *See Eramo v. Rolling Stone*, Case. 3:15-cv-00023-GEV, Dkt. 188 (Sept. 22, 2016 W.D. Va.). Citing other authorities, the Western District of Virginia explained that "some types of evidence [] relate back and provide inferential evidence of defendant's knowing or reckless disregard of falsity at the time of publication" and that "[c]ircumstantial evidence showing reckless disregard may derive from the defendant's words or acts before, at, or after the time of the communication." In light of this and the other authorities cited in my letter, there can be no reasonable dispute that Puma's discovery responses contain a number of objections that are meritless.

As his recent order makes clear, Judge Dever will not hesitate to strike meritless objections and compel prompt certification of production. Before it comes to that, I am giving Puma another opportunity to withdraw its objections and serve amended responses in compliance with its discovery obligations. Please let me know by the end of this week if Puma will do so.

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
&lt;2016.10.5 - Puma's Amended Responses to Plaintiff's RFPs 1, 3, 4, 10, 13....pdf&gt;

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
&lt;2016.11.14 Puma's Amended Responses & Objections to Plaintiff's RFPs 2, ....pdf&gt;

From: **Megan Meier** megan@clarelocke.com
Subject: Re: Eshelman's Amended Responses & Puma's Objections To Discovery
Date: November 15, 2016 at 4:17 PM
To: Paul Sampson psampson@wilkinsonwalsh.com
Cc: Tom Clare tom@clarelocke.com, Libby Locke libby@clarelocke.com, Daniel Watkins daniel@clarelocke.com, Audrey Rabenberg audrey@clarelocke.com, Andrew K. McVey AMcvey@murchisontaylor.com, Brant W. Bishop bbishop@wilkinsonwalsh.com, Lori A. McGill lalvinomcgill@wilkinsonwalsh.com, Sean Eskovitz seskovitz@wilkinsonwalsh.com, Aurash Jamali ajamali@wilkinsonwalsh.com, Matthew Skanchy mskanchy@wilkinsonwalsh.com

Paul,

Thank you for taking the time to provide thoughtful responses to my questions and for seeking to resolve as many issues as possible without the Court's intervention. While it looks as though we have not been able to reach agreement on everything, I sincerely appreciate your willingness to narrow our areas of disagreement as much as possible. To follow-up regarding the compromise on #3 below, please provide the name(s) of the main person/people knowledgeable about Puma's business relationship with PPD and let me know when they are available in November and December to be deposed.

Megan Meier | Partner
C L A R E   L O C K E   L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Nov 14, 2016, at 5:07 PM, Paul Sampson <psampson@wilkinsonwalsh.com> wrote:

Megan:

See our responses below (non-highlighted). As explained, Puma is modifying its objections and responses to RFPs 2, 12, 40, 61, and 62. The amended objections and responses for those RFPs are attached. Please let us know if you would like to discuss.

If you ultimately decide to seek Court intervention regarding any of the issues below, we intend to file a cross-motion asserting that your objections to providing a privilege log regarding documents responsive to Puma's RFPs 19, 20, 22-30, and 40 are improper. I believe we have fully hashed that issue out over email. But let me know if you think further discussion would be helpful.

Paul

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Friday, November 11, 2016 2:23 PM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>
**Cc:** Brant Bishop <bbishop@wilkinsonwalsh.com>; Lori A. McGill <lalvinomcgill@wilkinsonwalsh.com>; Sean Eskovitz <seskovitz@wilkinsonwalsh.com>; Aurash Jamali <ajamali@wilkinsonwalsh.com>; Millen, Press <pmillen@wcsr.com>; Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Daniel Watkins <daniel@clarelocke.com>; Audrey Rabenberg <audrey@clarelocke.com>; Andrew K. McVey <AMcvey@murchisontaylor.com>; Matthew Skanchy <mskanchy@wilkinsonwalsh.com>
**Subject:** Re: Eshelman's Amended Responses & Puma's Objections To Discovery

Paul:

I appreciate you taking the time to address some of the issues I raised regarding Puma's responses to RFPs and interrogatories. I believe there are only a handful of remaining issues to be resolved:

(1) Web searches/histories/websites/documents relating to Puma's other statements about Dr. Eshelman (RFPs 26-28), without a cutoff date of the filing of the complaint, which is relevant to

Eshelman (RFP 26-28), without a cutoff date of the filing of the complaint, which is relevant to Puma's actual malice as set forth in the cases I've cited.  I understand that you've agreed to produce these materials through the filing of the complaint.  Setting aside work done by attorneys, I can't imagine that there is much after that point.  In light of that, would you withdraw that objection and produce all non-privileged documents responsive to these requests?

Puma stands by its earlier objection to producing documents responsive to this request after the filing of the complaint on February 2, 2016.  First, the text of these RFPs clearly seeks information reviewed by Puma that informed its January 7, 2016 presentation, which, by definition, would exclude information reviewed after its publication.  RFPs 26 and 27, for example, seek web browser histories and web search histories of persons who played a role in the Investor Presentation—presumably to understand what they reviewed as the presentation was being put together, not to pry into their post-complaint searches and browsing.  And RFP 28 specifically requests, using past tense, "documents and websites" that Puma "viewed, reviewed, relied upon, printed and/or utilized" in evaluating the truth or accuracy of the statements in the offending Investor Presentation.

Second, as the cases we previously sited explain, the question of actual malice is determined "at the time of publication" of the allegedly defamatory statements.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964).  Multiple cases within the Fourth Circuit are in accord with this principle.  *See, e.g.*, *Backus v. City of Parkersburg*, 980 F. Supp. 2d 741, 747-48 (S.D. W. Va. 2013) (requiring that "the statements were published with knowledge at the time of publication that they were false or misleading or were published with a reckless and willful disregard of truth"); *Fitts v. Kolb*, 779 F. Supp. 1502, 1515 (D. S.C. 1991) (requiring that "the publisher of a falsehood knows it was false at the time it was published or had a reckless disregard of whether it was false or true").  Pursuant to this rule, "it is hornbook libel law that post-publication events have no impact whatever on actual malice . . . since the existence or non-existence of such malice must be determined as of the date of publication."  *Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990).

I note that the allegedly defamatory statements were made in the January 7, 2016 presentation, and that Puma specifically laid out and linked to what it was relying on—Dr. Eshelman's testimony before Congress—in drawing its conclusions about him.  Dr. Eshelman's complaint was filed on February 2, 2016.  Shortly thereafter, Puma issued an internal hold notice requiring relevant individuals to preserve documents related to Dr. Eshelman's claims.  The hold notice did not identify web browser histories as among the type of "document" to be preserved.  On May 6, 2016, we received from you a letter asking Puma to collect and preserve, among other things, "web browser histories" of individuals involved in the drafting of the Investor Presentation.  This letter was sent more than 90 days after the filing of the complaint, and exactly 120 days after the publication of the Investor Presentation.  Google Chrome, the market's most popular web browser and the browser of choice at Puma, retains web browser history for only 90 days.  Accordingly, the information sought in RFPs 26-28, to the extent they call for web browser histories or searches, no longer exists and did not exist at the time of your letter, and we have been unable to retrieve it.  To the extent we identify documents or websites that are otherwise responsive to RFP 28 in our review of Puma's emails and other files, we will produce them.

(2) Documents reflecting the full nature and extent of Puma's relationship with PPD, which is also circumstantial evidence of Puma's actual malice (RFPs 2, 53-56, and Irog 3).  To address

your concerns about proportionality, I'd be willing to table these RFPs until after the depositions of the main person or people knowledgeable about Puma's business relationship with PPD. It could very well be that such a deposition or depositions would obviate the need for additional documents relating to PPD. Is that a compromise you'd consider?

We are okay with that compromise. I note that Puma's production on October 24, 2016, included many documents that are responsive to these requests. *See* Puma's Production Letter (Oct. 24, 2016) & PUMA00021601–00051441.

(3) Documents supporting Puma's contentions (RFP 33), documents that Puma intends to introduce as evidence (RFP 58), and documents containing any admission Puma contends Dr. Eshelman has made (RFP 59). I understand your objection to these requests to be one not of substance, but of timing: that Puma should not have to **identify** these documents until some later time. But these are RFPs, not interrogatories. All these RFPs require is that—in the unlikely event that there are documents that are responsive to these RFPs that are not responsive to some other RFPs—Puma produce them along with the rest of the documents it is producing. No need to identify them separately at this point. If, as I suspect, you are planning to produce these documents **notwithstanding** Puma's objections to these RFPs, I would appreciate it if you would let me know and modify Puma's responses accordingly, so that we don't have to bother the Court with this.

I agree that any documents that are responsive to these requests likely will be produced notwithstanding Puma's objections, but only because they are responsive to some other request. For that reason alone, our disagreement over these objections is unimportant. But Puma's objections to these requests are more than procedural, as you suggest; they are substantive as well. The requests purport to require Puma and its counsel to perform affirmative work—like identifying documents Puma intends to use at trial—as opposed to merely identifying documents that are responsive to a concrete request. Moreover, documents we may believe today that we will introduce at trial may ultimately be found to be useless or superseded by other documents or facts, as Puma's investigation and preparation for trial continues. The court-imposed deadlines for identifying the types of documents requested by these RFPs allow for Puma to take into account various considerations during the course of preparing for trial—something these RFPs seek to take away. Puma accordingly stands by its objections.

(4) As we've discussed a couple times, the problem with Puma's general objections and unspecific "relevance" limitations and objections (RFPs 2, 12, 37, 40, 61, and 62) is that—in addition to violating the FRCP—we have no way of knowing **what** Puma is withholding on the basis of these objections or what it is unilaterally determining to be relevant.

Puma already removed its relevance objection to RFP 37. *See* Puma's Amended Responses & Objections (Oct. 5, 2016). With respect to RFPs 2, 12, 40, 61, and 62, Puma modifies its objections and responses as follows (and as reflected in the attached file):

· Puma agrees to remove its relevance objections to RFPs 40 and 62.

· Puma agrees to modify its objection and response to RFP 61 in an attempt to clarify its position and address your concerns.

- Puma agrees to delete the word "relevant" from the last sentence of its objections and responses to RFPs 2 and 12. As so modified, Puma objects to these RFPs "to the extent" they call for "information that is not relevant to the parties' claims and defenses" and are "disproportional to the needs of the case." The objections and responses then specifically provide a narrowing interpretation of the RFPs that Puma will respond to—*i.e.*, an interpretation that does not call for irrelevant information that is disproportional to the needs of the case. For example, while RFP 12 broadly calls for "All documents relating to the Ketek clinical trial," Puma objects on relevance and disproportionality grounds and provides a narrowing construction—that "Puma will search for and produce non-privileged documents relating to fraud in relation to the Ketek clinical trial." Puma's relevance objection is that documents related to the Ketek clinical trial but that do not relate to fraud in relation to it are irrelevant and searching for and producing them would be disproportional to the needs of the case. We believe the relevance objection is clear.

Please let us know if you have continued concerns with Puma's objections and responses to these RFPs.

We intend to file a motion with respect to these remaining issues early next week. Before we do so, I wanted to reach out to you one last time to see if we could resolve or narrow these issues before seeking the Court's intervention. Especially with respect to numbers 1, 3, and 4 above, I could be wrong, but I assume that Puma is not really planning to withhold much (if anything) on the basis of these objections. In light of that, I hope that you will consider withdrawing them to avoid unnecessarily burdening the Court. Please let me know by close of business Monday how you want to proceed (or if you need an extra day to get back to me).

Megan Meier | Partner
C L A R E  L O C K E  L L P
902 Prince Street
Alexandria, Virginia 22314
Office (202) 628-7403
Mobile (202) 280-4454

On Oct 5, 2016, at 4:10 PM, Paul Sampson <psampson@wilkinsonwalsh.com> wrote:

Megan:

I write in response to your email below and to clarify what you said about damages during our phone call on September 22, 2016.

