THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:16-CV-18-D

FREDRIC N. ESHELMAN,           )
                               )
            Plaintiff,         )
                               )
      v.                       )           **ORDER**
                               )
PUMA BIOTECHNOLOGY, INC.,      )
                               )
            Defendant.         )

On October 28, 2015, Fredric N. Eshelman ("Eshleman" or "plaintiff"), a pharmacist and venture capitalist, submitted a proposal to the shareholders of Puma Biotechnology, Inc. ("Puma" or "defendant") to increase the size of Puma's board of directors from five to nine seats, while nominating himself and three other people to the additional four seats. See [D.E. 370-1] ¶¶ 46–50. Puma vigorously opposed Eshelman's proposal and published an investor presentation about Eshelman in January 2016 on its own website and the website of the Securities and Exchange Commission ("SEC"). See id. at ¶¶ 51, 55, 58, 130–45. One of Puma's slides stated that "Eshelman's misrepresentations are no surprise given his history," that Eshelman was the Chief Executive Officer ("CEO") of Pharmaceutical Product Development, LLC ("PPD") "when it managed a clinical trial during the development of the antibiotic drug Ketek," that "[f]raud was uncovered in this trial by the FDA's Office of Criminal Investigation," that "[a]s [CEO]" of PPD, Eshelman was "forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008," and that "Eshelman was replaced as CEO for PPD in 2009." Id. at ¶ 58. Another slide stated that "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company;

particularly a company that is in the process of seeking FDA approval." Id. at ¶ 58.

On January 20, 2016, Eshleman wrote Puma and demanded a retraction and requested an apology. See id. at ¶ 143. Puma refused in a letter that it published with the SEC. See id. at ¶¶ 144–45. On February 3, 2016, Eshleman sued Puma for defamation. See id. at ¶ 146; [D.E. 1] 5.

In this diversity action, North Carolina law applies. On September 28, 2018, the court granted in part and denied in part Eshelman's motion for partial summary judgment and denied Puma's motion for summary judgment [D.E. 304]. The court held that Puma's allegedly defamatory statements concerned Eshelman and that Puma published the allegedly defamatory statements. See [D.E. 306] 20. The court also held that two of Puma's statements were libelous per se. See id. at 20–24.

As for Puma's statement that Eshelman was "involved in clinical trial fraud," the court held that the statement is libel per se because fraud is an infamous crime that involves dishonesty. Id. at 23; see Badame v. Lampke, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955); Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 30, 568 S.E.2d 893, 898 (2002); Raymond U v. Duke Univ., 91 N.C. App. 171, 182, 371 S.E.2d 701, 709 (1988); Gibby v. Murphy, 73 N.C. App. 128, 131–32, 325 S.E.2d 673, 675–76 (1985). When Puma said that "Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company" as part of a series of slides impugning Eshelman's integrity, Puma accused Eshelman of fraud. [D.E. 370-1] ¶ 58. The court also held that whether this statement was false and made with actual malice were jury questions, but as a matter of law the statement that Eshelman was "involved in clinical trial fraud" is libel per se. See [D.E. 306] 23; Badame, 242 N.C. at 757, 89 S.E.2d at 468; Boyce & Isley, PLLC, 153 N.C. App. at 30, 568 S.E.2d at 898; Raymond U, 91 N.C. App. at 182, 371 S.E.2d at 709; Gibby, 73 N.C. App. at 131–32, 325 S.E.2d at 675–76.

2

As for Puma's statement that Eshelman was "replaced as CEO of PPD in 2009 after being forced to testify regarding fraud in 2008," the court rejected Puma's argument that the word "replaced" in this statement does not mean "fired." [D.E. 306] 23. Stating that a CEO was "replaced" "after being forced to testify regarding fraud in 2008" impeaches that person in his trade or profession. See id. at 23–24; Badame, 242 N.C. at 757, 89 S.E.2d at 468; Boyce & Isley, PLLC, 153 N.C. App. at 30, 568 S.E.2d at 898; Raymond U, 91 N.C. App. at 182, 371 S.E.2d at 709; Gibby, 73 N.C. App. at 131–32, 325 S.E.2d at 675–76. The court also held that whether this statement was false and made with actual malice were jury questions, but as a matter of law, the court held that this statement is libel per se. See [D.E. 306] 23–24.

The trial began on March 11, 2019. Before trial, the parties entered 146 stipulations. See [D.E. 370-1]. At trial, the court received the stipulations as a joint exhibit of stipulated facts. See id. Additionally, Eshleman presented six witnesses, and the court received twenty-five exhibits from Eshleman. Puma presented seven witnesses, and the court received eighteen exhibits from Puma. See [D.E. 429–31]. During closing argument, Eshleman argued that the two statements at issue were false and that Puma made them with actual malice and requested $52,000,000 in compensatory damages. See [D.E. 431] 183–224. Puma argued in opposition.

On March 15, 2019, after extensive deliberations, the jury returned a verdict in favor of Eshelman on his defamation claim against Puma. In its verdict, the jury answered three issues. Issue one was, "When read in the context of the entire presentation, were defendant Puma Biotechnology, Inc.'s statements that plaintiff Fredric N. Eshelman was 'replaced as CEO of PPD' after being 'involved in clinical trial fraud' false?" The jury answered, "Yes" to issue one. See id. Issue two was, "Did defendant Puma Biotechnology, Inc. act with actual malice when it accused plaintiff Fredric N. Eshelman of being 'replaced as CEO of PPD' after being 'involved in clinical trial

3

fraud'?" The jury answered, "Yes" to issue two. See id. Issue three was, "What amount of compensatory damages is plaintiff Fredric N. Eshelman entitled to recover from defendant Puma Biotechnology, Inc.?" The jury answered "$15,850,000." Id.

The jury then considered punitive damages. See [D.E. 433]. Eshleman introduced one additional exhibit, and the court instructed the jury that it could consider the other trial evidence in considering the issue of punitive damages. See id. at 22. Eshleman then argued in favor of punitive damages and requested $100,000,000 in punitive damages. See id. at 22–28. Puma argued in opposition. See id. at 29–35. After deliberating, the jury awarded Eshleman $6,500,000 in punitive damages. See id. at 57–58; [D.E. 389]. On March 25, 2019, the court entered judgment pursuant to the jury verdict. See [D.E. 395].

On April 3, 2019, Eshelman moved for an award of reasonable attorneys' fees under N.C. Gen. Stat. § 1D-45 [D.E. 397]. On April 8, 2019, Eshelman filed a memorandum in support [D.E. 405]. On April 29, 2019, Puma responded in opposition [D.E. 426]. On May 13, 2019, Eshelman replied [D.E. 435]. On May 17, 2019, Puma supplemented its response [D.E. 437]. On May 30, 2019, Eshelman replied to Puma's supplement [D.E. 438].

On April 8, 2019, Eshelman timely moved for $205,903.55 in costs [D.E. 403]. On April 22, 2019, Puma moved to disallow some of the costs [D.E. 414] and filed a memorandum in support [D.E. 415]. On April 29, 2019, Eshelman responded in opposition [D.E. 425]. On April 22, 2019, Puma moved for a new trial or, in the alternative, remittitur [D.E. 416]. On May 17, 2019, Puma filed a memorandum in support [D.E. 436]. On June 7, 2019, Eshelman responded in opposition [D.E. 439]. On June 21, 2019, Puma replied [D.E. 440]. On June 21, 2019, Puma moved for a hearing concerning its motion for a new trial or, in the alternative, remittitur [D.E. 441]. Finally, on April 22, 2019, Eshelman moved to amend the judgment to include prejudgment interest [D.E. 418]

4

and filed a memorandum in support [D.E. 419].

The court has reviewed the entire record. As explained below, the court denies Eshelman's motion for attorneys' fees, grants Eshelman's motion for costs, denies Puma's motion to disallow costs, denies Puma's motion for a new trial or remittitur, grants Eshelman's motion to amend the judgment to include prejudgment interest, and denies Puma's motion for a hearing.

I.

Eshelman seeks $3,075,897.85 in attorneys' fees under N.C. Gen. Stat. § 1D-45. See [D.E. 405] 1. Under N.C. Gen. Stat. § 1D-45, "[t]he court shall award reasonable attorney[s'] fees against a defendant who asserts a defense in a punitive damages claim that the defendant knows or should have known to be frivolous or malicious." N.C. Gen. Stat. § 1D-45. "A defense is frivolous if a proponent can present no rational argument based upon the evidence or law in support of it." Rhyne v. K-Mart Corp., 149 N.C. App. 672, 689, 562 S.E.2d 82, 94 (2002) (alteration and quotation omitted), aff'd, 358 N.C. 160, 594 S.E.2d 1 (2004); see Raynor v. G4S Secure Sols. (USA) Inc., 327 F. Supp. 3d 925, 946 (W.D.N.C. 2018); Bryan v. Bryan, No. 1:11CV141, 2013 WL 1010481, at *1 (W.D.N.C. Mar. 14, 2013) (unpublished); cf. Messer v. Pollack, 809 S.E.2d 375, 2018 WL 710051, at *2 (N.C. Ct. App. Feb. 6, 2018) (unpublished table decision); Fed. Point Yacht Club Ass'n v. Moore, 244 N.C. App. 543, 781 S.E.2d 351, 2015 WL 8755698, at *7 (Dec. 15, 2015) (unpublished table decision); Philips v. Pitt Cty. Mem'l Hosp., Inc., 242 N.C. App. 456, 458, 775 S.E.2d 885, 884 (2015). "A defense is malicious if it is wrongful and done intentionally without just cause or excuse or as a result of ill will." Rhyne, 149 N.C. App. at 689, 562 S.E.2d at 94 (quotation omitted); see Raynor, 327 F. Supp. 3d at 946.