### Dr. Eshelman's Amended Initial Disclosures

I first want to clarify your position on damages. In the verified complaint, your client said that "Defendants' false claims have been extremely damaging to Dr. Eshelman's reputation and business." ¶ 39. Regarding harm to his business, Dr. Eshelman claimed that Puma's statements have:

- "impaired" his "ability to be elected as a director of the board or into a leadership position

for other public companies," ¶ 41;

- "harmed" his "general commercial relationships, have harmed his business standing, and have impaired his ability to enter into commercial relationships," ¶ 42; and

- "impaired" his "ability to attract co-investors to invest alongside Eshelman Ventures, depriving Dr. Eshelman of business opportunities," ¶ 43.

*See also* ¶ 63 ("As a result of the false and defamatory accusations published by Defendants, Dr. Eshelman's business and investments have been adversely affected in an amount yet to be determined."); ¶ 80 (same).

Dr. Eshelman's amended initial disclosures, which you provided to us on September 19, 2016, appear to abandon any claim that Dr. Eshelman's business has suffered any actual harm by Puma's allegedly defamatory statements. Instead, Dr. Eshelman asserts only that his reputation has been harmed to the tune of $7.5 million, without providing any explanation of how he arrived at that figure. And during our meet-and-confer phone call on September 22, you confirmed that the only materials you are providing as required by Rule 26 of the Federal Rules of Civil Procedure are certain of Dr. Eshelman's business awards reflecting his reputation. Given that you have not provided any other "materials bearing on the nature and extent of injuries suffered," Fed. R. Civ. P. 26(a)(1)(A)(iii), we understand that you will not be presenting any evidence of actual harm to Mr. Eshelman's business in this case—*e.g.*, actual impairment of his ability to attract co-investors or be elected to corporate boards. Please let us know if we misunderstand your position.

## Dr. Eshelman's Objections to Puma's RFPs and Interrogatories

We have reviewed Dr. Eshelman's amended responses to Puma's RFP Nos. 11, 15, and 16 and to Puma's Interrogatory No. 9. We are satisfied with these amended responses and do not have further pushback at this time.

But your objections to RFP Nos. 19, 20, 22-30, and 40 remain improper to the extent they seek to withhold documents relating to the proxy contest. The federal rules provide that the parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). For purposes of discovery, "[r]elevancy is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *Jones v. Wet Seal Retail, Inc.*, 245 F.R.D. 724, 725 (D. Kan. 2007). "[T]he party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 243 (M.D.N.C. 2010). "Where a prima facie showing of discoverability has been made by the party seeking discovery, the burden shifts to the resisting party to show lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption of broad discovery." *Eramo v. Rolling Stone, LLC*, 314 F.R.D. 205, 209 (W.D. Va. 2016) (internal quotation marks omitted).

Dr. Eshelman's documents relating to the proxy contest are not of marginal relevance, but

Dr. Eshelman's documents relating to the proxy contest are not of marginal relevance, but rather are crucial to Puma's defense. Puma will argue at trial that the January 7 presentation was an appropriate response—given publicly available information about Dr. Eshelman's involvement in the Ketek fraud (which he had not disclosed to Puma shareholders) and Puma's own experience dealing with him during the proxy contest—to Dr. Eshelman's proxy proposals. Dr. Eshelman's objections to these RFPs accordingly are improper.

You also have waived these objections. During our phone call on September 22, you conceded that you already have produced documents related to the proxy contest and don't object to continuing to do so, but you said you don't want to go through the hassle of creating a privilege log for the documents you claim are privileged. Since you expressly waived your relevance objection during our phone call, you cannot sua sponte decide to withhold a privilege log. In essence, you are arguing that Dr. Eshelman "should not have to produce a privilege log because he has already produced all non-privileged documents or those not subject to the work product doctrine." *MacEachern v. Quicken Loans, Inc.*, 2016 WL 3964814, at *4 (E.D. Mich. July 25, 2016). As the *MacEachern* court recognized, this argument "lacks merit as defendants, and if necessary, the court, must be able to assess the validity of the privilege claimed." *Id.*

Please withdraw these objections or we will file a motion to compel with the Court.

## Puma's Objections to Dr. Eshelman's RFPs and Interrogatories

We remain unconvinced by your citation of a recent decision in the Western District of Virginia. Perhaps if Puma's position was to produce documents only up until the day of the publication of the Investor Presentation on January 7, 2016, we would take your point. But Puma has agreed to produce documents from up until the time the Complaint was filed, on February 2, 2016, nearly a month later. Puma has thus already agreed to provide documents potentially reflecting "subsequent" statements during the month following the Investor Presentation.

For the reasons we provided in our August 3, 2016 letter, we also believe Puma's general objections—accompanied as they are with specific objections to each RFP or Interrogatory—are not improper, as you claim. Nonetheless, we are attaching amended responses and objections to RFP Nos. 1, 3, 4, 10, 13, 19-22, 24, 25, 31, 37, and 41. Please let us know if you are not satisfied with our amended responses and objections.

Finally, as you know, we are working diligently to comply with the Court's order requiring Puma to produce documents responsive to RFPs Nos. 14-18. It is possible that in working with Puma in this effort additional amendments to Puma's responses and objections to the RFPs and Interrogatories will become necessary. Puma will endeavor to make these amendments as promptly as possible.

Best regards,
Paul

---

**From:** Megan Meier [mailto:megan@clarelocke.com]
**Sent:** Tuesday, September 27, 2016 10:29 AM
**To:** Paul Sampson <psampson@wilkinsonwalsh.com>

**Cc:** Brant Bishop <bbishop@wilkinsonwalsh.com>; Lori A. McGill <lalvinomcgill@wilkinsonwalsh.com>; Sean Eskovitz <seskovitz@wilkinsonwalsh.com>; Aurash Jamali <ajamali@wilkinsonwalsh.com>; Millen, Press <pmillen@wcsr.com>; Tom Clare <tom@clarelocke.com>; Libby Locke <libby@clarelocke.com>; Daniel Watkins <daniel@clarelocke.com>; Audrey Rabenberg <audrey@clarelocke.com>; Andrew K. McVey <AMcvey@murchisontaylor.com>
**Subject:** Eshelman's Amended Responses & Puma's Objections To Discovery

Paul:

In response to the concerns you raised during our telephonic meet-and-confer on Thursday, I am serving the attached amended responses and objections to Requests for Production 11, 15, and 16 and to Interrogatory 9.

Although Dr. Eshelman's initial objections remain valid and Puma's requests are unduly broad and call for documents and information that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, we are serving these amended responses in the spirit of compromise and in order to avoid burdening the Court with pointless disputes over documents and information that have no material impact on the case.

I hope that Puma will reconsider its refusal to withdraw a single one of the meritless objections I brought to your attention in writing on July 27 and during our lengthy telephonic meet-and-confer on August 4. I urge you to read the cases set forth in my letter to you and to consult with your local counsel before we are forced to bring those disputes to the Court. If you do so, you will see that the Fourth Circuit does not tolerate the sort of boilerplate general objections that Puma has raised. In light of this, Dr. Eshelman did not raise general objections (except as to privilege), but stated only a limited number of specific objections, thereby making it clear what responsive materials were being withheld on the basis of his objections. Puma did not do so and appears to be hiding the ball with respect to what it is withholding, not only regarding its contacts with North Carolina and PPD, but also regarding its actual malice toward Dr. Eshelman.

As set forth in my letter, the United States Supreme Court has explained that circumstantial evidence is relevant to the actual malice inquiry, including "prior *or subsequent* defamations, *subsequent statements of the defendant,* circumstances indicating the existence of rivalry, ill will, or hostility between the parties," and so forth. *Hebert v. Lando*, 441 U.S. 153, 170 (1979). Just last week, another court in the Fourth Circuit denied Rolling Stone Magazine's motion for summary judgment in a defamation case, elaborating that broad categories of circumstantial evidence are relevant to actual malice, including the defendant's actions and words **after** publication of the defamatory statements. *See Eramo v. Rolling Stone*, Case. 3:15-cv-00023-GEV, Dkt. 188 (Sept. 22, 2016 W.D. Va.). Citing other authorities, the Western District of Virginia explained that "some types of evidence [] relate back and provide inferential evidence of defendant's knowing or reckless disregard of falsity at the time of publication" and that "[c]ircumstantial evidence showing reckless disregard may derive from the defendant's words or acts before, at, or after the time of the communication." In light of this and the other authorities cited in my letter, there can be no reasonable dispute that Puma's discovery responses contain a number of objections that are meritless.

As his recent order makes clear, Judge Dever will not hesitate to strike meritless objections and

compel prompt certification of production.  Before it comes to that, I am giving Puma another opportunity to withdraw its objections and serve amended responses in compliance with its discovery obligations.  Please let me know by the end of this week if Puma will do so.

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
<2016.10.5 - Puma's Amended Responses to Plaintiff's RFPs 1, 3, 4, 10, 13....pdf>

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Wilkinson Walsh + Eskovitz LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
<2016.11.14 Puma's Amended Responses & Objections to Plaintiff's RFPs 2, ....pdf>

# Exhibit 13



# CLARE LOCKE
L L P

**MEGAN L. MEIER**
megan@clarelocke.com
(202) 628-7403

902 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

December 19, 2016

*Via Email*

Paul J. Sampson
Wilkinson Walsh + Eskovitz
1900 M Street NW, Suite 800
(202) 847-4000
psampson@wilkinsonwalsh.com

Re:     *Eshelman v. Puma Biotechnology*

Paul:

I write regarding Puma's document production.

Parent Emails & Attachments.    In Puma's production, attachments are not electronically associated with their respective parent emails.  Please have your discovery vendor correct this error and send us associated files this week.

Drafts of the Investor Presentation.  I have not been able to locate any drafts of the investor presentation in Puma's document production.  The only versions that appear to have been produced are identical final PDF versions from January 7, 2016.  It does not appear that Puma has produced a single PowerPoint file.  If I am mistaken, please direct me to the drafts of the investor presentation that Puma has produced.  If I am not mistaken, please explain why Puma has not produced those drafts.

Documents from Alan Auerbach.  Puma has not produced any documents with Alan Auerbach listed as the custodian.  Please explain.

Documents from Puma's contractors.  Puma engaged a number of contractors—Innisfree M&A, Broadridge Financial Services, Russo Partners, LLC, and Latham & Watkins, to name a few—to provide services relating to Dr. Eshelman, but it does not appear that Puma has produced any



documents from those contractors. Federal Rule of Civil Procedure 34 requires that a party produce documents within its possession, custody, or control. The definition of control in the context of Rule 34 "does not require a party to have legal ownership or actual physical possession of any [of the] documents at issue."[1] Instead, the Fourth Circuit and its district courts, including the Eastern District of North Carolina, have held that "documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Id.* Please let me know whether Puma will be producing responsive documents from Puma's contractors and, if so, when.

I look forward to your prompt response.

Regards,

Megan L. Meier

---

[1] *Owens v. United States*, No. 5:09-CT-3167-FL, 2012 WL 6057126, at *4 (E.D.N.C. Dec. 6, 2012) (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d. 494, 515 (D. Md. 2009)).

# Exhibit 14



1900 M STREET, NW
SUITE 800
WASHINGTON, DC 20036

WWW.WILKINSONWALSH.COM
—
A LIMITED LIABILITY PARTNERSHIP

WASHINGTON, D.C. | LOS ANGELES

August 3, 2016

*Via Email*

Megan Meier
Clare Locke LLP
902 Prince Street
Alexandria, VA 22314
(202) 628-7400
megan@clarelocke.com

**Re:** ***Eshelman v. Puma Biotechnology***

Megan:

By separate cover today, we are producing several documents. In contrast, you have not produced any documents. Nor have you indicated when you will produce documents, despite the fact that you should have provided information and documents related to Dr. Eshelman's computation of damages with your Initial Disclosures on July 15, 2016.