Because "punitive damages are intended to punish a litigant for conduct that had already occurred by the time that the litigation had commenced," a court "focuses on the conduct of the party

5

during litigation" to determine whether to award reasonable attorneys' fees under N.C. Gen. Stat. § 1D-45. Raynor, 327 F. Supp. 3d at 946 (quotations omitted). Courts applying N.C. Gen. Stat. § 1D-45 have awarded attorneys' fees when a party "[k]nowingly and intentionally commit[s] perjury on the stand on matters related to the punitive damages defense" and when a party "persistently den[ies] a fact alleged by plaintiff but then later confess[es] to such acts." Id.; see Fed. Point Yacht Club Ass'n, 2015 WL 8755698, at *7–8; Philips, 242 N.C. App. at 458, 775 S.E.2d at 884; Bryan, 2013 WL 1010481, at *1. At the same time, courts distinguish between a party engaging in "malicious acts or practices as a corporation," which do not warrant awarding attorneys' fees under N.C. Gen. Stat. § 1D-45, and a party asserting a malicious or frivolous defense. Rhyne, 149 N.C. App. at 689, 562 S.E.2d at 95.

Eshelman argues that he is entitled to an award of reasonable attorneys' fees under N.C. Gen. Stat. § 1D-45. In support, Eshelman alleges that Puma only stipulated to certain facts on "the eve of trial after three years of litigation," concealed facts during discovery, "malicious[ly]" denied facts at summary judgment, did not make a good faith effort to resolve the claim at mediation, and refused to stipulate to certain facts. [D.E. 405] 3–10. Additionally, Eshelman alleges that Puma's Chief Executive Officer Alan Auerbach ("Auerbach") "repeatedly contradicted the stipulated facts and his own prior sworn deposition testimony" (i.e., committed perjury) when Auerbach testified at trial. Id. at 10–15.

Eshelman concedes that Puma's defenses were not frivolous. See [D.E. 438] 1–2. As for whether Puma's defenses were malicious, the decision to go to trial by itself does not constitute a malicious defense. Although Eshelman cites examples of allegedly malicious conduct, the court declines to find Puma's conduct malicious. Cf. Rhyne, 149 N.C. App. at 689–90, 562 S.E.2d at 95. Moreover, although Eshelman vigorously cross-examined Auerbach and exposed Auerbach as a non-

6

credible witness, the court declines to find that Auerbach's testimony rises to the level of perjury that would justify awarding attorneys' fees to Eshelman. Accordingly, the court denies Eshelman's motion for attorneys' fees under N.C. Gen. Stat. § 1D-45.

## II.

Federal Rule of Civil Procedure 54(d)(1) governs a post-judgment motion for an award of costs. See Fed. R. Civ. P. 54(d)(1). Rule 54(d)(1) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Id. A "prevailing party" is "a party in whose favor a judgment is rendered" or "one who has been awarded some relief by the court." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 603 (2001) (quotation and alteration omitted). Rule 54(d)(1) creates "a presumption in favor of an award of costs to the prevailing party." Teague v. Bakker, 35 F.3d 978, 996 (4th Cir. 1994); see Delta Air Lines, Inc. v. August, 450 U.S. 346, 352 (1981); Cherry v. Champion Int'l Corp., 186 F.3d 442, 446 (4th Cir. 1999).

Federal courts may assess only those costs listed in 28 U.S.C. § 1920. See 28 U.S.C. § 1920; Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 301 (2006); Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441–43 (1987), superseded on other grounds by statute, 42 U.S.C. § 1988(c); Herold v. Hajoca Corp., 864 F.2d 317, 323 (4th Cir. 1988).[1] Local Civil Rule 54.1

---

[1] Taxable costs under section 1920 include:

(1)     Fees of the clerk and marshal;

(2)     Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3)     Fees and disbursements for printing and witnesses;

(4)     Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

7

"further refines the scope of recoverable costs." Howard v. College of the Albemarle, No. 2:15-CV-39-D, 2017 WL 3754620, at *1 (E.D.N.C. Aug. 29, 2017) (unpublished) (quoting Earp v. Novartis Pharm. Corp., No. 5:11-CV-680-D, 2014 WL 4105678, at *1 (E.D.N.C. Aug. 19, 2014) (unpublished)); see Local Civil Rule 54.1.[2]

Eshelman lists various costs totaling $205,903.55 on his bill of costs: fees of the clerk

---

(5)     Docket fees under section 1923 . . . ;

(6)     Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services . . . .

28 U.S.C. § 1920.

[2] Local Civil Rule 54.1(c)(1) provides a non-exhaustive list of normally recoverable costs:

(a)     those items specifically listed on the bill of costs form. The costs incident to the taking of depositions (when allowable as necessarily obtained for use in the litigation) normally include only the reporter's fee and charge for the original transcript of the deposition;

(b)     premiums on required bonds;

(c)     actual mileage, subsistence, and attendance allowances for necessary witnesses at actual costs, but not to exceed the applicable statutory rates, whether they reside in or out of the district;

(d)     one copy of the trial transcript for each party represented by counsel.

Local Civil Rule 54.1(c)(1). Local Civil Rule 54.1(c)(2) also identifies items "normally not taxed, without limitation" as

(a)     witness fees, subsistence, and mileage for individual parties, real parties in interest, parties suing in representative capacities, and the officers and directors of corporate parties;

(b)     multiple copies of depositions;

(c)     daily copy of trial transcripts, unless prior court approval has been obtained.

Local Civil Rule 54.1(c)(2).

($593.00), fees for service of summonses and subpoenas ($3,819.75), fees for printed or electronically recorded transcripts necessarily obtained for use in the case ($53,953.01), fees and disbursements for printing ($43,078.76), fees for witnesses ($80.00), fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case ($97,116.53), docket fees under 28 U.S.C. § 1923 ($22.50), and costs as shown on Mandate of Court of Appeals ($1,840.00). See [D.E. 403] 1–2. Such fees are recoverable. See 28 U.S.C. § 1920; Local Civil Rule 54.1; Howard, 2017 WL 3754620, at *1 (collecting cases); Silicon Knights, Inc. v. Epic Games, Inc., 917 F. Supp. 2d 503, 511–15 (E.D.N.C. 2012), aff'd, 551 F. App'x 646 (4th Cir. 2014) (per curiam) (unpublished). Accordingly, the court grants Eshelman's motion for costs, denies Puma's motion to disallow costs, and awards Eshelman $205,903.55 in costs under section 1920 and Local Civil Rule 54.1.

## III.

A court "may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Remittitur "is the established method by which a trial judge can review a jury award for excessiveness" and order "a new trial unless the plaintiff accepts a reduction in an excessive jury award." Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 593 (4th Cir. 1996); see Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 430–31 (1996); Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co., 226 F. Supp. 3d 520, 527 (W.D.N.C. 2016). A district court may, in its discretion, grant a new trial if the verdict "(1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." U.S. Equal Emp't Opportunity Comm'n v. Consol Energy, Inc., 860 F.3d 131, 145 (4th Cir. 2017); see Fed. R. Civ. P. 59(a)(1)(A); Gasperini, 518 U.S. at 438–39; Huskey v. Ethicon, Inc., 848

9

F.3d 151, 158 (4th Cir. 2017); see also Knussman v. Maryland, 272 F.3d 625, 639 (4th Cir. 2001); Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998); Atlas Food Sys. & Servs., Inc., 99 F.3d at 594; Variety Stores, Inc. v. Wal-Mart Inc., 359 F. Supp. 3d 315, 325 (E.D.N.C. 2019); Sociedad Espanola, 226 F. Supp. 3d at 527; SAS Inst., Inc. v. World Programming Ltd., No. 5:10-CV-25-FL, 2016 WL 3435196, at *2 (E.D.N.C. June 17, 2016) (unpublished). A district court may "weigh evidence and assess credibility in ruling on a motion for a new trial." Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994) (quotation omitted); see Finch v. Covil Corp., 388 F. Supp. 3d 593, 608–09 (M.D.N.C. 2019).

Puma argues that the court should grant its motion because the jury's award of compensatory and punitive damages was excessive and unlawful, "the jury's liability findings were against the clear weight of the evidence, and the verdict was marred by instructional, evidentiary, and other errors that prejudiced Puma and impeded a fair trial." [D.E. 436] 3.

## A.

Before the court addresses Puma's motion, the court recites the 146 stipulated facts in this case. See [D.E. 370-1]. These stipulated facts provide necessary background information and help to explain the jury's verdict.

### EXHIBIT OF STIPULATED FACTS

#### *Puma Biotechnology, Inc.*

1. Defendant Puma Biotechnology, Inc. ("Puma") is a publicly-traded for profit biopharmaceutical corporation incorporated in Delaware with its principal place of business in Los Angeles, California.

2. Puma's lead product is neratinib (branded as NERLYNX), which is for the extended adjuvant treatment of early stage, HER2-positive breast cancer.

3. Since founding Puma in 2010, Alan Auerbach has been Puma's President, Chief Executive Officer ("CEO"), Secretary, and Chairman of its Board of Directors.

10

4. From 2012 to 2014, Puma paid Mr. Auerbach compensation valued at more than $52 million.

5. From 2012 to 2017, Puma paid Mr. Auerbach compensation valued at more than $73 million.

6. In 2018, Mr. Auerbach received base pay of $757,260.

7. Between 2011 and 2013, Mr. Auerbach recommended that Puma shareholders elect Jay Moyes and Troy Wilson to Puma's Board of Directors.

8. Before he recommended that Puma's shareholders elect Mr. Moyes to the Board, Mr. Auerbach and Mr. Moyes had been good friends for years, and it was Mr. Auerbach who first asked Mr. Moyes if he was interested in joining Puma's Board.

9. Mr. Auerbach introduced Troy Wilson to Puma's Board of Directors in October 2013, and Mr. Wilson was approved to join Puma as a director shortly thereafter.

10. In April 2015, Adrian Senderowicz joined Puma's Board at Mr. Auerbach's request.

11. In September 2015, Frank Zavrl joined Puma's Board at Mr. Auerbach's request.

12. Before joining Puma's board, Mr. Zavrl had been a partner at Adage Capital Management ("Adage Capital"), Puma's largest initial stockholder.

13. Mariann Ohanesian has been the senior director of investment relations for Puma since November 2011.

14. Charles Eyler has been the senior vice president and finance, administration, and corporate treasurer for Puma Biotechnology, Inc. since September 2011.

### *Dr. Fredric Eshelman*

15. Plaintiff Dr. Fredric Eshelman is a resident of, and is domiciled in, Wilmington, North Carolina.

16. Dr. Eshelman has spent more than forty years working in the pharmaceutical profession, developing medicines and bringing them to market, monitoring clinical trials, and investing in new pharmaceutical products.