The cases you cited in the Initial Disclosures in support of your position that "compensatory damages . . . based on reputational harm . . . [are] not readily amenable to mathematical quantification" are inapposite, as they deal with damages for emotional distress, which Dr. Eshelman does not claim. *See Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000) ("compensatory damages for ***emotional distress*** are necessarily vague and are generally considered a fact issue for the jury" and "may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)" (emphasis added)); *Burrell v. Crown Cent. Petroleum*, 177 F.R.D. 376, 386 (E.D. Tex. 1997) (plaintiffs not required to submit a computation of compensatory damages attributable to "***mental anguish***" (emphasis added)). These cases accordingly do not support your refusal to provide "a computation of each category of damages claimed" by Dr. Eshelman. Fed. R. Civ. P. 26(a)(1)(A)(iii).

As I am sure you are aware, the purpose of Rule 26 is to "accelerate the exchange of basic information" that is "needed in most cases to prepare for trial or make an informed decision about settlement." *Sender v. Mann*, 225 F.R.D. 645, 650 (D. Colo. 2004); *see also Lucas v. Transamerica Life Ins. Co.*, 2011 WL 5148883, at *1 (E.D. Ky. Oct. 21, 2011) ("[T]he economic scope of a case informs decisions about resource use, burdensomeness, settlement, and potentially insurance issues."). Early disclosure also assists the parties "in focusing and prioritizing their organization of discovery." *City and Cnty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003). Your refusal to provide even a preliminary computation of damages

frustrates the purposes of Rule 26. It is also improper. "Rule 26(a)(1)(A)(iii) is unambiguous—it applies to *each* category of damages claimed; it is not limited to economic damages."). *Lucas*, 2011 WL 5148883, at *1 (requiring that "Plaintiffs each identify an amount—either a specific sum or a range—to be sought as to each non-economic category"); *see also McKinney v. Reassure Am. Life Ins. Co.*, 2006 WL 3228791, at *1 (E.D. Okla. Nov. 2, 2006) (rejecting plaintiffs' assertion that Rule 26(a)(1)(A)(iii) does not apply to non-economic damages because the rule does not state "except, of course, non-economic damages" and plaintiffs did "not explain the incongruity of the assertion that a jury can and must calculate such non-economic damages, yet the person claiming them is excused from doing so"). Even for non-economic damages, like reputational harm, although a plaintiff may be unable to "precisely explain his quantification . . . the plaintiff is required to provide specific amounts of compensatory and punitive damages he seeks." *Richardson v. Rock City Mech. Co.*, 2010 WL 711830, at *2 (M.D. Tenn. Feb. 24, 2010).

Indeed, it is apparent to us that you don't even believe your objection that the damages are not amenable to computation because ***your disclosures describe that you will present a computation***. Given this fact, you should already have included at least a preliminary computation of damages, even if it might later be supplemented. Your failure to provide even a preliminary computation of damages or the amount or range you will seek, as required by Rule 26(a), means that you are "not allowed to use that information … on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1). We can avoid having to take the position that your violation of the initial disclosure requirements should preclude you from presenting a computation of damages if you will promptly amend the Initial Disclosures to provide a computation of the damages Dr. Eshelman will seek. You should prepare this computation "in light of the information currently available" to you, "in sufficient detail so as to enable [Puma] to understand the contours of its potential exposure and make informed decisions as to settlement and discovery." *Tutor-Saliba*, 218 F.R.D. at 221.

Rule 26 also requires the disclosure of "materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). As is true of other information required to be disclosed by Rule 26(a), the rules provide that "[i]f a party fails to provide information . . . as required by Rule 26(a) . . ., the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* 37(c)(1). There is no justification for failing to provide documentation bearing on the nature or extent of injuries Dr. Eshelman claims because Dr. Eshelman's Initial Disclosures themselves describe the existence of documents that bear on this topic, but have not been disclosed. For example, the Initial Disclosures state that "Dr. Eshelman anticipates that he will present . . . certain records bearing on Dr. Eshelman's business and reputation, awards and certificates that Dr. Eshelman has received, and estimates or invoices from one or more online reputation management consultants." Because you have made clear that those records exist, you should already have provided them, without awaiting a discovery request. Please promptly provide all documents you may use to make or support a computation of damages. In doing so, please provide reasons for why you were "substantially justified" in not already providing these documents with your Initial Disclosures.

I also write in response to your letter of July 27, 2016, raising "issues with Puma's responses" to your client's First Set of Interrogatories ("Interrogatories") and First Set of Requests

for Production ("RFPs").  Puma responds to your letter as follows (with your original text highlighted gray):

1. **Unspecific General Objections**. Puma relies on numerous unspecific general objections and conditions without specifying the interrogatories or document requests to which such objections apply.  This is improper.  Rule 33 requires that "[t]he grounds for objecting to an interrogatory ***must*** be stated with ***specificity***."  Fed. R. Civ. P. 33(b)(4).  Rule 34 likewise requires that "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state ***with specificity*** the grounds for objecting to the request" and that "[a]n objection must state whether any responsive materials are being withheld on the basis of that objection."  Fed. R. Civ. P. 34(b)(2).  General objections are highly disfavored in the Fourth Circuit.  *See Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238 (E.D.N.C. 2010) (mere recitation of the familiar litany that a request is overly broad, burdensome, oppressive, and irrelevant does not constitute a specific objection); *Hager v. Graham*, 267 F.R.D. 486, 492 (N.D.W.Va. 2010) ("General objections to discovery, without more, do not satisfy the burden of the responding party under the Federal Rules of Civil Procedure to justify objections to discovery because they cannot be applied with sufficient specificity to enable courts to evaluate their merits.").  Puma must promptly withdraw all general objections and serve amended responses that comply with the Federal Rules of Civil Procedure, stating any objections with specificity and thereby making it clear whether Puma is withholding responsive documents on the basis of each objection.

   **Puma's response**.  The cases you site undermine your position that "Puma must promptly withdraw all general objections."  Although the Court in *Mainstreet Collection* expressed the general sentiment that "[m]ere recitation of the familiar litany that an interrogatory or a document production request is overly broad, burdensome, oppressive, and irrelevant does not suffice as a specific objection," 270 F.R.D. at 240 (internal quotation marks omitted), that is not what Puma has done here.  Puma did not "mere[ly] recit[e]" general objections only, but for each separate RFP raised specific and detailed objections.  As the *Hager* court said, "[t]hough a general objection on vagueness, ambiguity, broadness, and excessive burden ***without more*** does not comply with the requirements of Rule 34, *specific grounds in addition to boilerplate is permissible*." 267 F.R.D. at 492 (emphases added).  Moreover, even if Puma's other general objections were somehow improper, its general privilege objection is valid.  *See Ramsey v. Bimbo Foods Bakeries Distrib., LLC*, 2016 WL 676378, at *5-*6 (E.D.N.C. Feb. 18, 2016) (defendant who "asserted general objections to the interrogatories [and production requests] based on privilege and various types of undue burden and overbreadth" allowed to "withhold from production information and documents for which it claims privilege or work product protection").

   Puma accordingly declines to withdraw its general objections.

2. **General Objection To The Production Of Documents That Do Not Specifically Refer To The Events Which Are The Subject Matter Of This Litigation**. Puma has raised a "general" objection to producing "documents that do not specifically refer to the events which are the subject matter of this litigation."  I understand this to mean that you do not intend to review documents for possible production unless they contain at least one of a set of search terms.  If my understanding is correct, that would be improper.  While I agree that search terms can be

employed to identify potentially responsive documents from certain categories of voluminous electronic information (e.g., email), there are other categories of documents that are likely to contain responsive documents but that would probably not be captured by running search terms across an electronic dataset. By way of example only, this includes hard copy documents, handwritten notes, Post-Its affixed to responsive documents, insurance policies, financial records, audio and video recordings, voice messages, text messages, organizational charts, and materials associated with meetings during which relevant topics were mentioned, referenced, or discussed. In light of the above considerations, please clarify the scope of your collection and review of potentially responsive documents. In addition, please withdraw this "general" objection and clarify, in response to each request, whether Puma is withholding responsive documents on the basis that it should not have to search for documents that do not specifically refer to the events that are the subject matter of this litigation.

**Puma's response**. Our document collection efforts included requests for the sorts of hard copy documents you reference above. To the extent there are responsive hard copy documents, we will produce them.

3. **Unspecific "Relevance" Limitations And Objections In Response To Requests For Production**. In response to many of Dr. Eshelman's Requests for Production, Puma has responded that it will only produce "relevant" non-privileged documents that are responsive to the requests or has objected "to the extent that [the requests] call[] for information that is not relevant to the parties' claims and defenses." This is improper because it purports to limit the production of responsive documents to only those that are determined by Puma to be "relevant" based on undisclosed criteria, without stating "***with specificity*** the grounds for objecting to the request," and thereby obscuring "whether any responsive materials are being withheld on the basis of that objection." Rule 34. Because Puma has failed to state its relevance limitations and objections with specificity as required under Rule 34, it is not clear whether Puma is withholding responsive documents on the basis that they are not "relevant" according to some undisclosed criteria. Therefore, any such objections and limitations based on "relevance" have been waived and Puma must produce all documents that are ***responsive***, not merely those that Puma unilaterally determines to be ***relevant***. Please confirm in writing that Puma will be doing so, or serve amended responses that: (1) remove all "relevance" qualifiers from Puma's responses; and (2) state with specificity the reasons for each relevance objection, thereby making clear whether any responsive materials are being withheld on the basis of that relevance objection.

**Puma's response**. As you note, Puma made a general objection to the RFPs "insofar as [they] call[] for the production of documents that are either not relevant to the claims or defenses of the parties or the production of which would not be proportional to the needs of this case." Puma also made specific relevance objections to many of the RFPs. For example, RFP 26 improperly requests the entire "web browser histories (***reflecting all websites visited***) from May 18, 2015 through the present on the computer(s) and smart phone(s) of every person" who had a role in the Investor Presentation. This is a plainly overbroad request that encompasses countless matters that have no bearing on and are completely irrelevant to this case—including, by way of example, visits to sports websites, personal online banking, and general internet news consumption. *See, e.g., Finkle v. Howard Cnty.*, 640 Fed. App'x 245, 247 (4th Cir. 2016) (request seeking "subscriber information for four years' worth of social media, email, and cell

phone and text messaging records for seven [police] officers" was "overbroad" because it "was not limited to the information contained in those accounts *relevant to her claims*" (emphasis added)); *Spring v. Bd. of Trustees of Cape Fear Cmty. Coll.*, 2016 WL 1389957, at *3 (E.D.N.C. Apr. 7, 2016) (a request is "overbroad in scope" if "it does not limit the subject matter of the communications sought"). Puma specifically objected to this RFP "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case, including the lack of any relevant limitation of website histories to websites related to any issue in this case." Moreover, Puma provided specific limitations on the documents it would produce in response to RFP 26, stating that it would "search for and produce any relevant, non-privileged documents dated between May 18, 2015, and February 2, 2016, *relating to the matters at issue in this litigation*." (emphasis added.)

Given that it provided specific relevance objections for many of its responses, Puma declines to withdraw its general relevance objection.

4. **"Duplicative" Objections**. In response to numerous RFPs, Puma has objected that the request is "duplicative" and has referred Dr. Eshelman to Puma's responses to other RFPs. Please confirm that Puma is not withholding any documents on the basis of its "duplicative" objections, and that it is only withholding documents on the basis of objections set forth in response to the RFPs that are specifically cross-referenced.

**Puma's response**. That is correct.

5. **Production of Metadata**. Puma has objected to producing "any metadata applicable to any document" and stated that it would confer about the appropriate metadata information to be provided in producing any documents in electronic form. We already agreed, in the Joint Discovery Plan, "to produce all documents and data electronically, as Bates-stamped images (where appropriate and not logistically prohibitive) and in native format *with all metadata intact*, along with load files associating the Bates-stamped images with their respective native files and metadata." Please confirm that Puma still intends to comply with this agreement.