17. In 1985, Dr. Eshelman founded Pharmaceutical Product Development ("PPD"), a North Carolina based contract research organization ("CRO"). A "CRO" is a group that helps companies run clinical trials or preclinical trials.

11

18. From 1990 to 2009, Dr. Eshelman served as CEO of PPD.

19. Dr. Eshelman served as the Executive Chairman of PPD's board of directors from 2009-2011, when PPD was sold to two private equity firms.

20. Dr. Eshelman was the founding chairman of Furiex Pharmaceuticals, Inc. ("Furiex"), and served as the Chairman of the board of directors of Furiex from 2009 to 2014.

21. In 2014, Dr. Eshelman founded Eshelman Ventures, LLC, a company focused on investing in healthcare companies.

### Puma's Dealings With Dr. Eshelman and Other Stockholders

22. Puma reported in its March 3, 2014 10-K, "We believe that there are approximately 36,000 patients in the United States and 34,000 patients in the European Union, or EU, with newly diagnosed HER2-positive breast cancer, representing an estimated total market opportunity between $1 billion and $2 billion."

23. On August 11, 2014, Puma announced that it expected to file a New Drug Application ("NDA") with the United States Food and Drug Administration ("FDA") for neratinib during 2015.

24. On November 10, 2014, Puma announced that it would increase its research and development budget to support the development of neratinib and preparation of its NDA.

25. On December 2, 2014, Puma announced that it intended to "delay its proposed timeline for filing the NDA [for neratinib] until the first quarter of 2016."

26. After the "first quarter of 2016" arrived and passed Puma announced that it "anticipate[d] submitting a New Drug Application (NDA) to the FDA in mid-2016."

27. Puma did not submit its NDA for neratinib to the FDA until July 21, 2016.

28. On July 21, 2014, Puma's stock price was less than $60 per share.

29. On July 22, 2014, Puma and Mr. Auerbach represented that the drug and placebo disease-free survival rates were "in line" with prior Herceptin Adjuvant Studies, *i.e.*, clinical trials for an FDA approved early-stage breast cancer treatment.

30. On July 23, 2014, Puma's stock price exceeded $230 per share.

31. On July 23, 2014, the value of Adage Capital's investment in Puma increased by approximately $950 million.

32. Mr. Zavrl remembers July 23, 2014 "[k]ind of like the birth of [his] children" because he was out on a fishing trip with his son and "came back $100 million richer" as a result of his stockholdings in Puma.

33. On July 30, 2014, *Forbes* reported that Puma's and Auerbach's July 22, 2014 announcement had caused Puma's stock price to increase significantly, making Mr. Auerbach an "Overnight Billionaire," in an article for which Mr. Auerbach was interviewed and did not dispute the reported numbers.

34. Between May 18 and 19, 2015, Dr. Fredric Eshelman invested nearly $9 million in Puma.

35. On June 1, 2015, two weeks after Dr. Eshelman purchased Puma's shares, the American Society of Clinical Oncology ("ASCO") held a conference. During the conference, it was revealed that the disease-free survival rates for neratinib were far inferior to the Herceptin Adjuvant Studies, rather than "in line" with them, as Mr. Auerbach had previously claimed.

36. An investor blog later reported:

> Puma has a reputation of being very selective with data releases and allegedly denied attendance to an investor event taking place around the time of ASCO to those that were not bulls on the stock. The company additionally allegedly selectively released data to a number of sell-side analysts after a negative reaction to an ASCO abstract release as a way to provide support to the company's poor performing stock . . . these seem to me to display a pattern of secrecy that makes an investor question if management is being fully honest with shareholders and disclosing all information (including negative clinical information) when it should. Some in the investment community would note that this reputation is one thing that makes them especially concerned about the data from the NSABP FB-7 trial that Puma had originally stated it would release to investors back in Q4 2013. These investors would suggest that Puma has avoided releasing this data, as it is poor.

37. On June 1, 2015, when Puma announced the clinical data related to the"extent of the benefit for ExteNET in the trial" at the ASCO conference, investors were disappointed with the results.

38. Mr. Gross, the founder of Puma's then-largest stockholder, Adage Capital, was disappointed with the June 1, 2015 ASCO conference data release, which had wiped

out $250 million of the value of Adage Capital's investment in Puma. But when he asked to speak with Mr. Auerbach at the ASCO conference, Mr. Auerbach said, "you have 30 seconds" and then "started to count, one, two, three." That was "a very, very difficult conversation," and Adage Capital was "very, very frustrated with Alan."

39. When confronted with Mr. Gross's video testimony about Mr. Auerbach counting "one, two, three" at the ASCO conference, Mr. Auerbach yelled, "FALSE! FALSE! FALSE!" while the video of Mr. Gross's testimony played on.

40. Mr. Gross explained that, with Puma, "it happens quite frequently that, the company sets expectations, and they're disappointed – investors are disappointed by the actual results. It happens all the time." Mr. Gross testified that "this was a recurring pattern with Alan Auerbach, in his . . . disclosures to investors, and then the actual results when we saw them."

41. Adage Capital offered to restrict its stock (remove its ability to trade its shares in order to gain access to nonpublic information) so that it could review Mr. Auerbach's slide decks prior to presenting them to the public to help Mr. Auerbach better manage investors' expectations, but Mr. Auerbach "want[ed] no part of that."

42. Frustrated with Puma's stock price and Mr. Auerbach's mismanagement, Dr. Eshelman began speaking about Puma to Mr. Gross, whom he had previously met because of Dr. Eshelman's positions as the CEO of Furiex Pharmaceuticals, Inc. and as a director for The Medicines Company.

43. Mr. Gross, who understood Dr. Eshelman to have a reputation for caring "more about shareholders getting a good return on their investment than he cares about management remaining entrenched and in charge of the company," spoke with Dr. Eshelman several times about Puma.

44. Beginning in June 2015, Puma and Mr. Auerbach were repeatedly sued for securities fraud in publicly-filed complaints alleging that they had "made false and/or misleading statements" regarding the clinical trial for their flagship drug, neratinib, on July 22, 2014.

45. On February 4, 2019, a unanimous jury found that Puma and Mr. Auerbach had committed securities fraud on July 22, 2014 by knowingly misleading the public about the effectiveness of neratinib.

### *The Consent Solicitation*

46. On July 16, 2015, Dr. Eshelman sent a stockholder's "books and records" request to Puma pursuant to Delaware Code section 220.

14

47. Puma's outside counsel, Latham & Watkins, advised Puma regarding Dr. Eshelman's books and records request.

48. By October 22, 2015, Dr. Eshelman had invested considerable money to purchase shares of Puma.

49. As of October 28, 2015, Dr. Eshelman had served as the Non-Executive Chairman of the Medicines Company and on the Boards of the following companies: AeroMD Inc.; Cellective Biotherapy, Inc.; Dignify Therapeutics, Inc.; Eyenovia, Inc.; GI Therapeutics, Inc.; Innocrin Pharmaceuticals, Inc.; Medikidz USA, Inc.; Meryx, Inc. and Neoantigenics LLC. As of October 28, 2015, Dr. Eshelman also served on the advisory Board of Auven Therapeutics.

50. On October 28, 2015, Dr. Eshelman filed a Preliminary Consent Statement with the United States Securities and Exchange Commission ("SEC"), proposing that Puma's stockholders vote to increase the size of Puma's Board from five to nine directors and elect Dr. Eshelman, James Daly, Seth Rudnick, and Ken Lee to fill the proposed additional four director seats (the "Consent Solicitation").

51. Mr. Auerbach expressed his frustrations, to both Puma's Board and Charles Eyler that Dr. Eshelman's Consent Solicitation was "a major distraction," and "utterly ridiculous."

52. In early November 2015, Ms. Ohanesian asked Benjamin Matone of NASDAQ Corporate Solutions to obtain "sell-side notes" (industry research) to gather information on Dr. Eshelman and PPD.

53. On November 12, 2015, Ms. Ohanesian sent an email calling Dr. Eshelman "quite annoying."

54. On November 17, 2015, Ms. Ohanesian sent an email calling Dr. Eshelman a "fool."

55. Puma's outside counsel, Latham & Watkins, advised Puma regarding Puma's response to Dr. Eshelman's Consent Solicitation.

56. On December 23, 2015, Institutional Shareholder Services ("ISS") issued its recommendation against Dr. Eshelman's Consent Solicitation, while acknowledging that "[m]uch of [Puma's] stock price volatility driving the consent solicitation appears to have resulted from two specific events: Puma's stock shot up nearly 300 percent in July 23, 2014, following the company's announcement that trial results 'demonstrated that treatment with neratinib resulted in 33% disease-free survival versus placebo,' and in the first week of June 2015, Puma stock dropped nearly 30% following the presentation of neratinib data at the American Society of Clinical Oncology (ASCO) Annual Meeting. Since then the company's stock price has

continued a gradual decline." The ISS report also acknowledged that Dr. Eshelman's "assertion that Puma's board composition is still not optimal may hold some truth."

57. After ISS issued its recommendation, Mr. Gross texted Mr. Zavrl: "We finally had contact [with ISS] yesterday, hence you see their recommendation today...."

### *Puma's Research Regarding and Publication of the Presentation*

58. On January 7, 2016 Puma published an investor presentation entitled, "Continued Focus on Developing Shareholder Value" ("Presentation"), which included the following slides:

### Eshelman Continues to Demonstrate a Lack of Integrity (cont'd)

- A whistleblower from PPD, Ann Marie Cisneros – a clinical trial associate for PPD – testified that she sent evidence of fraud to PPD management, which was ignored

  - "[b]ased upon what I observed and learned in monitoring the Kirkman-Campbell site, Dr. Kirkman-Campbell indeed had engaged in fraud . . . I knew it, PPD knew it"

  - Cisneros' Testimony: http://www.circare.org/foia5/cisneros_testimony_20070213.pdf*

- Eshelman denied before Congress that fraud had occurred at the time despite Cisneros' e-mail to PPD management summarizing fraudulent practices and "red flags"

  - Eshelman's Video Testimony:
    - Part 1: https://www.youtube.com/watch?v=mzOBlX7hLMs*
    - Part 2: https://www.youtube.com/watch?v=GeM9ZDMBc0M*
    - Part 3: https://www.youtube.com/watch?v=FhEOyN8ceAE*

  - Eshelman's Statement and Testimony:
    - https://www.gpo.gov/fdsys/pkg/CHRG-110hhrg48587/html/CHRG-110hhrg48587.htm*

- Puma's Board does not believe that someone who was involved in clinical trial fraud that was uncovered by the FDA should be on the Board of Directors of a public company; particularly a company that is in the process of seeking FDA approval

*Please paste the links above into your browser to view the content.