**Puma's response**. We do not anticipate any issues with producing all metadata. If we run into technical issues that may make some data unduly difficult to extract or produce, we will notify you.

6. **Communications Not Contained in Documents.** Numerous RFPs seek certain "communications" and Puma objected to the extent that these requests call for the production of "communications" not contained in documents. Please confirm that Puma is not withholding any text messages, voice messages, instant messages, electronic data, or notes, transcriptions, or recordings of conversations on the basis of this objection.

**Puma's response**. That is correct.

7. **Evidence Of Puma's Actual Malice**. One of the elements of defamation is that the defendant knew or recklessly disregarded that its accusations were false, *i.e.*, acted with actual malice. Put simply, Puma's knowledge is a central issue in this case. Defamation defendants almost never admit "to entertaining serious subjective doubt about the authenticity of [the statements

5

they] publish[].” *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002) (citation omitted). Because of the fact that party testimony tends to be self-serving, courts have long recognized that defamation plaintiffs “will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself…” *See Herbert v. Lando*, 441 U.S. 153, 170 (1979). A defamation defendant “cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.” *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). To counter a defendant’s self-serving protestations, courts have long permitted defamation plaintiffs to introduce circumstantial evidence to show the defendant’s state of mind. *See, e.g., Harte-Hanks Commc’ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (a plaintiff is entitled to prove the defendant’s state of mind through circumstantial evidence). The United States Supreme Court has explained that such evidence can take a variety of forms. In *Herbert*, the Court approvingly quoted in full Section 455 from the second edition of American Jurisprudence, Volume 50:

> The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and ***all the relevant circumstances surrounding the transaction may be shown***, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, ***circumstances indicating the existence of rivalry, ill will, or hostility between the parties***, facts tending to show a reckless disregard of the plaintiff’s rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items and the nature of the one under consideration.

*Hebert*, 441 U.S. at 164, n. 12 (quoting 50 Am.Jur.2d § 455).

Puma has objected to producing – or has failed to produce – relevant and discoverable evidence regarding its actual malice. For example:

a. **Interrogatory No. 4** asks Puma to “[d]escribe each act undertaken by Puma to assess, analyze, examine, investigate, explore, probe, confirm, or evaluate, directly or indirectly, the truth, falsity, accuracy, or inaccuracy of Puma’s statements about Dr. Eshelman or PPD, including by identifying: (a) the date on which such act was undertaken; (b) the specific employee(s) or other person(s) who undertook such act; (c) all web searches conducted; (d) all websites viewed or visited; and (e) all documents reviewed or printed.” Puma has failed to provide most of the requested information, including: (1) the web searches Mr. Auerbach conducted and the date(s) on which he conducted them; (2) all websites Mr. Auerbach viewed or visited and the date on which he did so; and (3) the identity of all documents Mr. Auerbach reviewed or printed and the date on which he did so. In addition, Puma failed to identify what “news reports” Mr. Auerbach reviewed concerning PPD’s press release. All of this information is highly relevant to actual malice, because it provides insight into Mr. Auerbach’s thought process in terms of what he chose to research, what search results he chose to disregard, and what information he reviewed and then disregarded. Unless Puma has violated its obligation to preserve relevant data and documents, all of this information should be readily available to Puma in Mr. Auerbach’s web browser history, search history, and files. Puma should promptly provide the requested information or explain in detail the circumstances under which it was deleted or destroyed.

**Puma's response**.  In response to Interrogatory No. 4, Puma provided a considerable amount of information regarding Mr. Auerbach's review of Dr. Eshelman's testimony to a hostile Congress, based on Mr. Auerbach's recollection, including:

- Statements by Representative Bart Stupak thanking PPD whistleblower employee Ann Marie Cisneros for agreeing to "shar[e] her experience with the Committee, despite attempts by her employer [PPD] to extort her silence";

- Statements by Cisneros that she was "called on two occasions by PPD lawyers who reminded [her] of the confidentiality agreement [she] signed, and advised [her] not to speak with the FDA without Aventis approval and PPD attorneys present";

- Statements by Representative Stupak, responding in exasperation to Dr. Eshelman's statements by detailing a litany of irregularities in the research, in light of which he asked "how would that not indicate fraud?":

  > [There were] errors on just about every informed consent, date modifications, initials different from signature, study coordinator entering date for subjects and principal investigator, blatantly forged signature on informed consent, medical records are very limited, use of different color ink on medical charts, overwrites, crossouts, inserts of diagnosis in different color ink, routine failure to give pregnancy tests to women of childbearing years, study investigator and coordinator unaware of the definitions of serious adverse events, no adverse events for the first 300 patients enrolled with drugs known to have adverse events, lab results indicating blood splitting, lack of proper diagnosis for study eligibility, husbands and wives being enrolled together, large number of patients randomized in the interactive voice response system in a short increment of time when the office was closed.  I mean, how would that not indicate fraud?

- Dr. Eshelman's lack of disagreement with these points;

- Statement by Dr. Eshelman, in the face of intense questioning by Representative Stupak, that ultimately PPD's failures are his "responsibility."

Answering the Interrogatory on the basis of Mr. Auerbach's memory is wholly appropriate and does not remotely imply that any information was not properly retained.

Puma's response also details how Mr. Auerbach evaluated these statements against the background of his prior experience dealing with Dr. Eshelman during the proxy contest. The response also indicates that Mr. Auerbach reviewed Internet news reports reporting on a press release that PPD had put out, saying that PPD named David L. Grange to be chief executive, replacing Dr. Eshelman in that position.

We are reviewing documents and data collected from Puma, and will produce documents responsive to document requests on a rolling basis within a reasonable time, as agreed upon

in the Joint Discovery Plan. To the extent the information we collect allows us to do so or further jogs Mr. Auerbach's memory, we will further supplement the response to this Interrogatory.

b. **Internet Research About Dr. Eshelman**. Dr. Eshelman has requested documents relating to Puma's internet research about him, including web browser histories (**RFP 26**), web search histories (**RFP 27**), documents and websites viewed, reviewed, relied upon, printed, and/or utilized (**RFP 28**). Puma has objected that the phrase "Puma's other statements about Dr. Eshelman" is vague and undefined. These are plain words conveying an unambiguous meaning, and Puma has not explained what it purportedly finds vague about these words. In addition, Puma has objected to producing documents dated after the filing of the complaint in this case. This objection is meritless because, as the Supreme Court has explained, "*subsequent* statements of the defendant" and other "circumstances indicating the existence of rivalry, ill will, or hostility between the parties" are both relevant to the existence of actual malice. *Hebert*, 441 U.S. at 164, n. 12 (quoting 50 Am.Jur.2d § 455). In addition, Puma objected because of "the lack of any relevant limitation of website histories to websites related to any issue in this case." Please clarify whether Puma intends to withhold or redact any documents on the basis of this objection.

**Puma's response**. We do not agree that the phrase "Puma's other statements about Dr. Eshelman" is "plain" and "convey[s] an unambiguous meaning." Nowhere do the RFPs explain what "other statements" these RFPs seek. Puma is not required to guess at the meaning of Dr. Eshelman's requests.

Puma also declines to withdraw its objection to producing documents dated after the filing of the complaint. The U.S. Supreme Court has long declared that a plaintiff alleging actual malice must establish by clear and convincing evidence that the defendant "realized the inaccuracy *at the time of publication*." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984) (emphasis added); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) (malice must be shown "at the time of publication"). Numerous courts have recognized this rule. *See, e.g.*, *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 450 (3d Cir. 1987) (discussing "the importance of considering the editors' states of mind at the time of publication"); *McFarlane v. Ben-Menashe*, 1995 WL 129073, at *9 (D.D.C. Mar. 16, 1995) ("Actual malice is measured at the time of publication"); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 564 (S.D.N.Y. 1984) (discussing "temporal element [that] actual malice rests on the defendant's state of mind at the time of publication"); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 173 (Tex. 2003) ("The actual malice inquiry focuses on the defendant's state of mind at the time of publication."). "Accordingly, it is hornbook libel law that post-publication events have no impact whatever on actual malice . . . since the existence or non-existence of such malice must be determined as of the date of publication." *Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990). Documents dated after the filing of the complaint, nearly a month after the publication of the allegedly defamatory Investor Presentation, are therefore irrelevant to Dr. Eshelman's claims of actual malice.

With respect to Dr. Eshelman's overbroad request for "web browser histories (reflecting *all* websites visited)," see Puma's response to (3) above. Puma continues to object to

Dr. Eshelman's overbroad request for completely irrelevant web browser histories, and will search for and produce only "relevant, non-privileged documents dated between May 18, 2015, and February 2, 2016, *relating to the matters at issue in this litigation*." (emphasis added.)

c.  **RFP 31** seeks "all documents Puma reviewed in researching, drafting, fact-checking, editing, commenting on, or advising with respect to the Investor Presentation." Puma objected "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case." As set forth above, Puma's editorial process is highly relevant to its actual malice and is therefore discoverable.

**Puma's response**. Dr. Eshelman alleges that only three out of 17 pages of the Investor Presentation contain allegedly defamatory statements. Documents Puma reviewed "in researching, drafting, fact-checking, editing, commenting on, or advising with respect to" those pages obviously would be responsive to RFP 31 and relevant to Eshelman's claims. Moreover, any documents reviewed in preparing portions of the Investor Presentation discussing Dr. Eshelman would also be responsive, and Puma does not object to searching for and producing them. However, some parts of the Investor Presentation are unrelated to Dr. Eshelman or the allegedly defamatory statements. Puma objects only to searching for and producing all these documents. For example, slide 3 of the Investor Presentation contains biographical information for some of Puma's management team. Documents reviewed in drafting this slide would not be, as you say, "highly relevant to [Puma's] actual malice" and should not therefore be "discoverable." Requiring Puma to search for and produce these documents, and thereby necessitating the need on Dr. Eshelman's part to review them, would unnecessarily add to the burden on both parties and prolong this litigation.

Accordingly, Puma will not withdraw its objection to RFP 31 "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case."

d.  **RFP 12** seeks "all documents relating to the Ketek clinical trial." Puma objected "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case." But the very defamatory accusation at issue in this case is that Dr. Eshelman was involved in fraud in the Ketek clinical trial. As such, there is no basis for claiming that documents relating to that clinical trial are not relevant, and the objection should be withdrawn.

**Puma's response**. We do not intend to withhold any documents that are related to fraud in the conduct of the Ketek clinical trial. What we would object to, however, is having to track down or produce information that may mention the Ketek trial but is not related to problems with it. It may be that we will not encounter any such documents. We are only attempting to avoid wasteful over-production of documents that have no bearing on the case. What we will do is to inform you if we learn of documents that may be related to the Ketek trial in some way but do not appear to have any bearing on fraud in that trial; we can then confer further about whether we should have to produce the documents or not.

9

e. **Meeting Materials**. With respect to meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis, the Ketek clinical trial, or the proxy contest were mentioned, referenced, or discussed, Dr. Eshelman requested all related documents including draft and final agendas (**RFP 19**), draft and final minutes (**RFP 20**), documents containing edits to minutes (**RFP 21**), draft and final transcripts (**RFP 22**), recordings (**RFP 23**), documents, materials, and presentations utilized, distributed, or presented (**RFP 24**), and call logs and meeting invitations (**RFP 25**). Puma objected to each of these requests to the extent that they "call for Puma to determine whether any of the stated subjects were mentioned, referenced, or discussed…without regard to whether the documents themselves refer to those subjects." This is not a valid basis for objecting. If Puma had meetings, calls, or conferences during which Dr. Eshelman, PPD, the Investor Presentation, Aventis, the Ketek clinical trial, or the proxy contest was mentioned, referenced, or discussed, then all of the circumstances and documents relating to those meetings are relevant and discoverable. Puma cannot shield those documents from discovery just because they might not happen to contain a particular search term. A meeting invitation, for example, is unlikely to contain detailed information about what was discussed at the meeting, but would reveal important information about when the meeting was called, who was invited, and what materials were sent to participants to review before the meeting (if any). And, if Puma board members had a meeting during which they discussed Dr. Eshelman or the other topics listed above, but studiously avoided mentioning his name in the minutes or other materials related to the meeting, then that fact itself would be circumstantial evidence regarding Puma's state of mind in dealing with Dr. Eshelman, which would be relevant to actual malice.