13

16



**Eshelman Continues to Demonstrate a Lack of Integrity (cont'd)**

*Eshelman's misrepresentations are no surprise given his history*

- Eshelman was Chief Executive Officer (CEO) of Pharmaceutical Product Development (PPD) when it managed a clinical trial during the development of the antibiotic drug Ketek for the treatment of outpatient upper respiratory infections and pneumonia

  - Fraud was uncovered in this trial by the FDA's Office of Criminal Investigation

- Fraud with the trial included:

  - Fabrication of data at one clinical site (investigator convicted of fraud)

  - Manipulation of data at another site (investigator had medical license suspended)

  - Fraud occurred at highest enrolling site

- As Chief Executive Officer of PPD, Eshelman was forced to testify before Congress regarding PPD's involvement in this clinical trial fraud in 2008

  - Eshelman was replaced as CEO of PPD in 2009

12

59. The drafting of the Presentation was done by Mr. Auerbach with consultation and advice from Latham & Watkins.

60. No member of the Board of Directors of Puma or anyone else from Puma asked any questions about the statements that Mr. Auerbach had made about Dr. Eshelman and the Ketek clinical trial in the Presentation.

### *The Ketek Clinical Trial*

61. On November 1, 2001, Aventis Pharmaceuticals Inc. ("Aventis") hired PPD to monitor Study 3014, a clinical trial of Ketek, an antibiotic that Aventis had developed for the treatment of upper-respiratory tract infections.

62. The Ketek clinical trial had approximately 25,000 study subjects enrolled by nearly 2,000 physicians who were the principal investigators ("PIs") for the trial.

63. Dr. Kirkman-Campbell was one of the PIs on the Ketek clinical trial.

64. At the time she was a PI on the Ketek clinical trial, Dr. Kirkman-Campbell was not on a blacklist maintained by the FDA, the Institutional Review Board, or anyone else. All of the PIs on the Ketek clinical trial, including Dr.Kirkman-Campbell, were required to attend training for the Ketek clinical trial.

65. An "Institutional Review Board" or "IRB" is a group of people who monitor a clinical trial.

66. Dr. John Reynolds, a pharmacovigilance and drug safety professional who worked for PPD, was in charge of analyzing and reviewing lab values for the Ketek clinical trial.

67. On February 13, 2002, PPD's Dr. Reynolds emailed Aventis's Study Manager Nadine Grethe and voiced his concern that Dr. Kirkman-Campbell had not actually recruited the number of patients into the study that she had reported.

68. Dr. Reynolds spoke with Ann Marie Cisneros (a PPD employee and clinical research associate ("CRA")) and Abby Wear (a PPD employee and site management CRA) to discuss potential issues with Dr. Kirkman-Campbell's site and to help prepare Ms. Cisneros for an upcoming site review at Dr. Kirkman-Campbell's office.

69. On February 18, 2002, Ms. Cisneros conducted a site review at Dr. Kirkman-Campbell's office. She reported various issues she identified at the site to the IRB.

70. On Wednesday, February 20, 2002, Dr. Reynolds analyzed data from Dr. Kirkman-Campbell's site, which led him to believe that Dr. Kirkman-Campbell may have been engaging in "blood splitting," *i.e.*, assigning certain blood samples to multiple patients. He reported his concerns to Aventis's Nadine Grethe via email the next Monday.

71. On February 27, 2002, PPD employee Jessica Lasley sent an email titled "Teleconference to discuss findings from monitoring Kirkman-Campbell" to Aventis employees Nadine Grethe and Ranjan Khosla, copying PPD personnel Ann Marie Cisneros, John Reynolds, Robert McCormick, Cathy Tropmann, Teresa Dunlap, Melinda Edwards, and Mary Price. The email stated: "We would like to hold a teleconference with you to review some of the information that is of concern to us. ... Ann Marie [Cisneros] and John [Reynolds] had assembled some examples of this information that we can share with you. Let us know when it would be possible to discuss this with you. We have attached a summary of Ann Marie's findings during her visit." A summary of Ann Marie Cisneros's findings was attached to the email.

72. PPD held a teleconference with Aventis on March 4, 2002 to discuss PPD's concerns about Dr. Kirkman-Campbell's trial site. On behalf of PPD, the participants on the teleconference were Dr. John Reynolds, Ann Marie Cisneros, Abby Wear, and Robert McCormick. The Aventis representatives on the teleconference were Nadine

Grethe, William Stager, M. Shoemaker, M. Aschenbrenner, and Rajan Khosla. During the teleconference, Dr. Reynolds and Ms. Cisneros elaborated on the issues and concerns that PPD had previously reported to Aventis via email. After the teleconference, a written "Investigative Plan" was developed in which Aventis was to perform a statistical analysis of the lab data; to ensure that a follow-up letter was sent to the Dr. Kirkman-Campbell site asking for a written explanation of issues; and to review the follow-up letter before it was sent to ensure that all outstanding issues had been addressed and appropriate follow up was requested.

73. Ms. Cisneros left PPD shortly after the March 4, 2002 teleconference and has no knowledge of what took place at PPD or Aventis after that teleconference.

74. Data from the Ketek clinical trial was submitted to the FDA.

75. Beginning in 2002, Special Agent Robert West of the FDA's Office of Criminal Investigations led an investigation into the Ketek clinical trial.

76. Special Agent West began his career as a criminal investigator in the U.S. Army, where he served by conducting criminal investigations for more than twenty-one years. After retiring from the Army in 1996, he was hired by the FDA's Office of Criminal Investigations, where he served for another twenty years, received multiple promotions, and handled criminal investigations into clinical trial fraud and other matters.

77. Over the course of his forty-one-year career, Special Agent West has conducted close to ten thousand investigations, at least half of which he led.

78. Special Agent West describes himself as "very detail-oriented" and, in conducting investigations, he follows the trail as it leads him, interviewing everyone who needs to be interviewed. Special Agent West tries, to the best of his ability, to conduct his investigations objectively, ethically, and thoroughly.

79. Special Agent West's investigation into the Ketek clinical trial was conducted by a team of approximately twenty-five federal agents who spent between 20,000 and 30,000 hours working on the case, reviewing close to one million documents, and interviewing Dr. Kirkman-Campbell's staff and patients, PPD employees, and Aventis employees.

80. Special Agent West prepared written reports and memoranda of interviews in connection with his investigation of the Ketek clinical trial.

81. Special Agent West personally interviewed Aventis personnel including Nadine Grethe and Ranjan Khosla.

82. Special Agent West personally interviewed PPD personnel including Ann Marie Cisneros, Dr. John Reynolds, Cathy Tropmann, and Robert McCormick.

83. Special Agent West obtained a search warrant to search Dr. Kirkman-Campbell's clinic and home. Through use of that search warrant, he found in Dr. Kirkman-Campbell's home a record that had been missing from her clinic, as well as some medication for the Ketek study.

84. The Office of Criminal Investigations accepted Special Agent West's recommendation and later opened an investigation into Aventis; that investigation was led by Special Agent Douglas Loveland.

85. The FDA did not rely on the data from Study 3014 in approving Ketek.

86. Ketek remained on the market until March 11, 2016 when it was discontinued for business reasons.

### *Congressional Testimony About the Ketek Clinical Trial*

87. On February 13, 2007, Ann Marie Cisneros testified before a Congressional committee about the Ketek clinical trial.

88. Ms. Cisneros also submitted a statement, dated February 13, 2007, in which she wrote, "what brings me here today is my disbelief at Aventis's statements that it did not know that fraud was being committed. Mr. Chairman, I knew it, PPD knew it, and Aventis knew it."

89. On February 12, 2008, Ms. Cisneros, Special Agent West, Special Agent Loveland, and Dr. Eshelman testified before a Congressional committee about the Ketek clinical trial. Their testimony was included in a hearing transcript titled, "Ketek Clinical Study Fraud: What Did Aventis Know?"

90. The 2008 Congressional hearing transcript indicated that Ms. Cisneros had previously testified in a Congressional hearing.

91. The 2008 Congressional hearing transcript indicated that on the Ketek clinical trial, Aventis was the drug sponsor, PPD was the CRO, and Copernicus was the IRB.

92. The 2008 Congressional hearing transcript included the following testimony from Ms. Cisneros:

> While at the site, I was so concerned about patient safety, I called Copernicus Independent Review Board or IRB to express my concerns and seek guidance. An IRB, which is under contract to the drug sponsor, has as its primary purpose patient advocacy. It is

allowed to contact patients directly and is duty-bound to report to the FDA any unanticipated problems involving risk to subjects and serious noncompliance with regulations.

93. The 2008 Congressional hearing transcript included the following testimony from Ms. Cisneros:

I e-mailed a summary of my site visit findings to Robert McCormick, head of quality assurance at PPD, and copied Aventis personnel. I also participated in a teleconference between PPD and Aventis, at which I discussed issues identified in my site visit.

At some point after that, I understand that Aventis took site management responsibilities away from PPD because Dr. Campbell would not cooperate with anyone but the sponsor.

94. The 2008 Congressional hearing transcript included the following:

MR. WALDEN. Thank you, Mr. Chairman. Ms. Cisneros, you participated in that conference call with Aventis in March of 2002 to discuss concerns with Dr. Kirkman-Campbell's site, correct?

Ms. CISNEROS. Correct.

MR. WALDEN. And what follow-up did Aventis decide to do to address PPD's concerns?

Ms. CISNEROS. Well, unfortunately, I left PPD shortly after that teleconference, so I am not quite sure what took place after that teleconference.