**Puma's response**. I believe we understand your point. Withholding the described documents (*e.g.*, agendas, minutes, transcripts, etc. for meetings, calls or conferences during where Puma recognizes that the identified subjects were mentioned, referenced or discussed) merely because the documents do not themselves describe those issues being mentioned, referenced or discussed was never the intention of Puma's objection. The mere absence of an explicit term in a document would not be the basis for us to withhold documents. To be clear, though, we all recognize that memories are not perfect and that in attempting to remember the contents of what was discussed in meetings, calls or conferences, people will naturally rely on what the documents say. But if we are able to identify documents responsive to this request, we do not intend to withhold documents merely because the documents themselves do not reference the stated subjects.

f. **RFP 37** seeks "all documents relating to and/or reflecting Puma's decision to publish the Investor Presentation on January 7, 2016." Puma has objected to the extent that this request "calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case." To the contrary, in *Harte-Hanks*, the Supreme Court held that circumstantial evidence of motive for publishing, while not alone sufficient to meet the actual malice standard, is relevant to the inquiry. *Harte-Hanks Comm's*, 491 U.S. at 668. The objection is therefore meritless and should be withdrawn.

**Puma's response**. We do not intend to withhold any documents that are related to Dr. Eshelman's proxy proposals or the portion of the Investor Presentation that he contends defamed him. In objecting to RFP 37 on relevance and proportionality grounds, we simply

sought to limit the burden of searching for and producing documents to only those documents that could reasonably have any bearing on Dr. Eshelman's claims and the portions of the presentation from which they arise. To the extent we identify documents that appear to be related to the decision to publish aspects of the Investor Presentation that are ***not*** related to the sections from which Dr. Eshelman's claims arise, we will notify you and discuss.

g. **RFP 39** seeks "all documents relating to and/or reflecting any communication by, between, or among, you, any person identified in your response to any of Dr. Eshelman's Interrogatories, and/or any other person relating to (a) Dr. Eshelman; (b) PPD; (c) the Investor Presentation; (d) the subject matter(s) of the Complaint; and/or (e) the subject matter(s) of these Requests for Production." Puma objected "to the extent it calls for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case" and responded, "subject to and without waiving the foregoing objections and the objections and conditions set forth below, Puma will search for and produce documents responsive to RFP No. 39 if (d) above is read in the conjunctive." Please clarify what you mean by this. What responsive documents is Puma withholding?

**Puma's response**. I see that our objection could have been more fully explained. The nature of the problem is that, as written, RFP 39 applies to documents that are wholly unrelated to the claims and defenses of this case. The nature of the problem arises from the first use of "and/or." Read as an "or," the request seeks all documents relating to/reflecting any communication involving Puma and anyone identified in response to the Interrogatories, even if that communication is unrelated to Dr. Eshelman, his claims, etc. For example, reading the first "and/or" as "or" would mean that the RFP purports to require Puma to produce all documents relating to or reflecting any communications between anyone at Puma and Mariann Ohanesian. Period. Such a request is overbroad and would sweep in all kinds of information that is irrelevant and disproportionate to the needs of the case. If subpart (d), "the subject matter(s) of the Complaint," is always read conjunctively with other parts of the request, searching for documents that may be relevant to the case is more feasible.

8. **Information And Documents Relating To PPD And Aventis**.

a. **Interrogatory 3** asks Puma to identify each person with whom Puma has communicated regarding Dr. Eshelman or PPD and describe the circumstances and content of such communications. Puma objected to identifying and describing communications "regarding PPD that are not related to the Ketek clinical trial or fraud in relation to it on the ground that such communications are not relevant to the parties' claims and defenses and attempting to identify the persons with whom such communications were had would be unduly burdensome and disproportional to the needs of the case." However, the circumstances and content of Puma's communications regarding PPD are relevant to Puma's actual malice, regardless of whether those communications are related to the Ketek clinical trial. The fact that Puma has a business relationship with PPD and engages in communications with and about PPD is circumstantial evidence that Puma knew that PPD had not been involved in fraud. Puma should withdraw its objection, identify each person with whom Puma has communicated regarding PPD, and describe the circumstances and

content of such communications, regardless of whether those communications related specifically to the Ketek clinical trial. In addition, Puma failed to identify the specific individual or individuals from Adage Capital with whom Mr. Auerbach communicated regarding Dr. Eshelman. Puma should supplement its response and identify them without further delay.

**Puma's response**. Identifying all communications "regarding . . . PPD" would include, for example, any communications where someone observed that in 2011 PPD was acquired by a Carlyle Group fund, or where someone mentioned that in September 2015 PPD launched a web-based event adjudication system. Such communications would have nothing to do with this case, and we do not intend to try to require Puma representatives to try to think of every time that PPD was mentioned in any communication. Nor do we intend to try to require Puma representatives to remember every conversation they have ever had with someone at PPD, where PPD may have been mentioned. As Puma noted in opposition to your recent motion seeking leave to file a supplemental brief opposing Puma's motion to dismiss, Puma's potentially "[h]aving some dealings," such as conversations, with PPD in 2016 has nothing to do with whether under Eshelman's leadership before 2007 PPD was embroiled in controversy over the Ketek fraud." Docket No. ("Dkt.") 52, at 4. Conversations with or about PPD, which is no longer run by Dr. Eshelman, are thus irrelevant to whether Dr. Eshelman bears responsibility (as even he admitted in testimony before Congress) for the fraud that occurred on his watch nearly 15 years ago.

As Puma noted in its response to Interrogatory 3, "some" investors "contacted Puma and spoke with Alan Auerbach" after Dr. Eshelman "contacted institutional holders of Puma's stock." There is nothing improper about failing to identify specific individuals where Mr. Auerbach does not remember who those individuals were. We have done what we could do by mentioning what Mr. Auerbach could recall about these conversations—"Mr. Auerbach does not remember at this point who all these investors were, [he] believes it included Adage Capital"—and by committing that we "will supplement to the extent the identities of other investors are determined or recalled." The individual at Adage Capital with whom Mr. Auerbach believes he spoke was Phill Gross (the same individual identified in Puma's response to Interrogatory No. 1).

b. Dr. Eshelman also served several requests for documents relating to PPD and Aventis. For example, **RFP 2** seeks "all documents relating to PPD." **RFP 53** seeks "all documents relating to or reflecting the relationship between Puma and PPD, including contracts, invoices, records of accounts receivable and accounts payable, and all documents reflecting any work performed by PPD for Puma or vice versa." **RFP 54** seeks "all communications with PPD." **RFP 11** seeks "all documents relating to Aventis Pharmaceuticals, Inc." **RFP 55** seeks "all communications with any former employee of PPD." And **RFP 56** seeks "all communications with any current employee of PPD."

Puma objected to these requests "to the extent [they] call[] for information that is not relevant to the parties' claims and defenses and is disproportional to the needs of the case" and "on the ground that any relationship between Puma and PPD is not relevant to the

parties' claims and defenses and the production of related documents would be disproportional to the needs of this case."

These objections are meritless and should be withdrawn. PPD and Aventis are the companies at the center of the defamatory accusation at issue in this case. The volume and content of Puma's communications and documents with and about PPD and Aventis would tend to reveal the nature and extent of Puma's business relationships with PPD and Aventis, which is important circumstantial evidence that Puma knew that Aventis and PPD – and by extension, PPD's CEO Dr. Eshelman – had ***not*** had culpable involvement in clinical trial fraud and that Puma's accusation to the contrary was false. In addition, because PPD is a North Carolina company, Puma's documents relating to PPD are relevant to the jurisdictional analysis. Puma should withdraw these objections and produce all documents relating to PPD and Aventis without further delay.

**Puma's response**. See Puma's response to 8(a) above. Moreover, any relationship Puma has with PPD is irrelevant to the specific jurisdiction question at issue in this case, as explained in Puma's opposition to Dr. Eshelman's motion for leave to file a supplemental brief. *See* Dkt. 52.

With respect to Aventis, any relationship Puma has with Aventis would have commenced many years after the Ketek fraud and would have nothing to do with Dr. Eshelman's involvement in that matter. They are thus irrelevant to Dr. Eshelman's claims.

9. **Omissions Of Responsive Information**.

a. **Interrogatory 1** requires Puma to "[i]dentify *every* person who directly or indirectly participated in researching, drafting, editing, discussing, fact-checking, presenting, publishing, or disseminating the Investor Presentation and/or the News Release, and for each such person, provide a detailed description of his or her participation." In responding, Puma admits that Latham & Watkins and Innisfree M&A were involved, but it fails to identify the individuals from those firms who had such involvement. Puma refers to "others who spoke in [Congressional] hearings" and "other large institutional shareholders of Puma" but it again fails to identify specific individuals. The identity of individuals likely to have discoverable information (along with the subjects of that information) is plainly discoverable. *See* Fed. R. Civ. P. 26(a)(1)(A)(i). Puma must supplement its response promptly to identify the specific individuals involved.

**Puma's response**. Dr. Eshelman knows firsthand who spoke at the Congressional hearing in which he was excoriated. And you can equally review the transcripts of those hearings. Based on information we have been reviewing in response to discovery requests, as soon as we can coordinate with Mr. Auerbach we will provide further supplemental information about individuals at Latham & Watkins and Innisree M&A who participated in the Investor Presentation and/or News Release in the manner described in Interrogatory 1.

b. **Interrogatory 2** asks Puma to "[i]dentify every person who directly or indirectly participated in the proxy contest, including by conducting any research, due diligence, or investor outreach, or by communicating regarding the proxy contest, and for each such

person, provide a detailed description of his or her participation." Puma limited its answer to information related to the preparation of the defamatory investor presentation, and admitted that "Alan Auerbach was involved in the Proxy Contest as the individual from Puma who was *principally* responsible for speaking with investors [and] preparing proxy solicitation materials, with advice and consultation from Latham & Watkins and Innisfree M&A and input from Mariann Ohanesian." As requested in the interrogatory, Puma must "[i]dentify *every* person" involved, not merely those whom it deems to be "principally" involved. Puma must supplement its response to identify other Puma employees who directly or indirectly participated in the proxy contest, the specific individuals from Latham & Watkins and Innisfree M&A, and the investors with whom Mr. Auerbach communicated regarding the proxy contest. In addition, as requested in the interrogatory, Puma must "provide a detailed description of [the] participation" of each such individual.

**Puma's response**. We are working to identify all persons who worked on the proxy contest, and will supplement Puma's response to Interrogatory 2 as we become aware of additional individuals.

10. **Objections To The Timing Of Production**. In response to several RFPs, Puma objected that the request "would vary the scope and timing of pretrial disclosures under the Court's rules and scheduling orders." *See* **RFPs 33, 58, and 59**.

   a. **RFP 33** seeks "*documents* that Puma contends support, establish, demonstrate, or show that Dr. Eshelman perpetrated, committed, or otherwise had culpable involvement in fraud in connection with the Ketek clinical trial." Puma objected "on the ground that it is a request for *contentions* of a party that would vary the scope and timing of pretrial disclosures…" But the request seeks "documents," not "contentions." Nor does the request ask Puma to *identify* which documents support its contentions. The request only requires that, to the extent Puma currently has documents that support its contentions, it must produce them. If Puma later discovers documents that it believes support its contentions, it must supplement its document production at that time. Puma should withdraw this objection promptly.