### *Before Publishing the Presentation, Puma Knew About the Congressional Testimony Regarding the Ketek Clinical Trial*

95. Before publishing the Presentation, Mr. Auerbach read Ms. Cisneros's February 13, 2007 statement.

96. Before publishing the Presentation, Mr. Auerbach read the entire transcript of the February 12, 2008 Congressional hearing titled "Ketek Clinical Study Fraud: What Did Aventis Know?"

97. Mr. Auerbach "assumed that the work done by the FDA" was both factual and accurate.

***Puma Has a Multi-Million Dollar Multi-Year Contract with PPD and Multiple***
***Points of Contact at PPD, But Never Asked Anyone at PPD About Dr. Eshelman***

98. Puma has "been working with contract research organizations" from the day it was founded.

99. Mr. Auerbach is "knowledgeable about the relationship between a drug sponsor and a contract research organization on clinical trials."

100. Puma hired PPD as a CRO on the clinical trial of Puma's flagship drug, neratinib.

101. In the beginning of their contractual relationship—from 2012-2014—Puma hired PPD to provide regulatory strategy and overall clinical trial management related to the development and subsequent FDA approval of neratinib.

102. To date, Puma has received CRO services worth roughly $16 million from PPD.

103. Puma entered into a "MASTER CONTRACT SERVICES AGREEMENT" with PPD, on September 25, 2012, and Puma renewed its contract with PPD on April 25, 2014 and September 28, 2016.

104. Mr. Auerbach signed the amendments that extended Puma's contract with PPD.

105. Puma maintains that its Master Contract Services Agreement with PPD is confidential and should be concealed from the public.

106. Paragraph 2.4 of the Master Contract Services Agreement between PPD and Puma—entitled Regulatory Contacts—states:

> Puma will be solely responsible for all contacts and communications (including submissions of information) with any regulatory authorities with respect to matters relating to Services.
>
> Unless required by applicable law, Service Provider will have no contact or communication with any regulatory authority regarding Services without the prior written consent of Puma, which consent will not be unreasonably withheld.
>
> Unless prohibited by applicable law, Service Provider will consult with Puma regarding the response to any inquiry or observations from any regulatory authority relating in any way to Services and will allow Puma at its discretion to participate and, to the extent such inquiry is directly related to the Services, control, any further contacts or communications relating to Services.

107. Puma's contract with PPD provides that it "will expire on the later of (a) six years from the Effective Date or (b) the completion of all Services under all Statements of Work executed by the parties prior to the sixth anniversary of the Effective Date."

108. The earliest the Master Contract Services Agreement between PPD and Puma could end is six years after September 28, 2016.

109. Beginning in 2014, as Puma commenced Phase II pivotal trial of neratinib, Puma became "disenchanted with the CRO that was managing the trial in the U.S., Latin America, and [the] Pacific Rim, and [Puma] changed CROs and employed PPD to manage said trial."

110. In 2014, representatives from Puma traveled to North Carolina and conducted a quality audit of PPD.

111. Puma's quality assurance audits typically last for several days.

112. Since 2014, Puma and PPD have conducted bi-weekly teleconferences.

113. Puma has more than 600 pages of business records relating to its relationship with PPD.

114. Representatives from Puma and PPD held several face-to-face meetings in North Carolina between 2014 and 2016.

115. Puma has ongoing business communications with PPD representatives in North Carolina.

116. Puma had six or eight points of contact with PPD who were located in North Carolina.

117. Puma was introduced to PPD through Richard Phillips, who was an employee of PPD before becoming an employee of Puma. Puma never asked Mr. Phillips about Dr. Eshelman before January 2016.

118. No one from Puma ever asked anyone from PPD about Dr. Eshelman before January 2016.

### *Puma Did Not Ask Any of Its North Carolina Contacts About Dr. Eshelman*

119. Puma has contracted with Biologics, Inc., a North Carolina corporation, for clinical research services. No one at Puma reached out to Puma's North Carolina contacts at Biologics, Inc. to ask whether they knew anything about Dr. Eshelman before January 2016.

120. Puma has contracted with Rho, Inc., a North Carolina corporation, for biostatistical analysis. Puma's points of contact at Rho, Inc. were located in North Carolina. No one at Puma reached out to Puma's North Carolina contacts at Rho, Inc. to ask whether they knew anything about Dr. Eshelman before January 2016.

121. Puma has contracted with Cato Research, a company headquartered in North Carolina. Puma's points of contact at Cato Research were located in North Carolina. No one at Puma reached out to Puma's North Carolina contacts at Cato Research to ask whether they knew anything about Dr. Eshelman before January 2016.

122. Puma has contracted with Personalized Medicines Partners, a North Carolina Company, for consulting services. No one at Puma reached out to their points of contact at Personalized Medicine Partners in North Carolina about Dr. Eshelman before January 2016.

### *Puma Purposefully Avoided Numerous Sources That Would Have Rebutted Its Accusations About Dr. Eshelman*

123. No one at Puma reached out to Ann Marie Cisneros or Special Agent Robert West before Puma published the Presentation.

124. Mr. Auerbach never asked Mr. Gross if he knew Dr. Eshelman, if he had ever heard of Dr. Eshelman, if Dr. Eshelman had been involved in fraud, or anything else about Dr. Eshelman.

125. Mr. Auerbach never bothered to look for Dr. Kirkman-Campbell's indictment, even though it is publicly available, and Mr. Auerbach's staff would have pulled it for him if he had asked.

126. While drafting the Presentation, Mr. Auerbach reviewed Ms. Cisneros's February 13, 2007 Congressional statement that says: "In my eight years in clinical research work, this is the only instance I've come across of such bad behavior by a drug sponsor. I feel I can speak for those who agonized over this situation when I say we are pleased that Dr. Kirkman-Campbell is serving prison time for her actions. But what brings me here today is my disbelief at Aventis's statements that it did not know that fraud was being committed. Mr. Chairman, I knew it, PPD knew it, and Aventis knew it."

127. A draft of the Presentation from 1:04 a.m. on January 6, 2016 stated:

o A whistleblower from PPD, Ann Marie Cisneros, testified that she sent evidence of fraud to the head of quality assurance at PPD and to personnel at Aventis, which was ignored by both organizations.

24

128. Mr. Auerbach revised that paragraph to read as follows: "A whistleblower from PPD, Ann Marie Cisneros – a clinical trial associate for PPD –testified that she sent evidence of fraud to PPD management, which was ignored.

A whistleblower from PPD, Ann Marie Cisneros, - a clinical trial associate for PPD - testified that she sent evidence of fraud to ~~the head of quality assurance at~~ PPD ~~and to personnel at Aventis~~ management, which was ignored ~~by both organizations.~~

129. The final version of the Presentation that Puma published contains no references to Aventis and omits all details of PPD's numerous reports to Aventis.

### *Scope of Publication*

130. Puma published the Presentation on its website at the "Consent Revocation" portion of Puma's website at the following URL: http://investor.pumabiotechnology.com/consent-revocation.

131. From January 7, 2016 through February 2, 2016, there were 85-page views of the "Consent Revocation" portion of Puma's website located at investor.pumabiotechnology.com/consent-revocation. Those page views included users from: (1) Janus, an institutional investor; (2) UBS, a brokerage firm; (3) Comerica, a bank; (4) CSFB, Credit Suisse First Boston; (5) Amgen, a large biotechnology company; and (6) RBCCM, a bank. Those page views included users in New York City, El Monte, Los Angeles, San Francisco, Denver, Washington, D.C., Hong Kong, Atlanta, Madrid, Mumbai, and Portland. Puma's page view data does not include views of its website that may have occurred after February 2, 2016 or views of the Presentation on the SEC's website.

132. Between January 7, 2016 and July 11, 2016, there were 198-page views of the "Consent Revocation" portion of Puma's website located at investor.pumabiotechnology.com/consent-revocation. Those page views included users in New York City, Washington, D.C., Los Angeles, Raleigh, Durham, Chicago, and Milwaukee.

133. Puma also published the Presentation at the "SEC Filings" portion of Puma's website at the following URL: http://investor.pumabiotechnology.com/secfilings. The Presentation was available for download at this location.

134. Puma posted the "Consent Revocation" and "SEC Filings" URLs under the "Investors" tab on its website. From January 7, 2016 through February 2, 2016, there were 436 views of the "Investors" tab on Puma's website. Those page views included

users located in California, New York, Massachusetts, Maryland, Texas, Florida, Illinois, Arizona, North Carolina, Virginia, and England.

135. Puma filed the Presentation with the SEC on January 7, 2016.

136. Puma's page view data does not include how many times the Presentation may have been downloaded and distributed from either of the locations from which it was available on Puma's website or how many times the Presentation may have been downloaded and distributed from the SEC's website.

137. At Puma's direction, Revocation Cards and Revocation Statements were mailed to Puma's shareholders, including shareholders in North Carolina; those materials directed Puma's stockholders to the "Investors" tab of Puma's website where Puma posted the Presentation.

138. Puma also published its Revocation Statement under the "Consent Revocation" portion of its website.

139. At the request of Mr. Auerbach, Puma sent the Presentation to Vanguard—an investment manager—on January 13, 2016.

140. When asked what he understood Puma to be saying in the Presentation, Mr. Gross testified that, "They believe that his associates at PPD and PPD's association with Ketek made [Dr. Eshelman] a party to fraud."

> [I]t's a very spurious relationship anyways, just because he's CEO of the company, and that company – if you know how PPD works, it's a contract research organization. So anybody inside the company can commit fraud. You know, they could go out and steal – the could shoplift. It doesn't make the CEO responsible for that. So even when I read this back then, this is, you know, ridiculous.
>
> ...
>
> Well, Puma's board is making the connection between, again, the CEO of a company, the conduct of that company, of somebody inside that company, not necessarily systematically, and, therefore, it's a spurious connection, but they've chosen to decide to connect the two, which I would say the same thing I said on the other one. Anybody who is . . . practiced in . . . the business wouldn't necessarily blame the CEO for the conduct of a single trial or a single . . . person or . . . . clinical trial, especially if it's a contract research organization.

141. Mr. Gross would "absolutely not" support someone who had been involved in fraud to be a director on the board of one of the companies in which Adage Capital invests. When evaluating whether Adage Capital should invest in a company, the fact

26

that one of the company's directors had been involved in fraud would absolutely impact whether he chose to invest in the company.