   **Puma's response**. Given the fact that Puma will be producing documents relevant to the claims in this case in response to other requests, this request is unlikely to accomplish anything independently substantive. The last portion of your comments on this request confirms the propriety of our objection, however. While RFP 33 seeks documents, *the condition those documents must satisfy in order to be responsive* to the request is that "Puma contends [they] support, establish, demonstrate, or show" certain things. To the extent that it is aware of documents that "Puma contends" do these things, it will be producing them and has never said anything to the contrary. But Puma's contentions may develop over time, throughout the case and up to the time that pre-trial disclosures are required to be made. To the extent that your request purports to require Puma to already have reached a view on what it "contends" before final pre-trial disclosures are required, we continue to object to this request.

   b. **RFP 58** seeks the production of "all documents, tangible materials, or demonstrative evidence that you intend to introduce or use as evidence at trial or any other hearing in this

14

action." Like RFP 33, this request does not alter the timing of pretrial disclosures because it does not require Puma to ***identify*** its potential exhibits, but only to include them in its document production along with documents that are responsive to other RFPs. I recognize that you probably have not yet identified which documents you may use at trial, and this RFP does not require you to do so. Instead, this RFP requires only that – if you find a document that you do intend to use as a trial exhibit – you produce it, rather than withholding it from production in the unlikely event that it is not responsive to some other RFP.

**Puma's response**. Again, given that Puma will be producing documents relevant to the claims in this case in response to other requests, this request is not likely to accomplish anything independently substantive. But, again, your comments on this request confirm the propriety of our objection. For one thing, your comment fails to note that the scope of evidentiary disclosures generally does not include documents that a party may use only for impeachment. Our objection to your effort to vary the scope of pretrial disclosures recognizes that reality, and we continue to stand by it. With regard to timing, we likewise stand by our objection. Documents are responsive to this request only if Puma "intend[s] to introduce or use [them] at trial or any other hearing." To the extent that we are already aware that Puma intends to use a document at trial or other hearing (other than just for impeachment), we will be producing it and have never said anything to the contrary. But Puma's intentions with regard to the evidence it will seek to use are governed by pretrial disclosure schedules. To the extent that your request seeks to require us to reach a decision about whether it intends to use a document as evidence before that time, we continue to object.

c. <u>RFP 59</u> seeks "all documents containing any admission you contend any party to this lawsuit, or anyone acting on a party's behalf, made relevant to the issues raised by the claims or defenses in this action." Puma objected that the request "would vary the scope and timing of pretrial disclosures" and responded that it "will provide documents containing admissions of Dr. Eshelman on the timing established by the court or applicable rules." Our Joint Discovery Plan does not provide any date for producing "documents containing admissions" of the parties. Please clarify Puma's position regarding when such documents would be due and the basis for that position.

**Puma's response**. The key feature of this request is again the word "contend," which is ultimately governed by the schedule and scope of required disclosures. See our comments in response to 10(a) and (b), above.

11. <u>**Clarification Regarding Miscellaneous Issues**</u>.

a. <u>RFP 52</u> seeks "all documents reflecting or containing the information set forth in Brant Bishop's April 28, 2016 email and letter to Thomas Clare" and provides that "for the avoidance of doubt, this Request does not seek any emails exchanged with Puma's attorneys, but—to the extent that the information contained in Mr. Bishop's email and letter exists in documents not created by attorneys—this Request seeks production of those documents." Puma responded: "Subject to and without waiving the foregoing objections, Puma states that the information set forth in the identified email/letter was already provided

to Dr. Eshelman's counsel in that letter. To the extent that there is some other or additional documents that this request is intended to seek, Puma will meet and confer with Dr. Eshelman's counsel to discuss those issues." I am writing to confer regarding this. As a general matter, Brant's email and letter made representations disclaiming the existence of certain contacts with North Carolina. Presumably, those representations were based on a review of business records in Puma's possession, custody, or control. If so, please confirm that Puma will produce those records.

**Puma's response**. We are not sure what "representations disclaiming the existence of certain contacts with North Carolina" you believe the April 28, 2016 letter (which was from me, not Brant) made. All discussion of North Carolina in the letter was made either on the basis of our conversations with our client; our review of the declarations of Alan Auerbach, Mariann Ohanesian, and Larry Miller, which were provided with Puma's motion to dismiss; conversations with Larry Miller of Innisfree and Beau Heath of Business Wire; a December 17, 2015 list of registered stockholders; and the Google Analytics reports that were provided with and attached to the letter.

b. **RFP 60** seeks an organizational chart of Puma Biotechnology, Inc. In response, Puma agreed to meet and confer to determine what organizational information may be reasonably related to the claims and defenses in this case and search for and produce an appropriate organizational chart. I am writing to confer regarding this issue. We are interested in an organizational chart that will clarify the positions and reporting relationships of Puma employees and directors with knowledge of the claims at issue, who sent, received, or were copied on the emails Puma will be producing, or who worked on documents that Puma will be producing.

**Puma's response**. With this letter, Puma is producing two organizational charts, one dated October 19, 2015, and one dated February 8, 2016. The charts show the organization of Puma's executives and senior management. The organizational charts will be marked and designated "CONFIDENTIAL" pursuant to the terms of the Proposed Joint Stipulated Protective Order the parties have agreed to abide by. We are not currently aware of additional organization charts maintained by Puma.

\*       \*       \*

We can discuss these issues further during our meet and confer call Thursday morning at 10 a.m.

Regards,

Paul J. Sampson

# Exhibit 15

| | |
|---|---|
| FREDRIC N. ESHELMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALAN H. AUERBACH and PUMA | ) |
| BIOTECHNOLOGY, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT PUMA BIOTECHNOLOGY, INC.'S INITIAL DISCLOSURES
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)**

Pursuant to Federal Rule of Civil Procedure 26(a)(1) and the joint Case Management Order, defendant Puma Biotechnology, Inc. ("Puma"), through its undersigned counsel, makes the following initial disclosures based on information presently known.  Puma reserves the right to amend or supplement these initial disclosures, including by identifying other potential witnesses, documents, and by disclosing other pertinent information.

By providing these initial disclosures, Puma does not represent that it is identifying every document, tangible thing, or witness possibly relevant to this action.  In addition, these disclosures are made without Puma waiving its objection to personal jurisdiction or venue.  *See* Motion to Dismiss, Docket No. ("Dkt.") 20.  Nor does Puma waive its right to object to any discovery request or proceeding involving or relating to the subject matter of these disclosures on any grounds, including competency, privilege, relevancy and materiality, hearsay, undue burden, confidentiality, or any other appropriate grounds.  Furthermore, these disclosures are not an admission by Puma regarding any matter.

Each and every disclosure set forth below is subject to the above qualifications and limitations.

## 1.  **Individuals Likely to Have Discoverable Information**

The following individuals are likely to have discoverable information that may be used to support Puma's positions in the above-referenced lawsuit.

| Employee | Topics for Initial Disclosures |
|---|---|
| Alan Auerbach<br>Chief Executive Officer<br>10880 Wilshire Blvd., Suite 2150<br>Los Angeles, CA 90024<br>(424) 248-6500<br>(Contact through Defendant's counsel) | Proxy contest; January 6, 2016 investor presentation |
| Mariann Ohanesian<br>Investor Relations<br>10880 Wilshire Blvd., Suite 2150<br>Los Angeles, CA 90024<br>(424) 248-6500<br>(Contact through Defendant's counsel) | Proxy contest |
| Larry W. Miller<br>Managing Director, Innisfree M&A Inc.<br>501 Madison Avenue<br>New York, NY 10022<br>(212) 750-5833 | Proxy contest |

## 2.  **Description of Documents**

The following enumerates documents, data compilations, and other tangible things in the possession, control, or custody of Puma that Puma may use to support its defenses:

    a.  Documents relating to the proxy contest, including investor presentations.

    b.  Transcript of February 12, 2008 congressional hearing involving Fredric Eshelman.

3.  **Computation of Damages**

Puma denies liability and denies that Mr. Eshelman has sustained any damages.  Puma has not filed any claims seeking recovery of damages from plaintiff (other than recovery of costs and attorney fees).  Puma would present evidence of its court costs and attorney fees after the claims against it have been denied or dismissed.

Subject to the foregoing, Puma has certain financial and other records that may be relevant to damages calculations.

4.  **Insurance**

Puma has identified the following insurance agreements[1] under which an insurance business may be liable to satisfy all or part of a possible judgment in the above-referenced lawsuit or to indemnify or reimburse for payments made to satisfy the judgment:

    a.  AIG Policy No. 01-842-36-51

    b.  XL Policy No. ELU136887-14

    c.  Old Republic Policy No. CUG 37165

    d.  Catlin Policy No. XSP-691819-1114

    e.  Old Republic Policy No. CUG 37166

    f.  XL Policy No. ELU136888-14

    g.  Berkley Policy No. 18013847

---

[1] Puma will provide copies of the insurance agreements upon the entry of an appropriate confidentiality order or agreement to confidential treatment among the parties.

This the 15<sup>th</sup> day of July, 2016.

/s/ Pressly M. Millen
Pressly M. Millen, NCSB: 16178
Womble Carlyle Sandridge & Rice,
*a Professional Limited Liability Company*
Post Office Box 831
Raleigh, North Carolina 27602
Telephone:    (919) 755-2100
Facsimile:    (919) 755-6067
Email:  pmillen@wcsr.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
1158 26th Street, Suite 883
Santa Monica, CA 90402
Telephone:    (424) 316-4000
Facsimile:    (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone:    (202) 847-4000
Facsimile:    (202) 847-4005
Emails:
bbishop@wilkinsonwalsh.com
lalvinomcgill@wilkinsonwalsh.com
psampson@wilkinsonwalsh.com

*Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendant Puma Biotechnology, Inc.'s Initial

Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1) was served on July 15, 2016, to

the following via email:

- Thomas A. Clare
  tom@clarelocke.com

- Elizabeth M. Locke
  libby@clarelocke.com

- Megan L. Meier
  megan@clarelocke.com

- Dustin A. Pusch
  dustin@clarelocke.com

- Andrew Kent McVey
  amcvey@murchisontaylor.com


DATED:  July 15, 2016

By:     /s/ Paul J. Sampson
        Paul J. Sampson

# Exhibit 16

**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:16-cv-00018-D**

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| *Plaintiff*, | ) | **Case No. 7:16-cv-00018-D** |
| | ) | |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

## DR. FREDRIC ESHELMAN'S FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-170) TO PUMA BIOTECHNOLOGY, INC.

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Dr. Fredric Eshelman issues his First Set of Requests for Admission (Nos. 1-170), to be answered separately by Defendant Puma Biotechnology, Inc., in accordance with governing Rules and the Parties' June 29, 2017 agreement regarding the formatting of Requests for Admission and Responses.