142. Puma's Presentation is publicly available on the internet where it can easily be reviewed, re-published, and called up in electronic searches.

143. On January 20, 2016, Dr. Eshelman sent Puma a retraction demand, requesting an apology and retraction of Puma's defamatory Presentation.

144. On January 26, 2016, Mr. Auerbach emailed Puma's Board:

> On Friday we received a letter from our good buddy Fred Eshelman where he has asked that we retract all of the negative statements that we have made about him in our Investor Presentations and issue an apology to him. If we do not, he is threatening to sue us. Note that his letter (attached) did not come from an attorney, like his other letters did, but instead directly from him. As you can see in our attached response to him, all of our comments were based on publicly available information, hence we have done nothing wrong. We will be filing this 14A tomorrow after the market close with his letter and o[u]r response to it.

145. On January 27, 2016, Puma filed a Form 14A with the SEC. The filing attached a letter from Puma's outside counsel, Latham & Watkins, to Dr. Eshelman, and published the following statements to a global internet audience:

> **LATHAM & WATKINS LLP**
> ...
>
> Dear Mr. Eshelman:
>
> As you know, our firm represents Puma Biotechnology, Inc. ("Puma"). Your January 20, 2016 letter to Mr. Alan Auerbach of Puma has been referred to our attention for handling. Your demands that Puma retract its investor presentation filed with the U.S. Securities and Exchange Commission on January 7, 2016 (the "Investor Presentation") and issue an apology are rejected. Puma stands by the truth of the statements contained in the Investor Presentation.
> ...
> In addition, Puma has uncovered additional, public, and true information about you and your past activities which would be relevant to your shareholder proposal and prior comments in this regard. Puma will be compelled to ensure that shareholders are aware

27

of this information if you persist with further public statements or filings about Puma, its Board, and its management.

146. On February 3, 2016, Dr. Eshelman filed this defamation lawsuit against Puma. [D.E. 370-1].

B.

As for Puma's argument that the jury's award of compensatory damages was excessive, the court reviews the jury's award applying North Carolina law. See Gasperini, 518 U.S. at 430–31, 438–39 (state standards for reviewing damages awards are substantive under Erie R.R. v. Tompkins, 304 U.S. 64 (1938)); Fontenot v. Taser Int'l, Inc., 736 F.3d 318, 334–35 (4th Cir. 2013); Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 280–81 (4th Cir. 1999). Although the court may, in its discretion, set aside an excessive judgment, North Carolina trial courts "have traditionally exercised their discretionary power to grant a new trial in civil cases quite sparingly in proper deference to the finality and sanctity of the jury's findings." Worthington v. Bynum, 305 N.C. 478, 487, 290 S.E.2d 599, 605 (1982); see Finch, 388 F. Supp. 3d at 621–23.

The court determined that the two statements at issue in the trial were libelous per se. See Order [D.E. 306] 20–24. At trial, the parties presented evidence on three issues: whether Puma's statements were false, whether Puma made the statements with actual malice, and what amount of compensatory damages, if any, Eshelman was entitled to recover. See [D.E. 372–74, 388, 429–31]. The court instructed the jury that compensatory damages "include matters such as loss of reputation or standing in the community, mental or physical pain and suffering, inconvenience, or loss of enjoyment which cannot be definitively measured in monetary terms." [D.E. 386] 21; see N.C. Pattern Jury Inst. - Civ. 806.83. The court instructed the jury that Eshelman need not specifically prove his compensatory damages, that the jury should estimate "the probable extent of actual harm"

28

to Eshelman, and that the jury may award Eshelman nominal damages. [D.E. 386] 21–22. The jury deliberated for over eleven hours on the three issues. See [D.E. 378–79, 432–33].[3] The jury found that Puma's statements were false and that Puma made the statements with actual malice. See [D.E. 388]. The jury awarded Eshelman $15,850,000 in compensatory damages. See id.

Under North Carolina law, damages are presumed in libel per se claims. See Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984); Flake v. Greensboro News Co., 212 N.C. 780, 785, 195 S.E. 55, 59 (1938). Because the law presumes that damages result from the publication of a libelous per se statement, a plaintiff is not required to present evidence "as to any resulting injury." Boyce & Isley, PLLC, 153 N.C. App. at 30, 568 S.E.2d at 898; see Renwick, 310 N.C. at 316, 312 S.E.2d at 408; Roth v. Greensboro News Co., 217 N.C. 13, 22, 6 S.E.2d 882, 888 (1940); Flake, 212 N.C. at 785, 195 S.E. at 59 ("The law presumes that general damages actually, proximately, and necessarily result from an unauthorized publication which is libelous per se and they are not required to be proved by evidence since they arise by inference of law, and are allowed whenever the immediate tendency of the publication is to impair plaintiff's reputation, although no actual pecuniary loss has in fact resulted."); cf. Gertz v. Robert Welch, Inc., 418 U.S. 323, 349 (1974) ("Juries may award substantial sums as compensation for supposed damages to reputation without any proof that such harm actually occurred."); N.C. Pattern Jury Inst. - Civ. 806.83. Puma concedes that "presumed damages are not required to be proved by evidence" and that "such damages are inherently speculative and imprecise." [D.E. 436] 8 (quotation omitted).

The Restatement (First) of Torts lists factors that the trier of fact may consider in determining the amount of presumed damages. These factors include "the character of the plaintiff and his

[3] On the fourth day of the trial, the jury deliberated from 9:45 a.m. to 5:02 p.m. See [D.E. 378, 432]. On the fifth day of the trial, the jury deliberated from 9:01 a.m. to 10:39 a.m. and from 10:50 a.m. to 1:26 p.m. See [D.E. 379, 433].

29

general standing and reputation in the community," "the character of the defamatory publication and the probable effect of the language used as well as the effect which it is proved to have had," "the area of dissemination and the extent and duration of the circulation of the publication," whether the defendant "made a public retraction or apology," whether the defendant unsuccessfully argued that the statement was true, and whether the plaintiff was "engaged in a trade, business, or profession." Restatement (First) of Torts § 621 cmt. c (Am. Law. Inst. 2019). These factors comport with North Carolina law. See N.C. Pattern Jury Inst. - Civ. 806.83; [D.E. 386] 21–22.

Puma argues that the jury's compensatory damages award was "excessive" without citing any persuasive factor to support its argument. That Eshelman did not prove his actual damages at trial is inherent in the law of libel per se in North Carolina and does not warrant a new trial. See, e.g., Renwick, 310 N.C. at 316, 312 S.E.2d at 408; Roth, 217 N.C. at 22, 6 S.E.2d at 888; Flake, 212 N.C. at 785, 195 S.E. at 59; Boyce & Isley, PLLC, 153 N.C. App. at 30, 568 S.E.2d at 898. Under North Carolina law, damages are presumed in libel per se cases specifically because of the difficulty of determining the harm that publishing a libelous statement causes. Additionally, the jury was entitled to consider the very unique facts of this case, including the 146 stipulations and the extensive trial record.

The evidence showed that Eshleman built an extraordinary reputation over a 40-year period. Eshleman rose from humble beginnings in North Carolina to train as a pharmacist and then founded PPD. Eshleman developed PPD from a one-man consulting company into a publically traded multi-billion dollar contract research organization. During his lengthy career, Eshleman became a noted CEO, philanthropist, board member, and investor. He is prominently involved in the community, including at the University of North Carolina at Chapel Hill which named its Pharmacy School after him. As witness Judd Hartman testified, Eshleman was "the founder of [PPD]" and "dedicated his

30

life, [and] his professional career to the industry, [and] was passionate and committed to ethical clinical research and ethical business conduct." [D.E. 430] 11–13. Witness Kenneth Lee testified that Eshleman had an "excellent" reputation and was considered a "leader in the industry." [D.E. 429] 102–15.

Puma's Chief Executive Officer Alan Auerbach personally drafted the defamatory statements, and Puma permanently published the defamatory statements on Puma's website and the SEC's web site, which have global reach. The statements can be reviewed and republished forever. See, e.g., [D.E. 370-1] ¶¶ 58–59, 125–39. The jury found that Puma's statements were false and made with actual malice. See [D.E. 388]. Puma has never retracted the false statements or apologized for making them. Rather, Auerbach testified, and Puma unsuccessfully argued, that the statements were and are true.

The jury deliberated for over eleven hours before determining liability and the amount of Eshelman's compensatory damages, and Puma does not raise a persuasive argument to set aside the jury's verdict. In fact, this court could not locate a single case applying North Carolina law in which a trial court remitted a jury's award of presumed damages or a North Carolina appellate court reduced such an award. Accordingly, in light of the stipulations, the evidence produced at trial, the credibility of the witnesses, and North Carolina law, the court declines to set aside the jury's compensatory damages award. See Worthington, 305 N.C. at 487, 290 S.E.2d at 605; Finch, 388 F. Supp. 3d at 621–23; accord Cantu v. Flanigan, 705 F. Supp. 2d 220, 226–31 (E.D.N.Y. 2010) (jury award of $150 million for general damages was not excessive for defaming a businessman by falsely accusing him of corruption); Anagnost v. The Mortgage Specialists, Inc., No. 216201CV0027, 2017 WL 7690898 (N.H. Super. Ct. Sept. 29, 2017) (unpublished) (award of $105 million in general damages not excessive for falsely accusing a local developer, a cardealer, and a

banker of dealing drugs and related crimes); Wynn v. Francis, No. B245401, 2014 WL 2811692, at *4–10 (Cal. Ct. App. June 23, 2014) (affirming $17 million award for presumed damages for oral accusation of fraud).[4]

C.

As for Puma's argument that the jury's award of punitive damages was excessive, the court applies North Carolina law. See Gasperini, 518 U.S. at 430–31, 438–39. The court's instructions on punitive damages comported with N.C. Gen. Stat. § 1D-35. See [D.E. 387] 12–13. The jury deliberated for over an hour and awarded Eshelman $6,500,000 in punitive damages. See [D.E. 379, 389, 433].