# REQUESTS FOR ADMISSION

## REQUEST FOR ADMISSION NOS. 1-170

Admit that the documents marked with the Bates stamps or attached as the exhibits set forth below are true and accurate reproductions of genuine and authentic original documents.

| Request for Admission | Document |
|---|---|
| 1 | Exhibit 1 |
| 2 | Exhibit 2 |
| 3 | Exhibit 3 |
| 4 | Exhibit 4 |
| 5 | Exhibit 5 |
| 6 | Exhibit 6 |
| 7 | Exhibit 7 |
| 8 | Exhibit 8 |
| 9 | Exhibit 9 |
| 10 | Exhibit 10 |
| 11 | Exhibit 11 |
| 12 | Exhibit 12 |
| 13 | Exhibit 13 |
| 14 | Exhibit 14 |
| 15 | Exhibit 15 |
| 16 | Exhibit 16 |
| 17 | Exhibit 17 |
| 18 | Exhibit 18 |
| 19 | Exhibit 19 |
| 20 | Exhibit 20 |
| 21 | Exhibit 21 |
| 22 | Exhibit 22 |
| 23 | Exhibit 23 |
| 24 | Exhibit 24 |
| 25 | Exhibit 25 |
| 26 | Exhibit 26 |
| 27 | Exhibit 27 |
| 28 | Exhibit 28 |
| 29 | Exhibit 29 |
| 30 | Exhibit 30 |
| 31 | Exhibit 31 |

2

| | |
|---|---|
| 32 | Exhibit 32 |
| 33 | Exhibit 33 |
| 34 | PUMA00000313 – PUMA00000315 |
| 35 | PUMA00000336 – PUMA00000339 |
| 36 | PUMA00000350 – PUMA00000351 |
| 37 | PUMA00000356 – PUMA00000377 |
| 38 | PUMA00000391 – PUMA00000392 |
| 39 | PUMA00000426 – PUMA00000426 |
| 40 | PUMA00000433 – PUMA00000435 |
| 41 | PUMA00000436 – PUMA00000437 |
| 42 | PUMA00000438 – PUMA00000438 |
| 43 | PUMA00000446 – PUMA00000446 |
| 44 | PUMA00000448 – PUMA00000450 |
| 45 | PUMA00000574 – PUMA00000575 |
| 46 | PUMA00000641 – PUMA00000642 |
| 47 | PUMA00000663 – PUMA00000663 |
| 48 | PUMA00001223 - PUMA00001241 |
| 49 | PUMA00001242 - PUMA00001242 |
| 50 | PUMA00001249 - PUMA00001250 |
| 51 | PUMA00001255 - PUMA00001255 |
| 52 | PUMA00001267 - PUMA00001267 |
| 53 | PUMA00001293 - PUMA00001320 |
| 54 | PUMA00001324 - PUMA00001325 |
| 55 | PUMA00001326 - PUMA00001339 |
| 56 | PUMA00001340 - PUMA00001341 |
| 57 | PUMA00001342 - PUMA00001401 |
| 58 | PUMA00001407 - PUMA00001484 |
| 59 | PUMA00001485 - PUMA00001490 |
| 60 | PUMA00001544 - PUMA00001604 |
| 61 | PUMA00001607 - PUMA00001609 |
| 62 | PUMA00001629 - PUMA00001671 |
| 63 | PUMA00001686 - PUMA00001736 |
| 64 | PUMA00001745 - PUMA00001754 |
| 65 | PUMA00001757 - PUMA00001804 |
| 66 | PUMA00001885 - PUMA00001896 |
| 67 | PUMA00001909 - PUMA00001913 |
| 68 | PUMA00001914 - PUMA00001918 |
| 69 | PUMA00001919 - PUMA00001923 |
| 70 | PUMA00001924 - PUMA00001928 |

| 71 | PUMA00001931 - PUMA00001933 |
|---|---|
| 72 | PUMA00001938 - PUMA00001940 |
| 73 | PUMA00002111 - PUMA00002112 |
| 74 | PUMA00002113 - PUMA00002114 |
| 75 | PUMA00002115 - PUMA00002116 |
| 76 | PUMA00002117 - PUMA00002118 |
| 77 | PUMA00002132 - PUMA00002136 |
| 78 | PUMA00002138 - PUMA00002140 |
| 79 | PUMA00002221 - PUMA00002221 |
| 80 | PUMA00002230 - PUMA00002296 |
| 81 | PUMA00002877 - PUMA00002878 |
| 82 | PUMA00002905 - PUMA00002907 |
| 83 | PUMA00003888 - PUMA00003889 |
| 84 | PUMA00003995 - PUMA00003996 |
| 85 | PUMA00004027 - PUMA00004028 |
| 86 | PUMA00004155 - PUMA00004155 |
| 87 | PUMA00004792 - PUMA00004859 |
| 88 | PUMA00005265 - PUMA00005265 |
| 89 | PUMA00005437 - PUMA00005437 |
| 90 | PUMA00005723 - PUMA00005724 |
| 91 | PUMA00005730 - PUMA00005730 |
| 92 | PUMA00005764 - PUMA00005766 |
| 93 | PUMA00005774 - PUMA00005774 |
| 94 | PUMA00052871 - PUMA00052872 |
| 95 | PUMA00052898 - PUMA00052899 |
| 96 | PUMA00052918 - PUMA00052921 |
| 97 | PUMA00053020 - PUMA00053020 |
| 98 | PUMA00053021 - PUMA00053021 |
| 99 | PUMA00053022 - PUMA00053022 |
| 100 | PUMA00053023 - PUMA00053025 |
| 101 | PUMA00053038 - PUMA00053038 |
| 102 | PUMA00053039 - PUMA00053039 |
| 103 | PUMA00053062 - PUMA00053067 |
| 104 | PUMA00053068 - PUMA00053070 |
| 105 | PUMA00053071 - PUMA00053071 |
| 106 | PUMA00053073 - PUMA00053073 |
| 107 | PUMA00053074 - PUMA00053075 |
| 108 | PUMA00053076 - PUMA00053077 |
| 109 | PUMA00053078 - PUMA00053079 |

| | |
|---|---|
| 110 | PUMA00053080 - PUMA00053081 |
| 111 | PUMA00053082 - PUMA00053082 |
| 112 | PUMA00053089 - PUMA00053093 |
| 113 | PUMA00053094 - PUMA00053094 |
| 114 | PUMA00053106 - PUMA00053108 |
| 115 | PUMA00053112 - PUMA00053112 |
| 116 | PUMA00053119 - PUMA00053119 |
| 117 | PUMA00053138 - PUMA00053142 |
| 118 | PUMA00053143 - PUMA00053148 |
| 119 | PUMA00053149 - PUMA00053154 |
| 120 | PUMA00053176 - PUMA00053183 |
| 121 | PUMA00053202 - PUMA00053202 |
| 122 | PUMA00053206 - PUMA00053208 |
| 123 | PUMA00053209 - PUMA00053209 |
| 124 | PUMA00053214 - PUMA00053214 |
| 125 | PUMA00053220 - PUMA00053252 |
| 126 | PUMA00053255 - PUMA00053257 |
| 127 | PUMA00053270 - PUMA00053288 |
| 128 | PUMA00053301 - PUMA00053301 |
| 129 | PUMA00053311 - PUMA00053359 |
| 130 | PUMA00053379 - PUMA00053379 |
| 131 | PUMA00053390 - PUMA00053391 |
| 132 | PUMA00053421 - PUMA00053421 |
| 133 | PUMA00053422 - PUMA00053425 |
| 134 | PUMA00053426 - PUMA00053426 |
| 135 | PUMA00053427 - PUMA00053446 |
| 136 | PUMA00053447 - PUMA00053476 |
| 137 | PUMA00054109 - PUMA00054137 |
| 138 | PUMA00053314 - PUMA00053341 |
| 139 | PUMA00003501 - PUMA00003532 |
| 140 | PUMA00445481 - PUMA00445498 |
| 141 | PUMA00444738 - PUMA00444755 |
| 142 | PUMA00444775 - PUMA00444795 |
| 143 | PUMA00445544 - PUMA00445563 |
| 144 | PUMA00444700 - PUMA00444718 |
| 145 | PUMA00445564 - PUMA00445581 |
| 146 | PUMA00444756 - PUMA00444774 |
| 147 | PUMA00445526 - PUMA00445543 |
| 148 | PUMA00286636 - PUMA00286653 |

| | |
|---|---|
| 149 | PUMA00444796 - PUMA00444816 |
| 150 | PUMA00444719 - PUMA00444737 |
| 151 | PUMA00053235 - PUMA00053252 |
| 152 | PUMA00053342 - PUMA00053359 |
| 153 | PUMA00003389 - PUMA00003410 |
| 154 | PUMA00002855 - PUMA00002873 |
| 155 | PUMA00003411 - PUMA00003428 |
| 156 | PUMA00004727 - PUMA00004745 |
| 157 | PUMA00021850 - PUMA00021867 |
| 158 | PUMA00021868 - PUMA00021906 |
| 159 | PUMA00022210 - PUMA00022224 |
| 160 | PUMA00022258 - PUMA00022265 |
| 161 | PUMA00022493 - PUMA00022493 |
| 162 | PUMA00023205 - PUMA00023205 |
| 163 | PUMA00023262 - PUMA00023262 |
| 164 | PUMA00023482 - PUMA00023482 |
| 165 | PUMA00023702 - PUMA00023702 |
| 166 | PUMA00023712 - PUMA00023712 |
| 167 | PUMA00023732 - PUMA00023733 |
| 168 | PUMA00023752 - PUMA00023753 |
| 169 | PUMA00021850 - PUMA00027795 |
| 170 | PUMA00031583 – PUMA00031642 |

This 17th day of August 2017.                    Respectfully Submitted,

/s/ Megan L. Meier
Andrew K. McVey
North Carolina State Bar No. 20217
(Local Civil Rule 83.1 Counsel)
Murchison, Taylor & Gibson PLLC
16 North Fifth Avenue
Wilmington, NC 28401-4537
Telephone: 910-763-2426
Email: amcvey@murchisontaylor.com

Thomas A. Clare (of counsel)
Elizabeth M. Locke (of counsel)
Megan L. Meier (of counsel)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: megan@clarelocke.com
*Attorneys for:*
*Dr. Fredric Eshelman*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Dr. Fredric N. Eshelman's First Set of Requests for Admission (Nos. 1-170) to Puma Biotechnology, Inc. was served on August 17, 2017 to the following via email:

Pressly M. Millen
Womble Carlyle Sandridge & Rice, PLLC
Post Office Box 831
Raleigh, NC 27602
Telephone: (919) 755-2100
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

Brant W. Bishop, P.C.
Lori Alvino McGill
Paul J. Sampson
Enbar Toledano
Hayter L. Whitman
Wilkinson, Walsh + Eskovitz LLP
1900 M Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
Email: bbishop@wilkinsonwalsh.com
Email: lalvinomcgill@wilkinsonwalsh.com
Email: psampson@wilkinsonwalsh.com
Email: etoledano@wilkinsonwalsh.com
Email: hwhitman@wilkinsonwalsh.com

Sean Eskovitz
Wilkinson, Walsh + Eskovitz LLP
11726 San Vicente Blvd., Suite 600
Los Angeles, CA 90049
Telephone: (424) 316-4000
Facsimile: (202) 847-4005
Email: seskovitz@wilkinsonwalsh.com

Dated: August 17, 2017                    By: */s/ Megan L. Meier*
                                          Megan L. Meier

**From:** **Audrey Rabenberg** audrey@clarelocke.com 📎 🚩
**Subject:** Dr. Eshelman's First Set of RFAs to Puma (Nos. 1-170)
**Date:** August 17, 2017 at 4:15 PM
**To:** Paul Sampson psampson@wilkinsonwalsh.com, Brant Bishop bbishop@wilkinsonwalsh.com, Lori A. McGill lalvinomcgill@wilkinsonwalsh.com, Press Millen pmillen@wcsr.com, Sean Eskovitz seskovitz@wilkinsonwalsh.com, Hayter Whitman hwhitman@wilkinsonwalsh.com, Enbar Toledano etoledano@wilkinsonwalsh.com
**Cc:** Megan Meier megan@clarelocke.com, Daniel Watkins daniel@clarelocke.com, paralegals@clarelocke.com

Counsel:

Attached, please find Dr. Eshelman's First Set of RFAs to Puma. The Exhibits referenced therein are saved at this link: https://clarelocke.box.com/v/RFAExhibits. It is protected by the password below which will expire on August 24, 2017. Please let me know if you have any trouble accessing the Exhibits.

Password: 6YFAuW&9/eW_Ktju

Sincere Regards,
Audrey Rabenberg

Audrey Rabenberg | Associate
C L A R E  L O C K E  L L P
10 Prince Street | Alexandria, VA 22314
(202) 899-3871
Admitted to practice in the Commonwealth of Virginia.

This electronic message transmission contains information from the law firm of Clare Locke LLP, which may be confidential or privileged. The information is intended exclusively for the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you received this electronic transmission in error, please notify us immediately at admin@clarelocke.com.