Under North Carolina law, a jury may award punitive damages "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. In determining the amount of punitive damages, a jury must consider the purposes of punitive damages and may consider only evidence that relates to the following:

a.    The reprehensibility of the defendant's motives and conduct.

b.    The likelihood, at the relevant time, of serious harm.

c.    The degree of the defendant's awareness of the probable consequences of its conduct.

d.    The duration of the defendant's conduct.

e.    The actual damages suffered by the claimant.

_____

⁴ The cases that Puma cites in support of setting aside the verdict are factually and legally distinguishable. See, e.g., MyGallons LLC v. U.S. Bancorp, 521 F. App'x 297, 304–06 (4th Cir. 2013) (per curiam) (unpublished); Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 687–90 (4th Cir. 1989); Mann v. Swiggett, No. 10-CV-182, 2012 WL 5512453, at *1 (E.D.N.C. Nov. 14, 2012) (unpublished); Beach v. Hughes, 199 N.C. App. 615, 687 S.E.2d 319 (2009) (unpublished); Boileau v. Seagrave, 193 N.C. App. 454, 667 S.E.2d 341 (2008) (unpublished); Kroh v. Kroh, 152 N.C. App. 347, 355–58, 567 S.E.2d 760, 765–67 (2002); McLean v. Mechanic, 116 N.C. App. 271, 272–76, 447 S.E.2d 459, 461–62 (1994).

f.      Any concealment by the defendant of the facts or consequences of its conduct.

g.      The existence and frequency of any similar past conduct by the defendant.

h.      Whether the defendant profited from the conduct.

i.      The defendant's ability to pay punitive damages, as evidenced by its revenues or net worth.

Id. § 1D-35(1)–(2). In reviewing a punitive damages award, the court also must assess the constitutionality of the award under the Due Process Clause. See, e.g., BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574 & n.22 (1996); Equal Emp't Opportunity Comm'n v. Fed. Express Corp., 513 F.3d 360, 376 (4th Cir. 2008). Reviewing courts must consider the degree of reprehensibility of the defendant's misconduct, the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003). "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," which may be evidenced by the defendant's "intentional malice, trickery, or deceit." Id. at 419 (quotation omitted). In comparing a compensatory damages award to a punitive damages award, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution . . . ." Id. at 425.

Eshelman presented compelling evidence that Puma, through Auerbach who is Puma's most senior employee and drafted the defamatory presentation himself, acted with actual malice in making the statements about Eshelman. See, e.g., [D.E. 359] ¶¶ 124–30; [D.E. 370-1] ¶¶ 123–29. For example, Eshelman presented an e-mail that Auerbach wrote shortly before Puma published the statements in which Auerbach stated that he was "just getting warmed up" and that he was going to

"f*** this Eshelman guy up. Bad." [D.E. 431] 65. The jury was entitled to discredit Auerbach's explanation for this e-mail and other evidence contemporaneous with the publication reflecting Puma's malice. Moreover, Auerbach was a particularly non-credible witness. In fact, it is really hard to describe how incredible (i.e., disastrous) a witness Auerbach was. You needed to see it to understand it completely. For example, Auerbach indignantly and repeatedly contradicted his deposition testimony and facts to which Puma stipulated. See [D.E. 431] 6–7, 9–10, 15–17, 19–20, 24–27, 29–44, 45–53, 55–56, 57–59, 60–63, 64–67, 68–99, 100–14, 115–23, 124–28, 167–69. Auerbach did not testify credibly, and was impeached repeatedly during cross examination. See id. Moreover, Eshelman presented compelling evidence about the reprehensibility and duration of Puma's conduct and Puma's ability to pay. See, e.g., [D.E. 370-1] ¶¶ 130–38, 142, 145–46.

In light of the stipulations, the evidence presented at trial, and the credibility of the witnesses, the punitive damages award was not excessive. The jury properly considered evidence pursuant to N.C. Gen. Stat. § 1D-35, carefully deliberated, and reached a unanimous verdict. Eshelman presented compelling evidence of the reprehensibility of Puma's motives and conduct, the likelihood of serious harm to Eshelman, Puma's awareness of the probable consequence of its actions, the duration of Puma's conduct, and Puma's ability to pay. Additionally, the jury's punitive damages award totals less than half of its compensatory damages award, and does not violate the Due Process Clause. Cf. Campbell, 538 U.S. at 418–19. Moreover, the court rejects Puma's argument that the punitive damages award is simply "too high." On the unique facts of this case, the jury's punitive damages award was not a miscarriage of justice, and the court declines to set it aside.

D.

As for Puma's argument that the jury's findings on falsity and actual malice were against the clear weight of the evidence, the court has considered the stipulations, the evidence presented at trial,

34

and the credibility of the witnesses. As for the falsity of the statements, the court credits the overwhelming evidence that Puma's statements were false. The evidence includes the testimony of Judd Hartman ("Hartman"), general counsel and Chief Administrative Officer of PPD, that PPD did not fire or replace Eshelman as CEO but instead promoted him to Executive Chairman of PPD's Board of Directors. See [D.E. 429] 123–25. The court also credits Hartman's testimony and Special Agent Robert West's testimony that Eshelman was not involved in clinical trial fraud. See [D.E. 429] 125; [D.E. 430] 24; [D.E. 375-1] 12–13, 15. The court also credits Eshelman's testimony about the antibiotic drug Ketek and the ensuing FDA investigation. See, e.g., [D.E. 430] 194–96. The stipulations and exhibits bolster these conclusions. See, e.g., [D.E. 370-1] ¶¶ 64–72.

The jury carefully and thoughtfully considered the evidence. The jury rejected Puma's evidence and argument that the statements, when read in the context of the entire presentation, were true. Cf. [D.E. 388]. Accordingly, the court finds that the jury's determination that Puma's statements were false is not against the clear weight of the evidence.

As for actual malice, abundant evidence supports the jury's verdict. First, before publishing the statements about Eshleman, Puma's attorneys informed its Board and Mariann Ohanesian informed Auerbach that Eshleman had served as Executive Chairman of PPD from 2009 until 2011. See PX-314, at 12; PX-217; [D.E. 376-1] 1, 7. Second, the parties stipulated that Auerbach had read "the entire transcript of the February 12, 2008 Congressional hearing titled 'Ketek Clinical Study Fraud: What Did Aventis Know?'" before publishing the defamatory presentation, that Auerbach "assumed that the work done by the FDA was both factual and accurate," and that Puma purposefully avoided numerous sources that would have rebutted Puma's accusations about Eshelman. [D.E. 370-1] ¶¶ 96–97, 124–30.

Tellingly, Puma stipulated that it had worked with contract research organizations ("CROs") since its founding, see id. ¶ 98, and that Auerbach knew the relationship between a CRO and a drug sponsor on a clinical trial. See id. ¶ 99. Nonetheless, Puma omitted facts from the SEC presentation about Eshleman that would have revealed the falsity of Puma's accusations about Eshleman. Moreover, Puma stipulated that PPD had reported the issues that it had concerning the clinical drug trial concerning Aventis, but Puma deleted that fact from its SEC presentation about Eshelman. See id. ¶¶ 126–29; PX-42; PX-193. Furthermore, Puma (which had an ongoing, multi-year, multi-million dollar contract with PPD as a CRO) knew that PPD could not communicate directly with the FDA without its client's consent. See [D.E. 370-1] ¶¶ 98–108. The jury was entitled to find that Puma attached hyperlinks to the 2008 Congressional testimony but omitted material facts relevant to understanding that testimony in order to bolster Puma's assertion that Eshleman had been forced to testify and had been "replaced as CEO" after being involved in "clinical trial fraud." See PX-42.

Puma also stipulated that it "[p]urposefully avoided numerous sources that would have rebutted its accusation about Dr. Eshleman." See, e.g., [D.E. 370-1] ¶¶ 98–125. For example, Puma did not ask Puma contacts at PPD or Puma's contacts within the pharmaceutical industry about Eshleman. Likewise, Puma did not ask Special Agent Robert West who investigated Aventis and the clinical trial fraud of Dr. Kirkman-Campbell. See id. at ¶¶ 118–24. Moreover, Auerbach knew from reading the 2008 Congressional transcript that a federal grand jury in Alabama indicted Dr. Kirkman-Campbell for clinical trial fraud and had named PPD as a victim of Dr. Kirkman-Campbell's fraud. See id. ¶ 96; PX-15 at 8; PX-1. Puma also stipulated that Auerbach "never bothered to look for Dr. Kirkman-Campbell's indictment, even though it is publically available, and Mr. Auerbach's staff would have pulled for him if he had asked." [D.E. 370-1] ¶ 125. Furthermore, Puma stipulated that "[n]o member of the Board of Directors of Puma or anyone else from Puma

asked any questions about the statements that Mr. Auerbach had made about Dr. Eshleman and the Ketek clinical trial in the Presentation." Id. at ¶ 60. Puma's stipulations show that it was aware of "key witness[es] and . . . failed to make any effort to interview [them]" and support a finding of actual malice. See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 692 (1989); see also Curtis Publ'g Co. v. Butts, 388 U.S. 130, 156–58 (1967); Young v. Gannett Satelite Info. Network, Inc., 734 F.3d 544, 548 (6th Cir. 2013).

Puma's refusal to retract the defamatory statements also supports the jury's actual malice finding. Eshleman's retraction demand specifically referenced Dr. Kirkman-Campbell's indictment and its reference to PPD as a victim of the fraud. See PX-189 at 5–6. In response, Puma filed a public letter with the SEC and doubled-down on "the truth of [its] statements" and threatened to release "additional" information about Eshleman. PX-189 at 7. Puma's response supports the jury's actual malice finding. See, e.g., Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066, 1071–72 (5th Cir. 1987).

Puma's motive to defame Eshleman also supports the jury's actual malice finding. When Eshleman decided to initiate the proxy contest, Puma had missed financial targets and Auerbach appeared to have his own hand-picked Board of Directors. See [D.E. 370-1] ¶¶ 1–14. Puma's Board had rewarded Auerbach with compensation valued at tens of millions of dollars, despite serious allegations of mismanagement, including allegations of Auerbach's own securities fraud following statements that Auerbach made about Puma's drug neratanib. See id. at ¶¶ 4–11, 22–27, 41, 44–45; PX-20; PX-344. In the proxy contest, Eshleman wanted to add four independent directors to the Board to add oversight to Puma's management, including Auerbach. See, e.g., DX-30. The jury was entitled to disbelieve Auerbach's testimony about an alleged motive to tell the truth in the SEC presentation and to believe the opposite. Cf. United States v. Mejia, 82 F.3d 1032, 1038 (11th Cir.