20170817
Eshelm...a.docx

# Exhibit 17

**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| FREDRIC N. ESHELMAN, | ) | |
| | ) | |
| *Plaintiff*, | ) | **Case No. 7:16-cv-00018-D** |
| | ) | |
| v. | ) | |
| | ) | |
| PUMA BIOTECHNOLOGY, INC. | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

**PUMA BIOTECHNOLOGY, INC.'S RESPONSES AND OBJECTIONS TO**
**FREDRIC ESHELMAN'S FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-170)**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Puma Biotechnology,

Inc. responds and objects to Fredric Eshelman's First Set of Requests for Admission (Nos. 1-170).

**GENERAL RESPONSES AND OBJECTIONS**

1.     To the extent it admits that a certain Bates range of referenced documents were

produced by Puma without alteration, Puma does not admit that any Bates range as listed in

Eshelman's Requests for Admission constitutes a single, whole, unitary document.

**SPECIFIC RESPONSES AND OBJECTIONS**

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 1 | Exhibit 1 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 2 | Exhibit 2 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 3 | Exhibit 3 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 4 | Exhibit 4 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 5 | Exhibit 5 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 6 | Exhibit 6 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 7 | Exhibit 7 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 8 | Exhibit 8 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 9 | Exhibit 9 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 10 | Exhibit 10 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 11 | Exhibit 11 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 12 | Exhibit 12 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 13 | Exhibit 13 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny |

3

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 14 | Exhibit 14 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 15 | Exhibit 15 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 16 | Exhibit 16 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 17 | Exhibit 17 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 18 | Exhibit 18 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 19 | Exhibit 19 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 20 | Exhibit 20 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 21 | Exhibit 21 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 22 | Exhibit 22 | Puma admits that the referenced document appears to be a genuine copy of all or part of an SEC filing as altered by Morningstar for use in its information services. Beyond that, Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 23 | Exhibit 23 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 24 | Exhibit 24 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 25 | Exhibit 25 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 26 | Exhibit 26 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 27 | Exhibit 27 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 28 | Exhibit 28 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 29 | Exhibit 29 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 30 | Exhibit 30 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 31 | Exhibit 31 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 32 | Exhibit 32 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 33 | Exhibit 33 | Puma cannot admit or deny this matter. Puma did not produce the referenced document, and the information Puma knows or can readily obtain is insufficient to admit or deny the matter. |
| 34 | PUMA00000313 – PUMA00000315 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 35 | PUMA00000336 – PUMA00000339 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 36 | PUMA00000350 – PUMA00000351 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 37 | PUMA00000356 – PUMA00000377 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 38 | PUMA00000391 – PUMA00000392 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 39 | PUMA00000426 – PUMA00000426 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 40 | PUMA00000433 – PUMA00000435 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 41 | PUMA00000436 – PUMA00000437 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 42 | PUMA00000438 – PUMA00000438 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 43 | PUMA00000446 – PUMA00000446 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 44 | PUMA00000448 – PUMA00000450 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 45 | PUMA00000574 – PUMA00000575 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 46 | PUMA00000641 – PUMA00000642 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 47 | PUMA00000663 – PUMA00000663 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 48 | PUMA00001223 - PUMA00001241 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 49 | PUMA00001242 - PUMA00001242 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 50 | PUMA00001249 - PUMA00001250 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | produced in this matter without alteration other than the addition of production numbering. |
| 51 | PUMA00001255 - PUMA00001255 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 52 | PUMA00001267 - PUMA00001267 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 53 | PUMA00001293 - PUMA00001320 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 54 | PUMA00001324 - PUMA00001325 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 55 | PUMA00001326 - PUMA00001339 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 56 | PUMA00001340 - PUMA00001341 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 57 | PUMA00001342 - PUMA00001401 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

9

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 58 | PUMA00001407 - PUMA00001484 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 59 | PUMA00001485 - PUMA00001490 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 60 | PUMA00001544 - PUMA00001604 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 61 | PUMA00001607 - PUMA00001609 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 62 | PUMA00001629 - PUMA00001671 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 63 | PUMA00001686 - PUMA00001736 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 64 | PUMA00001745 - PUMA00001754 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 65 | PUMA00001757 - PUMA00001804 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 66 | PUMA00001885 - PUMA00001896 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 67 | PUMA00001909 - PUMA00001913 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 68 | PUMA00001914 - PUMA00001918 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 69 | PUMA00001919 - PUMA00001923 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 70 | PUMA00001924 - PUMA00001928 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 71 | PUMA00001931 - PUMA00001933 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 72 | PUMA00001938 - PUMA00001940 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | produced in this matter without alteration other than the addition of production numbering. |
| 73 | PUMA00002111 - PUMA00002112 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 74 | PUMA00002113 - PUMA00002114 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 75 | PUMA00002115 - PUMA00002116 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 76 | PUMA00002117 - PUMA00002118 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 77 | PUMA00002132 - PUMA00002136 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 78 | PUMA00002138 - PUMA00002140 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 79 | PUMA00002221 - PUMA00002221 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 80 | PUMA00002230 - PUMA00002296 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 81 | PUMA00002877 - PUMA00002878 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 82 | PUMA00002905 - PUMA00002907 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 83 | PUMA00003888 - PUMA00003889 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 84 | PUMA00003995 - PUMA00003996 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 85 | PUMA00004027 - PUMA00004028 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 86 | PUMA00004155 - PUMA00004155 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 87 | PUMA00004792 - PUMA00004859 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 88 | PUMA00005265 - PUMA00005265 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 89 | PUMA00005437 - PUMA00005437 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 90 | PUMA00005723 - PUMA00005724 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 91 | PUMA00005730 - PUMA00005730 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 92 | PUMA00005764 - PUMA00005766 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 93 | PUMA00005774 - PUMA00005774 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 94 | PUMA00052871 - PUMA00052872 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | produced in this matter without alteration other than the addition of production numbering. |
| 95 | PUMA00052898 - PUMA00052899 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 96 | PUMA00052918 - PUMA00052921 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 97 | PUMA00053020 - PUMA00053020 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 98 | PUMA00053021 - PUMA00053021 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 99 | PUMA00053022 - PUMA00053022 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 100 | PUMA00053023 - PUMA00053025 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 101 | PUMA00053038 - PUMA00053038 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 102 | PUMA00053039 - PUMA00053039 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 103 | PUMA00053062 - PUMA00053067 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 104 | PUMA00053068 - PUMA00053070 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 105 | PUMA00053071 - PUMA00053071 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 106 | PUMA00053073 - PUMA00053073 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 107 | PUMA00053074 - PUMA00053075 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 108 | PUMA00053076 - PUMA00053077 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 109 | PUMA00053078 - PUMA00053079 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 110 | PUMA00053080 - PUMA00053081 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 111 | PUMA00053082 - PUMA00053082 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 112 | PUMA00053089 - PUMA00053093 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 113 | PUMA00053094 - PUMA00053094 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 114 | PUMA00053106 - PUMA00053108 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 115 | PUMA00053112 - PUMA00053112 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 116 | PUMA00053119 - PUMA00053119 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | produced in this matter without alteration other than the addition of production numbering. |
| 117 | PUMA00053138 - PUMA00053142 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 118 | PUMA00053143 - PUMA00053148 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 119 | PUMA00053149 - PUMA00053154 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 120 | PUMA00053176 - PUMA00053183 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 121 | PUMA00053202 - PUMA00053202 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 122 | PUMA00053206 - PUMA00053208 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 123 | PUMA00053209 - PUMA00053209 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 124 | PUMA00053214 - PUMA00053214 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 125 | PUMA00053220 - PUMA00053252 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 126 | PUMA00053255 - PUMA00053257 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 127 | PUMA00053270 - PUMA00053288 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 128 | PUMA00053301 - PUMA00053301 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 129 | PUMA00053311 - PUMA00053359 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 130 | PUMA00053379 - PUMA00053379 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 131 | PUMA00053390 - PUMA00053391 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 132 | PUMA00053421 - PUMA00053421 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 133 | PUMA00053422 - PUMA00053425 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 134 | PUMA00053426 - PUMA00053426 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 135 | PUMA00053427 - PUMA00053446 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 136 | PUMA00053447 - PUMA00053476 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 137 | PUMA00054109 - PUMA00054137 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 138 | PUMA00053314 - PUMA00053341 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | produced in this matter without alteration other than the addition of production numbering. |
| 139 | PUMA00003501 - PUMA00003532 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 140 | PUMA00445481 - PUMA00445498 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 141 | PUMA00444738 - PUMA00444755 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 142 | PUMA00444775 - PUMA00444795 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 143 | PUMA00445544 - PUMA00445563 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 144 | PUMA00444700 - PUMA00444718 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 145 | PUMA00445564 - PUMA00445581 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 146 | PUMA00444756 - PUMA00444774 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 147 | PUMA00445526 - PUMA00445543 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 148 | PUMA00286636 - PUMA00286653 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 149 | PUMA00444796 - PUMA00444816 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 150 | PUMA00444719 - PUMA00444737 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 151 | PUMA00053235 - PUMA00053252 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 152 | PUMA00053342 - PUMA00053359 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 153 | PUMA00003389 - PUMA00003410 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
|  |  | admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 154 | PUMA00002855 - PUMA00002873 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 155 | PUMA00003411 - PUMA00003428 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 156 | PUMA00004727 - PUMA00004745 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 157 | PUMA00021850 - PUMA00021867 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 158 | PUMA00021868 - PUMA00021906 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 159 | PUMA00022210 - PUMA00022224 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 160 | PUMA00022258 - PUMA00022265 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| | | produced in this matter without alteration other than the addition of production numbering. |
| 161 | PUMA00022493 - PUMA00022493 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 162 | PUMA00023205 - PUMA00023205 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 163 | PUMA00023262 - PUMA00023262 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 164 | PUMA00023482 - PUMA00023482 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 165 | PUMA00023702 - PUMA00023702 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 166 | PUMA00023712 - PUMA00023712 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 167 | PUMA00023732 - PUMA00023733 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

| Request for Admission | Document | Puma's Response |
|---|---|---|
| 168 | PUMA00023752 - PUMA00023753 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 169 | PUMA00021850 - PUMA00027795 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |
| 170 | PUMA00031583 – PUMA00031642 | Subject to its General Responses and Objections, which Puma incorporates into this Response, Puma admits that the referenced document or documents is a copy of a document or documents that Puma produced in this matter without alteration other than the addition of production numbering. |

This the 18th day of September, 2017.

Respectfully submitted,

/s/ Brant W. Bishop, P.C.

Pressly M. Millen, NCSB: 16178
Womble Carlyle Sandridge & Rice,
*a Professional Limited Liability Company*
Post Office Box 831
Raleigh, North Carolina 27602
Telephone:     (919) 755-2100
Facsimile:      (919) 755-6067
Email:  pmillen@wcsr.com

Brant W. Bishop, P.C.
Paul J. Sampson
Wilkinson, Walsh + Eskovitz LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
Telephone:     (202) 847-4000
Facsimile:      (202) 847-4005
Emails:
bbishop@wilkinsonwalsh.com
psampson@wilkinsonwalsh.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Puma Biotechnology, Inc.'s Responses and Objections to Fredric Eshelman's First Set of Requests for Admission (Nos. 1-170) was served on September 18, 2017 via email on the following:

Thomas A. Clare
Elizabeth M. Locke
Megan L. Meier
Dustin A. Pusch
Joseph R. Oliveri
Daniel P. Watkins
Clare Locke LLP
902 Princess Street
Alexandria, VA 22314
Telephone: 202-628-7400
Emails:
tom@clarelocke.com
libby@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com
joe@clarelocke.com
daniel@clarelocke.com

Andrew Kent McVey
Murchison, Taylor & Gibson, PLLC
16 North Fifth Avenue
Wilmington, NC 28401-4537
Telephone: 910-763-2426x126
Email: amcvey@murchisontaylor.com