37

1996) ("A proper inference the jury can make from disbelieved testimony is that the opposite of the testimony is true."), abrogated on other grounds by Bloate v. United States, 559 U.S. 196 (2010). The jury also was entitled to consider that evidence of motive, with the other substantial evidence in the case, to find actual malice. See, e.g., Connaughton, 491 U.S. at 668, 689–93; Young, 734 F.3d at 548 n.1; Suzuki Motor Corp. v. Consumers Union, 330 F.3d 1110, 1135–36 (9th Cir. 2003).

Puma's stipulations, when coupled with Auerbach's incredible testimony and the other evidence at trial, show that the jury's finding that Puma acted with actual malice was not against the clear weight of the evidence. Accordingly, the court denies Puma's motion for a new trial.

E.

Puma argues that evidentiary, instructional, and other rulings by the court were erroneous and prejudicial. The court rejects the argument.

First, Puma argues that the verdict form improperly combined Puma's statements on the verdict form. The verdict form, however, merely quotes Puma's statements and properly summarizes the statements at issue. See [D.E. 388] 1–2. Moreover, the jury received a copy of Puma's entire presentation and was properly instructed to consider the quoted statements "in the context of the entire presentation." [D.E. 388] 1; see [D.E. 386] 14–15; Badame, 242 N.C. at 757, 89 S.E.2d at 468; Boyce &. Isley, 153 N.C. App. at 31, 568 S.E.2d at 899. Relatedly, the court rejects Puma's argument that the statement "Eshelman was replaced as CEO" was not and had not been found defamatory per se. See [D.E. 306] 22–24 (collecting cases).

Second, Puma argues that the court's order excluding Puma's damages expert, Dr. Anil Shivdasani's ("Shivdasani"), was prejudicial. The court will not recite the entire twelve-page order excluding Shivdasani's testimony and report. See [D.E. 368]. Nonetheless, as the court explained at length in its order excluding Shivdasani's testimony and report, some of Shivdasani's opinions

were within the everyday knowledge of the jury. See id. at 8. Moreover, Puma failed to show, inter alia, that other Shivdasani's opinions were the product of reliable methodology. See id. at 9–12. For example, Shivdasani opined that business opportunities correspond to reputation and concluded that, because Eshelman did not experience a decline in business opportunities, he did not suffer reputational harm. See [D.E. 335-1] ¶ 10. But Shivdasani also opined that, even if Eshelman had experienced a decline in business opportunities, "that alone would not constitute sufficient evidence of reputation harm caused by Puma's statements." Id. ¶ 27 n.40. Because Shivdasani's model is premised on the relationship between business opportunities and reputation (i.e., that business opportunities are dependent on reputation), and because Shivdasani concedes in his report that business opportunities are independent of reputation, the court properly excluded Shivdasani's expert opinion and testimony. See [D.E. 368] 9–12; see also Fed. R. Evid. 104(b), 702; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143–50 (1997).

Third, Puma objects that admission of evidence of a securities fraud judgment against Puma and Auerbach constitutes prejudicial error. Specifically, in February 2019, a federal jury in the United States District Court for the Central District of California found in favor of a plaintiffs' class and against Puma and Auerbach with respect to a misleading statement that Auerbach and Puma made about neratanib's efficacy and a resulting dramatic decline in Puma's stock price following disclosure of the truth about neratanib. See [D.E. 370-1] ¶¶ 44–45; [D.E. 431] 125–28.

The court rejects Puma's arguments about the admission of the securities fraud litigation for numerous reasons. Initially, the court never limited the admissibility of this evidence to impeachment evidence on cross examination of Auerbach under Federal Rule of Evidence 608. See

[D.E. 394] 37–38; [D.E. 360]; [D.E. 371] 17–18.[5]  Moreover, Puma waived any objection to "extrinsic evidence" of the securities fraud litigation when it included such evidence in its exhibits and failed to ask for a limiting instruction at trial.  See DX-30.  Furthermore, Puma stipulated that, in February 2019, a jury found that Puma and Auerbach committed securities fraud.  See [D.E. 370-1] ¶¶ 44–45.

The jury in this defamation case was entitled to consider whether Puma and Auerbach's securities fraud motivated, in part, Puma to respond to Eshleman's proxy fight by publishing the defamatory statements about Eshleman.  Such evidence is relevant to the issue of Puma's actual malice.  See, e.g.,Connaughton, 491 U.S. at 667–68.  Additionally, any alleged error in permitting the jury to hear about the securities fraud verdict was harmless in that Eshleman properly used the

_____

[5] Fed. R. Evid. 608 provides:

(a) Reputation or Opinion Evidence. A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

(b) Specific Instances of Conduct. Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

(1) the witness; or

(2) another witness whose character the witness being cross-examined has testified about.

By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

Fed. R. Evid. 608.

adverse judgment under Rule 608 when cross-examining Auerbach. See Fed. R. Evid. 608(b). Moreover, Puma never requested a limiting instruction.

Next, Puma objects to the jury instructions concerning actual malice and presumed damages. "Instructions will be considered adequate if construed as a whole, and in light of the whole record, they adequately inform the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Rowland v. Am. Gen. Fin., Inc., 340 F.3d 187, 191 (4th Cir. 2003) (alterations and quotations omitted).

As for Puma's objection to the jury instruction concerning actual malice, Puma's proposed instruction failed to adequately instruct the jury about what constitutes actual malice in a defamation case. See [D.E. 341] 22. In contrast, the court's instructions properly used the phrase "clear and convincing evidence," provided examples of what constitutes actual malice, and, importantly, emphasized what does not constitute actual malice (e.g., "mere negligence," "mere mistake," "a defendant's personal hostility or ill will towards the plaintiff," and a defendant's "failure to investigate"). See [D.E. 386] 18–19. The court cited the controlling legal principles behind each example in the instructions. See [D.E. 430] 216, 221–24. Additionally, the court incorporated nearly all of Puma's proposed instruction concerning the definition of actual malice. Accordingly, the court rejects Puma's attack on the jury instruction concerning actual malice.

As for Puma's objection to the jury instruction concerning presumed damages, Puma's proposed instruction did not contain the "reasonable certainty" language that Puma claims is error to have excluded. See [D.E. 341] 26–28. Indeed, Puma's proposed instruction, which tracks the North Carolina Pattern Instruction, concedes that presumed damages "arise by inference of law and are not required to be specifically proved by evidence," that presumed damages "cannot be measured precisely or definitively in monetary terms," that determining the amount of presumed damages "is

41

not a task which can be completed with mathematical precision and is one which unavoidably includes an element of speculation," and that the amount of presumed damages "is an estimate, however rough, of the probable extent of actual harm." Id. Thus, Puma waived this objection. See Fed. R. Civ. P. 51(c)(1).

Alternatively, the court's instruction properly informed the jury about presumed damages. Moreover, excluding the phrase "such as one dollar" did not materially change the statement that the jury could award Eshelman nominal damages. Accordingly, the jury instruction concerning presumed damages did not prejudice Puma.

## IV.

Eshelman seeks to modify the judgment to include $3,984,646.58 of prejudgment interest for a total award of $26,334,646.58. See [D.E. 418]. Rule 59(e) of the Federal Rules of Civil Procedure allows a party to file a motion to alter or amend a judgment "no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). Rule 59(e) permits three grounds for amending a prior judgment: (1) to accommodate an intervening change in controlling law, (2) to account for new evidence that was not available at trial, or (3) to correct a clear error of law or prevent manifest injustice. See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998); EEOC v. Lockheed Martin Corp., 116 F.3d 110, 112 (4th Cir. 1997); Hutchinson v. Staton, 994 F.2d 1076, 1081 (4th Cir. 1993).

North Carolina law governs the award of prejudgment interest in this diversity case. See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999); Silicon Knights, 917 F. Supp. 2d at 524–25; Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2012 WL 2458638, at *1 (E.D.N.C. June 27, 2012) (unpublished). Under North Carolina law, "[i]n an action other than contract, any portion of a money judgment designated by the fact finder as

42

compensatory damages bears interest from the date the action is commenced until the judgment is satisfied." N.C. Gen. Stat. § 24-5(b); see, e.g., Castles Auto & Truck Serv., Inc. v. Exxon Corp., 16 F. App'x 163, 168 (4th Cir. 2001) (per curiam) (unpublished). Under N.C. Gen. Stat. § 24-5(b), prejudgment interest is mandatory. See Castles Auto & Truck Serv., 16 F. App'x at 168; Hamby v. Williams, 196 N.C. App. 733, 738, 676 S.E.2d 478, 481 (2009). Therefore, a manifest injustice would arise if the court failed to award Eshleman prejudgment interest "at the legal rate." N.C. Gen. Stat. § 24-5(b); see N.C. Gen. Stat. § 24-1 (setting the legal rate at 8% per annum).

Eshelman filed this action on February 2, 2016, and the court entered judgment on March 25, 2019. Accordingly, Eshelman is entitled to prejudgment interest at 8% per annum (i.e., $1,268,000 per annum), and the court grants Eshelman's motion to alter the judgment to include $3,984,646.58 in prejudgment interest for a total award of $26,334,646.58.

V.

In sum, the court DENIES Eshelman's motion for attorneys' fees [D.E. 397], GRANTS Eshelman's motion for costs [D.E. 403], DENIES Puma's motion to disallow costs [D.E. 414], DENIES Puma's motion for a new trial or remittitur [D.E. 416], GRANTS Eshelman's motion to amend the judgment to include prejudgment interest [D.E. 418], and DENIES Puma's motion for a hearing or, in the alternative, remittitur [D.E. 441]. The court AWARDS Eshelman $205,903.55 in costs under 28 U.S.C. § 1920 and Local Civil Rule 54.1. Finally, the court ALTERS the judgment to include $3,984,646.58 in prejudgment interest under N.C. Gen. Stat. § 24-5(b). The clerk shall close the case.

SO ORDERED. This 2 day of March 2020.

J. Dever
JAMES C. DEVER III
United States District Judge

44